```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         (FORT LAUDERDALE)
                        CASE NO.  23-CR-80064
 3

 4    UNITED STATES OF AMERICA,
                Plaintiff,              Fort Lauderdale, Florida
 5    vs.                              February 12, 2024

 6    FRANK STANZIONE,
                Defendant.
 7    -------------------------------------------------------
                            Motion Hearing
 8              BEFORE THE HONORABLE RODNEY SMITH
                   UNITED STATES DISTRICT JUDGE
 9
      APPEARANCES:
10    FOR THE PLAINTIFF:   UNITED STATES ATTORNEY'S OFFICE, by:
                           Mark Dispoto, Esq.,
11                         500 E. Broward Blvd., 7th Floor
                           Fort Lauderdale, Florida  33301
12
                           UNITED STATES CAPITOL POLICE, by:
13                         Joseph Herman Wheeler
                           499 South Capitol Street SW
14                         Washington, DC  20003

15    FOR THE DEFENDANT:   FEDERAL PUBLIC DEFENDER'S OFFICE, by:
                           Jan Christopher Smith, Esq.,
16                         One East Broward Blvd., Suite 1100
                           Fort Lauderdale, Florida  33301
17

18

19

20    STENOGRAPHICALLY
      REPORTED BY:         ELLEN A. RASSIE, RMR-CRR
21                         Official Court Reporter to the
                           Honorable Rodney Smith
22                         299 E. Broward Blvd., Room 207-C
                           Fort Lauderdale, Florida  33301
23

24

25
```

1

**INDEX**

2

3  **DEFENDANT WITNESSES:**

4                                              **DIRECT   CROSS  REDIRECT  RECROSS**

5  CHARLES LOVETT                     11      14      16
   NAYSA WOOMER                       20      22      27
6  GUILLERMO TORRES                   33      54      66
   AGENT MATTHEW HURTIG               78      86      91

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**MONDAY MORNING SESSION, FEBRUARY 12, 2024**</u>

1

2                P-R-O-C-E-E-D-I-N-G-S

3                        -  -  -

4            (Call to the Order of the Court.)

5            THE COURT:  Good morning, everyone.  You may be

6    seated.

7            THE COURTROOM DEPUTY:  This is United States of

8    America versus Frank Stanzione.  Case number is 23-CR-80064,

9    Smith.

10           Counsel, please state your appearances for the record.

11           MR. DISPOTO:  Good morning, Your Honor.  Mark Dispoto

12   and Joe Wheeler appearing on behalf of the United States and

13   present with us at counsel table is the case agent, Joshua Bank

14   from the Capitol Police.

15           THE COURT:  Good morning.

16           MR. SMITH:  Your Honor, good morning.  Jan Smith,

17   Federal Public Defender's Office on behalf of Frank Stanzione.

18   He's present before the Court.

19           THE COURT:  Good morning, as well.  All right.  We're

20   here for the motion to dismiss the indictment filed by the

21   defendant.

22           Are we ready to proceed, Mr. Smith?

23           MR. SMITH:  Yes, Your Honor, I am.

24           THE COURT:  You may do so.

25           MR. SMITH:  Thank you, Your Honor.  So, Your Honor,

1   and as you can see in our motion, the case law for a selective

2   prosecution motion establishes that there's two steps involved

3   in this motion.

4          The first step is is that we must make a prima facie

5   showing that the defendant has been singled out for prosecution

6   though others who are similarly situated who have committed

7   similar acts have not been prosecuted.

8          You can find that in docket entry 16 in our motion and

9   it stems from an Eleventh Circuit case, Jones versus White,

10  which is at 992 F.2d 1548.

11         So, the initial step is my burden of proof.  I have to

12  prove to the Court that others who are similarly situated have

13  not been prosecuted in this fashion or at all, and I can

14  provide the term "similarly situated" is also defined by the

15  Eleventh Circuit, and it states that a similarly situated

16  person for selective prosecution motion purposes, excuse me, is

17  one who engaged in the same type of conduct which means that

18  the comparator committed the same basic crime in substantially

19  the same manner as the defendant so that any prosecution of

20  that individual would have the same deterrence value and would

21  be related in the same way to the Government's enforcement

22  priorities and enforcement plan and against whom the evidence

23  was as strong or stronger than against the defendant.  And

24  that's from the Smith case, 213 F.3d at 810.

25         So, in attempting to meet this initial step burden,

1    Your Honor, what I am prepared to do is is we have, I believe,

2    four defense witnesses on Zoom ready to testify.  I don't think

3    that the testimony will take long from each of them.

4            And then once the testimony is done, what I would

5    presume -- what I would propose to do, excuse me, is finish the

6    testimony, and then I have a number of exhibits I'd like to

7    propose to introduce, and then if the Court believes that I

8    have satisfied step one, I can then at that time move to step

9    two if that's okay with the Court.

10           THE COURT:  That's fine.

11           MR. SMITH:  So, Your Honor, what I'd like to do is

12   call a witness on Zoom if that is possible.

13           MR. DISPOTO:  Your Honor, may I be heard on that

14   subject?

15           THE COURT:  Sure.

16           MR. DISPOTO:  Your Honor, my co-counsel is prepared

17   to argue the law as it relates to the motion to dismiss.  But

18   on the subject of the calling of witnesses, the Government

19   objects to that for the following reason.  The defense is

20   arguing to the Court, in essence, that it has -- that it should

21   be able to call witnesses to meet the first step, and only if

22   the defense meets that first step of the test do we then get to

23   the second.

24           And I would submit to Your Honor that there's no case

25   law that requires an analysis of this particular test to be in

1    that fashion.  That the Court could look at the second prong

2    first and say what evidence is there that the Government has

3    chosen to prosecute Mr. Stanzione for a constitutionally

4    invidious purpose.

5            And if there is no evidence of that, then there's no

6    need to waste the Court's time to have testimony to see if the

7    defense can meet the first prong.

8            And what I would submit to Your Honor is what the

9    defense has suggested in its papers is that the

10   constitutionally invidious purpose is the defendant's exercise

11   of political speech related to gay rights, and that the

12   prosecution was retaliatory and vindictive.  None of these

13   witnesses are going to be addressing that issue, and I would

14   submit to Your Honor that if Mr. Smith has some independent

15   evidence to satisfy the second prong, he could submit that now

16   and argue whatever evidence he has on that point.

17           But to call witnesses to purportedly meet a first

18   prong which will lead to no evidence of the second would just

19   turn out to be a waste of the Court's time.

20           So we would submit to Your Honor that if the defendant

21   has evidence of a constitutionally invidious purpose that the

22   Government relied on in choosing to prosecute Mr. Stanzione, he

23   should present that to the Court before any witnesses are even

24   called.

25           Because if he can't do that, he can't meet the test,

1    and the motion has to be denied, and we don't have to go

2    through four witnesses and an hour or so of court testimony.

3    So we would propose that procedure relative to this morning's

4    hearing.

5              THE COURT:  All right.  Well, I think that does make

6    sense in terms because obviously, you can't have one without

7    the other.  You have to have both.

8              So, Mr. Smith, you want to address what is the

9    constitutionally invidious purpose that the Government relied

10   on in order to satisfy prong two?

11             MR. SMITH:  So, Your Honor, initially, the

12   Government's wrong, and we already addressed this in their

13   motion for reconsideration and I point the Court to all of the

14   case law in that motion for reconsideration in my response that

15   indicates that this is a sequential analysis.  The first step

16   precedes the second.

17             The only thing the Government's right about here is is

18   that actually the second step of the analysis is not a clean

19   step in the sense that the first step analysis is part of the

20   second step analysis too.

21             And so the facts that we -- and the evidence that we

22   admit into evidence as step one is also something that the

23   Court can consider as evidence towards purpose.

24             Now, this is all this -- this, for lack of a better

25   term, game.  The Government knows very well because they have

1    responded in numerous motions in response to my motions that

2    they know that I'm not entitled to discovery on a selective

3    prosecution motion.

4          So the Government at our hearing I believe it was on

5    August 25th -- yes, August 25th, counsel for the Government

6    indicated that the key issue was that the defendant could not

7    prove why those prosecutors in other jurisdictions that I was

8    referring to made the prosecution choices that they did, or why

9    that information would be relevant to the decision in this

10   case.

11         The Government stated at that hearing nobody is privy

12   to the charging decisions of the various prosecution agencies

13   that would have reviewed the other threats.

14         Now, that's not true because the Government has the

15   ability -- they will not turn over to me or the Court, let's

16   just say the grand jury testimony in this case.  They will not

17   turn over to the Court any internal discussions between them

18   and, for example, other prosecutors, their supervisor.  This

19   case is not being supervised locally.

20         When I requested the pretrial diversion plea offer in

21   this case, that review did not go through a supervisor in West

22   Palm Beach because this is not being prosecuted by that

23   division.  My understanding is is this is being prosecuted, and

24   that's why we have an out of district U.S. attorney on the

25   case, is by a different supervisor.  I believe it is a female

1    supervisor from the National Security Division, if I'm not

2    mistaken.  I don't think this went through Mr. McMichael, and

3    that's what I was told.

4           So, the situation is this:  The Government has the

5    power and the ability to reach out to these other districts and

6    see why these cases were prosecuted differently.  I don't, but

7    they're not going to do that here.

8           And so it's -- what's really happening here is the

9    Government is sitting here saying you can't prove it and we

10   know you can't prove it because you can't get at this evidence,

11   and we're not going to give you this evidence and we're not

12   going to lift a finger to try and find out this information.

13   We're just going to block you.

14          And that was what we went through in the discovery

15   motions, and that's what we're going through right here, and

16   what happens in these selective prosecution motions is that the

17   Court indicates that this Court, in making its decision, can

18   refer to circumstantial evidence.  It can refer to statistical

19   evidence.  It can refer to anecdotal evidence.

20          It's the same as in a Batson challenge case.  It's one

21   in the same.  In a Batson challenge case under Flowers versus

22   Mississippi, the prosecution is not going to sit here and say

23   to the judge, oh, we struck this juror because they were a

24   minority.  And yet, the Court can still find that that was the

25   reason for the strike.

1          And so the criteria have been laid out in Flowers

2    versus Mississippi that a Court can look to to try and find the

3    actual intent.

4          Now, what I'm prepared to show this Court is this.

5    And I put all this in my pleadings and the witnesses, I have to

6    put this on the record.  I have to meet my burden of proof.

7          If the Court denies the motion, if Mr. Stanzione loses

8    at trial, this is going to go up on appeal.  And the

9    Government's appellate attorneys are going to say, well, they

10   didn't meet their burden on step one and it's the defendant's

11   burden and I'm going to say I was blocked from doing that.

12         I have evidence that the Threat Assessment Section,

13   they investigate thousands of cases every year.  Thousands.

14         THE COURT:  Let me ask you this.  Is the Government

15   conceding to the first element or not?

16         MR. DISPOTO:  No, we're not conceding.

17         THE COURT:  All right.  No problem.  Mr. Smith, you

18   may call your witness.

19         MR. SMITH:  Thank you, Your Honor.

20         MR. DISPOTO:  Can I just -- do we have a second?

21         THE COURT:  Go ahead.

22         MR. DISPOTO:  I just want to clarify something

23   Mr. Jan said which was in error and through no fault of his, he

24   maybe just doesn't understand the internal workings of the

25   prosecutor's office, but I believe when he made reference to a

1    female supervisor on this case, he was referring to AUSA Maria

2    Nadidas who at the time was the chief of our National Security

3    Section here in the Southern District of Florida.  So there is

4    no outside agency who was supervising this case.  This case is

5    being prosecuted by my office in the Southern District of

6    Florida and I am the lead prosecutor on.

7             MR. SMITH:  Yes, Your Honor.  I didn't mean some

8    super national.  I just meant it was outside of major crimes.

9             THE COURTROOM DEPUTY:  Mr. Lovett, can you hear me?

10            THE WITNESS:  Yes.

11            THE COURTROOM DEPUTY:  Great.  Please raise your

12   right hand.

13                      (Witness sworn.)

14            THE WITNESS:  Yes.

15            THE COURTROOM DEPUTY:  Thank you.

16            MR. SMITH:  May I proceed, Your Honor?

17            THE COURT:  Yes.

18            MR. SMITH:  May I do so seated for the microphone?

19            THE COURT:  That's fine.

20                      -  -  -  -  -

21            **DIRECT EXAMINATION OF CHARLES LOVETT**

22   **BY MR. SMITH:**

23   Q.   Mr. Lovett, can you please state your name for the record?

24   A.   Charles Lovett.

25   Q.   And, Mr. Lovett, in the essence of time, I'm going to

 1   direct you straight to testimony here.  Were you formerly the

 2   chief of staff for former Representative George Santos?

 3   A.   Yes.

 4   Q.   And that time period, was it January 7th or so of 2023 to

 5   May 31st of 2023?

 6   A.   Yes.

 7   Q.   Okay.  Did you end up being the individual who played a

 8   voicemail received by the defendant, Mr. Frank Stanzione in

 9   this case?

10   A.   Yes, I received it, like, through my email.

11   Q.   Okay.  So, on January 30th, I believe -- I'm sorry,

12   January 29th, I believe it was, January 30th, you received a

13   voicemail, is that right, at the office?

14   A.   Correct.

15   Q.   Okay.

16   A.   Yes, correct.

17   Q.   Was this the main office line for Representative Santos?

18   A.   Yes.  Yeah, it was through the general phone, the office

19   lines, correct.

20   Q.   And had the voicemail come in overnight?

21   A.   Yes, to my best recollection.

22   Q.   So it was after business hours, right?

23   A.   Correct.

24   Q.   And you also did an interview with U.S. Capitol Police

25   Officer Joshua Bank last summer, right?

1    A.    I believe so.

2    Q.    Did you talk to him about your recollection of the

3    voicemail in this case?

4    A.    Yeah, I believe so.  Yes, I believe so.

5    Q.    When you receive an -- excuse me -- a voicemail of that

6    nature, is it procedure to report it to the U.S. Capitol Police

7    Threat Assessment Section?

8    A.    Yes.

9    Q.    And did you do that in this case?

10   A.    Yes.

11   Q.    Do you recall whether you indicated the voicemail made you

12   fear for Representative Santos' safety?

13   A.    To the best of my recollection, after I had forwarded the

14   email with the transcript and the recording itself to Capitol

15   Police, Capitol Police reached out to me and that was a

16   question that they asked me.

17         And to the best of my recollection, I believe, yes, I did

18   say yes, it was.  I did believe it was a threat to the

19   congressman's safety.

20   Q.    Couple more questions.  First, in reference to that

21   feeling, do you recall on July 6th telling Special Agent Bank

22   that you indicated it was tough to say if you feared for

23   Representative Santos' safety based on the voicemail?

24   A.    I don't recall a lot of the specifics in the conversation.

25   I apologize, I don't recall.

1   Q.   That's okay.  Okay.  So we'll move on to the next question

2   is do you recall if you reported any other threats that you

3   received to the Threat Assessment Section of the Capitol Police

4   during your time with Representative Santos?

5   A.   I don't recall personally reporting any more.  Me

6   personally.  I can't speak for the rest of the office or

7   members of the office, but personally me, I believe that was

8   the only one.

9          MR. SMITH:  Okay.  Thank you.  I have no further

10  questions, Your Honor.  I pass the witness.

11         THE COURT:  Thank you.  Cross-examination?

12                       -  -  -  -  -

13           **CROSS EXAMINATION OF CHARLES LOVETT**

14  **BY MR. WHEEL:**

15  Q.   Yes.  Mr. Lovett, this is Joe Wheeler, one of the

16  prosecutors.  You were only in this office for less than five

17  months; is that accurate?

18  A.   Correct.  Yeah, about five months.

19  Q.   And other members of the office did make other reports to

20  the U.S. Capitol Police regarding, let's say concerning

21  communications that came into the office; is that correct?

22  A.   Correct.

23  Q.   And when you submit those, you're submitting them as a

24  concerning communication, that can include threats or it could

25  include other things, correct?

```
 1    A.    Correct.
 2    Q.    So if somebody calls in and just says, hey, you're a
 3    loser, I hope bad things happen to you, or says, hey, I wish
 4    you would die, any of those things, whether they meet the
 5    definition of a true threat, you still would have the
 6    opportunity to report them to the Threat Assessment Section,
 7    correct?
 8    A.    Correct.
 9    Q.    And to your knowledge, that happened from time to time
10    with that office?  Not necessarily true threats, but other
11    concerning communications were reported even though they
12    weren't reported by you, correct?
13    A.    Yes, correct.
14    Q.    Of the concerning communications that came in, you were
15    aware of, would you agree that this was the most egregious or
16    the most concerning?
17    A.    Yes.  I would say it was the most concerning.
18    Q.    All right.  And then one final question for you.  You
19    don't exercise any prosecutorial discretion, correct?  To put
20    it another way, you don't get to decide whether the Department
21    of Justice brings a prosecution of a particular threat?
22    A.    Personally, no, I do not, no.
23              MR. WHEELER:  No further questions, Your Honor.
24              THE COURT:  All right.
25                             -  -  -  -  -
```

<u>**REDIRECT EXAMINATION OF CHARLES LOVETT**</u>

**BY MR. SMITH:**

Q.   Mr. Lovett, what was the second most concerning message that you got during your time with the office?

A.   As I mentioned earlier, to the best of my recollection, this was the only one that I personally had reported.  Like I said, I can't speak for the rest of the office because I know some of the other members of the office, you know, that were getting phone calls or seeing voicemails come through were forwarding them on to Capitol Police, but with those, I was -- that wasn't me doing it and frankly, I don't honestly know what was said in those communications.

Q.   So you indicated on cross with the prosecutor that this was the most concerning voicemail that you received in your time with former Representative Santos.  What do you base that on then?

A.   I would say I'm basing it off of all the other voicemails that were coming into the office.

Q.   So what were in those?

A.   Anything from reaching out to see if someone could help me with my passport case to you're a loser, and, you know, you're a loser, you're a liar, you're this, you're that.  Things like that.

Q.   So you didn't personally get any of these voicemails, right?  Other than the one in this case?

A.   Well, the ones that were -- so all of the voicemails that were coming into the office were coming into my inbox, and I was -- I was going through them and this particular one that we are discussing, I saw but we had an office manager that was more closely monitoring the voice -- incoming voicemails and so that was something that was more of her task so I wasn't necessarily going through them on a regular day-to-day basis. But they were coming to my inbox.

Q.   And who was that?

A.   Ms. Gabrielle Lipsky.

Q.   How many voicemails did you direct to be reported to Capitol Police?

A.   As I mentioned earlier, to the best of my recollection, this was the only one that was reported, that I directed to be sent to the Capitol Police, and if I recall correctly, I was the one who actually forwarded the voice mail to the Capitol Police.

Q.   Do you know how many other voicemails or phone calls were reported by the representative's office during your time there?

A.   You know, I don't know what that exact number is.  You know, I can try to give an estimate but I don't know what the exact number would be.

Q.   Understanding that it will be an estimate, can you give us that estimate of how many phone calls and voicemails were referred to Capitol Police during your time there?

```
 1    A.    Yeah, my estimation it would be anywhere from about eight
 2    to twelve.
 3    Q.    How were those particular eight to twelve messages and/or
 4    phone calls selected for reference to the Capitol Police?
 5    A.    They were at the discretion of the staffer, whatever
 6    staffer decided to forward them on to Capitol Police.  So when
 7    they came in, the receiver or the person who was on our end of
 8    things felt this was something that needed to be reported they
 9    would do so.  They weren't necessarily being --
10           THE COURT:  Wait a minute, Mr. Lovett.  We're having
11    technical difficulties.  We're trying to fix the situation.
12    Just give us a moment, please.
13           THE COURTROOM DEPUTY:  Mr. Lovett, can you hear us?
14           THE WITNESS:  Yes.
15           THE COURTROOM DEPUTY:  Okay.
16           THE COURT:  Are you ready?  You may continue with
17    your questioning, Mr. Smith.
18           MR. SMITH:  Thank you, Your Honor.  Almost done.
19    BY MR. SMITH:
20    Q.    Mr. Lovett, this was the only report that you did to the
21    Capitol Police in your time with Representative Santos, right?
22    A.    Personally, yes, to the best of my recollection.
23    Q.    And did it come to your attention that several days later,
24    Mr. Stanzione had called to apologize for his prior voicemail
25    message?
```

```
 1              MR. WHEELER:  Objection, Your Honor.  Relevance.

 2              THE WITNESS:  Yes.

 3              MR. WHEELER:  Lack of personal knowledge.

 4              THE COURT:  Sustained.

 5              MR. SMITH:  Your Honor, the Rules of Evidence are

 6    relaxed in motion hearings, and the Government knows that I

 7    believe nobody at the office knows who took that call, I

 8    believe.

 9              THE COURT:  For the purpose of hearing, I will allow

10    that.  Repeat the question, Mr. Smith.

11              MR. SMITH:  Yes, Your Honor.

12    BY MR. SMITH:

13    Q.   Did it come to your attention that several days later,

14    Mr. Stanzione had called the office to apologize for his prior

15    voicemail?

16    A.   Yes.

17              MR. SMITH:  Nothing further, Your Honor.

18              THE COURT:  All right.  Next witness?

19              MR. SMITH:  We call Naysa Woomer.

20              THE COURTROOM DEPUTY:  Ms. Woomer, are you there?

21    Mr. Lovett, we're done with you.  Thank you, sir.

22              MR. LOVETT:  Okay.  Thank you.

23              MS. WOOMER:  Yes, I'm here.

24              THE COURTROOM DEPUTY:  You're not displayed.  Please

25    raise your right hand.
```

1    (Witness sworn.)

2    THE WITNESS:  Yes.

3    THE COURTROOM DEPUTY:  Great.  Thank you.

4    - - - - -

5    **DIRECT EXAMINATION OF NAYSA WOOMER**

6  **BY MR. SMITH:**

7  Q.   Ms. Woomer, can you please state your name for the record?

8  A.   Naysa Woomer.

9  Q.   And did you previously work for former Representative

10 George Santos?

11 A.   Yes, I did.

12 Q.   And do you recall from approximately how long you worked

13 for him?

14 A.   I would say from January until mid May.

15 Q.   All right.

16 A.   A little over four months.

17 Q.   Thank you.  And what was your role in the office?

18 A.   I was the communications director.

19 Q.   In that role, did you have responsibility for referring

20 any calls or voicemails or emails that came in during your time

21 to the Capitol Police that you believed were threatening in

22 nature?

23 A.   It was not my responsibility.  It was the responsibility

24 of the Chief of Staff.

25 Q.   And who was the Chief of Staff during that time?

```
 1   A.    Charles Lovett.
 2   Q.    So it was Mr. Lovett's responsibility to report any
 3   threats to Capitol Police; is that right?
 4   A.    That's the responsibility of the Chief of Staff, correct.
 5   Q.    Okay.  Do you recall during your time working for
 6   Representative Santos, whether you received -- the office, I
 7   should say, not you -- did the office receive any threatening
 8   communications by phone, email or voicemail?
 9   A.    Yes.
10   Q.    Do you recall approximately how many times?
11   A.    I do not recall the exact number, but I just recall if it
12   was -- I only recall one that was enough that warranted to be
13   forwarded to the Capitol Police for review.
14   Q.    Okay.  So during your time there, you believe that only
15   one call may have been forwarded to the Capitol Police for
16   review?
17   A.    To my knowledge, yes.
18   Q.    Okay.  Do you know if any other calls were received that
19   were also reported to Capitol Police, or you don't recall or
20   you don't know?
21   A.    I do not recall.  Well, actually, I do not recall and I
22   mean, I was never aware of any others.
23   Q.    Okay.  Did you take a -- were you the individual who
24   received an apology call from Frank Stanzione several days
25   after a voicemail was left or no?
```

```
 1                MR. DISPOTO:  Objection.  Relevance.

 2                THE COURT:  Sustained.

 3                MR. SMITH:  I'm just trying to identify if she's the

 4     one who took the call, Your Honor.

 5                THE COURT:  You can answer that question.

 6     BY MR. SMITH:

 7     Q.   Do you know if you answered that?  I'm sorry, I couldn't

 8     hear you.

 9     A.   I do not recall.

10                MR. SMITH:  Thank you.  Nothing further, Your Honor.

11                THE COURT:  Any cross-examination?

12                          -  -  -  -  -

13              CROSS EXAMINATION OF NAYSA WOOMER

14     BY MR. DISPOTO:

15     Q.   Yes.  Ms. Woomer, good morning.  My name is Mark Dispoto.

16     I'm one of the prosecutors in the case.  Can you hear me okay?

17     A.   Yes, I can.

18     Q.   Ms. Woomer, when -- excuse me, prior to you being hired to

19     work for Congressman Santos, were you trained at all in the

20     procedures for referring calls or emails to the -- did we lose

21     her?

22                THE COURT:  Yes, we lost somebody.  Can she hear us?

23     We lost connection.  Give us a moment.  There's a problem with

24     the networking system right now.  That's why we're having

25     technical difficulties, so just bear with us.
```

```
 1              MR. SMITH:  Yes, Your Honor.  What I can do in the

 2    meantime, I said I would go about attempting to move into

 3    evidence our exhibits.

 4              THE COURT:  That's fine.  You can move them in.

 5              MR. SMITH:  Okay.  Your Honor, we previously sent an

 6    exhibit list so I have an updated one and I have to do one

 7    change to it, but I'll give a copy of the updated one to the

 8    Government and to the Court.

 9              Your Honor, I'm going to start with Exhibit AAA.

10              THE COURT:  I see her there now.  She's back.

11              MR. SMITH:  Okay.  We can switch back.

12              THE COURT:  Patricia, do we have sound?

13              THE COURTROOM DEPUTY:  Ms. Woomer, can you hear?

14              THE WITNESS:  Yes, I can hear you.

15              THE COURTROOM DEPUTY:  Great.

16              MR. DISPOTO:  May I continue, Judge?

17              THE COURT:  Sure.

18    BY MR. DISPOTO:

19    Q.   Ms. Woomer, I believe I was in the process of asking my

20    first question which is this:  Prior to you working for

21    Congressman Santos, were you trained in the procedures for

22    handling threatening communications that came in to the

23    congressman's office?

24    A.   I wouldn't say there was a training, but I just knew of

25    what to do in a situation like that.
```

1    Q.    Okay.  And how did you know what to do?  Where did you

2    sort of get the information that enabled you to know what to

3    do?

4    A.    I had worked for three different members of Congress prior

5    to former Congressman George Santos, and I had a somewhat

6    similar situation in the previous office.

7    Q.    Okay.  And as communications director, is your office

8    located in Congressman Santos' main office in Washington or are

9    you up in New York?

10   A.    I'm in Washington DC.

11   Q.    So is it fair to say then that you're familiar with the

12   other individuals that worked for Congressman Santos like

13   Gabrielle Lipsky?

14   A.    Yes.

15   Q.    Okay.  Am I correct that based on your understanding of

16   sort of what to do when calls come in, that among the

17   communications that may be referred to the Threat Assessment

18   Section of the Capitol Police, or what we call concerning

19   communications?  Are you familiar with that term?

20   A.    Yes, I am.

21   Q.    And would you agree with me that concerning communications

22   are communications that, by definition, are concerning to the

23   staff but may not rise to the level of a direct explicit threat

24   to injure?

25   A.    Yes.

1    Q.   And are you also familiar with the phrase directions of

2    interest?

3    A.   No, I am not.

4    Q.   Okay.  So would you agree with me then that the world of

5    communications that are referred to the Threat Assessment

6    Center doesn't -- is not necessarily limited to direct threats.

7    They may also contain communications that are less threatening

8    but concerning?

9    A.   Correct.

10   Q.   Okay.  With respect to the threat that is the subject

11   matter of this case, do you recall the specific threat that

12   Mr. Stanzione allegedly made to the congressman's office?

13   A.   I recall that there were -- there were some direct

14   violence towards -- offering direct violence towards a member,

15   and that's the only thing I can really remember of that

16   voicemail.

17   Q.   Do you recall that that voicemail came in late at night on

18   a Sunday evening?

19   A.   Yes.

20   Q.   Do you also recall that it was Mr. Lovett who first

21   learned of that voicemail when he came into the office first

22   thing Monday morning?

23   A.   Yes.

24   Q.   And it was Mr. Lovett who then would have referred that

25   matter to the Capitol Police?

```
 1   A.    Yes, he did.

 2   Q.    Now, do you recall in the four months that you worked

 3   there, whether there were other communications that came into

 4   the office that were referred to the Threat Assessment Center?

 5   A.    Not to my knowledge.

 6   Q.    Okay.  I just want to make sure I understand.  When you

 7   say not to my knowledge, so you're aware or you know that there

 8   were none?

 9   A.    I don't recall any other threats being referred to Capitol

10   Police for further review.

11   Q.    Would that have been something that you would have learned

12   about if other concerning communications came in or as

13   communications director, is it possible that just never would

14   have sort of come across your desk, so to speak?

15   A.    It would probably most likely would have never -- would

16   have come across my desk unless it was elevated to -- if it

17   became a media -- an interest to the media of some sort.

18   That's the only time it would have been brought to my

19   attention, or if it was a more of a severe case.

20   Q.    Would this qualify as that?  Do you know what I mean by

21   that?

22   A.    I'm sorry?  Say that again.

23   Q.    Yeah, let me say that again.  I'm sorry.  Would this

24   threat have qualified as a matter of media interest that you

25   would have been notified about?
```

```
 1   A.   I was only notified about it because Mr. Lovett and I sat
 2   across from one another, and he played the recording for me and
 3   asked for my thoughts on the matter and I had advised that this
 4   is something that should potentially be sent to the Capitol
 5   Police for further review.
 6   Q.   Okay.  So I want to make sure I understand correctly.  It
 7   is possible, is it not, that other communications of a
 8   concerning nature came in to the congressman's office, were
 9   referred to the Threat Assessment Center, but you were never
10   notified about those?  That that is possible?
11   A.   That is correct.  That is always possible, yes.
12   Q.   And once matters are referred to the Threat Assessment
13   Section, you're not involved at all in the decision on whether
14   an individual is going to be criminally prosecuted for those
15   threats, correct?
16   A.   Correct.
17        MR. DISPOTO:  Okay.  Thank you, Ms. Woomer.  That's
18   all I have, Judge.
19        THE COURT:  All right.
20                   -  -  -  -  -
21            REDIRECT EXAMINATION OF NAYSA WOOMER
22   BY MR. SMITH:
23   Q.   Ms. Woomer, your desk was across from Mr. Lovett's?
24   A.   Yes, that's correct.
25   Q.   And you indicated that the reason that you knew about this
```

1    particular message was that because he asked you about it, is

2    that right?

3    A.   Yes.  He played the recording for both myself and him, and

4    we both -- I just said that this is a little bit more serious.

5    I would suggest sending this to the Capitol Police for further

6    review.

7    Q.   So you indicated in cross-examination with Mr. Dispoto

8    that Mr. Lovett asked for your thoughts about it.  What did he

9    ask you about it?

10           MR. DISPOTO:  Objection, relevance.

11           THE COURT:  Overruled.

12   **BY MR. SMITH:**

13   Q.   You can answer.  I'm sorry.

14   A.   No, that's fine.  He said this seems a little -- it was a

15   little bit more severe than other voicemails that the office

16   had received.  And he just said -- he said, you know, what

17   should we do with this, and I said given previous experience, I

18   would suggest forwarding it to Capitol Police just because,

19   again, this was a very high profile office and given the amount

20   of calls that, you know, we have to take necessary precautions.

21   Q.   Okay.  So, it was you who suggested that he should refer

22   it to the Capitol Police?

23   A.   It was suggested, yes.

24   Q.   Okay.  You indicated that this was a little bit more

25   severe than the norm.  Can you tell me the other ones you're

```
 1   referring to by comparison?
 2   A.   Usually the other ones would just be he needs to resign,
 3   he's a liar, just stuff like that but never anything that
 4   involved harming -- wishing harm on the actual member.
 5   Q.   All right.  So last couple questions.  Thank you for your
 6   patience.  This call came in on January 29th, and I believe
 7   that the congressman had assumed his role in his office on
 8   January 7th, right?
 9   A.   Yes.  Yeah, that sounds about right.
10   Q.   All right.  So when you are referring to the other ones,
11   are you -- were there other calls that had come in between
12   January 7th and January 29th?
13   A.   The other -- also phone calls?  Is that what you're
14   referring to?
15   Q.   Yeah, I'm sorry.
16   A.   No.  Yeah, these were very heated phone calls but like I
17   said, none of them were of major concern just because it was
18   the typical just saying he's a liar, he should resign, and just
19   stuff like that but nothing far worse than what involving
20   physical harm.
21   Q.   Okay.  I think --
22   A.   That I'm aware of, to be clear.
23   Q.   Okay.  I think this is the last question.  So, you've
24   worked for three -- this was your third congressperson.  And
25   you indicated you had dealt with --
```

```
 1   A.    Santos was my fourth.
 2   Q.    Your fourth.  Okay.  Forgive me.  And that you had an
 3   incident with a previous congress person with a threat.  And
 4   finally, just to set up this question, where I'm going with it
 5   is you indicated that the other sort of might be hostile but
 6   not a direct threat, in a hostile non-direct threat, you do not
 7   report those to Capitol Police.  It's just direct threats?
 8   A.    Honestly, I cannot remember.  It's usually the last -- the
 9   one that I had experienced was because I was on a phone call
10   and someone who had been following a former boss back in his
11   district and the chief of staff at the time had referred it to
12   Capitol Police for further review.
13         So that's the only thing that I can remember from that
14   situation.  It wasn't physical harm, but it was just the fact
15   that someone had been following the member during their
16   personal time.
17   Q.    Okay.  And do you know what the delineating line, I guess,
18   for you and the offices you worked for previously is between
19   reporting and not reporting?
20   A.    Correct.
21   Q.    Yeah, do you know what your delineating line is for the
22   offices you've worked?  What line would cause the office to
23   call the Capitol Police?
24   A.    It's just -- it's more of you have to listen.  It just
25   depends on the situation.  And the situation, the one that I
```

1   had prior to Santos involved someone saying is your boss

2   wearing a certain piece of clothing?  Are they going in here,

3   and just seemed very much like a stalker type of situation and

4   you have to take it seriously.  That was just, again, that was

5   a red flag and in that situation and so and with Mr. Santos, it

6   was, again, someone who wanted to harm him.

7   Q.   Okay.

8   A.   And these are just things you have to -- in the world we

9   live in, we just have to take the necessary precautions because

10  we just never know.

11  Q.   So there were hostile phone calls to the office, but they

12  didn't rise to a level of being reported but this one was

13  reported, right?

14  A.   Yes.

15          MR. SMITH:  Thank you.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Thank you.  Next witness?

18  You are excused, Ms. Woomer.  Thank you.

19          MR. SMITH:  Your Honor, the next witness we would

20  call would be U.S. Capitol Police Officer Matthew Hurtig.

21          THE COURTROOM DEPUTY:  I don't see him on.

22          MR. SMITH:  Is Officer Torres there?

23          THE COURTROOM DEPUTY:  Yes.

24          MR. SMITH:  We can do him then.  Thank you.

25          THE COURTROOM DEPUTY:  Agent Torres, are you there?

```
 1              THE COURT:  Who is going to come testify besides
 2   Officer Torres?  We don't have any witnesses left.
 3              MR. SMITH:  Agent Hurtig and Torres were under
 4   subpoena.  I think Ms. Carr just stepped out to contact them
 5   and see what's going on, Your Honor.
 6              THE COURT:  Thank you.  Also, Patricia, could you
 7   call Andre because my screen is not up on my end too.
 8              MR. SMITH:  Your Honor, I can report that general
 9   counsel for Capitol Police who we serve the subpoenas through
10   is reaching out to the two agents right now.
11              THE COURT:  After these two agents, that's it for
12   your two witnesses?
13              MR. SMITH:  Yes, Your Honor.  And depending on,
14   again, the Rules of Evidence, so one of the agents asked
15   certain questions, they were together and then another agent
16   would ask other questions.  I think with the relaxing of the
17   Rules of Evidence, it's possible I will only need one of them.
18              THE COURT:  Okay.  I see Special Agent Torres right
19   there on the screen.  Is he there?  Can he hear us?
20              MR. SMITH:  Agent Torres?
21              THE COURT:  All right.
22              THE COURTROOM DEPUTY:  Can you hear us, Agent Torres?
23   He needs to connect with his audio.
24              MR. SMITH:  Ms. Carr just texted him, Your Honor.
25              THE COURT:  Thank you.
```

1          THE COURTROOM DEPUTY:  Agent Torres, if you could

2  display your video and unmute yourself.  Can you hear?  You're

3  still muted on your end.

4          THE COURT:  So the microphone red in the corner, you

5  have to unmute that, Agent Torres.  There you go.

6          THE COURTROOM DEPUTY:  Can you hear okay?  We still

7  can't hear you.  You're still muted.

8          Please raise your right hand.

9                    (Witness sworn.)

10         THE WITNESS:  Yes, I do.

11         THE COURTROOM DEPUTY:  Give us your name again for

12  the record.

13         THE WITNESS:  My name is Guillermo Torres.  That's

14  spelled G-U-I-L-L-E-R-M-O  Last name Torres, T-O-R-R-E-S.

15                  -  -  -  -  -

16     **DIRECT EXAMINATION OF OFFICER GUILLERMO TORRES**

17  **BY MR. SMITH:**

18  Q.   Agent Torres, good morning.  Can you tell the Court where

19  you're employed?

20  A.   I'm employed with the United States Capitol Police.

21  Q.   And are you in the Threat Assessment Section?

22  A.   Say it again.

23  Q.   Are you also a member of the Threat Assessment Section of

24  the Capitol Police or no?

25  A.   Yes, sir.

1   Q.   Okay.  How long have you been with the Threat Assessment

2   Section?

3   A.   I've been with Threat Assessment Section, I've been since

4   2020.

5   Q.   All right.  Am I correct that you met, along with Agent

6   Hurtig from -- I hope I'm saying that right, Agent Hurtig from

7   the Capitol Police with Frank Stanzione on January 31st of

8   2023?

9   A.   Yes.

10  Q.   And was this in reference to a voicemail message that was

11  left with former Representative George Santos two days earlier

12  on January 29th of 2023?

13  A.   Yes.

14  Q.   Did you and Agent Hurtig go to Mr. Stanzione's home?

15  A.   Yes.

16  Q.   And what was the purpose of the interview with

17  Mr. Stanzione?

18  A.   The purpose of the interview was to interview him in

19  reference to a threat investigation for a threat against a

20  member of Congress.

21  Q.   All right.  And what was the purpose of the interview with

22  him portion of the investigation?  What were you there to try

23  and ascertain from him?

24  A.   We were there to interview him to ask him questions in

25  reference to that threat to one, determine whether he was the

```
 1   one who made it, and two, to see if there's any -- he provided
 2   any information to that.
 3   Q.   Okay.  What information are you referring to?
 4   A.   Any information, any additional information related to the
 5   threat.
 6   Q.   Okay.  Let me direct you in the essence of time here.
 7   Have you seen a copy of the transcript of the interview?
 8   A.   Yes, sir.
 9   Q.   All right.  So on page 7, for instance, Agent Hurtig asked
10   Mr. Stanzione if he had any specialized military training.
11   Before you answer, he also asked him if Mr. Stanzione had any
12   weapons.  Do you recall Agent Hurtig asking those two questions
13   on page 7?
14   A.   Okay, you're referring to -- you reference made to page 7.
15   I don't have that with me right now.
16   Q.   Okay.  Well, we can do it this way.  Do you recall Agent
17   Hurtig asking Mr. Stanzione if he had any specialized military
18   training?
19   A.   Yes.
20   Q.   And do you also recall if he was asked -- Mr. Stanzione
21   that is -- if he had any weapons?
22   A.   Yes.
23   Q.   Now, why was he asked questions -- well, essentially those
24   two questions, but questions like that as well?
25   A.   Those are standard questions that we ask.
```

```
 1   Q.    Okay.

 2   A.    Whenever there's a threat involved, those are standard

 3   questions that we normally ask anyone.

 4   Q.    All right.  So these are questions you ask in all of these

 5   types of interviews?

 6   A.    Yes.

 7   Q.    And you also asked if his parents had -- or excuse me,

 8   Agent Hurtig asked if his parents had any weapons.  Do you

 9   remember that?

10   A.    No, I don't recall that.

11   Q.    Do you remember Agent Hurtig -- is that a standard

12   question?

13   A.    To the person that we're interviewing, yes.

14   Q.    Okay.  Is it also a standard question to ask if the person

15   has ever tried to buy a gun?

16   A.    Yes.

17   Q.    And to question somebody about their mental health?

18   A.    Yes.

19   Q.    All right.  And all of these standard questions, why

20   do you ask persons these questions?

21   A.    To get a background, to get a baseline of where are they

22   at at that moment, and pretty much to assist us with the

23   interview, but it's more to get a background on the person.

24   Q.    All right.  Mr. Stanzione, he did admit to leaving that

25   voicemail, didn't he?
```

```
1    A.    He did, yes, sir.

2    Q.    And did he -- was he cooperative with you?

3    A.    He was.

4    Q.    Mr. Stanzione also indicated that he was gay, right?

5    A.    I don't recall.

6    Q.    If I were to read you a portion of the transcript at page

7    27, might that refresh your recollection?

8    A.    Sure.

9    Q.    Okay.  I'm going to go to page 27.  Actually, the question

10   is on page 26.  I'll go there first.

11   A.    I don't have the transcript with me, right?  You're

12   reading to me and I'm listening but I do not have anything --

13   Q.    Yeah --

14   A.    -- in front of me, okay?

15   Q.    Yep, I understand that.  That's why I'm doing this.

16         You said -- well, Mr. Stanzione, on page 26 said I'm

17   sorry, and Special Agent Hurtig said it's fine.  And then

18   Mr. Stanzione said I'm gay, I'm offended by him, I don't want

19   him in my community and Special Agent Hurtig said right.

20         Do you recall now, does that refresh your recollection

21   that Mr. Stanzione admitted that he was gay in the interview?

22   A.    Yes.

23   Q.    Okay.  He also apparently indicated, if you recall, that

24   he was offended by former Representative Santos.  Do you

25   remember him saying that?
```

```
1    A.    Yes.
2    Q.    All right.  Now, I know you don't have the transcript in
3    front of you.  So I'll just direct the people in the courtroom
4    to page 28 and I'll ask you is this is do you recall that
5    Mr. Stanzione was asked what he was trying to accomplish with
6    the voicemail he left?  Do you recall that?
7    A.    I recall that question.  It's a standard question that we
8    ask, but I do not recall actually word by word what he said
9    after that, but yes, that's a standard question.
10   Q.    And do you recall Mr. Stanzione answering to the effect of
11   he just wanted to make him, Representative Santos that is, feel
12   like shit?
13   A.    I would have to look, but that's something that, yes, I
14   believe he said that.
15   Q.    All right.  And do you also recall Mr. Stanzione
16   indicating that he did not think the message he left would
17   influence Representative Santos?
18   A.    I would have to look at the transcript, sir.
19   Q.    Let me -- I'll read it.  I know you don't have it so I'll
20   read it and see if this refreshes your recollection.
21         MR. DISPOTO:  Your Honor, may I interrupt for one
22   second?  I'm sorry, Your Honor.  If Mr. Smith wants to admit
23   the transcript as evidence, we have no objection to that.  This
24   witness is not needed to confirm what is in the transcript.  We
25   will stipulate that the transcript is accurate and if he wants
```

```
 1   to move the transcript into evidence, we have no objection to
 2   him doing that.
 3             MR. SMITH:  Okay, Your Honor.  I can do that.  It
 4   will make it easier.
 5             THE COURT:  That's fine.
 6             MR. SMITH:  I'll get the exhibit number once we're
 7   done with this.  Thank you.
 8   BY MR. SMITH:
 9   Q.   So, the question about the questioning that was going on,
10   why do you ask the person being interviewed what the intentions
11   of the voicemail were?
12   A.   Why do I ask the person that we interview the intentions
13   as to the threat that he made?
14   Q.   Yeah.
15   A.   Or that was made?  It's to get a baseline on where are
16   they at at that time, and whether they have an intention to
17   carry the threat.
18   Q.   Right.  So he was also asked if he had any intention of
19   carrying out the threat and he said no, right?
20   A.   Yes, sir.
21   Q.   Do you also recall -- now I'm going to move over to the
22   portion of the transcript where you took over questioning.  Do
23   you recall stating to Mr. Stanzione that he seemed like a
24   person who would not harm someone?
25   A.   Correct.
```

```
 1   Q.   And was that -- this is towards the end of the interview.

 2   Was that based on the conversation to that point with him?

 3   A.   No.  That was based on us talking to him and my job at

 4   that interview was taking notes and then make sure that if I

 5   didn't get all the information, to get that information, and

 6   the reason why I made that statement was to make him feel

 7   comfortable, to make him feel that he could talk to us because

 8   at that point, we didn't want him to lie to us.  We want him to

 9   just feel comfortable and be able to tell us the truth.

10   Q.   He, Mr. Stanzione that is, he told you that he regretted

11   making the call?

12   A.   Word by word, but I would like to see the transcript if

13   that's what he told me.

14   Q.   Okay.  So it will be in evidence shortly, and I'll direct

15   the parties and yourself to page 45.  Mr. Stanzione, I regret

16   it.

17               THE COURT:  What line?

18               MR. SMITH:  It's near the end of the page on page 45,

19   Your Honor.  It's the last thing Mr. Stanzione says on that

20   page.  Special Agent Hurtig responded, okay, yeah.  And, you

21   know, my thing is to err on the side of caution.  If you don't

22   need something from the members of Congress, don't call them.

23               Do you see it, Your Honor?

24   BY MR. SMITH:

25   Q.   So, does that refresh your recollection, sir?
```

```
 1   A.    No.  I would like to see it, if you don't mind.

 2   Q.    Okay.  I don't know if I have a way to show it to you.

 3   But it's in evidence.  We can -- if you don't recall, that's

 4   fine.

 5   A.    Okay.

 6   Q.    Now Mr. Stanzione, he was not under arrest that day,

 7   right?

 8   A.    That is correct.

 9   Q.    And why not?

10   A.    We made it very clear.  The purpose of us going to --

11   going to his residence and make contact with him, it was to ask

12   him about the threat.  It was to pretty much see what his

13   intentions were on that threat and whether he had the means to

14   carry that threat.

15        So we made it clear from the beginning that he was not

16   under arrest, and that we were there to ask him questions in

17   reference to that threat to kill a member of Congress.

18   Q.    All right.  Was he also told by Agent Hurtig that the two

19   of you would present this case to the U.S. Attorney's Office?

20   A.    Yes.

21   Q.    And that you present a lot of these kinds of cases?

22   A.    We do when they come to us.  Yes, we do, yes.

23   Q.    And that you told him that this stuff happens quite often?

24   A.    The amount of threats against government officials, yes,

25   it does happen quite often.  Yes, sir.
```

```
 1   Q.   He was also told by Agent Hurtig that not all of these
 2   cases move forward, right?
 3   A.   Not all threats that we present to the Attorney's Office,
 4   they do move forward to prosecution.  That is correct.
 5   Q.   And you told -- I'm sorry, I should say Agent Hurtig also
 6   told him whether it moves forward is out of you and Agent
 7   Hurtig's hands?
 8   A.   That is correct.
 9   Q.   But Agent Hurtig told Mr. Stanzione that it had helped
10   that Mr. Stanzione had spoken freely to the two of you, right?
11   A.   It was important that we -- yes, it was important that he
12   speak to us.
13   Q.   Okay.  So my question is is how did it help?
14        MR. DISPOTO:  Objection, Judge.  Relevance.
15        THE COURT:  Sustained.
16   BY MR. SMITH:
17   Q.   Well, you indicated that he had answered all of your
18   questions, right?
19   A.   Are you talking to me, sir?
20   Q.   Yes.
21   A.   Oh, repeat the question, please.
22   Q.   Agent Hurtig told Mr. Stanzione that Mr. Stanzione had
23   answered all of his questions, right?
24   A.   At the end of the interview, yes, sir.
25   Q.   And Agent Hurtig told him that goes a long way, right?
```

```
 1   A.   It was important for him to tell us exactly what his state

 2   of mind was at that time and when he made the threat and yes,

 3   it's -- it was important at that time because that way we could

 4   relay that information to the AUSA and let the AUSA determine

 5   how to move forward.

 6   Q.   Do you recall Agent Hurtig telling Mr. Stanzione near the

 7   end of the interview that he, that's Agent Hurtig, couldn't say

 8   one way or the other if he would be in trouble or not?

 9   A.   It's not up to us to tell the person whether they're in

10   trouble or not.  Our job was there to interview him, and we

11   made it clear from the beginning, and it was not up to us to

12   make any statement to that effect.

13   Q.   I understand that.  I'm just asking do you recall Agent

14   Hertig told Mr. Stanzione that?

15   A.   I would have to look at the transcript, sir, if you don't

16   mind.

17   Q.   Okay.  I'll read it to you and you can tell me if this

18   refreshes your recollection, okay?  So it's on page 46.

19        MR. DISPOTO:  Judge, once again, we stipulate that if

20   it's in the transcript, it's what was said so the witness

21   doesn't need to confirm one way or the other.

22        THE COURT:  All right.  Sustained.

23        MR. SMITH:  That's fine, Your Honor.

24   BY MR. SMITH:

25   Q.   How many of these threat cases to Congress have you
```

```
 1   investigated or worked on?
 2   A.   In the past year, sir, or -- give me a time.
 3   Q.   Why we don't start with the past year.  One year period.
 4   A.   Threat cases against members of Congress, I would say
 5   about ten.
 6   Q.   Okay.  How many of those ten cases have been prosecuted?
 7          MR. DISPOTO:  Objection, Judge.  Lack of foundation.
 8          THE COURT:  Overruled.  If he knows.
 9   BY MR. SMITH:
10   Q.   You can answer.
11   A.   I do not know, sir.
12   Q.   You don't know?
13   A.   I don't know the number.  I would -- I don't think it's in
14   my position to tell you a number because I do not know the
15   number of cases that's been prosecuted as you stated.
16   Q.   How many cases that you investigated in the last year are
17   you --
18   A.   Yes, sir.
19   Q.   -- are you presently --
20   A.   Sorry.
21   Q.   Yes.  So how many cases from the last year that you
22   investigated are you presently a witness on that are open in
23   court?
24          MR. DISPOTO:  I would object again, Judge, to the
25   form of the question.  Lack of foundation.  I don't know if the
```

1    witness knows whether he's listed as a witness on a pending

2    case.

3              THE COURT:  The objection is sustained.

4    **BY MR. SMITH:**

5    Q.  Do you know whether you're a witness in any open cases

6    right now?

7    A.  Yes, sir.  I'm witness to at least three to four cases

8    right now, sir.

9    Q.  Okay.  So you did about ten cases this year.  Or was that

10   last year?

11   A.  That was last year.

12   Q.  Okay.  So how many cases in total of threats to

13   congressmen or women have you done in your time with the

14   Capitol Police approximately?

15   A.   I would say between 25 to 40, sir.

16   Q.   25 to what?

17   A.   Between 25 and 40 threat cases, threat cases.

18   Q.   Okay.

19   A.   There's a big difference between threat cases and other

20   cases.

21   Q.   So 25 to 40 cases since 2020 that involved threats to

22   members of Congress?

23   A.   Yes, sir.

24   Q.   And how many, if any, of those cases have you testified in

25   court on, if you know?

```
 1   A.    This is the first time.
 2   Q.    Do you know, if you know, how many of those 25 to 40 cases
 3   resulted in prosecutions?
 4              MR. DISPOTO:  Objection, Judge.  Lack of foundation.
 5              THE COURT:  All right.  Sustained.
 6              MR. SMITH:  Your Honor, if he knows.
 7              THE COURT:  If he can answer.  If he knows.  He can
 8   answer if he knows.
 9              THE WITNESS:  No, I could not.
10   BY MR. SMITH:
11   Q.    So, Agent, let's back up a little bit.  In this case,
12   there was an interview that was done and it was recorded,
13   right?
14   A.    In this case that we're talking about, us right now,
15   right?
16   Q.    Yes.
17   A.    Yes, sir.
18   Q.    How many interviews like that have you done in your career
19   as a Capitol Police officer approximately?
20              MR. DISPOTO:  Objection.  Relevance.
21              THE COURT:  Overruled.
22   BY MR. SMITH:
23   Q.    You can answer.
24   A.    I'm sorry, can you repeat what's going on?
25   Q.    Yes.  Approximately how many interviews with subjects like
```

```
 1   Mr. Stanzione have you done in your career as a Capitol Police
 2   officer?
 3   A.   Okay, can you explain what do you mean by subjects like
 4   Mr. Stanzione?
 5   Q.   Well, let me do it -- okay.  So Mr. Stanzione, you met
 6   with him to try and figure out whether he was an immediate
 7   threat to Representative Santos.  That was the reason you met
 8   with him two days after the voicemail, right?
 9   A.   That is correct.  Yes, sir.
10   Q.   And that's why this interview happened is you're trying to
11   figure out if he was dangerous or not, right?
12   A.   Yes.
13   Q.   And you were trying to figure out how much of a risk he
14   actually posed to Representative Santos, right?
15   A.   That is correct.
16   Q.   And that's why you have these standard questions, right?
17   A.   Correct.
18   Q.   All right.  I would think that this is a large part of
19   your job, right?  Is interviewing people who have made such
20   calls to Congress?  Is that right or wrong?
21   A.   That is correct.
22   Q.   All right.  So do you know how many people that you have
23   interviewed for what I'll refer to as these threat interviews
24   in your time as a Capitol Police officer?
25   A.   Every threat interview that I mentioned before, I have
```

1   interviewed the subject with the same line of questioning.  Any

2   threat that we receive, we interview the person.

3   Q.   Now, I'm assuming in this case, without saying what the

4   communication was, that you have communicated with the

5   prosecutors in this case, right?

6   A.   Yes, sir.

7   Q.   All right.  So when you communicate with the prosecutors,

8   I'm going to guess that that is a telltale that perhaps there's

9   an investigation or prosecution pending; am I right about that?

10   A.   An investigation.

11   Q.   An investigation.  Okay.  And so in these 25 to 40 cases,

12   did you communicate with prosecutors in every one of those

13   cases?

14   A.   For threat cases, yes, sir.

15   Q.   Now in this case, I'm guessing that because it's an open

16   prosecution, that you have had discussions and conversations

17   and preparations with the prosecutors on the case, right?

18   A.   No, sir.  So let me explain to you a little bit.  That

19   typically how it works, my job here as a United States Capitol

20   Police Threat Special Agent with Threat Investigation in the

21   State of Florida, my job is to receive the lead that comes to

22   us, a threat lead, and we -- our job is to locate, interview,

23   and forward that information to the case agent which in this

24   case, the case agent was able to speak to the AUSA.

25   Q.   Okay.  Thank you.  That clarifies it.  So I'm guessing you

```
 1  did not testify to the grand jury in this case?

 2              MR. DISPOTO:  Objection.  Relevance.

 3              THE COURT:  Sustained.

 4  BY MR. SMITH:

 5  Q.   Have you ever testified to a grand jury in any of your

 6  case investigations?

 7              MR. DISPOTO:  Objection.  Relevance.

 8              MR. SMITH:  Your Honor, it goes to the number of

 9  prosecutions based off the investigations which is the heart of

10  step one.

11              THE COURT:  I'll overrule it.  You can answer that

12  question.

13  BY MR. SMITH:

14  Q.   You can answer.  Have you ever testified to a grand jury

15  in any of your threat cases?

16  A.   I never testified in front of a grand jury, sir, for a

17  threat case.

18  Q.   Okay.  Have you ever, before this, testified in court on

19  any of your cases?

20              MR. DISPOTO:  Objection.  Relevance.

21              MR. SMITH:  Same relevance, Your Honor.

22              THE COURT:  Overruled.

23  BY MR. SMITH:

24  Q.   You can answer.  You can answer, sir.  How many times

25  you've testified before this you've testified, if ever, in
```

1   court?

2   A.   How many -- repeat that again, sir.

3   Q.   How many times prior to this, if ever, have you testified

4   in court about one of your threat cases?

5   A.   The first time, sir.  I stated that before.

6   Q.   Okay.  Do you make any recommendations to the U.S.

7   Attorney in your cases about whether to proceed with

8   prosecution, or do you not make any recommendations to them?

9   A.   If it's asked by the -- by the United States Attorney for

10  based on your interview or our opinion based on the interview

11  and what we felt at that time when we interviewed the person,

12  we provide our findings and our opinions, but other than that,

13  we just let the AUSA determine that.

14  Q.   Okay.  So in this case, did you make any recommendations

15  to the U.S. Attorney for prosecution?

16  A.   It was not up to me, sir.  It was up to the case agent.

17  Q.   I understand that.  I was just asking if you were asked

18  for a recommendation or not.

19  A.   No, no, sir.

20  Q.   All right.  Agent, in your 25 to 40 threat cases, other

21  than Mr. Stanzione, do you recall if any of the other

22  individuals you interviewed were homosexual?

23          MR. DISPOTO:  Objection, Judge.  Lack of foundation.

24  How would he know?

25          MR. SMITH:  If he knows, Your Honor.

```
 1              THE COURT:  If that was revealed to him.

 2              THE WITNESS:  I did not.

 3    BY MR. SMITH:

 4    Q.    Okay.  Now, you've been working for the Capitol Police

 5    since 2020 so --

 6    A.    No, sir.  Hold on.

 7    Q.    Yep.

 8    A.    When you asked questions about the Capitol Police, I've

 9    been working for Threats in 2020.  I've been working for the

10    U.S. Capitol Police since 2014.  They're two different things.

11              When you come in for the Capitol Police, you come in as a

12    uniform and I was in uniform division protecting the Capitol,

13    protecting the congressional office building as a uniform, and

14    then in 2020, I transferred from the uniform to a plain clothes

15    investigator.

16    Q.    Yes.  Thank you.

17    A.    So, yes, I was going to refer you to since 2020, with the

18    U.S. Capitol Police Threat Assessment Section, you indicate

19    that you've handled 25 to 40 threat cases.  What else do you do

20    with your time as an agent?  Do you work on other types of

21    cases?

22    A.    Yes.

23    Q.    And what types of cases do you also work on?

24    A.    The direction of interest cases.

25    Q.    And what are those?
```

1   A.   Direction of interest cases are -- that's when someone

2   made a concerning statement, not necessarily that reached the

3   level of a threat, but they made a concerning statement to a

4   member, their family or staff, and those are called direction

5   of interest.

6        A threat is very clear.  A threat is a threat.  You have

7   I'm going to do this.  The subject will say that.  A direction

8   of interest is more -- it's concerning, it's a concerning

9   statement, but it's not a direct threat to harm someone.

10  Q.   Okay.  And thank you.  How many approximately direction of

11  interest cases do you believe that you have investigated since

12  2020 with the Threat Assessment Section?

13  A.   Wow, I would say around 300.

14  Q.   And who at the Capitol Police or elsewhere, I don't know

15  who it is, who makes the decision on which type of case a

16  particular communication is going to travel under?  Do you

17  know?

18  A.   Repeat your question.

19  Q.   Sure.  Do you --

20  A.   Can you repeat your question?

21  Q.   Yeah.  Do you know who determines whether a case is going

22  to be a threat case or a case -- or a direction of interest

23  case?

24  A.   Well, the case is sent to a lead email, a Threat

25  Assessment email which is reviewed by a supervisor and the

1    supervisor will assign those cases to an agent.

2        And based on the language of the concerning statement of

3    the threat, then in my opinion, it is the supervisor who can

4    ask the agent and determine how to treat it, but as an agent,

5    you learn through the academy in training that a direct threat,

6    it's a direct threat.  It's very simple, very plain.  It's

7    someone stated that they are going to do something to harm the

8    other person.

9    Q.   All right.  In your direction of interest cases,

10   approximately how many persons did you interview in those cases

11   really in the same situation as Mr. Stanzione is as a person

12   who made the communication?

13   A.   I have interviewed not as many.  It all depends on there

14   are different factors for direction of interest for me to

15   interview that person.  The location of where they are and the

16   information that they provide, or the concerning statement, so

17   not all of those -- we call them DOI, direction of interest,

18   not all of them raise to the interview.

19       For the most part, they don't raise to the level of

20   interview, but if it's as an agent, I want to make sure that

21   whenever we receive a DOI, I cover all the areas, and if I feel

22   that they're this person based on the statement and based on

23   the background on that person, criminal background, if they

24   have a lengthy criminal background, and I feel comfortable

25   based -- again based on the statement, I feel comfortable an

 1    interview needs to be done, then an interview will be done.

 2    But not all of them raise to the level of an interview.

 3    Q.   Did you participate in the arrest of Mr. Stanzione in this

 4    case or no?

 5    A.   Yes, sir.

 6    Q.   And he was arrested, I believe it was approximately --

 7    yes, it's April 5th of 2023; is that right?

 8    A.   Yes, sir.

 9    Q.   Between the date of the interview on January 31, 2023 and

10    April 5, 2023, the date of his arrest, did you do any other

11    investigation in this particular case?

12    A.   No, sir, no.

13    Q.   Last couple questions for you I think.  Approximately how

14    many arrests in threat cases have you participated in since

15    transferring to the Threat Assessment Section in 2020?

16    A.   Approximately I would say 10 to 15 cases, sir.

17              MR. SMITH:  Thank you.  I have no further questions,

18    Your Honor.

19              THE COURT:  All right.  Any cross-examination?

20              MR. DISPOTO:  Yes, Judge.  Thank you.

21                         -  -  -  -  -

22         **CROSS EXAMINATION OF OFFICER GUILLERMO TORRES**

23    BY MR. DISPOTO:

24    Q.   Agent Torres, good morning.  My name is Mark Dispoto.  I'm

25    one of the prosecutors on this case.

```
 1   A.    Good morning.
 2   Q.    You were asked about whether Mr. Stanzione had reported to
 3   you and Agent Torres during your initial interview of him on
 4   January 31st that Mr. Torres was gay.  I'm sorry, that
 5   Mr. Stanzione was gay; is that right?
 6   A.    I am Torres.
 7   Q.    Right.  I'm sorry.  I corrected myself.  Mr. Stanzione had
 8   reported that he was gay; is that right?
 9   A.    I'm sorry, can we start all over?
10   Q.    Yes.  My apologies.  I misspoke.  You were questioned on
11   direct examination that during the initial interview of
12   Mr. Stanzione, he had reported to you and Agent Hurtig that he,
13   Mr. Stanzione, was gay, correct?
14   A.    Yes, correct.
15   Q.    Was Mr. Stanzione's sexual orientation a factor or
16   consideration in anything that you did investigatively in this
17   case?
18   A.    It's never a factor, sir, no.
19   Q.    So in all of the cases that you have been a part of,
20   whether it be the 300 or so direction of interest matters, or
21   the 25 to 40 direct threat cases that you've investigated, do
22   you ever consider a person's sexual orientation in making any
23   decisions relative to your investigation?
24   A.    Never.  No, sir.
25   Q.    What about one's political views or political affiliation?
```

1    Is that a factor that you ever consider or rely on in making

2    any investigative decisions?

3    A.    Never.

4    Q.    Okay.

5    A.    No, sir.

6    Q.    Okay.  You testified that since 2020, you've been assigned

7    to the Threat Assessment Section; is that correct?

8    A.    That is correct.

9    Q.    And your home base, if you will, is in the Tampa area?

10   A.    Correct.

11   Q.    Am I correct that your -- for lack of better terms --

12   jurisdiction is predominantly the entire State of Florida and

13   possibly some of the surrounding states in the southeast like

14   Alabama, Georgia, Mississippi, Louisiana?  Do I have that

15   correct?

16   A.    That is correct, sir.

17   Q.    And you are generally tasked with locating subjects,

18   conducting interviews and reporting back to the case agent on

19   individuals who allegedly made either concerning or threatening

20   communications that were reported to the Threat Assessment

21   Section for those people that live in those areas, correct?

22   A.    Correct.

23   Q.    So like in Mr. Stanzione's case, a direct threat is made

24   to a member of Congress, the subject lives in Florida, so you

25   and officer -- Agent Hurtig would be tasked with following up

1    on conducting an interview of Mr. Stanzione, correct?

2    A.   That is correct.

3    Q.   Am I -- do I understand correctly that you have no role

4    and you have no involvement in any investigations by the U.S.

5    Capitol Police regarding matters that were referred to the

6    Threat Assessment Section for subjects that live in the other

7    45 states?

8    A.   Say that again.  I'm sorry, I'm sorry.

9    Q.   Sure.  Am I correct that you have no involvement in any

10   investigations involving threats or concerning communications

11   that were referred to the Threat Assessment Section from

12   subjects that reside in the other 45 states?  That being

13   outside of Florida and surrounding states?

14   A.   Correct.

15   Q.   So since you're not involved in those other

16   investigations, you have no personal knowledge or really any

17   information regarding the nature of those threats and how those

18   matters were handled criminally, correct?

19   A.   That is correct.

20   Q.   Okay.  Let's talk for a few minutes about the distinction

21   between directions of interest and direct threats.  I believe

22   you told us that the Threat Assessment Section gets numerous

23   referrals, if you will, that involve both kinds of

24   communications, correct?

25   A.   Correct.

1    Q.   So by way of example, Mr. Stanzione's communication in

2    this case was classified as a direct threat because it involved

3    a direct threat to harm a member of Congress, correct?

4    A.   That is correct.

5    Q.   Directions of interest, however, are matters that don't

6    necessarily rise to that level, but still may be concerning to

7    congressional staff and the Capitol Police; am I right?

8    A.   You are right.  Yes, sir.

9    Q.   Am I also correct that a majority of the matters that you

10   and I'll -- for lack of better terms, I'll use the term

11   investigate, are directions of interest and not direct threats,

12   correct?

13   A.   Correct.

14   Q.   And I believe that bore out by the numbers when you

15   estimated that -- I think you estimated that since 2020, you

16   have investigated approximately 300 directions of interests but

17   25 to 40 direct threat cases, correct?

18   A.   That is correct, sir.

19   Q.   Now, are you -- is part of your job to sort of triage the

20   referral that comes in to the Threat Assessment Section to

21   determine whether it's going to be categorized as a direction

22   of interest or a direct threat, or is that done by a

23   supervisor?

24   A.   You're right.  It is not my job.  It is done by a

25   supervisor.

1  Q.   Are you familiar with what the supervisor considers when

2  determining what is a direct threat versus what is direction of

3  interest?

4  A.   No, I will leave the supervisor to speak on that.  I don't

5  want to speak on behalf of a supervisor.

6  Q.   Well, would it be fair to say -- and I'm not asking you to

7  speak for a supervisor, but would it be fair to say that

8  obviously the content of the communication is probably the most

9  important, if not the exclusive factor in determining how it's

10 initially characterized?

11      MR. SMITH:  Your Honor, I would object.  It's beyond

12 his scope of knowledge.  He just testified he didn't want to

13 speak for a supervisor.

14      THE COURT:  Overruled.  He can answer that question.

15 **BY MR. DISPOTO:**

16 Q.   Do you agree with that?

17 A.   I agree.

18 Q.   Are you aware as to whether any supervisor is permitted or

19 has ever considered the sexual orientation of the alleged

20 speaker of that communication in determining whether this is a

21 direct threat or a direction of interest?

22      MR. SMITH:  I would object, Your Honor.  That it's

23 beyond his scope of knowledge as to what supervisors think.

24      THE COURT:  Overruled.  He asked him if he's aware of

25 any.

**BY MR. DISPOTO:**

Q.   Are you aware?

A.   No, no, I'm not aware.

Q.   Okay.  Now, so you get the referral and it's already classified as either a direction of interest or a direct threat, correct?

A.   Correct.

Q.   And is it fair to say that you're going to investigate it the same way in that you're going to try to locate the subject, conduct an interview, and report back to the case agent?

A.   No.  A threat is more immediate investigation.  When we receive a threat and when we look at the content, we try to determine where the person is located, and it is treated very urgent because of the safety of the member of Congress.

Q.   But do you -- understood.  But do you also -- in the direction of interest cases, do you also attempt to locate those individuals?

A.   Some of them.  Not all of them, no.  Not for -- for the direction of interest, it all depends on because we have subjects that have many cases, dozens of cases with our agency, and direction of interest, so if this is a recurring concerning statement, then as an agent, I would try to -- that case is a little bit different because this is someone that has multiple cases with our agency related to the same concerning statement.

     Again, it hasn't reached the level of threat, but as an

```
 1   agent, we make sure we cover all the boxes, I would try to
 2   interview that person, but we wouldn't treat that as a threat.
 3   Q.   Understood.
 4   A.   That comes with a direct threat.
 5   Q.   Understood.  So, there are some direction of interest
 6   cases that you are never able to actually follow up on; is that
 7   correct?
 8   A.   That is correct.
 9   Q.   Okay.  And is it fair to say that due to maybe limited
10   resources and limited time, you have to prioritize the cases
11   that you investigate?
12        MR. SMITH:  Objection, Your Honor.  Beyond his scope
13   of knowledge.
14        THE COURT:  Overruled.  If he knows.
15        THE WITNESS:  That is correct.
16   BY MR. DISPOTO:
17   Q.   And direct threats take the highest priority?
18   A.   A hundred percent.
19   Q.   Okay.  Now, you testified on cross-examination that there
20   are a series of questions that you ask all subjects as part of
21   your standard form, if you will, to get -- I'm using your
22   words.  I think you said a background or a baseline of
23   information?
24   A.   Correct.
25   Q.   Is the person's sexual orientation part of that background
```

1    or baseline standard questionnaire that you ask of subjects?

2    A.   No, sir.

3    Q.   What about a person's political views or political

4    association?  Is that something that you ask subjects as part

5    of your standard questionnaire?

6    A.   No, sir.

7    Q.   In fact, in this case, who was it that brought up -- if

8    you recall, who was it that brought up Mr. Stanzione's sexual

9    orientation during your interview?  Was it you, Officer Hurtig

10   or Mr. Stanzione?

11   A.   No.  The best of my recollection, it was the subject.  I'm

12   sorry, I can't -- I probably won't be able to pronounce his

13   name well, Stanzione.  It was him who brought it up.  We were

14   not aware about his sexual orientation.  It really didn't

15   matter in the case, and it doesn't matter in the case.

16   Q.   Okay.  You were also asked on cross-examination about the

17   total number of threat cases to Congress that you've worked on

18   in the past year.  And I believe you said about ten, correct?

19   A.   That is correct.

20   Q.   You, in fact, were involved in arresting two individuals

21   just this past January on threat cases, were you not?

22   A.   Yes, sir.

23   Q.   And those two cases resulted in arrests, did they not?

24   A.   Yes, sir.

25   Q.   Now, you testified that you've never testified in court or

1   in front of a grand jury; is that right?

2   A.   That is correct.

3   Q.   You're aware, sir, that even if you were involved in

4   investigating a threat, and even being involved in an arrest,

5   that your appearance in front of a grand jury would not

6   necessarily be necessary in a case in which one of the people

7   you investigated ultimately was prosecuted?  You're aware of

8   that, are you not?

9   A.   Okay, can I -- so can you rephrase that?  That means even

10  though I never went to court or testified like I'm doing right

11  now, this is a first time for me.

12  Q.   Right.

13  A.   Still part of the case.  I'm still part of the grand jury.

14  Is that what you're saying?

15  Q.   Let me rephrase the question.  You're aware, are you not,

16  that it is very possible that individuals can be prosecuted for

17  making threats that you investigated where you were never

18  required to come into court and testify?  You're aware of that,

19  aren't you?

20  A.   Yes.

21  Q.   Okay.  Now, you had also testified that in this case, you

22  spoke with prosecutors prior to the decision being made for

23  Mr. Stanzione to be arrested, correct?

24  A.   That is correct.

25  Q.   And I believe you testified that you were not asked your

1   opinion as to whether you thought Mr. Stanzione should be

2   criminally charged?

3   A.   Correct.

4   Q.   In the course of your conversations with prosecutors in

5   this case, was the subject of Mr. Stanzione's sexual

6   orientation discussed as a factor to be considered in whether

7   to charge him with a crime?

8   A.   No.

9   Q.   Was Mr. Stanzione's political affiliations or political

10  views discussed as a factor in determining whether he should be

11  charged with a crime?

12  A.   No.

13  Q.   Finally, getting back to the subject of direct threats

14  versus directions of interest, is it possible that in some

15  cases that are referred to you as a direct threat, gets -- for

16  lack of better terms -- downgraded to a direction of interest

17  as a result of the investigation that you conduct?

18  A.   Yes, sir.

19  Q.   So, in some -- on some occasions, what may appear to be a

20  direct threat initially, you may see it differently as a result

21  of your investigation and downgrade it as a direction of

22  interest, correct?

23  A.   Correct.

24  Q.   And those cases wouldn't be referred for criminal

25  prosecution, correct?

```
 1   A.    That is correct.
 2   Q.    So, when you talk about the 25 to 40 threat cases that to
 3   the best of your knowledge you've been involved in since 2020,
 4   are those cases that ultimately resulted in a determination of
 5   the direct threat having been made, or are those the initial
 6   direct threat cases that came to you, some of which may have
 7   been downgraded to a direction of interest?
 8   A.    Threat that came to me?
 9   Q.    Initially.
10   A.    Initially, correct.
11   Q.    So, of those 25 to 40, some of those may have ultimately
12   resulted in downgrades to directions of interest that did not
13   result in referrals for prosecution?
14         MR. SMITH:  I object, Your Honor.  Foundation of
15   knowledge.  He indicated he didn't know how many had been
16   prosecuted.  I would assume he wouldn't know this either.
17         THE COURT:  Sustained.
18   BY MR. DISPOTO:
19   Q.    Yeah.  So, Agent, are you familiar with your office's
20   policies and procedures regarding what is to be determined as a
21   threat and presented to prosecutors for prosecution?
22   A.    Yes, I'm familiar.
23   Q.    And is it true that the policy in your office is to
24   present cases that were initially determined to be threats?
25   A.    Yes.
```

1    MR. DISPOTO:  That's all I have, Judge.  Thank you.

2    THE COURT:  All right.  Thank you.  Any redirect?

3    - - - - -

4    **REDIRECT EXAMINATION OF GUILLERMO TORRES**

5    **BY MR. SMITH:**

6    Q.   Agent, you indicated two different things here.  I need

7    you to enlighten me here.  You indicated initially that the

8    decision on whether to downgrade a threat case to a direction

9    of interest is yours; is that right?

10   A.   Based on the investigation, based on what is sent to me,

11   and after an interview, or let's say we have a threat case and

12   I interview the subject and -- well, it's -- I would say that's

13   a bad example.

14       If a case comes to me and I see that after my interview,

15   the person doesn't have the means or doesn't have the means or

16   will to carry the threat, I will consult with a supervisor and

17   share it with the supervisor my investigation, and then we

18   determine whether we lower that to a DOI or not.

19   Q.   All right.  Before I continue my question, I'm going to

20   pause there and I want to ask you about what you just answered.

21       What in Mr. Stanzione's interview with you indicated to

22   you that he meant to carry out the threat, or have the means

23   and ability to do so?  What was it in there?

24   A.   It was not my determination, sir.  The purpose of the

25   interview was to go there, interview him and report back to the

1    case agent.  Nothing more, nothing less.

2    Q.   Right.  But you had just answered me that you would look

3    through the interview to see whether there was something that

4    indicated whether there was an ability or an intent to carry

5    out the threat, and that would lead to your decision on whether

6    to recommend a downgrade or not.

7         So I'm asking you apparently, apparently this case was not

8    downgraded, so I'm asking what in your interview with him

9    caused that not to be a recommendation?

10   A.   Sure.  I think it's important to note that my job here in

11   the State of Florida, we moved here in 2021, and my job is

12   slightly different than the job that I just described to you

13   with the threat.

14        So, in the past before I moved to Florida, before this

15   case, as a case agent, I will do the interview.  I will be the

16   one talking to the AUSA and I will the one talking to

17   supervisors to see how we move forward.

18        On this particular case with Mr. Stanzione, my job was

19   only to interview him and provide that information to the case

20   agent.

21   Q.   Why was this one different than the norm?

22   A.   It's just the position that we had right here.  The amount

23   of cases that we get for only two agents in the State of

24   Florida, it gets -- it's our job to locate, interview and

25   present that to our -- share those interview summaries with the

1    case agent.

2    Q.   So, you previously testified that it was -- to Mr. Disposto

3    that it was your choice on whether to downgrade a threat case

4    to a direction of interest.  Is it now your testimony that you

5    do not have that right in threat cases in Florida?

6    A.   For this particular case, my job is to interview and

7    report that to the case agent in DC.

8    Q.   Did you have the authority in this case to downgrade it or

9    no?

10   A.   I could have recommended that to the case agent, but that

11   was not my position, sir.  So no, that was not my position.

12   Q.   So that leads back to my initial question.  And thank you,

13   and that is what in that interview led to your position to not

14   downgrade this case?

15   A.   It was not my position to determine whether to downgrade

16   the case or do anything but to interview Mr. Stanzione, put a

17   summary of the interview together and provide that to the case

18   agent.

19   Q.   So agent --

20   A.   I had no --

21   Q.   Go ahead.  I didn't mean to interrupt you.  I thought

22   you were done.  I apologize, go ahead.

23   A.   I apologize.  That was pretty much my position.  It was to

24   locate, interview, and provide that to the case agent.

25   Q.   So you and I are sort of going around in circles here.

1    I'm going to try to end this circle.

2    A.   Sure.

3    Q.   I'm going to back up and say this.  Did you tell

4    Mr. Dispoto that in a case that you investigate as a threat, it

5    is up to you to determine whether to recommend downgrade to a

6    direction of interest?

7              MR. DISPOTO:  Objection, Judge.  Asked and answered.

8              MR. SMITH:  He hasn't answered it yet.

9              THE COURT:  Overruled.  You can answer.

10   **BY MR. SMITH:**

11   Q.   Is that normal?

12             THE COURT:  You can answer.

13             MR. DISPOTO:  Judge, I don't think he heard you.

14             MR. SMITH:  You can answer the question, Agent.

15             THE WITNESS:  Oh.

16             THE COURT:  You can answer.  My mic was off.

17             THE WITNESS:  Sure.

18   **BY MR. SMITH:**

19   Q.   I'll repeat it.  Did you not testify that in the standard

20   case, you testified -- threat case -- you get to make a

21   recommendation as to whether to downgrade the case to a

22   direction of interest case?  You told Mr. Dispoto that, right?

23   A.   There's a difference of things, sir.  I know we're going

24   back and forth on two things.  You asked me about my overall

25   case going from 2020, and how I treated my cases.

```
1        This is -- I'm not the case agent here.  I'm only the
2   interviewing agent here.  So there's two different things.  I
3   can't tell you that I made a determination because I did not on
4   this case.  My job and only my job on this case was to locate,
5   interview, and provide that information to the case agent.
6   Q.   So here's why I'm confused is is you told Mr. Dispoto, the
7   question was between the 25 to 40 threat cases that you've
8   handled in the Threat Assessment Section since 2020, that you
9   indicated that you had the ability to make a recommendation as
10  to a downgrade; is that right?
11  A.   Again, I took that as my cases.  My cases when I was in
12  DC.
13  Q.   Okay.
14  A.   Now that I'm -- I'm sorry, going back and forward, but
15  there's two different things, and we can't put the two
16  together.  There's two things.  I'm a case agent --
17        THE COURT:  Wait, for the record, let's not talk over
18  him.  I understand what he's saying.  He had two different
19  roles here.  When he was a case agent, he has a different
20  responsibility in terms of making recommendations.  Is that
21  correct, Special Agent Torres?
22        THE WITNESS:  That is correct, sir.
23        THE COURT:  However in this particular case as your
24  role, you were only tasked to interview and not make any
25  recommendations with respect to Mr. Stanzione's case; is that
```

```
 1    correct?
 2              THE WITNESS:  That is correct.
 3              THE COURT:  All right.  The Court understands.  Thank
 4    you.
 5    BY MR. SMITH:
 6    Q.   So, the 25 to 40 cases you're talking about since 2020
 7    with the Threat Assessment Section, those are your cases,
 8    right?
 9    A.   Again, that question was asked.  From 2020 to the present,
10    that is threat cases overall as a whole.  There's a difference
11    of my own cases which then we'll have to deduct from 2021 to
12    the present.
13    Q.   So, how many cases since 2020 have been your cases?
14    A.   I would say 15.
15    Q.   I'm sorry, could you repeat that?  I couldn't hear.
16    A.   I would say 15 cases, sir.
17    Q.   Okay.  And the rest of them were just cases like this that
18    you were assisting on; is that right?
19    A.   That is correct.
20    Q.   All right.  Now, you also indicated that it is office
21    policy, agency policy that if the case starts as a threat case,
22    it must be presented to who to get a downgrade?  Who do you
23    have to present it to?
24    A.   Yes, sir.  If the case -- if the case is a threat case, we
25    will present that case to the AUSA.
```

```
 1   Q.   So, the agent -- it's agency policy that the agent
 2   himself, if the case starts as a threat case, cannot downgrade
 3   it without going through the AUSA?
 4   A.   Are you making the statement or are you asking me?
 5   Q.   I'm asking you.  I don't know.
 6   A.   Okay.  Go ahead.  Repeat that again, please.
 7   Q.   Sure.  It sounds like agency policy is if the case starts
 8   out as a threat case, you can't downgrade it as an agent
 9   without going through the AUSA; is that right?
10   A.   A threat case needs to be presented to the AUSA, correct.
11   Q.   Okay.
12   A.   If I'm understanding.  I'm getting confused here.
13   Q.   No, I think you answered my question.  It's just that if a
14   case starts out as a threat case, if it's provided to you as a
15   threat case, you have to go through the AUSA to get a
16   downgrade.  You can't do it yourself is what it sounds like; is
17   that right?
18   A.   What do you mean, I can't do it myself?
19   Q.   Can you downgrade a threat case if you want to without
20   going through the AUSA?
21   A.   No, no, no.  I have to talk to the AUSA.
22   Q.   Thank you.  That was the question.  Okay.  Now --
23   A.   It's --
24   Q.   Now you have had discussions with the AUSA since 2020
25   about whether to charge a case, right?  That's what you
```

```
 1   indicated.
 2   A.   Correct.
 3   Q.   And how many times have you done that since 2020?
 4   A.   For my own cases?
 5   Q.   Let's start with your own cases.
 6   A.   Every threat that I receive, I have to talk to the AUSA.
 7   Q.   So in approximately 16 cases, you have talked to an AUSA
 8   about how to proceed, right?
 9   A.   I don't tell the AUSA how to proceed, sir.  Maybe I'm
10   misunderstanding your question.  My job is to -- even as the
11   case agent is to get -- gather the information and provide that
12   to the AUSA and let the AUSA determine that.  That's not my
13   job.
14   Q.   Okay.
15   A.   To determine how to move forward.
16   Q.   You remember Mr. Dispoto asking if in your discussions
17   with AUSAs whether they ever talk to you about somebody's
18   sexuality or political views.  Do you remember him asking you
19   that?
20   A.   Yes, sir.
21   Q.   So obviously you've had discussions with AUSAs; that's
22   true, right?
23   A.   Discussions about cases, yes, that is true.
24   Q.   Yes, discussions about cases.  And we now know that if
25   it's a threat case, you have to speak to the AUSA, right?
```

```
 1   A.    Mm-hmm.
 2   Q.    You have to say yes or no, I apologize.  That's a yes?
 3   A.    I'm sorry, yes.
 4   Q.    Okay.  No worries.  And so you also indicated that you
 5   have had 16 of your own threat cases, right?
 6   A.    About 15 of my own threat cases, yes, sir.
 7   Q.    Fifteen.  I stand corrected.  In those 15 cases then, you
 8   have had discussions with AUSAs in those cases, right?
 9   A.    Yes.
10   Q.    I'm assuming the discussions are about how to proceed,
11   right?
12   A.    About my investigation.  If the AUSA asks me for my
13   opinion, I would provide my opinion.  Otherwise, I would not
14   provide my opinion.  I would provide, as always, the facts.
15   Q.    Well, Mr. Dispoto asked you if the decision on whether to
16   charge in these discussions with the AUSAs was ever based on
17   sexuality, so I'm assuming that the discussions are about the
18   decisions about whether to charge; am I right?
19             MR. DISPOTO:  Objection, Judge.  Asked and answered.
20             THE COURT:  Sustained.
21   BY MR. SMITH:
22   Q.    What are the discussions about?
23             MR. DISPOTO:  Objection.  Asked and answered.
24             THE COURT:  Sustained.
25
```

1    **BY MR. SMITH:**

2    Q.   Have you made recommendations to the AUSA about whether to

3    charge?

4    A.   Not my job, sir.  My job is to provide the facts, not my

5    opinion.

6    Q.   So it would be impossible for you to present or recommend

7    charging, right?

8    A.   That's not my job, sir.

9    Q.   Right.  So, you would not have a discussion about

10   sexuality, right, because it's not your job?

11   A.   No, not my job, no.

12   Q.   Okay.  The AUSA alone decides whether to charge the case,

13   right?

14   A.   It's up to the AUSA to charge that case, yes, sir.  Not my

15   job.

16   Q.   Okay.

17   A.   Not my job.

18   Q.   In the 16 cases that you handled as threats as lead

19   investigator, how many of those cases resulted in arrests, if

20   you know?

21   A.   I do not recall right now.

22   Q.   Well, you remember that there was at least one of them you

23   told Mr. Dispoto was arrested in January, right?

24   A.   This past January.  That's not the 16 cases.  You're

25   mixing two things.

1   Q.   Wait, the case that you did an arrest on in January was

2   not one of yours?

3   A.   That's -- no.  As I stated before, from September, 2021 to

4   the present, my job here in the State of Florida is to -- only

5   job is to locate, interview the subject, and provide that to

6   the case agent.  That's my job here.

7   Q.   So, am I correct that you have no idea how many of your 16

8   cases resulted in prosecutions?

9   A.   I will have to look at my jacket, but I don't recall at

10  the moment.

11  Q.   You have no idea, no estimate, no approximation?

12  A.   No, I don't recall.

13  Q.   All right.  Now last year, you only handled ten cases,

14  right?

15  A.   Correct.

16  Q.   Were those threat cases or direction of interest cases?

17  A.   Those were threat cases.

18  Q.   So last year, you handled ten threat cases.  You don't

19  know how many even of last year's cases have resulted in

20  prosecution of those ten?

21  A.   Yes, I can tell you.  You never asked me that question but

22  I can tell you.

23  Q.   Okay.  Let me ask you that question.  How many of last

24  year's ten cases resulted in prosecution?

25  A.   At least two.

```
 1   Q.   And do you know where those were prosecuted?

 2   A.   I don't recall right now.

 3   Q.   Do you know what charge was prosecuted in those cases?

 4             MR. DISPOTO:  Objection.  Relevance.

 5             THE COURT:  Sustained.

 6             MR. SMITH:  Your Honor, this goes directly to our

 7   motion as to the decision whether to charge a felony or a

 8   misdemeanor.

 9             THE COURT:  That's handled by the grand jury to make

10   that determination, okay?  I'm sustaining the objection.

11             MR. SMITH:  I understand, Your Honor.

12   BY MR. SMITH:

13   Q.   Of the other approximate eight cases, do you know why they

14   were not prosecuted?

15   A.   No.

16   Q.   Do you have any idea why a prosecutor charges or chooses

17   not to charge a case that you investigated?

18   A.   No, sir.

19             MR. SMITH:  Thank you.  I have nothing further, Your

20   Honor.

21             THE COURT:  All right.  Thank you.  All right.  We're

22   done.  Thank you, Special Agent Torres.  We're done.  Have a

23   good day, sir.

24             THE WITNESS:  Okay.  Thank you.

25             THE COURT:  Are you calling a next witness?
```

```
 1              MR. SMITH:  No, Your Honor.

 2              THE COURT:  All right.

 3              MR. SMITH:  Are they available, Your Honor?  Then the

 4    next witness, are they on there?

 5              THE COURT:  I don't see anyone else on there.

 6              MR. SMITH:  Yeah, that's what I thought.

 7              THE COURT:  Matthew Hurtig.  That's the one.  Someone

 8    is on here.

 9              MR. SMITH:  Then I can ask him a couple questions.

10              THE COURT:  Go ahead.

11              MR. SMITH:  Agent Hurtig, can you hear me?

12              THE COURTROOM DEPUTY:  Can you hear us, Agent Hurtig?

13              THE WITNESS:  Yes.  Can you hear me?

14              THE COURTROOM DEPUTY:  We can hear you, but your

15    screen is not displayed.  Okay.  Please raise your right hand.

16                          (Witness sworn.)

17              THE WITNESS:  I do.

18              THE COURTROOM DEPUTY:  Say that once again.

19              THE WITNESS:  I do.

20              THE COURTROOM DEPUTY:  You're breaking up just a tad

21    bit.

22              THE WITNESS:  Can you hear me now?

23                       -  -  -  -  -

24         DIRECT EXAMINATION OF AGENT MATTHEW HURTIG

25
```

**BY MR. SMITH:**

1

2   Q.   Agent Hurtig, can you state your name, please?

3   A.   I'm sorry, you said can I spell my name?

4   Q.   Can you say your name?

5   A.   Matthew Hurtig.

6   Q.   And where are you employed?

7   A.   The United States Capitol Police.

8   Q.   Are you a member of the Threat Assessment Section?

9   A.   Yes.

10  Q.   And how long have you been with TAS?

11  A.   Since we opened the field office in 2021.

12  Q.   Since 2021 as a TAS agent, approximately how many threat

13  cases have you been lead investigator on?

14  A.   We don't take the lead on any investigations down here.

15  Our role is to locate and interview subjects when a case lead

16  is sent down to us from DC.

17  Q.   How many threat cases with TAS have you -- have been your

18  cases?

19  A.   I have not led a threat case yet.

20  Q.   All right.  How many threat cases in total have you been a

21  part of with TAS?

22  A.   I wouldn't be able to give you a number without

23  researching that.

24  Q.   Have you worked on a lot of threat cases since joining

25  TAS?

```
 1   A.   Yes.
 2   Q.   Approximately how many interviews like the one that was
 3   conducted with Mr. Stanzione have you been a part of?
 4   A.   If I were to guess, maybe 25.
 5   Q.   Are there standard interview questions that are asked?
 6   A.   Yes.  There's an outline for questions, and then we add
 7   questions based on the situation.
 8   Q.   Is the purpose of the interview to identify the urgency of
 9   the risk with the person being interviewed?
10   A.   It can be.
11   Q.   What is the purpose of the interview in a threat case?
12   A.   The purpose of the interview is to identify the person's
13   background, and, you know, what -- whether or not they were,
14   you know, would like to talk to us about what transpired or
15   what led up to, you know, in this case, making the phone call
16   and get some background history on the individual.
17   Q.   Am I right that getting the background information and
18   talking to them about the communication that was made is to
19   assist with an assessment by the agency as to whether they're
20   likely to carry out the threat?
21   A.   I mean, it's impossible to predict whether or not
22   someone's going to carry out the threat.
23   Q.   I understand that.  But the purpose of the interview is,
24   to the best of your ability, determine if they seem likely to
25   carry out the threat, correct?
```

```
 1   A.   Taking into account their criminal history, what was said
 2   during the threat, that is -- that has been made, and what is
 3   told to us during the interview.
 4   Q.   You interviewed Mr. Stanzione two days after this message
 5   was left, right?
 6   A.   I believe we interviewed him on the 31st, so yes.
 7   Q.   So there was a sense of urgency, right?
 8   A.   Yes.
 9   Q.   He wasn't arrested until April 5th.  Did you participate
10   in the arrest?
11   A.   I did.
12   Q.   Why wasn't he arrested on January 31st?
13   A.   That is not the process.  The process is for us to locate,
14   interview a subject, and report the findings back to the case
15   agent, and present to the U.S. Attorney's Office.
16   Q.   Did you present to the U.S. Attorney's Office?
17   A.   I had an initial meeting with the U.S. Attorney down in
18   Miami to discuss the case.  They expressed interest in the
19   case, and I believe another U.S. Attorney was assigned and
20   Agent Bank proceeded further with the presentations.
21   Q.   During the meeting with the U.S. Attorney, did you make
22   any recommendations as to how to proceed in this case?
23   A.   I don't recall if I made a recommendation or not.  I
24   believe I just gave the facts of what was initially said and
25   what Mr. Stanzione shared with us during the interview.
```

 1    Q.    Approximately how many times have you met with U.S.

 2    Attorneys on cases you have participated in involving threats?

 3    A.    Any time I'm assigned to a threat, we present to the U.S.

 4    Attorney's Office, so I mean, I've done it often.  I can't give

 5    you a number.

 6    Q.    And in those meetings with the U.S. Attorneys, do you ever

 7    make recommendations as to how to proceed in the case?

 8    A.    Only if I'm asked.

 9    Q.    Do you ever get asked?

10    A.    Once in a while, I will be.

11    Q.    Do you know whether you were asked in this case?

12    A.    I don't recall being asked.

13    Q.    Okay.  Do you know the policy regarding downgrading a

14    threat case to a direction of interest case?  Can that be done?

15    A.    I believe it can be done by our command.  It cannot be

16    done solely by a case agent.

17    Q.    Do you know what goes into making that decision?

18    A.    I believe it is the results of the investigation.

19    Q.    Have you ever testified -- go ahead.

20    Q.    I was just saying if no threat was determined, then I

21    would assume it would be downgraded to a direction of interest.

22    Q.    And who determines the threat?

23    A.    So initially when a case comes in, it is classified

24    initially as a direction of interest or a threat.  So what I

25    was saying is if something was classified as a threat and then

```
 1    during the course of the investigation, it was determined, in

 2    fact, it was not a threat or didn't rise to the level, then,

 3    you know, it can be downgraded.

 4    Q.    And who does that downgrade?

 5    A.    I believe it's the command would have to be able to do

 6    that.

 7    Q.    The -- do you know what the agency determination of the

 8    term "threat" is?

 9    A.    The agency determination, I mean, I would assume it's a

10    true threat.

11    Q.    Okay.  Do you know how the agency determines how to

12    classify the case initially?

13    A.    I think it's based on the information given to them so the

14    reporting initially given.

15    Q.    Do you know approximately how many arrests you have

16    participated in in your time in the TAS?

17    A.    I think only four or five.

18    Q.    Have you ever testified in court before?

19    A.    No.

20    Q.    Have you ever testified to a grand jury before?

21    A.    No.

22    Q.    Do you know approximately how many cases that you have

23    worked on involving threats with TAS have resulted in

24    prosecution?

25    A.    I do not know that.
```

1  Q.   In the interview with Mr. Stanzione, have you seen the

2  transcript of it?

3  A.   Yes.

4  Q.   All right.  I'm just going to ask you generally about it.

5  It's in evidence.  We don't need to go through it specifically,

6  but there were many questions regarding to his knowledge of

7  weapons, his access to weapons, his parents' access to weapons,

8  his travel plans.

9       Would I be correct that all of these questions are

10  attempting to find out his ability to carry out a threat?  Is

11  that why they're being asked?

12  A.   Not only his ability, but what preparation might he have

13  taken to carry out the threat as well.

14  Q.   All right.  So, that would be like travel plans?  That

15  would be preparation if he had made travel plans?

16  A.   Travel plans, or if he recently tried to purchase a

17  weapon.  That as well, or if he had access to weapons and knew

18  how to get, you know, access to them.

19  Q.   All right.  Was the recording of the interview presented

20  to your case agent or to the U.S. Attorney?

21  A.   Yes, it was shared with them.

22  Q.   And did you author any reports in this case?

23  A.   We did an investigative interview summary that was shared

24  as well.

25  Q.   And did you provide that as well to the case agent and/or

```
 1   U.S. Attorney?
 2   A.   Yes.
 3   Q.   Last couple of questions.  Thank you for your patience.
 4   Do you recall being asked by the U.S. Attorney any questions
 5   about the recorded interview?
 6   A.   I don't believe so.  Like I said, initially we only spoke
 7   with the U.S. Attorney down in Miami.  It was more of like a
 8   meet and greet since we have our own special U.S. Attorney here
 9   in the Middle District.
10   Q.   Do you also work on the direction cases, direction of
11   interest cases?
12   A.   Yes.  Yeah, if they're assigned to us, or if a subject
13   needs to be located and interviewed for a direction of interest
14   case, yes.
15   Q.   And do you also work on January 6th cases?
16   A.   I have not worked on a January 6th case, no.
17   Q.   All right.  Do you know approximately how many direction
18   of interest investigations you've participated in with the TAS?
19   A.   I mean, without looking up the records, I wouldn't even be
20   able to guess.
21   Q.   Is it a lot?
22   A.   I would say it's a lot, yes.
23   Q.   And do you know approximately how many direction of
24   interest cases you've handled that resulted in arrests?
25   A.   None.
```

```
 1   Q.   Can you explain to me what a direction of interest case is
 2   like, what that means?
 3   A.   So, it would be reporting from, you know, it could be as
 4   simple a reporting from congressional staff that someone either
 5   on social media or someone made a phone call and used
 6   concerning language.  So something as simple as "I wish you
 7   would die" or "I wish your whole family would die."
 8   Q.   Okay.  Did you ever work uniform Capitol Police?
 9   A.   I did.
10   Q.   And was that in Washington?
11   A.   It was.
12   Q.   Did you ever respond to a congressperson's office
13   regarding a threat by phone or in person while in uniform,
14   excuse me?
15   A.   I don't remember that.  I was only in uniform, I believe,
16   from 2004 to 2006.
17   Q.   Okay.
18   A.   I don't recall that.
19          MR. SMITH:  Thank you.  I have no further questions,
20   Your Honor.
21          THE COURT:  All right.  Cross-examination?
22          MR. DISPOTO:  Thank you, Judge.
23                      -  -  -  -  -
24          **CROSS EXAMINATION OF AGENT MATTHEW HURTIG**
25
```

1    **BY MR. DISPOTO:**

2    Q.   Agent Hurtig, good afternoon.  Mark Dispoto from the U.S.

3    Attorney's Office.  Can you hear me okay?

4    A.   Yes, sir.  Good afternoon.

5    Q.   You testified on direct examination about the purpose for

6    which you conduct interviews of subjects that are believed to

7    have made either a direct threat or a statement which was

8    classified, I guess, as a direction of interest; is that right?

9    A.   Correct.

10   Q.   And at least back in January of -- I'm sorry, yes, in

11   January of 2023, your main focus is to locate the individual,

12   conduct the interview, and report back to the case agent,

13   correct?

14   A.   That is correct, yes.

15   Q.   Now, Mr. Smith had asked you about among the purposes of

16   the interview is to determine whether the subject is likely to

17   carry out the threat.  Do you recall being asked those

18   questions?

19   A.   Yes.

20   Q.   And are you aware, sir, that in determining whether a true

21   threat as you made reference to earlier which is a prosecutable

22   offense, that one's intent to carry out the threat is not an

23   element to determine whether, in fact, it is a prosecutable

24   offense?  Are you aware of that?

25   A.   Yes.

```
 1   Q.   And I believe you said it's very hard to determine whether
 2   somebody is intending to carry out a threat, correct?
 3   A.   Correct.  It's impossible.
 4   Q.   So you can ask him --
 5   A.   Yes.
 6   Q.   If he -- right?  You can ask him if he intended to carry
 7   it out and he could say no, but you don't know if that's true,
 8   correct?
 9   A.   Correct.
10   Q.   You could ask him if he owns any guns, and he could tell
11   you he doesn't, but you don't know if he has access to
12   firearms, correct?
13   A.   Correct.
14   Q.   You could search the home and find no guns, but you don't
15   know if his neighbor, his brother, his friend, his accomplice
16   has firearms that he would have access to, correct?
17   A.   Correct.
18   Q.   So would you agree with me that while initial questioning
19   such as whether the individual intends to carry out a threat or
20   not, that is not necessarily dispositive one way or another as
21   to say how the case or the investigation is going to proceed?
22   A.   Correct.
23   Q.   In fact, even if you were to believe that Mr. Stanzione
24   did not intend to carry out a threat, that does not necessarily
25   mean that your direct threat investigation should be downgraded
```

1  to a direction of interest, right?

2  A.   Absolutely.  Correct.

3  Q.   Now, I believe you said earlier that you get a lot of

4  direction of interest cases that don't necessarily initially

5  rise to the level of direct threats, correct?

6  A.   Correct.

7  Q.   Can you give us an idea, like percentage wise, what

8  percentage of cases would you say come to you by way of a

9  direction of interest and not a direct threat?

10 A.   I mean, I couldn't accurately give you a percentage.  But

11 the directions of interest are far more higher than the threats

12 that we receive.

13 Q.   Now, I believe you were asked about your role in

14 recommending charges in individual cases.  Do you recall being

15 asked questions of that nature?

16 A.   Yes.

17 Q.   And I believe you said that if you were asked by the U.S.

18 Attorney's Office your opinion regarding whether someone would

19 be charged, you would make a recommendation under that

20 circumstance, correct?

21 A.   Only if my opinion is asked and sometimes, sometimes it's

22 just, you know, if a U.S. Attorney might not be familiar with

23 charging these threat cases.  There's different, you know,

24 codes that can be charged, so a recommendation to look at

25 various ones might be recommended.

```
 1   Q.   And I believe you told us that you don't recall really
 2   ever having been asked your opinion about whether someone is to
 3   be charged, correct?
 4   A.   Not in this case, no, I don't remember that.
 5   Q.   If you were asked your opinion about whether someone is to
 6   be charged, is it proper to factor in an individual's sexual
 7   orientation in determining whether that person should be
 8   charged or not?
 9   A.   Absolutely not.
10   Q.   Is it proper to consider one's political views or
11   political affiliation in determining whether someone should be
12   charged?
13   A.   No.
14   Q.   I'm sorry?
15   A.   I said no, that's irrelevant.
16   Q.   I don't know if you were asked this question earlier and
17   forgive me if you were.  Can you estimate for us approximately
18   how many times in your career with the Capitol Police that you
19   have had conversations with prosecutors prior to an individual
20   being charged?  Can you ballpark that for us?
21   A.   I honestly couldn't give you an honest answer under oath
22   of a number, but it's been a lot.  I've spoken to a lot of U.S.
23   Attorneys over the years.
24   Q.   And in those a lot of occasions that you have had
25   opportunities to speak with prosecutors about cases prior to
```

```
1   charging decisions having been made, have you ever discussed
2   with a prosecutor a subject's sexual orientation, political
3   views, or political affiliation as a relevant factor in
4   determining whether an individual is to be charged?
5   A.   No.
6   Q.   I'm sorry?
7   A.   No.
8   Q.   Would you agree with me, sir, that it would be highly
9   improper for you or anyone else to do that?
10  A.   Absolutely.
11  Q.   Okay.  And -- okay.
12           MR. DISPOTO:  That's all I have, Judge.  Thank you.
13           THE COURT:  All right.
14                        -  -  -  -  -
15       REDIRECT EXAMINATION OF AGENT MATTHEW HURTIG
16  BY MR. SMITH:
17  Q.   Agent, when you interviewed Mr. Stanzione, in one of these
18  interviews, if the person answered your questions, yeah, I
19  meant what I said, I'm going to kill that congressman, what
20  would you have done?
21           MR. DISPOTO:  Objection.  Relevance.
22           THE COURT:  Overruled.
23  BY MR. SMITH:
24  Q.   You can answer, I'm sorry.
25  A.   Okay, nothing would have changed.  We still would have
```

1    finished the interview and provided the summary to the case

2    agent and the U.S. Attorney.

3    Q.   So, there's no alarm bells that go off if somebody says,

4    yeah, I meant it, I'm going to do it?

5    A.   No, it's definitely concerning, and we would leave and we

6    would make some phone calls and see how we can proceed further,

7    but I would not be putting him in handcuffs right in that

8    moment.

9    Q.   I understand.  So what sort of phone calls have to get

10   made to do that?

11   A.   I would call the case agent, the U.S. Attorney, and go

12   from there.  Seek recommendations.

13   Q.   What if the person indicated that I'm armed and I have

14   travel plans?  Same result?  You would call the case agent and

15   the U.S. Attorney?

16   A.   Yes.

17   Q.   Did you do that in this case?

18   A.   I believe we spoke to the case agent after the interview.

19   Q.   What about the U.S. Attorney?

20   A.   I don't remember if we talked to the U.S. Attorney

21   immediately following the interview or not.

22   Q.   Last couple questions.

23   A.   Most likely.

24   Q.   Go ahead, I'm sorry.

25   A.   I just saying most likely we did.  That's usually how we

1    operate after an interview was concluded.

2    Q.    That you would speak to the U.S. Attorney after the

3    interview?

4    A.    Yes, just give them an update on the interview and let

5    them know that following we would provide a summary of the

6    interview and the recording of the interview.

7    Q.    So, after the interview in this case, the U.S. Attorney's

8    Office would have gotten a recording of the interview quickly?

9    A.    Relatively quickly.  I mean, I would have to look to see

10   when they received it.

11   Q.    All right.  Last topic for you.  After the interview with

12   Mr. Stanzione in this case, what, if any, alarm bells went off

13   in his case?

14          MR. DISPOTO:  Objection to the term of "alarm bells."

15          THE COURT:  Sustained.

16   **BY MR. SMITH:**

17   Q.    What, if any, immediate urgent action like we described

18   with the travel plans, the firearm, the yes, I'm going to do it

19   type answer, existed in this case, if any?

20          MR. DISPOTO:  Objection.  Relevance.

21          THE COURT:  Sustained.

22   **BY MR. SMITH:**

23   Q.    Was this case handled any differently than your other

24   threat cases?

25          MR. DISPOTO:  Objection.  Relevance.

```
1              THE COURT:  Sustained.
2   BY MR. SMITH:
3   Q.   Agent, were you part of the arrest of Mr. Stanzione in
4   April?
5   A.   I was there, yes.
6   Q.   Do you have any idea -- did you do anything between
7   January 31st and April 5th in this case?
8   A.   I'm sorry, I don't understand the question.
9   Q.   Did you do anything in this investigation between the
10  interview and the arrest?
11  A.   There might have been coordination between myself and law
12  enforcement in preparation for the arrest.
13  Q.   You said yourself and -- you broke up a little bit.  You
14  said yourself and who?
15  A.   Local law enforcement, so we had Boynton Beach and Palm
16  Beach County Sheriff's Office with us.
17  Q.   They were wearing body cameras during the arrest; is that
18  right?
19  A.   I believe so, yes.
20  Q.   And Mr. Stanzione was cooperative?
21              MR. DISPOTO:  Objection.  Relevance.
22              THE WITNESS:  Yes.
23              THE COURT:  Sustained.
24  BY MR. SMITH:
25  Q.   Do you recall telling Mr. Stanzione in the interview that
```

```
 1   this kind of thing happens quite often, these threat cases?
 2   A.   Yes.
 3   Q.   And do you know why you said that?
 4   A.   Because we get a lot of directions of interest and
 5   threats.
 6   Q.   You also indicated --
 7   A.   A lot of phone calls.  A lot of -- I'm sorry.
 8   Q.   No, I'm sorry.  I didn't want to interrupt you.
 9   A.   I was just saying a lot of phone calls, you know, from
10   subjects leaving voicemails.
11   Q.   You also told him that whether the case moved forward was
12   out of your hands.  Why did you tell him that?
13   A.   Because it's up to the U.S. Attorney's Office whether or
14   not to prosecute.
15   Q.   Last question from the transcript is is that you indicated
16   to him, you told him it helped that he spoke freely to you.
17   Why did you tell him that?
18   A.   Because it helps with the interview.  I appreciate him
19   being -- I thought he was being honest with us as much as he
20   can.
21        MR. SMITH:  Okay.  Thank you.  I have no further
22   questions, Your Honor.
23        THE COURT:  All right.  Thank you.  All right.  Agent
24   Hurtig, you're done.  Thank you.  Have a good day, sir.
25        THE WITNESS:  You as well.  Thank you.
```

1          THE COURT:  You're welcome.  That concludes all the

2     witnesses that you would have presented today; is that correct?

3          MR. SMITH:  That is correct, Your Honor.

4          THE COURT:  All right.  So, now it's -- the time is

5     13 after 12:00.  We're going to be in recess for lunch until

6     about 1:15.  What else do you have remaining left for this

7     hearing?

8          MR. SMITH:  Your Honor, I am just going to try and

9     move into evidence my exhibits and then I'll have argument.

10          THE COURT:  Any objection as to the exhibits he

11     intends to move in?

12          MR. WHEELER:  Your Honor, I don't think that we're

13     aware of exactly which exhibits he's intending to move in.  We

14     have been provided with some of these previously.  Some of them

15     I think probably were referenced in his pleadings, but we

16     didn't actually have copies of them.

17          Most of those I will say we probably could download.

18     They're indictments, they're sentencing memos.  We probably

19     could download from Case View.  It just may take us some time

20     to get the individual copies of those.  I don't think we're

21     going to object.  I think we just need to know which documents

22     he's looking to admit, and we have two of our own that we're

23     looking to admit as well.

24          MR. SMITH:  Your Honor, I can clarify that all of the

25     exhibits referenced are all referred to in various pleadings

```
 1    towards this motion.  So there's nothing that I'm aware of
 2    that's additional.  There's a lot of exhibits.  I would offer
 3    to print a copy of every one of them, but that would take
 4    longer than my lunch hour.  I can leave my exhibit folder here
 5    if the Government wants to go through the exhibits over lunch
 6    and get them back, and then I can move them in.
 7            THE COURT:  All right.  Mr. Dispoto, what do you want
 8    to do, sir?
 9            MR. DISPOTO:  Your Honor, we wouldn't ask Mr. Smith
10    at this time to provide us with copies.  So we'll go back and
11    do our best to review the list.  If we have any issues with
12    them, we'll report back to Your Honor at 1:15.
13            THE COURT:  Also I have other cases on today
14    beginning at 2:00, so we need to wrap up today by 2:00 because
15    I have other matters to address.  So how long is your argument?
16            MR. SMITH:  I'm hoping it would be no longer than 30
17    or 40 minutes, Your Honor, if that.  I'm usually pretty fast.
18    I think it will be 30 minutes, Your Honor.
19            THE COURT:  And Government?
20            MR. WHEELER:  With his 30 minute argument, I think we
21    could probably wrap up in 15, Your Honor.
22            THE COURT:  All right.  We'll see you here back at
23    1:15, all right?  Thank you.
24            MR. SMITH:  Thank you, Your Honor.
25                    (Luncheon recess was taken.)
```

1     **MONDAY AFTERNOON SESSION, FEBRUARY 12, 2024**

2       P-R-O-C-E-E-D-I-N-G-S

3         - - -

4     (Call to the Order of the Court.)

5    THE COURT:  You may be seated everyone.  Have you all

6 resolved the exhibit issues?

7    MR. WHEELER:  Yes, Your Honor.  We had an opportunity

8 to review the exhibits.

9    THE COURT:  All right.  Are you ready to proceed with

10 your arguments, Mr. Smith?

11    MR. SMITH:  So, first, Your Honor, I would move to

12 admit all of the exhibits for purposes of this hearing on my

13 exhibit list other than the exhibit labeled Triple D.  That is

14 a confidential sealed exhibit I believe that's going to be

15 Government's Exhibit Number 1 anyway, but it will have to be

16 treated as a sealed exhibit.

17    THE COURT:  Got it.

18    MR. SMITH:  I'll move to admit all other exhibits on

19 our list, Your Honor.

20    THE COURT:  All right.

21    MR. WHEELER:  The Government does not object to any

22 of those exhibits, and offers Government's Exhibit 1 which we

23 asked to be sealed and Government's Exhibit 2.

24    MR. SMITH:  We have no objection to those, Your

25 Honor, or to the sealing.

 1              THE COURT:  I don't have your exhibit list for the
 2    Government.
 3              MR. WHEELER:  Yes, Your Honor, and that's my fault.
 4    I presented these two exhibits to the Court this morning.  I
 5    apologize for the oversight on the exhibit list, but we will
 6    have that finished and filed.
 7              THE COURT:  All right.  Thank you.
 8              MR. SMITH:  So, Your Honor, would you like me to
 9    proceed with argument?
10              THE COURT:  Sure.
11              MR. SMITH:  Is it okay if I stay seated to be closer
12    to the microphone?
13              THE COURT:  That's fine, too.  If you want to stand,
14    you have the podium mic.
15              MR. SMITH:  Wherever the Court would like me, Your
16    Honor.
17              THE COURT:  That's fine.  I can hear you.  Go ahead
18    with your arguments.
19              MR. SMITH:  Obviously, under United States versus
20    Gordon, there are two steps involved in this motion.  The first
21    step is is that others who have committed the same alleged acts
22    have not been prosecuted for those acts.
23              And the second step is that the defendant was
24    prosecuted in this manner predicated on a constitutionally
25    appropriate motivation.

1          So the standard is that I have to make, I have the

2    burden of proof initially.  That I have to make a prima facie

3    showing that Mr. Stanzione has been singled out for prosecution

4    although similarly situated others who have committed the same

5    acts have not been prosecuted.

6          That stems from United States versus Smith, 231 F.3d

7    800.  And the burden of proof is that from Smith, that the

8    Eleventh Circuit has interpreted the Supreme Court's clear

9    evidence standard as requiring me to produce clear and

10   convincing evidence.

11         So similarly situated, this is where I think the

12   testimony becomes important.  Similarly situated person for a

13   selective prosecution motion is one who engaged in the same

14   type of conduct which means that the comparator committed the

15   same basic crime in substantially the same manner as

16   Mr. Stanzione so that any prosecution of that individual would

17   have the same deterrence value and would be related in the same

18   way to the Government's enforcement priorities and enforcement

19   plan and against whom the evidence was as strong or stronger

20   than that against the defendant.

21         So let me point the Court to the evidence that we are

22   seeking to point to in this case.  I'll start with

23   defendant's -- well, the category of exhibits I'm going to now

24   refer you to, and without going through them individually,

25   they're in evidence, the Court can review them, so I'm going to

1   start with my first category which is single and multiple

2   threat cases that were not prosecuted or have been not

3   identified as having been prosecuted.

4          This starts with Defense Exhibit Triple A which is a

5   newspaper article about Michael Kennedy who was not prosecuted

6   federally but was arrested in state court in Colorado on a

7   threat case against a congressman, so that was not prosecuted

8   federally.

9          The next exhibit in this category is BBB, which once

10  again, is a New York prosecution in state court, a person, this

11  defendant, this person who's Kenneth Gasper was not arrested or

12  prosecuted in federal court.  He threatened to kill a GOP

13  congressman who voted for the infrastructure bill, so these are

14  both non-prosecutions in federal court.

15         The next exhibit for this category is Exhibit CCC,

16  Triple C.  That's a case involving Jonathan Reeser.  Jonathan

17  Reeser apparently was never prosecuted at all, but sent a

18  threatening message to former U.S. -- or I'm sorry, U.S.

19  Representative Eric Swalwell which read in part, "I hope you

20  family is raped and murdered and I hope you get tied to the

21  back of a truck and drug 10,000 miles until your body is ripped

22  to pieces, you scum.  I wish I saw you in person.  I'd break

23  your, explicit, face so fast, you'd have plastic surgery and

24  never look the same again," which resulted in no federal

25  prosecution.

1          The next exhibit is DDD or Triple D, and that is a

2    case involving Bruce Miller who also threatened Representative

3    Swalwell and he was never prosecuted for these threats to kill

4    Agent Swalwell.

5          The next exhibit I'll refer the Court to is Triple E

6    in this category.  Triple E is a rather well-known case of

7    United States Representative Paul Gosar of Arizona who placed

8    on social media an Anime video depicting him beheading a fellow

9    U.S. Representative Alexandria Ocasio-Cortez of New York.  He

10   was censured but never prosecuted for that case.

11         The next exhibit I can point the Court to in this

12   category is Triple F and that was a news article regarding

13   former U.S. Representative Madison Cawthorn who encouraged a

14   rally that he was speaking at to lightly threaten their

15   representatives, and to intimidate them basically.  The article

16   is there and the Court can see the comments that were made that

17   did not result in prosecution.

18         The next exhibit for this category is Triple H which

19   is the pleadings in George Santos' case where he's a defendant

20   in the Eastern District of New York.  This Exhibit Triple H

21   involves attachments that were to his motion regarding bond,

22   and not to reveal the co-signers on the bond because of a

23   danger to them if their names were released.  And it includes

24   what they purported to be threats to Representative Santos'

25   well-being, his life.  Some of them were under seal but this

1   pleading includes a number of them also, and we can find no

2   record of prosecution for any of those particular threats.

3          The next exhibit in this category is Triple Q, and

4   that, Your Honor, is the declaration of Leo Feliciano.  Leo

5   Feliciano was an employee of Representative Santos' office, and

6   his declaration in lieu of testimony is in reference to several

7   threats that he received by phone and notified the Capitol

8   Police of in February of 2023 and we can find no record of

9   prosecution for those calls and referrals to the Capitol

10  Police.

11         The next exhibit, Your Honor, that I'll refer to for

12  this category is Defense Exhibit Triple M as in Michael, and,

13  Your Honor, this is an arrest summary report from the United

14  States Capitol Police, their website where they list arrests

15  that took place and they indicate the circumstances of them.

16  And there are several arrests on this list that are threats to

17  do bodily harm, threats to do bodily harm, threats to do bodily

18  harm.  They're all listed as misdemeanors by the Capitol Police

19  arrest summary reports.

20         And if you look all the way to the right on the

21  summary data, these were reports from congressional members to

22  the Capitol Police of, in some instances, phone call threats to

23  them to kill them, or in one case, an individual who showed up

24  outside the congressman's office in Washington.  We can find no

25  record of prosecution.  However, we do note that the arrests by

1    Capitol Police are listed as misdemeanors.

2          The next exhibit in this category, Your Honor, is PPP,

3    and this is a declaration of Gabrielle Lipsky, and you heard

4    testimony about Gabrielle Lipsky earlier.  This was a person

5    who was employed by representative -- former Representative

6    Santos at his Washington office, and I believe it was

7    Mr. Lovett who indicated that it was Gabrielle Lipsky who was

8    in charge of referring threats to the Capitol Police.

9          And this is an approximately five page document

10   listing out all of the threats that Gabrielle Lipsky recalls

11   and referred to Capitol Police, and we can find -- and the

12   nature of them, and we can find no record of prosecutions for

13   them.

14         The next exhibit in this category, Your Honor, is

15   Triple S as in Sierra, and this is a newspaper article about a

16   Georgia State representative who made some remarks saying that

17   if certain things happened in Georgia, that it would ignite a

18   civil war, and that they were going to have to go get their

19   firearm, and so we can find no record of any prosecution for

20   that particular statement.

21         The next exhibit I can refer to in this category is

22   Double Y as in Yahoo, and that is the United States Capitol

23   Police from their website, their Threat Assessment cases for

24   2022, and it lists the number of Threat Assessment Section

25   investigated cases.

1    In 2021, which was the last year recorded here, there

2    were 9,625 TAS investigation cases opened.  In 2020, it was

3    8,613.  In 2019, it was 6,955.  In 2018, 5,206 and in 2017,

4    3,939 cases.

5        The next exhibit I can refer the Court to in this

6    category is Double X.  Double X, Your Honor, I will change out

7    this exhibit.  This was an excerpt from the transcript of the

8    defendant's interview with Agents Hurtig and Torres.

9        And with the Court and the Government's permission,

10   what I'll do is I'll substitute for this exhibit the entire

11   transcript since there was no objection, but this was the

12   portion of the transcript on pages 46 and 47 where the agents

13   were discussing that they have a lot of these types of cases

14   and that they don't make the charging decision.

15       Finally, Your Honor, there is Exhibit Double Z, and

16   that exhibit is a case where an individual threatened the life

17   of a U.S. representative from Indiana and his family and was

18   not arrested federally, or charged federally, but was charged

19   by a local prosecutor's office in Indiana.

20       So, those are the exhibits that are in evidence as to

21   what I'll call my first category which are threat cases that we

22   can identify that are similar to this case and those have not

23   been prosecuted.

24       The next series of exhibits are cases where persons

25   made multiple threats to congressional members and were charged

1   under Section 875(c) like the defendant, and I'll just read

2   those off without discussing the facts of each.

3        But Exhibit WWW, as we indicate in our fourth

4   supplement is the Michael Shapiro case.  Exhibit Double D is

5   the Joshua Hall case which is referenced in docket entry 14,

6   Mark Leonetti is Exhibit EE which is also in docket entry 14,

7   Neil Walter is also in docket entry 14, that's HH.  Charles

8   Gregory is in docket entry 14 which is II.  Justin Kuchta,

9   which is K-U-C-H-T-A, it's in docket entry 14, Exhibit JJ.

10  Brian Gaherty is also in docket entry 14, Exhibit LL.  Darryl

11  Varnum, docket entry 14, Exhibit NN as in November.  Robert

12  Lemke, docket entry 14 is Exhibit PP, Laurence Key is in our

13  initial -- I'm sorry, our third supplement, I believe, and that

14  is docket entry SS.  Christopher McGowan is also I believe in

15  the second or third motion in this case, supplement.  That is

16  Exhibit UU.  Same with Todd Giffen which is Exhibit VV.

17  Cleveland Meredith is Exhibit UUU.  And finally, we have a

18  similar case involving an 871 prosecution instead of an 875.

19  That would be the Niviane Phelps and that will be Exhibit WW.

20  That's our second category which are multiple threat cases

21  which are unlike this one, but have been charged under 875(c).

22       We also have multiple threats to Congress members

23  prosecuted under both 875(c) and Section 115 of 18 United

24  States Code Section 115.  Those are Robert Vargo, Exhibit

25  Double M as in Mike, Carlos Bayon, docket entry 14, Exhibit OO,

1    and Ryder Winegar which is Exhibit TT.

2            There are multiple threat to Congress cases that were

3    not charged as 875(c) violations but were charged as Section

4    115 violations.

5            Those would be Chase Neill which is Defense Exhibit FF

6    and Government's Exhibit 2, Douglas Casey which is Defense

7    Exhibit GG.

8            We also have a multiple threats prosecution against

9    the president resulting in a Section 111 charge that is

10   somewhat similar here.  Not charged as an 875(c) in the

11   Ebrahimi case which is Double R.

12           We have a single threat to a Congress member

13   prosecution not under 875(c) but under Section 115 which would

14   be David Hannon.  That would be Defense Exhibit CC.

15           We have a single threat to a Congress member resulting

16   in an 875(c) and 115 charge.  That was the Allan Poller case

17   which is Defense Exhibit KK, and then we have Defense Exhibit

18   TTT which is a Department of Justice Definitions Report for

19   Uniform Criminal Justice Act Reporting, and the reason that's

20   in there is is because that's how they define assault, and they

21   show federal assault crimes as reported crimes which I think

22   will become important when we get later into our statistical

23   argument.

24           So those I believe are the exhibits, Your Honor,

25   towards this motion.  We also have the testimony of the agents

1    and the statistical information that is contained in all of our

2    motions.

3           So what is the result of all this?  We can finally get

4    to the full argument here, Your Honor, is that we can find no

5    evidence of a single threat to a congressperson that has

6    resulted in an 875(c) only prosecution.

7           Every one of the cases that we just referred to is not

8    a single threat 875(c) like this case.  None of them are.  So

9    we have now shown that there are individuals who have made

10   threats who have not been -- to a congressperson who have not

11   been federally prosecuted, but have been prosecuted in state

12   jurisdictions or not prosecuted at all.

13          And we have shown that persons who have made multiple

14   threats have been prosecuted under 875(c), but this appears to

15   be the only case we can find, and the Government points to no

16   others that are single threat 875(c) prosecutions.

17          So obviously this would appear unlikely --

18   statistically unlikely to be the only such case that exists of

19   a person threatening or sending a threatening voicemail to a

20   congressperson.  And just that one, but we can find no other

21   prosecutions for that.

22          We've searched Westlaw, we've done -- excuse me, a

23   LexisNexis searches.  That's how we found many of the news

24   articles.  We simply just can't find any.

25          So we also note that the testimony of Agents Hurtig

1    and Torres indicated that very few of the cases even for

2    threats to their knowledge admittedly which is not necessarily

3    robust, but they can point to very few of the cases they've

4    investigated that have resulted in prosecutions.

5         I think where this becomes especially evident is from

6    our initial motion to dismiss which indicated that if you take

7    the number of total threat assessment cases and, of course,

8    that does include non-threats and the substandard cases as well

9    just below threats, but if you look at the guideline in the

10   sentencing guidelines that would be used for these offenses

11   which is also not a perfect corollary because it includes other

12   cases, something like less two percent of that number of cases

13   seems to have been resulting in prosecutions.

14        So, obviously, there are a multitude of similarly

15   situated persons that we have now shown to this Court who are

16   not being prosecuted.

17        And I think that my initial comments this morning in

18   asking to be permitted to cross-examine witnesses -- or excuse

19   me, present the testimony of witnesses, I did indicate that at

20   prior hearings, the Government has indicated that not that they

21   disagree that these prosecutions have occurred, but that they

22   don't have anything to offer the Court as to why they're being

23   treated differently or prosecuted differently.  But they do

24   exist, and that's what's important for this first step but the

25   why is a second step.  We're not there yet.

1           But I think that acknowledging that they exist, we

2   have these other cases.  And so I believe that we have now

3   shown the Court and presented evidence to the Court of

4   similarly situated individuals who have not been prosecuted.

5           And in addition to that, we've also now have shown the

6   Court that there are similarly situated individuals in the

7   sense that they're more serious in that they have made multiple

8   threats are the only people being prosecuted like the

9   defendant.

10          And so I believe that we have met the first step in

11  this case and I will pause here before continuing.

12          THE COURT:  Okay.

13          MR. SMITH:  If you believe, Your Honor, that we have

14  met the first step, I'll proceed to the second step.

15          THE COURT:  You can proceed.

16          MR. SMITH:  Thank you, Your Honor.  So --

17          THE COURT:  I'm not making a reference as to whether

18  or not you met the first step or not.  You can give me your

19  total argument, and I can hear it at one time and again, I

20  haven't reviewed all the exhibits right now.  What I will do

21  still is to take it and review them and render a decision I

22  think on Wednesday around 1:30, so I'm going to make a note of

23  that to make sure I review everything you gave to this Court,

24  okay?

25          MR. SMITH:  Yes, Your Honor.  I understand.  So the

1    second step in this motion is obviously -- it's really a

2    question of why do we have a difference that has been

3    identified in step one, and what does the difference mean?  And

4    is the difference then based upon a constitutionally

5    impermissible factor?  So, initially, let me start by saying

6    this.

7         We've obviously identified that there seems to be a

8    difference here.  That the defendant is being prosecuted unlike

9    other individuals that we can find.  If we can find another

10   case of a similarly situated defendant being prosecuted the

11   same, neither party has offered that to the Court.  We have not

12   discovered that.  So the question becomes why?

13        And so, importantly, what we have so far is is in all

14   the pleadings and in all the hearings we've had before this

15   Court, the Government has never offered a why to you.

16        Now, let's stop for second.  It's not their burden to

17   prove it, so it's my burden.  So, in essence, they don't really

18   have to offer the Court a why other than I have now revealed to

19   the Court and the evidence shows that there is a difference

20   here, and so we're trying to figure out why this is because in

21   federal jurisdiction, this shouldn't exist.

22        Okay.  There shouldn't be a difference here because

23   obviously the federal system seeks to treat similarly situated

24   defendants similarly.  That's one of the guiding principles in

25   Section 3553(a).  It's why the sentencing guidelines exist at

all, so what the federal system does not want to do and what we

can't believe is happening here is that, oh, this is just based

on the whims of a specific prosecutor, a specific district.

It's all supposed to be the same.

And while this prosecution is supervised locally by a

National Security supervisor, the National Security portion of

the Department of Justice I have to think is in communication

with enforcement priorities.

And so one would think that we should see something

similar and what we're seeing here is perhaps a lack -- because

none have been proffered -- of identifiable standards for the

treatment of these cases.

The one case that gets similar to this one is the

Allan Poller case in the District of New Hampshire.  Allan

Poller, it's Defense Exhibit KK, and it's in docket entry 14.

Poller is the only other individual that we have

identified who was prosecuted for a single threat under 875(c)

other than there's one key difference, and that is he was also

prosecuted as a second count with a violation of Section 115.

And so that's the only difference between the two.

But these are the only two single threat cases that we can find

prosecuted under 875.  And there's only one -- they both -- as

the only cases we can find, they both share one similarity.

Allan Poller and Frank Stanzione are the only two individuals

identified in any of the pleadings in any of these cases, or in

the magazine articles, the newspaper articles and materials,

they're the only two identified as homosexual.  And so it's

just -- it's an interesting and problematic caveat here that

the only two single threat cases charged as 875(c) both happen

to be homosexual.

So, again, we raised this issue in our motions and the

Government has never -- not that they have to, again, but

they've never proffered why a difference exists here.

And -- excuse me.  So, instead, what they've claimed

is in their pleadings in response to our motion is that there's

basically an enforcement priority that these kinds of threats

to public servants can't be condoned and need to be taken

seriously.

And, of course, anybody would agree with that other

than that entire argument fails, and the reason that that

argument as a reason behind this prosecution fails is is

because we've already shown the Court that other people who

have done the same conduct were not prosecuted for that conduct

or have been prosecuted very differently from this case.

And so the enforcement priority reasoning behind this,

it has to extend through everything and it doesn't.  And so an

enforcement priority is recognized in the Smith case as a core

constitutional function and the ruling in Smith noted that an

analysis of enforcement priorities is difficult for courts to

undertake as we all know because we're not allowed to look

1   behind charging decisions.  If they choose to give us that

2   information, they choose to, but they have not so we can't look

3   at that.

4           So if an enforcement priority of taking threats

5   against public servants existed within the Department of

6   Justice, then every single good faith threat against a public

7   servant would be prosecuted the same way.  And that's not what

8   happened.  As we can see, that's not what's happening here.

9           Now, here's where this gets sort of interwoven is that

10  the Smith ruling noted that steps one and two are going to

11  co-mingle with each other when you get to step two.

12          So in step two, they noted we recognize that the

13  nature of the two prongs of a selective enforcement

14  prosecution -- excuse me, selective prosecution showing are

15  such that they will often overlap to some extent.

16          But they discussed them separately beginning with the

17  selectively or discriminatory effect prong.  So what we have is

18  is the Smith opinion telling us the facts from the first step,

19  these selective prosecutions themselves, they're going to be

20  evidence towards this second prong.  And that's kind of how we

21  landed where we did is what's the reason for the difference?

22  Why is there a difference here?

23          And the situation is is that we can find no reason.

24  And the only two individuals, as I've indicated, Mr. Poller and

25  Mr. Stanzione happen to be the only two homosexuals that

1    identified as being prosecuted here.

2           So this is sort of circumstantial evidence which the

3    Court has said the Court has to look at.  If you look at the

4    Gordon case which is cited in our pleadings, I'll quote from

5    it.  In deciding if a defendant has established selective

6    prosecution, a Court must undertake a sensitive inquiry into

7    such circumstantial and direct evidence of intent as may be

8    available.

9           Those are the words from the case.  It then continues.

10   Circumstantial evidence of insidious intent may include proof

11   of disproportionate impact.  So we look circumstantially to

12   what we see happening here, and the result we see happening

13   here and that is the available evidence.  Again, Gordon says

14   that we look to the available evidence.  And so that's what

15   we've got because nothing else, again, they don't have to

16   offer.  The Government doesn't have to offer anything to the

17   Court and they haven't.  But that leaves us with only this

18   evidence.  That's what we have.

19          And so the Court can look at disproportionate impact.

20   I think that Chavez versus I think it's Illinois State Police

21   which is also a case that we cite in our pleadings indicates

22   that to prove discriminatory effect, a plaintiff -- that was a

23   civil case, but they refer heavily in that opinion to the

24   Armstrong case out of the Supreme Court which was a criminal

25   selective prosecution case.

1          To prove discriminatory effect, plaintiffs are

2    required to show that they are members of a protected class and

3    that they were treated differently than other similarly

4    situated individuals of that class.

5          And that is what we have shown here.  Because of that,

6    I believe that we have met our step two analysis because again,

7    we can show this conclusion, we can show this effect.  We have

8    provided this evidence, we have provided evidence obviously

9    that, again, we don't know any reasons proffered why there's a

10   difference here where there should not be a difference.  If it

11   is an enforcement priority, we should see no differences, and

12   so there's a difference here.

13         And we've shown it throughout our pleadings.  And

14   without any other reason, what we've done is we've focused on

15   the only reason that pops up in the only two cases that were

16   single threat 875(c) cases, Poller and Stanzione.

17         And so towards that evidence, we have established that

18   as of January 31st, that Mr. Stanzione was self-identified as

19   homosexual and that according to Agent Hurtig's testimony, that

20   the Government had that video that same day or the day after it

21   was provided to them with the reports.  And that the agents did

22   not participate in this case who testified, Hurtig and Torres,

23   they did not participate in any way it would appear in the

24   recommendation to charge or not charge or get involved in that

25   at all.

1          So that is the case.  I can answer any questions the

2     Court has.  Otherwise, I would rely -- we've obviously filed a

3     lot of pleadings towards this motion.  I'll rely on those.

4               THE COURT:  All right.  Thank you, Mr. Smith.

5               MR. SMITH:  Thank you, Your Honor.

6               THE COURT:  Government?

7               MR. WHEELER:  Yes, Your Honor.  I will start off by

8     saying that the defense has many inaccuracies in the reasoning

9     laid out by their filings --

10              THE COURT:  Also state your name for the record.

11              MR. WHEELER:  I apologize.  Joseph Wheeler for the

12    Government.

13              THE COURT:  You may proceed.

14              MR. WHEELER:  I'm not going to hit on every one of

15    those.  We simply wouldn't have time here today.  I do plan on

16    focusing on two issues in this argument.

17         The first is that they list many different cases here,

18    and they've decided to divide these up into seven categories in

19    their pleadings.  Six categories today, making the argument

20    that certain ones are charged in certain ways.

21         First, getting to the first category of as they refer

22    to them, threat cases that were not prosecuted, I will spend a

23    few moments to discuss those are not the same as what we have

24    here and then the remainder of the cases where they try to make

25    a differentiation between someone that gets charged under 18

1   U.S.C. 115 and someone that gets charged under 18 U.S.C. 875,

2   that somehow one is a misdemeanor and one is a felony, that's

3   simply not the truth.  They are both felony offenses.

4       The statute book I think probably could be enough

5   reliance.  I also have an exhibit here.  It's the only case

6   that I decided to provide to the Court.  We are not going to go

7   down the lane of trying to provide --

8       THE COURT:  If they're both for felonies, what's the

9   difference between the two statutes?

10      MR. WHEELER:  So, the one statute, 875, requires it

11  to be an interstate transmission of a threat.  The other

12  statute, 115, requires there to be either one of three or four

13  things.  Either an attempt to impede, to influence, or to

14  retaliate against a U.S. official, doesn't have to be a member

15  of Congress, but a U.S. official in their official duties.

16      In this case, as you heard from the testimony today,

17  that the questions were asked of this defendant whether or not

18  he had any of those intents.  As he indicated, he did not, and

19  there was not separate proof of those separate intents, then

20  charging under 115 would probably be improper unless there was

21  some other way for us to provide that evidence.

22      And because of the interest of the Court, I'll go

23  ahead and skip forward to that part of the argument, Your

24  Honor.  If you look at 18 U.S.C. Section 115, I believe that

25  the only way that you can get to a misdemeanor here is it would

1   be a simple assault against a U.S. official with one of those

2   specific intents.

3          And so I believe that the defense must be looking at

4   Section (b)(1) and then capital B(1) to get to a misdemeanor.

5   However, that is B(1) is the punishment for an assault.  And

6   then (b)(1)(B)(1) is if an assault consists of a simple

7   assault.

8          Instead of going down the line of B(1) which there's a

9   lot of sections for B(1), which are all the assault stuff, if

10   we move all the way down to (B)(4), you get the actual

11   punishment for a threat.  And it says, a threat made in

12   violation of this section shall be punished by a fine under

13   this title or imprisonment for a term of not more than ten

14   years or both except that imprisonment for a threatened assault

15   shall not exceed six years.

16          In both circumstances, and we don't have a threat of

17   an assault here, we have a threat of murder, and, therefore, it

18   would be a ten-year offense.  In both sections though of

19   (B)(4), you have a maximum punishment that is greater than the

20   maximum punishment under 875 which is only a five year offense.

21          So there are prosecutors who look at the facts of the

22   case and say, well, it was both interstate and there was an

23   attempt to impede, or there was an attempt to retaliate against

24   and as a result, I'll charge both.

25          There are some prosecutors who say, well, I can't

```
 1   prove the interstate, or I don't want to go through the process

 2   of proving the interstate element, but we have a 115 element so

 3   I'll only charge 115.

 4        In this case, you have a situation where the

 5   interstate element is clear, the 875 charge, however the 115 is

 6   less clear, and the prosecutors in this case made the

 7   determination to try to reach on that 115 charge.

 8        That inures to the benefit of the defendant.  It does

 9   not inure to his detriment in any way.  So dividing these cases

10   up and saying, well, some people got charged under 115 and some

11   under 875, he is in the absolute most lenient category where he

12   only has one of the two, and it's only 875.

13        The defense wanted to talk to you about Allan Poller.

14   Allan Poller was an individual up in New Hampshire.  Allan

15   Poller wanted to enter into a plea agreement and his defense

16   counsel was able to actually negotiate a plea agreement where

17   he only was needed to plead guilty to the 875 which, therefore,

18   lowered his susceptibility to that higher max punishment.

19        That just happened since this case has been pending.

20   I believed that they negotiated the plea in September.  His

21   plea hearing was in October of this year, and I believe he was

22   just sentenced on the 24th of January, if I remember, Your

23   Honor.

24        The argument that every case of a threat has been

25   presented to this Court is far and away inaccurate.  The
```

```
 1   Government does not intend to inundate this Court with a bunch

 2   of different cases and pleadings, and there's a couple reasons

 3   for that.

 4          One of those is, though, and probably one of the

 5   reasons that the defense has had a hard time finding certain

 6   cases is some of the members of Congress, understandably so, do

 7   not want a lot of publicity.

 8          And so in those cases, they may be mentioned as Victim

 9   1, or Victim 1 and Victim 2.  For the Government now to come to

10   you and say, well, here we go, and here's who these different

11   victims are, the Government does not intend to do that.

12          However, there are cases just that have been before

13   this district.  The case of U.S. v. Kaye in which there was a

14   threat to an FBI agent.  That was a single 875 Charlie charge.

15          And you heard evidence today from the Capitol Police

16   officers that they have been a part of multiple arrests right

17   here in Florida, and for the defense now to say that they've

18   presented all of those cases, you simply don't have those in

19   front of you.

20          You also have the case of Shapiro.  That came to you

21   and that was actually mentioned by the defense, and so we'll

22   discuss that case.  Shapiro left five voicemails on

23   Congressman's Swalwell's office line.  However, those were just

24   kind of successive one after the other, and some rambling there

25   kind of went along the same line.
```

1          To make the argument those are multiple threats and,

2    therefore, somehow that makes it different than this case

3    simply because one individual talked a little longer than the

4    other seems to be disingenuous, Your Honor.  He is only charged

5    with a single count of 875(c).  I believe that the defense

6    mentioned in, I believe, there was a fourth supplement to their

7    motion, they indicated that as well.

8          Backing up just a little bit though, Your Honor, I

9    would like to talk about their first category in which they

10   discuss as they refer to them, single and multiple threat cases

11   that were not prosecuted that have been identified.

12         I won't go through every single one of these.  We

13   would ask the Court to consider Government's Exhibit 1, the

14   sealed exhibit.

15         Now, at the beginning of the hearing today, the

16   defense mentioned that there's a high bar even for discovery in

17   this case and, therefore, they haven't gotten discovery.  To

18   the contrary, they were entitled to get discovery based on the

19   last motions hearing, and we did provide that to them.  The

20   results of that discovery are what you have in Government's

21   Exhibit 1.

22         But there is a reason why the bar is so high, and I

23   think that we shouldn't overstep that, Your Honor.  The reason

24   for that is that there are many different considerations that

25   need to be given into a threat case.  They are difficult to

1    analyze at times because the determination needs to be met not

2    only whether it actually qualifies as a true threat under the

3    analysis that's been most recently laid out in Counterman v.

4    Colorado which was 600 U.S. 66 issued this last June, but also

5    looking back even to cases like Virginia v. Black or to the

6    Watts case where we look at political hyperbole, and we look at

7    whether or not something is a conditional threat not in the

8    sense of if you don't do this, then I will do "x" because that

9    would still be a true threat.

10           But, rather, if this situation was so different than

11   it possibly could be in reality, such as if an individual were

12   to say, well, if I was on the floor of the House right now, and

13   she said that in my face and I had a gun, then I would probably

14   shoot her.  That is not a threat that we would prosecute

15   because that is a conditional threat.  That is conditioned on

16   something that is not possible to exist.  He can't possibly be

17   on the House floor right now because he happens to be in

18   whatever location he is standing.

19           So there are many different considerations that need

20   to be given, but the biggest one is did they threaten?  Did

21   they give a statement of a present intent to commit violence

22   upon another?

23           And so any of these cases in which we get, well, I

24   wish that this had happened, or you know what I think would be

25   great if it did happen, or what really ought to happen to that

1    guy is, none of those are things that would be prosecuted and

2    none of those are threats, but you have a litany of those

3    before you today.  And again, I won't go through every single

4    on of these, but I would ask that the Court look at the

5    affidavits that it has, PPP and QQQ, in which the staffers from

6    the congressman's office discussed some of these different

7    threats and there are things like, well, you're a loser, I hope

8    you die.  Not a threat.

9          These are things that come in to the Capitol Police by

10   the thousands.  And as you have the evidence here of on certain

11   dates, 2020, let's go back to 2017, there was 3,000 and some,

12   2018, 5,000 and some, 2019, 6,000 and some, 2020, 8,000 and

13   some, 2021, 9,000 and some, and although there might have been

14   a slight drop in 2022, you can see a progression there.

15   Absolutely is there a priority in prosecuting these types of

16   cases?  There definitely is, and any suggestion otherwise is

17   certainly not coming from the Government.

18         This is not something that is acceptable and it's not

19   something that congressmen ought to have to put up with.  But

20   those concerning communications in the thousands are not

21   threats, Your Honor.  Those are just concerning communications.

22         And that is made clear on Exhibit YY in which it

23   specifically states -- let's see, in the second paragraph, that

24   number includes investigations into concerning statements and

25   direct threats.

1          So, I don't believe that the department issues

2    specific numbers of threats that come in to the public, at

3    least not regularly.  They are much lower than these numbers.

4          Each of the witnesses that you had before you today

5    made that clear, but also Government's Exhibit 1 in which you

6    have 62 different times that the office of George Santos during

7    the time that he was in Congress, a period of less than a year,

8    or at least up until November 16th when that report was run,

9    that you had 62 different instances of calls, and of those, one

10   was designated to be a threat.

11         The percentages here are extremely low.  Certainly

12   well under five percent and it probably depends on the year as

13   to what that percent would be.

14         So we can look at some of the different supposed

15   threat cases, as they termed them, that the defense has

16   provided to you.

17         So we look at Exhibit -- I was trying to take down the

18   different things that he was mentioning, which ones he put in

19   which category.  I'll start with Exhibit CCC.  This is the

20   article about Jonathan Reeser and as the defense counsel read

21   out to you, it starts with "I hope" in one sentence, and then

22   "I wish" in the next.  These are not threats that could be

23   prosecuted, Your Honor.

24         To add to this point, I would just stress the fact

25   that U.S. versus Bagdasarian out of the Ninth Circuit in which

```
1    Mr. Bagdasarian made some vary vulgar, very rude, very crude
2    racist remarks about former President Obama.
3            And at trial, he was convicted, and they were very
4    atrocious comments.  However, in the -- when that went up on
5    appeal, the Ninth Circuit looked at this and said, well, hey,
6    these aren't threats.  And they make the statement here,
7    neither statement constitutes a threat in the ordinary meaning
8    of the word.  An expression of an intention to inflict injury
9    on another.  That's Webster's dictionary.  The, quote, "Obama F
10   the" and then a racial slur statement is a prediction that
11   Obama, and then in, quotes, "will have a 50 cal in the head
12   soon."  Making these type of predictions, well, this is going
13   to happen are not threats.  Otherwise, the Secret Service would
14   probably be routinely prosecuted for threats when they come to
15   the president and say you can't ride down certain avenues in a
16   convertible or else you are going to be killed.
17           Someone who writes this, it may be very vulgar, it's
18   horrible, it shouldn't happen, but it doesn't mean that we can
19   prosecute that as an 875(c) or a 115(a) charge.  It's simply --
20   it doesn't meet the definition.
21           They go on to explain another one where he simply says
22   shoot the -- and then again, racial slur.  That this is an
23   exhortation to others to injure or kill the president.  The
24   threat statute, however, does not criminalize predictions or
25   exhortations to kill others, to injure or kill the president --
```

1    I'm sorry, to others to injure or kill the president.  It is

2    difficult to see how a rational trier of fact could reasonably

3    have found either statement on its face and take into context

4    expresses a threat against Obama by Bagdasarian.

5            I would say the exact same thing about arguments about

6    Jonathan Reeser here.  "I wish this happens.  I hope this

7    happens."  Those are not prosecutable threats, Your Honor.

8            We go on to Exhibit DDD.  This is a Twitter post by

9    Bruce Miller, and I'm going to read you the Twitter post.

10   Almost time, exclamation point, exclamation point, exclamation

11   point.  Would you rather Guantanamo or just execution, F-ing

12   traitor, period.

13           Your Honor, that's not a threat.  It's a question, but

14   it's certainly not a clear statement of intent to commit

15   violence, and there's no indication of even who would take that

16   individual to Guantanamo although the expectation would be that

17   somehow it would be government action, certainly not the

18   individual that's making this statement, Bruce Miller.

19           Exhibit EEE, the one by Paul Gosar.  This involved an

20   Anime image of one congressman killing another, certainly not

21   even slightly similarly situated to this instance in which the

22   defendant makes a very specific, very straightforward, and very

23   descriptive statement about what he is going to do to

24   Congressman Santos.

25           Exhibit FFF.  This is the one from Madison Cawthorn.

1  Goes into explaining -- he uses the word "threat" and maybe

2  that's what caught the defense's eye here.  "So, everybody, I'm

3  telling you I'm encouraging you please get on the phone, call

4  your congressman, and feel free.  You can lightly threaten them

5  and say you know what?  If you don't start supporting election

6  integrity, I'm coming after you.  Madison Cawthorn is coming

7  after you.  Everybody is coming after you."  There's no

8  statement of violence whatsoever.  The "coming after" from the

9  context seems to be voting out of office.  If we want to say it

10 was something else, there's no clear statement to it.

11         And I think that that kind of gets to the thrust of

12 the problem here.  That many congressional offices are going to

13 look at statements such as "you're a loser, I hope you die" and

14 refer to that as a threat.

15         Many newspaper articles are going to refer to things

16 as threats.  That doesn't mean that they meet the requirement

17 that everybody in this room looks at when we look at 875

18 Charlie and say is that a threat?

19         Just to touch on a couple others that they brought up

20 today.  They also brought up the filing they just put in a

21 couple weeks ago on the 24th of January.  I believe this was

22 the fourth supplement.  That they did bring a new one that was

23 Michael -- I'm sorry, that was John Schneider.

24         Again, I'll read to you the exact thing that was

25 posted at least based on the defense's motion, but I will point

1    out that even in the defense's motion, they say television

2    actor, John Schneider, posted on statement on Twitter

3    threatening President Joe Biden and his son, Hunter Biden.

4    That's just not true, Your Honor.  The statement is not

5    threatening them.

6            The statement is as follows.  "Mr. President, I

7    believe you are guilty of treason and should be publicly hung,

8    dot dot dot, your son, too, period.  Your response is, period,

9    period, question mark.  Sincerely, John Schneider."  That is

10   not a threat.  He's stating his belief.

11           These are the type of things that may come in to the

12   Capitol Police and add to this 9,000 number, may add to that

13   7,500 number.  But they're not something that a prosecutor

14   looks at and says that's something I want to take before a jury

15   and have a judge read them the elements of 875 Charlie or 115,

16   and then say somehow that we think that this meets.

17           If anything starts with "I wish," with "I think," with

18   "I hope," those things not things that are prosecutable without

19   more, Your Honor.

20           And as we move over to the 115 argument, Your Honor,

21   if the Court agrees, and based on the statute, I certainly hope

22   that the Court does that these are both felonies, then what we

23   have before us is a determination that prosecutors need to make

24   about which of two felonies and honestly, there are other

25   options as well.

1    As the defense mentioned, there are some cases that
2 may be charged under 871 if it happens to be with the
3 president.  They may be charged under other statutes depending
4 on who the victims are.  They may be charged in different ways,
5 Your Honor.  But between those two, which is what the defense
6 seems to latch onto, and so we'll focus our argument on those
7 two as well, 115 is the more serious charge.  Not 875.

8    And to the degree that there's any confusion over it,
9 we went ahead and the only part of the district court record
10 that we put in is Government Exhibit 2, and that's simply
11 because the defense had already mentioned that case.

12    And we feel comfortable going ahead and bringing
13 before the Court the final judgment in that case and in that
14 you have before you that an individual was charged with a
15 single -- or was found guilty, he pleaded guilty to a single
16 specification of 115.

17    There were multiple voicemails so I'm not making the
18 argument that it's exactly the same as this.  But under that
19 115, the single spec that he was found guilty of, he received
20 46 months.

21    So the Government is not trying to make the argument
22 that that's what is proper in this case, but what we would
23 point out that that is much higher than the twelve months that
24 would be required, and that should demonstrate even further
25 that 115 in a threats context is certainly a felony offense.

1          We also would ask the Court to consider what would

2     happen, the practical affect of granting a motion such as a

3     selective prosecution motion in a threats context when the

4     argument is they prosecuted me under one statute and I could

5     have been prosecuted under two but I wasn't.

6          The affect of granting that motion would mean that

7     every single one of the people that you have before you, all of

8     these people that the defense has pointed to that were actually

9     prosecuted could bring the same motion and say, well, some

10    other people weren't prosecuted so I shouldn't be prosecuted or

11    he was prosecuted under two different statutes, I only got one,

12    so I'm in the wrong.  Or I got both, why did Mr. Stanzione down

13    there in the Southern District of Florida, why did he only get

14    charged with 875?

15         These are prosecutorial decisions that need to be made

16    by prosecutors, and with all due deference to the Court, they

17    are not decisions that the Court ought to be making.

18         And as to the one other mention that the defense had

19    that I just want to make sure is mentioned is Defense Exhibit

20    AAA in which you have an individual who was prosecuted in state

21    court.  And I don't think that it's any secret or that I'm

22    sharing anything that would be behind closed doors.

23         The Department of Justice certainly looks to whether

24    an individual's actions can adequately and are adequately being

25    prosecuted by another prosecuting authority before determining

1     whether those are individuals that should be prioritized for

2     federal prosecution.

3           And so when you have somebody like this who was

4     prosecuted, this is Mr. Kennedy, who was prosecuted in

5     Colorado, the likelihood that the Government would then turn

6     around and bring a prosecution under 875 Charlie for the exact

7     same offense is highly unlikely, and it would probably be

8     something that would raise some eyebrows, Your Honor.

9           MR. SMITH:  Your Honor, if I may just in brief

10    response to the Government.  I think the problem is is basing

11    an argument on this is what we would do.

12          Your Honor, in the Kaye case which is at Footnote 5 of

13    docket entry 17, the Government has indicated if somebody said,

14    you know, I will or if this happens, it would not be a threat

15    but in that case that the Government convicted her on,

16    prosecuted her and she was convicted, quote, this was from

17    docket entry 3 in that case.  This is what she said.  "My

18    Second Amendment right to shoot your F-ing ass if you come

19    here."  This is also implying that she'll use violence against

20    FBI agents if they come to her residence.  The Government

21    charged her with that offense, she was convicted and the

22    Government sought a prison penalty in that case.

23          I'll refer you to two cases.  I'll give you the

24    citations for both, Your Honor.

25          THE COURT:  What happened?  Did that case go on

1    appeal or anything?

2         MR. SMITH:  It is.  I believe that oral argument was

3    canceled, and the case was affirmed on appeal about a jury

4    instruction issue, Your Honor.  Not -- I wasn't the attorney on

5    that case.  I don't know if there were any conditional threat

6    arguments made.

7         I know the Government was, but, again, just based on

8    the argument they've made to this Court that, well, we wouldn't

9    prosecute this, that's the first example I can show you where

10   there was --

11        THE COURT:  And it was from which district?

12        MR. SMITH:  This.

13        MR. WHEELER:  That was here in the Southern District

14   of Florida, Your Honor, and just to clarify, that is that first

15   half of those quote, unquote conditional threats that would

16   absolutely be prosecuted.

17        If I walked up and said if you don't land this plane

18   right now, I'm going to shoot you, then I am trying to threaten

19   that individual to take action that I want them to take.

20   However, if I say, boy, if I was already on the ground, and

21   something else happened and so on, and we were already in the

22   middle of a civil war and you were on the other side, I would

23   shoot you, then we would say those scenarios are not in

24   anyone's power and you're not trying to influence someone else.

25        So in this case, when the FBI is investigating someone

and is likely to come to the property to speak with them and

they say if you come here, I will shoot you, then that is

absolutely the exact type of threat that we would prosecute,

Your Honor.

It's not a conditional threat at that point because

the intention there is to try to influence the actions of

another by the threat.

And so these are different things, and I think that

the very fact that we're having this discussion with the

defense counsel here demonstrates the discussions that are

needed in each of these cases, to look at them and look at the

individual verbiage as opposed to just to say in general, well,

I saw a news article once where somebody claims that they had

been threatened.

The "if" conditionality needs to be determined based

on is this something that is in the power of the individual, or

is this something they believe to be in the power of the

individual that they are trying to threaten and that they are

trying to stop or trying to cause to happen.  If you scream out

right now, then I'm going to shoot you.  Or if you tell anybody

about what I've done to you, then I'll kill your dog.  All of

those could be looked at as conditional because they have the

word "if", but those are the type of threats that we absolutely

prosecute because they are not conditional threats.

They are threats intending to get the acquiescence or

1    the failure of another to commit actions they otherwise

2    wouldn't take.

3            MR. SMITH:  Your Honor, the two cites I'll give you

4    are United States versus Springer, 753 F.App 821.  It's an

5    unpublished case out of the Eleventh Circuit.

6            THE COURT:  753 --

7            MR. SMITH:  753 F.App 821.  It's an unpublished

8    opinion from the Eleventh Circuit in 2018.  It's a Section 18

9    U.S.C. 115 communication of threats case, not 875, but the

10   threat in that case by Mr. Springer, he was threatening to

11   murder a district court judge by strapping a bomb to a drone

12   and crashing it into her chambers.

13           And even the Court admitted it could be seen as angry

14   hyperbole, but it was enough, and he was convicted but the

15   Government charged him with that offense and he was convicted.

16           And then the other, it's worth taking a look at the

17   opinion for the conduct that was charged in light of the

18   Government's argument here.

19           The other case is U.S. versus Miah, which is M-I-A-H

20   which is 546 F.Supp 3d 407 which is a Western District of

21   Pennsylvania case from 2021.  I'm just going to read you what

22   the charged threats were in that case.

23           Count 1, the threat to the officer was, quote, these

24   were Twitter posts, "currently eating pasta and watching the

25   second plane hit the south tower.  Nick, Dave and Mike and the

whole bureau.  The deed will be done at a time which is most opportunistic for me chosen by myself."  That was Count 1.

Count 2, the threat on Twitter, "the zero hour is approaching."  That was Count 2.

Count 3 on Twitter, they were GPS coordinates for the FBI headquarters, I think it was in Pittsburgh.  That was Count 3, just that post.

Count 4, also on Twitter, "Rasheed, Dave, Nick, Mike, how's your investigation going?  Things are looking bright in 2021.  Did you find the Saudi passports?  2001 to 2021 is 20 years, an entire generation.  Yet men like me still exist and pop up into existence.  Next time you come in, Cowboy, with the crew, the hardwood will collapse beneath your feet."  That was Count 4 charged by the Government.

Count 5, also Twitter.  "Remember, boys, the more eyes on me, the less eyes on the others.  Regardless, yellow tapes will flow."  That was Count 5.

These were charges under 875(c).  Two counts of threatening to assault FBI agents in violation of Section 115(a)(1)(B) and one count of obstruction of justice.  There's -- this goes on.  That's why I say take a look at the opinion.  Count 6 and 7, the opinion lists out the language of the threats in each of the counts charged by the Government.  So it's worth looking at to counter the Government's argument here.

1        Finally, Your Honor, two final things.  The first is

2   is that I would also direct the Court to Defendant's Exhibit

3   into evidence QQ which was a threat against the president but

4   it was the Kevin Krohn case, but it shows the threat that was

5   communicated to the president at the time that was subsequently

6   dismissed by the Southern District of Florida.

7        So I'll finish with this, Your Honor.  As to the

8   difference and how Section 115 is charged and whether it's a

9   felony or a misdemeanor, so to be very blunt with the Court,

10  I will tell the Court this.

11       Having a similar state court background, I believe

12  that a threat was like an assault.  Nowhere in federal law can

13  I find -- and I would encourage anybody who wants to look it

14  up -- what the difference between a federal simple assault and

15  a threat are.

16       And this was noted in a case, it's United States

17  versus Cliven Bundy, the famous Nevada rancher.  2017 Westlaw

18  449593.  He was obviously charged with a number of violations

19  mostly in reference to threats under Section 115.

20       The Government in that case, the Government, this is

21  at Footnote 11 in that decision, the Government posted and

22  posited this argument according to the judge.  The Court notes

23  that the Government presents an interesting counterargument

24  based on the penalty structure of Section 115 to negate Payne's

25  assertion that threatening to commit a simple nonviolent

assault would fall under a Section 115(a)(1)(B).  Here's the

quote from the Government's pleading.  A person can be

convicted of actual simple assault under 18 United States Code

Section 115(a)(A), and the penalty is a term of imprisonment of

not more than one year.  It's a misdemeanor.

Continuing with the Government's pleading.  Penalty

for threatening to assault under Section 115(a)(1)(B) is a term

of imprisonment of not more than six years.  They refer to

Section (b)(4).

It is illogical -- this is the Government's

pleading -- it's illogical that one could receive six times the

penalty for threatening to commit a simple assault than for

committing an actual simple assault.

I hope I can be forgiven for misunderstanding Section

115 that an assault and a threat were the same thing.  But even

the Government in their pleading in the Bundy case indicated

that they can't figure this out either.

So I'll leave the Court with the 115 versus 875,

perhaps I was incorrect about the severity of it in my

arguments, but it doesn't change the fact of this.  The

Government has not done anything to rebut the evidence that we

have placed before this Court that this is one of only two

people we can find charged with a single threat.  Not five

voicemails, not a call and six emails, not multiple visits, all

of which are critical under the contextual totality of the

```
 1   requirements of a true threat analysis that every case since

 2   Virginia and Counterman and continued with what this says we

 3   have to look at, a single threat case -- this is one of only

 4   two we can find charged as an 875(c), and the Government offers

 5   nothing in return.  And that's the end of my argument, Your

 6   Honor.

 7              THE COURT:  All right.  Thank you.

 8              MR. DISPOTO:  We still on for trial next week?

 9              THE COURT:  As it stands now, you are.  Again, I will

10   reset this for Wednesday at 1:30.  Okay?

11              MR. DISPOTO:  Are you expecting the parties in at

12   1:30 or are you just going to issue an order?

13              THE COURT:  You can come in.  See you here at 1:30.

14              MR. DISPOTO:  1:30, Wednesday.  Thank you, Judge.

15              THE COURT:  Again, I'll give you a chance -- give me

16   an opportunity to read the exhibits that were mentioned by both

17   sides as well, so I haven't gotten a chance to review

18   everything.  I intend to work on that today and tomorrow.

19              MR. DISPOTO:  Thank you, Judge.

20              MR. SMITH:  Your Honor, you want me to pass up the

21   paper exhibits?

22              THE COURT:  Yes, please, so I can review them.

23        (Thereupon, this proceeding was adjourned at 2:31 p.m.)

24                         - - -

25
```

```
 1                       C-E-R-T-I-F-I-C-A-T-E

 2

 3           I hereby certify that the foregoing is an accurate

 4   transcription of the proceedings in the above-entitled matter.

 5

 6   FEBRUARY 13, 2024        Ellen A. Rassie_____
                              ELLEN A. RASSIE, RMR-CRR
 7                            Official Court Reporter
                              To the Honorable Rodney Smith
 8                            299 East Broward Blvd., Room 207-C
                              Fort Lauderdale, Florida  33301
 9                            (954)769-5448

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MR. DISPOTO: [40]
3/11 5/13 5/16 10/16
10/20 10/22 22/1
23/16 27/17 28/10
38/21 42/14 43/19
44/7 44/24 46/4 46/20
49/2 49/7 49/20 50/23
54/20 66/1 69/7 69/13
74/19 74/23 77/4
86/22 91/12 91/21
93/14 93/20 93/25
94/21 97/9 139/8
139/11 139/14 139/19
MR. LOVETT: [1]
19/22
MR. SMITH: [76]
3/16 3/23 3/25 5/11
7/11 10/19 11/7 11/16
11/18 14/9 18/18 19/5
19/11 19/17 19/19
22/3 22/10 23/1 23/5
23/11 31/15 31/19
31/22 31/24 32/3 32/8
32/13 32/20 32/24
39/3 39/6 40/18 43/23
46/6 49/8 49/21 50/25
54/17 59/11 59/22
61/12 65/14 69/8
69/14 77/6 77/11
77/19 78/1 78/3 78/6
78/9 78/11 86/19
95/21 96/3 96/8 96/24
97/16 97/24 98/11
98/18 98/24 99/8
99/11 99/15 99/19
110/13 110/16 110/25
117/5 132/9 133/2
133/12 135/3 135/7
139/20
MR. WHEELER: [13]
15/23 19/1 19/3 96/12
97/20 98/7 98/21 99/3
117/7 117/11 117/14
118/10 133/13
MS. WOOMER: [1]
19/23
THE COURT: [112]
3/5 3/15 3/19 3/24
5/10 5/15 7/5 10/14
10/17 10/21 11/17
11/19 14/11 15/24
18/10 18/16 19/4 19/9
19/18 22/2 22/5 22/11
22/22 23/4 23/10
23/12 23/17 27/19
28/11 31/17 32/1 32/6
32/11 32/18 32/21
32/25 33/4 39/5 40/17
42/15 43/22 44/8 45/3
46/5 46/7 46/21 49/3

49/11 49/22 51/1
54/19 59/14 59/24
61/14 65/17 66/2 69/9
69/12 69/16 70/17
70/23 71/3 74/20
74/24 77/5 77/9 77/21
77/25 78/2 78/5 78/7
78/10 86/21 91/13
91/22 93/15 93/21
94/1 94/23 95/23 96/1
96/4 96/10 97/7 97/13
97/19 97/22 98/5 98/9
98/17 98/20 99/1 99/7
99/10 99/13 99/17
110/12 110/15 110/17
117/4 117/6 117/10
117/13 118/8 132/25
133/11 135/6 139/7
139/9 139/13 139/15
139/22
THE COURTROOM
DEPUTY: [22] 3/7
11/9 11/11 11/15
18/13 18/15 19/20
19/24 20/3 23/13
23/15 31/21 31/23
31/25 32/22 33/1 33/6
33/11 78/12 78/14
78/18 78/20
THE WITNESS: [22]
11/10 11/14 18/14
19/2 20/2 23/14 33/10
33/13 46/9 51/2 61/15
69/15 69/17 70/22
71/2 77/24 78/13
78/17 78/19 78/22
94/22 95/25

**1**

**10 [1]** 54/16
**10,000 [1]** 101/21
**11 [1]** 137/21
**1100 [1]** 1/16
**111 [1]** 107/9
**115 [32]** 106/23
106/24 107/4 107/13
107/16 112/19 118/1
118/12 118/20 118/24
120/2 120/3 120/5
120/7 120/10 126/19
129/15 129/20 130/7
130/16 130/19 130/25
135/9 136/20 137/8
137/19 137/24 138/1
138/4 138/7 138/15
138/18
**12 [3]** 1/5 3/1 98/1
**12:00 [1]** 96/5
**13 [2]** 96/5 140/6
**14 [10]** 106/5 106/6
106/7 106/8 106/9
106/10 106/11 106/12

106/25 112/15
**15 [6]** 54/16 71/14
71/16 74/6 74/7 97/21
**1548 [1]** 4/10
**16 [6]** 4/8 73/7 74/5
75/18 75/24 76/7
**16th [1]** 125/8
**17 [1]** 132/13
**18 [6]** 106/23 117/25
118/1 118/24 135/8
138/3
**1:15 [3]** 96/6 97/12
97/23
**1:30 [5]** 110/22
139/10 139/12 139/13
139/14

**2**

**20 [1]** 136/10
**20003 [1]** 1/14
**2001 [1]** 136/10
**2004 [1]** 86/16
**2006 [1]** 86/16
**2014 [1]** 51/10
**2017 [3]** 105/3
124/11 137/17
**2018 [3]** 105/3
124/12 135/8
**2019 [2]** 105/3
124/12
**2020 [21]** 34/4
45/21 51/5 51/9 51/14
51/17 52/12 54/15
56/6 58/15 65/3 69/25
70/8 71/6 71/9 71/13
72/24 73/3 105/2
124/11 124/12
**2021 [10]** 67/11
71/11 76/3 79/11
79/12 105/1 124/13
135/21 136/10 136/10
**2022 [2]** 104/24
124/14
**2023 [9]** 12/4 12/5
34/8 34/12 54/7 54/9
54/10 87/11 103/8
**2024 [4]** 1/5 3/1
98/1 140/6
**207-C [2]** 1/22 140/8
**213 [1]** 4/24
**23-CR-80064 [2]**
1/2 3/8
**231 [1]** 100/6
**24th [2]** 120/22
128/21
**25 [15]** 45/15 45/16
45/17 45/21 46/2
48/11 50/20 51/19
55/21 58/17 65/2
65/11 70/7 71/6 80/4
**25th [2]** 8/5 8/5
**26 [2]** 37/10 37/16

**27 [2]** 37/7 37/9
**28 [1]** 38/4
**299 [2]** 1/22 140/8
**29th [4]** 12/12 29/6
29/12 34/12
**2:00 [2]** 97/14 97/14
**2:31 [1]** 139/23

**3**

**3,000 [1]** 124/11
**3,939 [1]** 105/4
**30 [3]** 97/16 97/18
97/20
**300 [3]** 52/13 55/20
58/16
**30th [2]** 12/11 12/12
**31 [1]** 54/9
**31st [7]** 12/5 34/7
55/4 81/6 81/12 94/7
116/18
**33301 [4]** 1/11 1/16
1/22 140/8
**3553 [1]** 111/25
**3d [1]** 135/20

**4**

**40 [14]** 45/15 45/17
45/21 46/2 48/11
50/20 51/19 55/21
58/17 65/2 65/11 70/7
71/6 97/17
**407 [1]** 135/20
**449593 [1]** 137/18
**45 [4]** 40/15 40/18
57/7 57/12
**46 [3]** 43/18 105/12
130/20
**47 [1]** 105/12
**499 [1]** 1/13

**5**

**5,000 [1]** 124/12
**5,206 [1]** 105/3
**50 [1]** 126/11
**500 [1]** 1/11
**5448 [1]** 140/9
**546 [1]** 135/20
**5th [3]** 54/7 81/9
94/7

**6**

**6,000 [1]** 124/12
**6,955 [1]** 105/3
**600 [1]** 123/4
**62 [2]** 125/6 125/9
**66 [1]** 123/4
**6th [3]** 13/21 85/15
85/16

**7**

**7,500 [1]** 129/13
**753 [3]** 135/4 135/6

135/7
**769-5448 [1]** 140/9
**7th [4]** 1/11 12/4
29/8 29/12

**8**

**8,000 [1]** 124/12
**8,613 [1]** 105/3
**800 [1]** 100/7
**80064 [2]** 1/2 3/8
**810 [1]** 4/24
**821 [2]** 135/4 135/7
**871 [2]** 106/18 130/2
**875 [35]** 106/1
106/18 106/21 106/23
107/3 107/10 107/13
107/16 108/6 108/8
108/14 108/16 112/17
112/22 113/4 116/16
118/1 118/10 119/20
120/5 120/11 120/12
120/17 121/14 122/5
126/19 128/17 129/15
130/7 131/14 132/6
135/9 136/18 138/18
139/4

**9**

**9,000 [2]** 124/13
129/12
**9,625 [1]** 105/2
**954 [1]** 140/9
**992 [1]** 4/10

**A**

**AAA [2]** 23/9 131/20
**ability [8]** 8/15 9/5
66/23 67/4 70/9 80/24
84/10 84/12
**able [9]** 5/21 40/9
48/24 61/6 62/12
79/22 83/5 85/20
120/16
**about [74]** 7/17 13/2
14/18 18/1 23/2 26/12
26/25 27/1 27/10
27/25 28/1 28/8 28/9
29/9 36/17 39/9 41/12
44/5 45/9 46/14 48/9
50/4 50/7 51/8 55/2
55/25 57/20 62/3
62/14 62/16 62/18
65/2 66/20 69/24 71/6
72/25 73/8 73/17
73/23 74/24 74/6
74/10 74/12 74/17
74/18 74/22 75/2 75/9
80/14 80/18 84/4 85/5
87/5 87/15 89/13 90/2
90/5 90/25 92/19 96/6
101/5 104/4 104/15
120/13 122/9 125/20

**A**

**about... [8]** 126/2
127/5 127/5 127/23
129/24 133/3 134/21
138/19
**above [1]** 140/4
**above-entitled [1]**
140/4
**absolute [1]** 120/11
**absolutely [7]** 89/2
90/9 91/10 124/15
133/16 134/3 134/23
**academy [1]** 53/5
**acceptable [1]**
124/18
**access [6]** 84/7 84/7
84/17 84/18 88/11
88/16
**accomplice [1]**
88/15
**accomplish [1]** 38/5
**according [2]** 116/9
137/22
**account [1]** 81/1
**accurate [3]** 14/17
38/25 140/3
**accurately [1]** 89/10
**acknowledging [1]**
110/1
**acquiescence [1]**
134/25
**across [4]** 26/14
26/16 27/2 27/23
**Act [1]** 107/19
**action [3]** 93/17
127/17 133/19
**actions [3]** 131/24
134/6 135/1
**actor [1]** 129/2
**acts [4]** 4/7 99/21
99/22 100/5
**actual [5]** 10/3 29/4
119/10 138/3 138/13
**actually [12]** 7/18
17/16 21/21 37/9 38/8
47/14 61/6 96/16
120/16 121/21 123/2
131/8
**add [4]** 80/6 125/24
129/12 129/12
**addition [1]** 110/5
**additional [2]** 35/4
97/2
**address [2]** 7/8
97/15
**addressed [1]** 7/12
**addressing [1]** 6/13
**adequately [2]**
131/24 131/24
**adjourned [1]**
139/23

**admit [7]** 7/22 36/24
38/22 96/22 96/23
98/12 98/18
**admitted [2]** 37/21
135/13
**admittedly [1]** 109/2
**advised [1]** 27/3
**affect [2]** 131/2
131/6
**affidavits [1]** 124/5
**affiliation [3]** 55/25
90/11 91/3
**affiliations [1]** 64/9
**affirmed [1]** 133/3
**after [21]** 12/22
13/13 21/25 32/11
38/9 47/8 66/11 66/14
81/4 92/18 93/1 93/2
93/7 93/11 96/5
116/20 121/24 128/6
128/7 128/7 128/8
**afternoon [3]** 87/2
87/4 98/1
**again [33]** 26/22
26/23 28/19 31/4 31/6
32/14 33/11 33/22
43/19 44/24 50/2
53/25 57/8 60/25
70/11 71/9 72/6 78/18
101/10 101/24 110/19
113/6 113/7 115/13
115/15 116/6 116/9
124/3 126/22 128/24
133/7 139/9 139/15
**against [17]** 4/22
4/23 34/19 41/24 44/4
100/19 100/20 101/7
107/8 114/5 114/6
118/14 119/1 119/23
127/4 132/19 137/3
**agencies [1]** 8/12
**agency [10]** 11/4
60/20 60/24 71/21
72/1 72/7 80/19 83/7
83/9 83/11
**agent [99]** 3/13
13/21 31/25 32/3
32/15 32/18 32/20
32/22 33/1 33/5 33/18
34/5 34/6 34/14 35/9
35/12 35/16 36/8
36/11 37/17 37/19
40/20 41/18 42/1 42/5
42/6 42/9 42/22 42/25
43/6 43/7 43/13 46/11
48/20 48/23 48/24
50/16 50/20 51/20
53/1 53/4 53/4 53/20
54/24 55/3 55/12
56/18 56/25 60/10
60/22 61/1 65/19 66/6
67/1 67/15 67/20 68/1

68/7 68/10 68/18
68/19 68/24 69/14
70/1 70/2 70/5 70/16
70/19 70/21 72/1 72/1
72/8 73/11 76/6 77/22
78/11 78/12 78/24
79/2 79/12 81/15
81/20 82/16 84/20
84/25 86/24 87/2
87/12 91/15 91/17
92/2 92/11 92/14
92/18 94/3 95/23
102/4 116/19 121/14
**agents [11]** 32/10
32/11 32/14 67/23
105/8 105/12 107/25
108/25 116/21 132/20
136/19
**ago [1]** 128/21
**agree [8]** 15/15
24/21 25/4 59/16
59/17 88/18 91/8
113/14
**agreement [2]**
120/15 120/16
**agrees [1]** 129/21
**ahead [11]** 10/21
68/21 68/22 72/6
78/10 82/19 92/24
99/17 118/23 130/9
130/12
**Alabama [1]** 54/14
**alarm [3]** 92/3 93/12
93/14
**Alexandria [1]** 102/9
**all [113]** 3/19 4/13
7/5 7/13 7/24 10/5
10/17 15/18 15/24
16/17 17/1 19/18
20/15 22/19 27/13
27/18 27/19 29/5
29/10 31/17 32/21
34/5 34/21 35/9 36/4
36/4 36/19 36/19
36/24 38/2 38/15 40/5
41/18 42/1 42/3 42/17
42/23 43/22 46/5
47/18 47/22 48/7
50/20 53/9 53/13
53/17 53/18 53/21
54/2 54/19 55/9 55/19
60/18 60/19 61/1
61/20 66/1 66/2 66/19
71/3 71/20 76/13
77/21 77/21 78/2
79/20 84/4 84/9 84/14
84/19 85/17 86/21
91/12 91/13 93/11
95/23 95/23 96/1 96/4
96/24 96/25 97/7
97/22 97/23 98/5 98/9
98/12 98/18 98/20

99/7 101/17 103/18
103/20 104/10 108/1
108/3 108/12 110/20
111/13 111/14 112/1
112/4 113/25 116/25
117/4 119/9 119/10
121/18 131/7 131/16
134/21 138/24 139/7
**Allan [7]** 107/16
112/14 112/14 112/24
120/13 120/14 120/14
**alleged [2]** 59/19
99/21
**allegedly [2]** 25/12
56/19
**allow [1]** 19/9
**allowed [1]** 113/25
**Almost [2]** 18/18
127/10
**alone [1]** 75/12
**along [2]** 34/5
121/25
**already [6]** 7/12
60/4 113/17 130/11
133/20 133/21
**also [60]** 4/14 7/22
12/24 21/19 25/1 25/7
25/20 29/13 32/6
33/23 35/11 35/20
36/7 36/14 37/4 37/23
38/15 39/18 39/21
41/18 42/1 42/5 51/23
58/9 60/15 60/16
62/16 63/21 71/20
74/4 85/10 85/15 95/6
95/11 97/13 102/2
103/1 106/6 106/7
106/10 106/14 106/22
107/8 107/25 108/25
109/11 110/5 112/18
115/21 117/10 118/5
121/20 123/4 125/5
128/20 131/1 132/19
136/8 136/15 137/2
**although [3]** 100/4
124/13 127/16
**always [2]** 27/11
74/14
**am [19]** 3/23 5/1
11/6 24/15 24/20 25/3
34/5 48/9 55/6 56/11
57/3 57/9 58/7 58/9
74/18 76/7 80/17 96/8
133/18
**Amendment [1]**
132/18
**AMERICA [2]** 1/4 3/8
**among [2]** 24/16
87/15
**amount [3]** 28/19
41/24 67/22
**analysis [9]** 5/25

7/15 7/18 7/19 7/20
113/24 116/6 123/3
139/1
**analyze [1]** 123/1
**Andre [1]** 32/7
**anecdotal [1]** 9/19
**angry [1]** 135/13
**Anime [2]** 102/8
127/20
**another [13]** 15/20
27/2 32/15 81/19
88/20 111/9 123/22
126/9 126/21 127/20
131/25 134/7 135/1
**answer [20]** 22/5
28/13 35/11 44/10
46/7 46/8 46/23 49/11
49/14 49/24 49/24
59/14 69/9 69/12
69/14 69/16 90/21
91/24 93/19 117/1
**answered [11]** 22/7
42/17 42/23 66/20
67/2 69/7 69/8 72/13
74/19 74/23 91/18
**answering [1]** 38/10
**any [80]** 4/19 6/23
8/17 14/2 14/5 15/4
15/19 16/24 20/20
21/2 21/7 21/18 21/22
22/11 26/9 32/2 35/1
35/2 35/4 35/4 35/10
35/11 35/17 35/21
36/8 39/18 43/12 45/5
45/24 48/1 49/5 49/15
49/19 50/6 50/8 50/14
50/21 54/10 54/19
55/22 56/2 57/4 57/9
57/16 59/18 59/25
66/2 70/24 77/16
79/14 81/22 82/3
84/22 85/4 88/10
93/12 93/17 93/19
93/23 94/6 96/10
97/11 98/21 100/16
103/2 104/19 108/24
112/25 112/25 116/9
116/14 116/23 117/1
118/18 120/9 123/23
124/16 130/8 131/21
133/5
**anybody [3]** 113/14
134/20 137/13
**anyone [3]** 36/3 78/5
91/9
**anyone's [1]** 133/24
**anything [13]** 16/20
29/3 37/12 55/16
68/16 94/6 94/9
109/22 115/16 129/17
131/22 133/1 138/21
**anyway [1]** 98/15

**A**

**anywhere [1]** 18/1
**apologies [1]** 55/10
**apologize [8]** 13/25
18/24 19/14 68/22
68/23 74/2 99/5
117/11
**apology [1]** 21/24
**apparently [4]** 37/23
67/7 67/7 101/17
**appeal [4]** 10/8
126/5 133/1 133/3
**appear [3]** 64/19
108/17 116/23
**appearance [1]** 63/5
**appearances [2]** 1/9
3/10
**appearing [1]** 3/12
**appears [1]** 108/14
**appellate [1]** 10/9
**appreciate [1]** 95/18
**approaching [1]**
136/4
**appropriate [1]**
99/25
**approximate [1]**
77/13
**approximately [21]**
20/12 21/10 45/14
46/19 46/25 52/10
53/10 54/6 54/13
54/16 58/16 73/7
79/12 80/2 82/1 83/15
83/22 85/17 85/23
90/17 104/9
**approximation [1]**
76/11
**April [5]** 54/7 54/10
81/9 94/4 94/7
**April 5 [1]** 54/10
**April 5th [3]** 54/7
81/9 94/7
**are [165]**
**area [1]** 56/9
**areas [2]** 53/21
56/21
**aren't [2]** 63/19
126/6
**argue [2]** 5/17 6/16
**arguing [1]** 5/20
**argument [26]** 96/9
97/15 97/20 99/9
107/23 108/4 110/19
113/15 113/16 117/16
117/19 118/23 120/24
122/1 129/20 130/6
130/18 130/21 131/4
132/11 133/2 133/8
135/18 136/24 137/22
139/5
**arguments [5]** 98/10

99/18 127/5 133/6
138/20
**Arizona [1]** 102/7
**armed [1]** 92/13
**Armstrong [1]**
115/24
**around [4]** 52/13
68/25 110/22 132/6
**arrest [13]** 41/6
41/16 54/3 54/10 63/4
76/1 81/10 94/3 94/10
94/12 94/17 103/13
103/19
**arrested [8]** 54/6
63/23 75/23 81/9
81/12 101/6 101/11
105/18
**arresting [1]** 62/20
**arrests [9]** 54/14
62/23 75/19 83/15
85/24 103/14 103/16
103/25 121/16
**article [6]** 101/5
102/12 102/15 104/15
125/20 134/13
**articles [4]** 108/24
113/1 113/1 128/15
**as [160]**
**ascertain [1]** 34/23
**ask [30]** 10/14 28/9
32/16 34/24 35/25
36/3 36/4 36/14 36/20
38/4 38/8 39/10 39/12
41/11 41/16 53/4
61/20 62/1 62/4 66/20
76/23 78/9 84/4 88/4
88/6 88/10 97/9
122/13 124/4 131/1
**asked [45]** 13/16
27/3 28/1 28/8 32/14
35/9 35/11 35/20
35/23 36/7 36/8 38/5
39/18 50/9 50/17 51/8
55/2 59/24 62/16
63/25 69/7 69/24 71/9
74/15 74/19 74/23
76/21 80/5 82/8 82/9
82/11 82/12 84/11
85/4 87/15 87/17
89/13 89/15 89/17
89/21 90/2 90/5 90/16
98/23 118/17
**asking [13]** 23/19
35/12 35/17 43/13
50/17 59/6 67/7 67/8
72/4 72/5 73/16 73/18
109/18
**asks [1]** 74/12
**ass [1]** 132/18
**assault [18]** 107/20
107/21 119/1 119/5
119/6 119/7 119/9

119/14 119/17 136/19
137/12 137/14 138/1
138/3 138/7 138/12
138/13 138/15
**assertion [1]** 137/25
**assessment [30]**
10/12 13/7 14/3 15/6
24/17 25/5 26/4 27/9
27/12 33/21 33/23
34/1 34/3 51/18 52/12
52/25 54/15 56/7
56/20 57/6 57/11
57/22 58/20 70/8 71/7
79/8 80/19 104/23
104/24 109/7
**assign [1]** 53/1
**assigned [2]** 56/6
81/19 82/3 85/12
**assist [2]** 36/22
80/19
**assisting [1]** 71/18
**association [1]** 62/4
**assume [3]** 65/16
82/21 83/9
**assumed [1]** 29/7
**assuming [3]** 48/3
74/10 74/17
**at [92]** 3/13 4/10
4/13 4/24 5/8 6/1 8/4
8/11 9/10 10/8 11/2
12/13 18/5 19/7 22/19
25/17 27/13 30/11
36/22 36/22 37/6
38/18 39/16 39/16
40/3 40/8 42/24 43/2
43/3 43/15 45/7 50/11
52/14 60/12 75/22
76/9 76/9 76/25 87/10
89/24 97/10 97/12
97/14 97/22 101/17
102/14 104/6 108/12
109/9 109/19 110/19
111/25 114/3 115/3
115/3 115/19 116/25
118/24 119/3 119/21
122/15 123/1 123/6
123/6 124/4 125/2
125/8 125/14 125/17
126/3 126/5 128/13
128/17 128/17 128/25
129/14 132/12 134/5
134/11 134/11 134/22
135/16 136/1 136/21
136/24 137/5 137/21
139/3 139/10 139/11
139/13 139/23
**atrocious [1]** 126/4
**attachments [1]**
102/21
**attempt [4]** 60/16
118/13 119/23 119/23
**attempting [3]** 4/25

23/2 84/10
**attention [3]** 18/23
19/13 26/19
**attorney [20]** 8/24
50/7 50/9 50/15 81/17
81/19 81/21 84/20
85/1 85/4 85/7 85/8
89/22 92/2 92/11
92/15 92/19 92/20
93/2 133/4
**ATTORNEY'S [10]**
1/10 41/19 42/3 81/15
81/16 82/4 87/3 89/18
93/7 95/13
**attorneys [4]** 10/9
82/2 82/6 90/23
**audio [1]** 32/23
**August [2]** 8/5 8/5
**August 25th [2]** 8/5
8/5
**AUSA [24]** 11/1 43/4
43/4 48/24 50/13
67/16 71/25 72/3 72/9
72/10 72/15 72/20
72/21 72/24 73/6 73/7
73/9 73/12 73/12
73/25 74/12 74/22 75/2
75/12 75/14
**AUSAs [4]** 73/17
73/21 74/8 74/16
**author [1]** 84/22
**authority [2]** 68/8
131/25
**available [4]** 78/3
115/8 115/13 115/14
**avenues [1]** 126/15
**aware [17]** 15/15
21/22 26/7 29/22
59/18 59/24 60/2 60/3
62/14 63/3 63/7 63/15
63/18 87/20 87/24
96/13 97/1
**away [1]** 120/25

**B**

**back [22]** 23/10
23/11 30/10 46/11
56/18 60/10 64/13
66/25 68/12 69/3
69/24 70/14 81/14
87/10 87/12 97/6
97/10 97/12 97/22
101/21 123/5 124/11
**background [11]**
36/21 36/23 53/23
53/23 53/24 61/22
61/25 80/13 80/16
80/17 137/11
**Backing [1]** 122/8
**bad [2]** 15/3 66/13
**Bagdasarian [3]**
125/25 126/1 127/4

**ballpark [1]** 90/20
**Bank [4]** 3/13 12/25
13/21 81/20
**bar [2]** 122/16
122/22
**base [2]** 16/15 56/9
**based [25]** 13/23
24/15 40/2 40/3 49/9
50/10 50/10 53/2
53/22 53/22 53/25
53/25 66/10 66/10
74/16 80/7 83/13
111/4 112/2 122/18
128/25 129/21 133/7
134/15 137/24
**baseline [4]** 36/21
39/15 61/22 62/1
**basic [2]** 4/18 100/15
**basically [2]** 102/15
113/11
**basing [2]** 16/17
132/10
**basis [1]** 17/7
**Batson [2]** 9/20 9/21
**Bayon [1]** 106/25
**BBB [1]** 101/9
**be [160]**
**Beach [3]** 8/22 94/15
94/16
**bear [1]** 22/25
**became [1]** 26/17
**because [50]** 6/25
7/6 7/25 8/14 8/22
9/10 9/23 16/7 27/1
28/1 28/18 29/17 30/9
31/9 32/7 40/7 43/3
44/14 48/15 58/2
60/14 60/19 60/23
70/3 75/10 95/4 95/13
95/18 97/14 102/22
107/20 109/11 111/20
111/22 112/10 113/17
113/25 115/15 116/5
116/6 118/22 122/3
123/1 123/8 123/15
123/17 130/11 134/5
134/22 134/24
**become [1]** 107/22
**becomes [3]** 100/12
109/5 111/12
**been [61]** 4/5 4/7
4/13 10/1 21/15 26/11
26/18 26/25 30/10
30/15 34/1 34/3 34/3
44/6 44/15 51/4 51/9
51/9 55/19 56/6 65/3
65/5 65/7 65/15 71/13
79/10 79/13 79/17
79/20 80/3 81/2 90/2
90/22 91/1 94/11
96/14 99/22 100/3
100/5 101/2 101/3

# B

**been... [20]** 105/23 106/21 108/10 108/11 108/11 108/14 109/13 110/4 111/2 112/11 113/19 120/19 120/24 121/12 121/16 122/11 123/3 124/13 131/5 134/14
**before [26]** 1/8 3/18 6/23 35/11 47/25 49/18 49/25 50/5 66/19 67/14 67/14 76/3 83/18 83/20 110/11 111/14 121/12 124/3 125/4 129/14 129/23 130/13 130/14 131/7 131/25 138/22
**beginning [5]** 41/15 43/11 97/14 114/16 122/15
**behalf [3]** 3/12 3/17 59/5
**beheading [1]** 102/8
**behind [4]** 113/16 113/20 114/1 131/22
**being [30]** 8/19 8/22 8/23 11/5 12/7 18/9 22/18 26/9 31/12 39/10 57/12 63/4 63/22 80/9 82/12 84/11 85/4 87/17 89/14 90/20 95/19 95/19 102/25 109/16 109/22 110/8 111/8 111/10 115/1 131/24
**belief [1]** 129/10
**believe [61]** 5/1 8/4 8/25 10/25 12/11 12/12 13/1 13/4 13/4 13/17 13/18 14/7 19/7 19/8 21/14 23/19 29/6 38/14 52/11 54/6 57/21 58/14 62/18 63/25 81/6 81/19 81/24 82/15 82/18 83/5 85/6 86/15 88/1 88/23 89/3 89/13 89/17 90/1 92/18 94/19 98/14 104/6 106/13 106/14 107/24 110/2 110/10 110/13 112/2 116/6 118/24 119/3 120/21 122/5 122/6 125/1 128/21 129/7 133/2 134/17 137/11
**believed [3]** 20/21 87/6 120/20
**believes [1]** 5/7
**bells [3]** 92/3 93/12

93/14
**below [1]** 109/9
**beneath [1]** 136/13
**benefit [1]** 120/8
**besides [1]** 32/1
**best [10]** 12/21 13/13 13/17 16/5 17/13 18/22 62/11 65/3 80/24 97/11
**better [4]** 7/24 56/11 58/10 64/16
**between [17]** 8/17 29/11 30/18 45/15 45/17 45/19 54/9 57/21 70/7 94/6 94/9 94/11 112/20 117/25 118/9 130/5 137/14
**beyond [3]** 59/11 59/23 61/12
**Biden [2]** 129/3 129/3
**big [1]** 45/19
**biggest [1]** 123/20
**bill [1]** 101/13
**bit [9]** 28/4 28/15 28/24 46/11 48/18 60/23 78/21 94/13 122/8
**Black [1]** 123/5
**block [1]** 9/13
**blocked [1]** 10/11
**blunt [1]** 137/9
**Blvd [4]** 1/11 1/16 1/22 140/8
**bodily [3]** 103/17 103/17 103/17
**body [2]** 94/17 101/21
**bomb [1]** 135/11
**bond [2]** 102/21 102/22
**book [1]** 118/4
**bore [1]** 58/14
**boss [2]** 30/10 31/1
**both [20]** 7/7 28/3 28/4 57/23 101/14 106/23 112/22 112/23 113/4 118/3 118/8 119/14 119/16 119/18 119/22 119/24 129/22 131/12 132/24 139/16
**boxes [1]** 61/1
**boy [1]** 133/20
**Boynton [1]** 94/15
**boys [1]** 136/15
**break [1]** 101/22
**breaking [1]** 78/20
**Brian [1]** 106/10
**brief [1]** 132/9
**bright [1]** 136/9
**bring [3]** 128/22 131/9 132/6

bringing [1] 130/12
**brings [1]** 15/21
**broke [1]** 94/13
**brother [1]** 88/15
**brought [6]** 26/18 62/7 62/8 62/13 128/19 128/20
**Broward [4]** 1/11 1/16 1/22 140/8
**Bruce [3]** 102/2 127/9 127/18
**building [1]** 51/13
**bunch [1]** 121/1
**Bundy [2]** 137/17 138/16
**burden [9]** 4/11 4/25 10/6 10/10 10/11 100/2 100/7 111/16 111/17
**bureau [1]** 136/1
**business [1]** 12/22
**but [118]** 5/17 6/17 9/6 10/25 14/7 15/10 16/10 17/14 17/8 17/21 21/11 23/7 23/24 24/23 25/8 27/9 29/3 29/16 29/19 30/5 30/14 31/11 31/12 35/24 36/23 37/12 38/8 38/9 38/13 40/12 41/3 42/9 50/12 52/3 52/9 53/4 53/20 54/2 58/6 58/16 59/7 60/15 60/15 60/25 61/2 67/2 68/10 68/16 70/14 76/9 76/21 78/14 80/23 84/6 84/12 88/7 88/11 88/14 89/10 90/22 92/7 96/15 97/3 98/15 99/5 101/6 101/17 102/10 102/25 105/11 105/18 106/3 106/21 107/3 107/13 108/11 108/14 108/20 109/3 109/9 109/21 109/23 109/24 110/1 112/21 113/7 114/2 114/16 115/17 115/23 118/15 120/2 122/22 123/4 123/10 123/20 124/2 124/4 124/19 125/5 126/18 127/13 128/25 129/13 130/5 130/18 130/22 131/5 132/15 133/7 134/23 135/9 135/14 135/14 137/3 137/4 138/15 138/20
**buy [1]** 36/15

# C

**C-E-R-T-I-F-I-C-A-T-E [1]** 140/1

**cal [1]** 126/11
**call [28]** 3/4 5/12 5/21 6/17 10/18 19/7 19/19 21/15 21/24 22/4 24/18 29/6 30/9 30/23 31/20 32/7 40/11 40/22 53/17 80/15 86/5 92/11 92/14 98/4 103/22 105/21 128/3 138/24
**called [4]** 6/24 18/24 19/14 52/4
**calling [2]** 5/18 77/25
**calls [21]** 15/2 16/9 17/18 17/24 18/4 17/20 17/24 18/20 24/16 28/20 29/11 29/13 29/16 31/11 47/20 92/6 92/9 95/7 95/9 103/9 125/9
**came [14]** 14/21 15/14 18/7 20/20 23/22 25/17 25/21 26/3 26/12 27/8 29/6 65/6 65/8 121/20
**cameras [1]** 94/17
**can [139]** 4/1 4/8 4/13 5/8 6/7 7/23 9/17 9/18 9/19 9/24 10/2 10/20 11/9 11/23 14/24 17/21 17/23 18/13 20/7 22/5 22/16 22/17 22/22 23/1 23/4 23/11 23/13 23/14 25/15 28/13 28/25 30/13 31/24 32/8 32/19 32/22 33/2 33/6 33/18 35/16 39/3 41/3 43/17 44/10 46/7 46/7 46/23 46/24 47/3 49/11 49/14 49/24 49/24 52/20 53/3 55/9 59/14 63/9 63/9 63/16 69/9 69/12 69/14 69/16 72/19 76/21 76/22 78/9 78/11 78/12 78/13 78/14 78/22 79/2 79/3 79/4 80/10 82/14 82/15 83/3 86/1 87/3 88/4 88/6 89/7 89/24 90/17 90/20 91/24 92/6 95/20 96/24 97/4 97/6 99/17 100/25 102/11 102/16 103/1 103/8 103/24 104/11 104/12 104/19 104/21 105/5 105/22 108/3 108/4 108/15 108/20 109/3 110/15 110/18 110/19 111/9 111/9 112/21
112/23 114/8 114/23 115/19 116/7 116/7 117/1 118/25 124/14 125/14 126/18 128/4 131/24 133/9 137/12 138/2 138/14 138/23 139/4 139/13 139/22
**can't [24]** 6/25 6/25 7/6 9/9 9/10 9/10 14/6 16/7 33/7 62/12 70/3 70/15 72/8 72/16 72/18 82/4 108/24 112/2 113/12 114/2 119/25 123/16 126/15 138/17
**canceled [1]** 133/3
**cannot [3]** 30/8 72/2 82/15
**capital [1]** 119/4
**CAPITOL [66]** 1/12 1/13 3/14 12/24 13/6 13/14 13/15 14/3 14/20 16/10 17/12 17/15 17/16 17/25 18/4 18/6 18/21 20/21 21/3 21/13 21/15 21/19 24/18 25/25 26/9 27/4 28/5 28/18 28/22 30/7 30/12 30/23 31/20 32/9 33/20 33/24 34/7 45/14 46/19 47/1 47/24 48/19 51/4 51/8 51/10 51/11 51/12 51/18 52/14 57/5 58/7 79/7 86/8 90/18 103/7 103/9 103/14 103/18 103/22 104/1 104/8 104/11 104/22 121/15 124/9 129/12
**career [3]** 46/18 47/1 90/18
**Carlos [1]** 106/25
**Carr [2]** 32/4 32/24
**carry [16]** 39/17 41/14 66/16 66/22 67/4 80/20 80/22 80/25 84/10 84/13 87/17 87/22 88/2 88/6 88/19 88/24
**carrying [1]** 39/19
**case [227]**
**cases [155]**
**Casey [1]** 107/6
**categories [2]** 117/18 117/19
**categorized [1]** 58/21
**category [19]** 100/23 101/1 101/9 101/15 102/6 102/12 102/18 103/3 103/12

## C

**category... [10]**
104/2 104/14 104/21
105/6 105/21 106/20
117/21 120/11 122/9
125/19
**caught [1]** 128/2
**cause [2]** 30/22
134/19
**caused [1]** 67/9
**caution [1]** 40/21
**caveat [1]** 113/3
**Cawthorn [3]** 102/13
127/25 128/6
**CC [1]** 107/14
**CCC [2]** 101/15
125/19
**censured [1]** 102/10
**Center [3]** 25/6 26/4
27/9
**certain [8]** 31/2
32/15 104/17 117/20
117/20 121/5 124/10
126/15
**certainly [8]** 124/17
125/11 127/14 127/17
127/20 129/21 130/25
131/23
**certify [1]** 140/3
**challenge [2]** 9/20
9/21
**chambers [1]** 135/12
**chance [2]** 139/15
139/17
**change [3]** 23/7
105/6 138/20
**changed [1]** 91/25
**characterized [1]**
59/10
**charge [22]** 64/7
72/25 74/16 74/18
75/3 75/12 75/14 77/3
77/7 77/17 104/8
107/9 107/16 116/24
116/24 119/24 120/3
120/5 120/7 121/14
126/19 130/7
**charged [38]** 64/2
64/11 89/19 89/24
90/3 90/6 90/8 90/12
90/20 91/4 105/18
105/18 105/25 106/21
107/3 107/3 107/10
113/4 117/20 117/25
118/1 120/10 122/4
130/2 130/3 130/4
130/14 131/14 132/21
135/15 135/17 135/22
136/14 136/23 137/8
137/18 138/23 139/4
**charges [3]** 77/16

89/14 136/18
**charging [7]** 8/12
75/7 89/23 91/1
105/14 114/1 118/20
**CHARLES [6]** 11/21
11/24 14/13 16/1 21/1
106/7
**Charlie [4]** 121/14
128/18 129/15 132/6
**Chase [1]** 107/5
**Chavez [1]** 115/20
**chief [6]** 11/2 12/2
20/24 20/25 21/4
30/11
**choice [1]** 68/3
**choices [1]** 8/18
**choose [2]** 114/1
114/2
**chooses [1]** 77/16
**choosing [1]** 6/22
**chosen [2]** 6/3 136/2
**Christopher [2]** 1/15
106/14
**circle [1]** 69/1
**circles [1]** 68/25
**Circuit [7]** 4/9 4/15
100/8 125/25 126/5
135/5 135/8
**circumstance [1]**
89/20
**circumstances [2]**
103/15 119/16
**circumstantial [4]**
9/18 115/2 115/7
115/10
**circumstantially [1]**
115/11
**citations [1]** 132/24
**cite [1]** 115/21
**cited [1]** 115/4
**cites [1]** 135/3
**civil [3]** 104/18
115/23 133/22
**claimed [1]** 113/9
**claims [1]** 134/13
**clarifies [1]** 48/25
**clarify [1]** 10/22
96/24 133/14
**class [2]** 116/2 116/4
**classified [5]** 58/2
60/5 82/23 82/25 87/8
**classify [1]** 83/12
**clean [1]** 7/18
**clear [13]** 29/22
41/10 41/15 43/11
52/6 100/8 100/9
120/5 120/6 124/22
125/5 127/14 128/10
**Cleveland [1]** 106/17
**Cliven [1]** 137/17
**closed [1]** 131/22
**closely [1]** 17/5

**closer [1]** 99/11
**clothes [1]** 51/14
**clothing [1]** 31/2
**co [3]** 5/16 102/22
114/11
**co-counsel [1]** 5/16
**co-mingle [1]**
114/11
**co-signers [1]**
102/22
**Code [2]** 106/24
138/3
**codes [1]** 89/24
**collapse [1]** 136/13
**Colorado [3]** 101/6
123/4 132/5
**come [25]** 12/20
16/9 18/23 19/13
26/14 26/14 26/16
29/11 32/1 41/22
51/11 51/11 63/18
89/8 121/9 124/9
125/2 126/14 129/11
132/18 132/20 134/1
134/2 136/12 139/13
**comes [5]** 48/21
58/20 61/4 66/14
82/23
**comfortable [5]**
40/7 40/9 53/24 53/25
130/12
**coming [9]** 16/18
17/2 17/2 17/8 124/17
128/6 128/6 128/7
128/8
**command [2]** 82/15
83/5
**comments [3]**
102/16 109/17 126/4
**commit [5]** 123/21
127/14 135/1 137/25
138/12
**committed [5]** 4/6
4/18 99/21 100/4
100/14
**committing [1]**
138/13
**communicate [2]**
48/7 48/12
**communicated [2]**
48/4 137/5
**communication [10]**
14/24 48/4 52/16
53/12 58/1 59/8 59/20
80/18 112/7 135/9
**communications
[23]** 14/21 15/11
15/14 16/12 20/18
21/8 23/22 24/7 24/17
24/19 24/21 24/22
25/5 25/7 26/3 26/12
26/13 27/7 56/20

57/10 57/24 124/20
124/21
**community [1]**
37/19
**comparator [2]** 4/18
100/14
**comparison [1]** 29/1
**conceding [2]** 10/15
10/16
**concern [1]** 29/17
**concerning [30]**
14/20 14/24 15/11
15/14 15/16 15/17
16/3 16/14 24/18
24/21 24/22 25/8
26/12 27/8 52/2 52/3
52/8 52/8 53/2 53/16
56/19 57/10 58/6
60/21 60/24 86/6 92/5
124/20 124/21 124/24
**concluded [1]** 93/1
**concludes [1]** 96/1
**conclusion [1]** 116/7
**conditional [7]**
123/7 123/15 133/5
133/15 134/5 134/22
134/24
**conditionality [1]**
134/15
**conditioned [1]**
123/15
**condoned [1]** 113/12
**conduct [9]** 4/17
60/10 64/17 87/6
87/12 100/14 113/18
113/18 135/17
**conducted [1]** 80/3
**conducting [2]**
56/18 57/1
**confidential [1]**
98/14
**confirm [2]** 38/24
43/21
**confused [2]** 70/6
72/12
**confusion [1]** 130/8
**congress [20]** 24/4
30/3 34/20 40/22
41/17 43/25 44/4
45/22 47/20 56/24
58/3 60/14 62/17
106/22 107/2 107/12
107/15 118/15 121/6
125/7
**congressional [6]**
51/13 58/7 86/4
103/21 105/25 128/12
**congressman [12]**
22/19 23/21 24/5 24/8
24/12 29/7 91/19
101/7 101/13 127/20
127/24 128/4

**congressman's [7]**
13/19 23/23 25/12
27/8 103/24 121/23
124/6
**congressmen [2]**
45/13 124/19
**congressperson [4]**
29/24 108/5 108/10
108/20
**congressperson's
[1]** 86/12
**connect [1]** 32/23
**connection [1]**
22/23
**consider [6]** 7/23
55/22 56/1 90/10
122/13 131/1
**consideration [1]**
55/16
**considerations [1]**
122/24 123/19
**considered [2]** 59/19
64/6
**considers [1]** 59/1
**consists [1]** 119/6
**constitutes [1]**
126/7
**constitutional [1]**
113/23
**constitutionally [6]**
6/3 6/10 6/21 7/9
99/24 111/4
**consult [1]** 66/16
**contact [2]** 32/4
41/11
**contain [1]** 25/7
**contained [1]** 108/1
**content [2]** 59/8
60/12
**context [4]** 127/3
128/9 130/25 131/3
**contextual [1]**
138/25
**continue [3]** 18/16
23/16 66/19
**continued [1]** 139/2
**continues [1]** 115/9
**continuing [2]**
110/11 138/6
**contrary [1]** 122/18
**conversation [2]**
13/24 40/2
**conversations [3]**
48/16 64/4 90/19
**convertible [1]**
126/16
**convicted [7]** 126/3
132/15 132/16 132/21
135/14 135/15 138/3
**convincing [1]**
100/10
**cooperative [2]** 37/2

**C**

**cooperative... [1]** 94/20
**coordinates [1]** 136/5
**coordination [1]** 94/11
**copies [3]** 96/16 96/20 97/10
**copy [3]** 23/7 35/7 97/3
**core [1]** 113/22
**corner [1]** 33/4
**corollary [1]** 109/11
**correct [103]** 12/14 12/16 12/19 12/23 14/18 14/21 14/22 14/25 15/1 15/7 15/8 15/12 15/13 15/19 21/4 24/15 25/9 27/11 27/15 27/16 27/24 30/20 34/5 39/25 41/8 42/4 42/8 47/9 47/15 47/17 47/21 55/13 55/14 56/7 56/8 56/10 56/11 56/15 56/16 56/21 56/22 57/1 57/2 57/9 57/14 57/18 57/19 57/24 57/25 58/3 58/4 58/9 58/12 58/13 58/17 58/18 60/6 60/7 61/7 61/8 61/15 61/24 62/18 62/19 63/2 63/23 63/24 64/3 64/22 64/23 64/25 65/1 65/10 70/21 70/22 71/1 71/2 71/19 72/10 73/2 76/7 76/15 80/25 84/9 87/9 87/13 87/14 88/2 88/3 88/8 88/9 88/12 88/13 88/16 88/17 88/22 89/2 89/5 89/6 89/20 90/3 96/2 96/3
**corrected [2]** 55/7 74/7
**correctly [3]** 17/15 27/6 57/3
**Cortez [1]** 102/9
**could [29]** 6/1 6/15 8/6 14/24 16/24 20/12 33/1 40/7 43/3 46/9 68/10 71/15 86/3 88/7 88/10 88/10 88/14 96/17 96/19 97/21 118/4 123/11 125/22 127/2 131/4 131/9 134/22 135/13 138/11
**could say [1]** 88/7
**couldn't [5]** 22/7

43/7 71/15 89/10 90/21
**counsel [8]** 3/10 3/13 5/16 8/5 32/9 120/16 125/20 134/10
**count [14]** 112/19 122/5 135/23 136/2 136/3 136/4 136/5 136/6 136/8 136/14 136/15 136/17 136/20 136/22
**counter [1]** 136/24
**counterargument [1]** 137/23
**Counterman [2]** 123/3 139/2
**counts [2]** 136/18 136/23
**County [1]** 94/16
**couple [9]** 13/20 29/5 54/13 78/9 85/3 92/22 121/2 128/19 128/21
**course [4]** 64/4 83/1 109/7 113/14
**court [90]** 1/1 1/21 3/4 3/18 4/12 5/7 5/9 5/20 6/1 6/23 7/2 7/13 7/23 8/15 8/17 9/17 9/17 9/24 10/2 10/4 10/7 23/8 33/18 44/23 45/25 49/18 50/1 50/4 62/25 63/10 63/18 71/3 83/18 98/4 99/4 99/15 100/21 100/25 101/6 101/10 101/12 101/14 102/5 102/11 102/16 105/5 105/9 109/15 109/22 110/3 110/3 110/6 110/23 111/11 111/15 111/18 111/19 113/17 115/3 115/3 115/6 115/17 115/19 115/24 117/2 118/6 118/22 120/25 121/1 122/13 124/4 129/21 129/22 130/9 130/13 131/1 131/16 131/17 131/21 133/8 135/11 135/13 137/2 137/9 137/10 137/11 137/22 138/18 138/22 140/7
**Court's [3]** 6/6 6/19 100/8
**courtroom [1]** 38/3
**courts [1]** 113/24
**cover [2]** 53/21 61/1
**Cowboy [1]** 136/12
**CR [2]** 1/2 3/8
**crashing [1]** 135/12
**crew [1]** 136/13

**crime [4]** 4/18 64/7 64/11 100/15
**crimes [3]** 11/8 107/21 107/21
**criminal [6]** 53/23 53/24 64/24 81/1 107/19 115/24
**criminalize [1]** 126/24
**criminally [3]** 27/14 57/18 64/2
**criteria [1]** 10/1
**critical [1]** 138/25
**cross [14]** 2/4 14/11 14/13 16/13 22/11 22/13 28/7 54/19 54/22 61/19 62/16 86/21 86/24 109/18
**cross-examination [7]** 14/11 22/11 28/7 54/19 61/19 62/16 86/21
**cross-examine [1]** 109/18
**CRR [2]** 1/20 140/6
**crude [1]** 126/1
**currently [1]** 135/24

**D**

**danger [1]** 102/23
**dangerous [1]** 47/11
**Darryl [1]** 106/10
**data [1]** 103/21
**date [2]** 54/9 54/10
**dates [1]** 124/11
**Dave [2]** 135/25 136/8
**David [1]** 107/14
**day [7]** 17/7 17/7 41/6 77/23 95/24 116/20 116/20
**days [6]** 18/23 19/13 21/24 34/11 47/8 81/4
**DC [5]** 1/14 24/10 68/7 70/12 79/16
**DDD [2]** 102/1 127/8
**dealt [1]** 29/25
**decide [1]** 15/20
**decided [3]** 18/6 117/18 118/6
**decides [1]** 75/12
**deciding [1]** 115/5
**decision [13]** 8/9 9/17 27/13 52/15 63/22 66/8 67/5 74/15 77/7 82/17 105/14 110/21 137/21
**decisions [8]** 8/12 55/23 56/2 74/18 91/1 114/1 131/15 131/17
**declaration [3]** 103/4 103/6 104/3

**deduct [1]** 71/11
**deed [1]** 136/1
**defendant [22]** 1/6 1/15 2/3 3/21 4/5 4/19 4/23 6/20 8/6 12/8 99/23 100/20 101/11 102/19 106/1 110/9 111/8 111/10 115/5 118/17 120/8 127/22
**defendant's [5]** 6/10 10/10 100/23 105/8 137/2
**defendants [1]** 111/24
**DEFENDER'S [2]** 1/15 3/17
**defense [31]** 5/2 5/19 5/22 6/7 6/9 101/4 103/12 107/5 107/6 107/14 107/17 107/17 112/15 117/8 119/3 120/13 120/15 121/5 121/17 121/21 122/5 122/17 122/16 125/15 125/20 130/1 130/5 130/11 131/8 131/18 131/19 134/10
**defense's [3]** 128/2 128/25 129/1
**deference [1]** 131/16
**define [1]** 107/20
**defined [1]** 4/14
**definitely [2]** 92/5 124/16
**definition [3]** 15/5 24/22 126/20
**Definitions [1]** 107/18
**degree [1]** 130/8
**delineating [2]** 30/17 30/21
**demonstrate [1]** 130/24
**demonstrates [1]** 134/10
**denied [1]** 7/1
**denies [1]** 10/7
**department [6]** 15/20 107/18 112/7 114/5 125/1 131/23
**depending [2]** 32/13 130/3
**depends [4]** 30/25 53/13 60/19 125/12
**depicting [1]** 102/8
**described [2]** 67/12 93/17
**descriptive [1]** 127/23
**designated [1]**

125/10
**desk [3]** 26/14 26/16 27/23
**determination [9]** 65/4 66/24 70/3 77/10 83/7 83/9 120/7 123/1 129/23
**determine [15]** 34/25 43/4 50/13 53/4 58/21 60/13 66/18 68/15 69/5 73/12 73/15 80/24 87/16 87/23 88/1
**determined [5]** 65/20 65/24 82/20 83/1 134/15
**determines [3]** 52/21 82/22 83/11
**determining [9]** 59/2 59/9 59/20 64/10 87/20 90/7 90/11 91/4 131/25
**deterrence [2]** 4/20 100/17
**detriment [1]** 120/9
**dictionary [1]** 126/9
**did [77]** 8/8 8/21 12/7 12/24 13/2 13/9 13/17 13/18 14/19 17/11 18/20 18/23 19/13 20/9 20/11 20/19 21/7 21/23 22/20 24/1 24/1 26/1 37/2 38/16 42/13 45/9 48/12 49/1 50/14 51/2 53/10 54/3 54/10 55/16 62/23 65/12 68/8 69/3 69/19 70/3 76/1 81/9 81/11 81/16 81/21 84/22 84/23 84/25 86/8 86/9 86/12 88/24 92/17 92/25 94/6 94/9 95/12 95/17 102/17 109/19 114/21 116/21 116/23 118/18 122/19 123/20 123/20 123/25 128/22 131/12 131/13 132/25 136/10
**didn't [14]** 10/10 11/7 16/24 31/12 36/25 40/5 40/8 59/12 62/14 65/15 68/21 82/3 95/8 96/16
**die [5]** 15/4 86/7 86/7 124/8 128/13
**difference [20]** 45/19 69/23 71/10 111/2 111/3 111/4 111/8 111/9 111/22 112/18 112/20 113/8 114/21 114/22 116/10

**D**

**difference... [5]**
116/10 116/12 118/9
137/8 137/14

**differences [1]**
116/11

**different [28]** 8/25
24/4 51/10 53/14
60/23 66/6 67/12
67/21 70/2 70/15
70/18 70/19 89/23
117/17 121/2 121/10
122/2 122/24 123/10
123/19 124/6 125/6
125/9 125/14 125/18
130/4 131/11 134/8

**differentiation [1]**
117/25

**differently [7]** 9/6
64/20 93/23 109/23
109/23 113/19 116/3

**difficult [3]** 113/24
122/25 127/2

**difficulties [2]** 18/11
22/25

**direct [47]** 2/4 11/21
12/1 17/11 20/5 24/23
25/6 25/13 25/14 30/6
30/6 30/7 33/16 35/6
38/3 40/14 52/9 53/5
53/6 55/11 55/21
56/23 57/21 58/2 58/3
58/11 58/17 58/22
59/2 59/21 60/5 61/4
61/17 64/13 64/15
64/20 65/5 65/6 78/24
87/5 87/7 88/25 89/5
89/9 115/7 124/25
137/2

**directed [1]** 17/14

**direction [39]** 51/24
52/1 52/4 52/7 52/10
52/22 53/9 53/14
53/17 55/20 58/21
59/2 59/21 60/5 60/16
60/19 60/21 61/5
64/16 64/21 65/7 66/8
68/4 69/6 69/22 76/16
82/14 82/21 82/24
85/10 85/10 85/13
85/17 85/23 86/1 87/8
89/1 89/4 89/9

**directions [9]** 25/1
57/21 58/5 58/11
58/16 64/14 65/12
89/11 95/4

**directly [1]** 77/6

**director [3]** 20/18
24/7 26/13

**disagree [1]** 109/21

**discovered [1]**
111/12

**discovery [6]** 8/2
9/14 122/16 122/17
122/18 122/20

**discretion [2]** 15/19
18/5

**discriminatory [3]**
114/17 115/22 116/1

**discuss [4]** 81/18
117/23 121/22 122/10

**discussed [5]** 64/6
64/10 91/1 114/16
124/6

**discussing [3]** 17/4
105/13 106/2

**discussion [2]** 75/9
134/9

**discussions [13]**
8/17 48/16 72/24
73/16 73/21 73/23
73/24 74/8 74/10
74/16 74/17 74/22
134/10

**disingenuous [1]**
122/4

**dismiss [3]** 3/20
5/17 109/6

**dismissed [1]** 137/6

**display [1]** 33/2

**displayed [2]** 19/24
78/15

**dispositive [1]** 88/20

**Dispoto [14]** 1/10
3/11 22/15 28/7 54/24
68/2 69/4 69/22 70/6
73/16 74/15 75/23
87/2 97/7

**disproportionate [2]**
115/11 115/19

**distinction [1]** 57/20

**district [19]** 1/1 1/1
1/8 8/24 11/3 11/5
30/11 85/9 102/20
112/3 112/14 121/13
130/9 131/13 133/11
133/13 135/11 135/20
137/6

**districts [1]** 9/5

**diversion [1]** 8/20

**divide [1]** 117/18

**dividing [1]** 120/9

**division [3]** 8/23 9/1
51/12

**do [162]**

**do you [19]** 16/15
25/20 35/20 36/20
38/15 39/10 39/21
50/6 50/8 51/19 51/23
52/19 59/16 60/15
60/15 60/16 82/6
85/10 85/15

**Do you see [1]**

**40/23**

**docket [14]** 4/8
106/5 106/6 106/7
106/8 106/9 106/10
106/11 106/12 106/14
106/25 112/15 132/13
132/17

**document [1]** 104/9

**documents [1]**
96/21

**does [15]** 7/5 37/20
40/25 41/25 83/4
88/24 98/21 109/8
111/3 112/1 120/8
121/1 121/11 126/24
129/22

**doesn't [14]** 10/24
25/6 43/21 62/15
66/15 66/15 88/11
113/21 115/16 118/14
126/18 126/20 128/16
138/20

**dog [1]** 134/21

**DOI [3]** 53/17 53/21
66/18

**doing [5]** 10/11
16/11 37/15 39/2
63/10

**don't [80]** 5/2 7/1
9/2 9/6 13/24 13/25
14/5 15/19 15/20
16/11 17/20 17/21
21/19 21/20 26/9
31/21 32/2 35/15
36/10 37/5 37/11
37/18 38/2 38/19
40/21 40/22 41/1 41/2
41/3 43/15 44/3 44/12
44/13 44/13 44/25
52/14 53/19 58/5 59/4
69/13 72/5 73/9 76/9
76/12 76/18 77/2 78/5
79/14 81/23 82/12
84/5 85/6 86/15 86/18
88/7 88/11 88/14 89/4
90/1 90/4 90/16 92/20
94/8 96/12 96/20 99/1
105/14 109/22 111/17
115/15 116/9 119/16
120/1 121/18 123/8
125/1 128/5 131/21
133/5 133/17

**done [28]** 5/4 18/18
19/21 39/7 45/13
46/12 46/18 47/1 54/1
54/1 58/22 58/24
68/22 73/3 77/22
77/22 82/4 82/14
82/15 82/16 91/20
95/24 108/22 113/18
116/14 134/21 136/1
138/21

**doors [1]** 131/22

**dot [3]** 129/8 129/8
129/8

**Double [7]** 104/22
105/6 105/6 105/15
106/4 106/25 107/11

**Douglas [1]** 107/6

**down [57]** 79/14
79/16 81/17 85/7
118/7 119/8 119/10
125/17 126/15 131/12

**downgrade [16]**
64/21 66/8 67/6 68/3
68/8 68/14 68/15 69/5
69/21 70/10 71/22
72/2 72/8 72/16 72/19
83/4

**downgraded [6]**
64/16 65/7 67/8 82/21
83/3 88/25

**downgrades [1]**
65/12

**downgrading [1]**
82/13

**download [2]** 96/17
96/19

**dozens [1]** 60/20

**drone [1]** 135/11

**drop [1]** 124/14

**drug [1]** 101/21

**due [2]** 61/9 131/16

**during [19]** 14/4
16/4 17/19 17/25
20/20 20/25 21/5
21/14 30/15 55/3
55/11 62/9 81/2 81/3
81/21 81/25 83/1
94/17 125/6

**duties [1]** 118/15

**E**

**each [6]** 5/3 106/2
114/11 125/4 134/11
136/23

**earlier [7]** 16/5
17/13 34/11 87/21
89/3 90/16 104/4

**easier [1]** 39/4

**East [2]** 1/16 140/8

**Eastern [1]** 102/20

**eating [1]** 135/24

**Ebrahimi [1]** 107/11

**EE [1]** 106/6

**EEE [1]** 127/19

**effect [6]** 38/10
43/12 114/17 115/22
116/1 116/7

**egregious [1]** 15/15

**eight [3]** 18/1 18/3
77/13

**either [9]** 56/19 60/5
65/16 86/4 87/7

**118/12 118/13 127/3
138/17**

**election [1]** 128/5

**element [5]** 10/15
87/23 120/2 120/2
120/5

**elements [1]** 129/15

**elevated [1]** 26/16

**Eleventh [5]** 4/9
4/15 100/8 135/5
135/8

**ELLEN [3]** 1/20
140/6 140/6

**else [5]** 51/19 78/5
91/9 96/6 115/15
126/16 128/10 133/21
133/24

**elsewhere [1]** 52/14

**email [5]** 12/10
13/14 21/8 52/24
52/25

**emails [3]** 20/20
22/20 138/24

**employed [4]** 33/19
33/20 79/6 104/5

**employee [1]** 103/5

**enabled [1]** 24/2

**encourage [1]**
137/13

**encouraged [1]**
102/13

**encouraging [1]**
128/3

**end [10]** 12/7 18/7
32/7 33/3 40/1 40/18
42/24 43/7 69/1 139/5

**enforcement [14]**
4/21 4/22 94/12 94/15
100/18 100/18 112/8
113/11 113/20 113/22
113/24 114/4 114/13
116/11

**engaged [2]** 4/17
100/13

**enlighten [1]** 66/7

**enough [3]** 21/12
118/4 135/14

**enter [1]** 120/15

**entire [4]** 56/12
105/10 113/15 136/11

**entitled [3]** 8/2
122/18 140/4

**entry [14]** 4/8 106/5
106/6 106/7 106/8
106/9 106/10 106/11
106/12 106/14 106/25
112/15 132/12 132/17

**Eric [1]** 101/19

**err [1]** 40/21

**error [1]** 10/23

**especially [1]** 109/5

**Esq [2]** 1/10 1/15

**E**

**essence [4]** 5/20
11/25 35/6 111/17
**essentially [1]** 35/23
**established [2]**
115/5 116/17
**establishes [1]** 4/2
**estimate [5]** 17/21
17/23 17/24 76/11
90/17
**estimated [2]** 58/15
58/15
**estimation [1]** 18/1
**even [18]** 6/23 15/11
63/3 63/4 63/9 73/10
76/19 85/19 88/23
109/1 122/16 123/5
127/15 127/21 129/1
130/24 135/13 138/15
**evening [1]** 25/18
**ever [20]** 36/15 49/5
49/14 49/18 49/25
50/3 55/22 56/1 59/19
73/17 74/16 82/6 82/9
82/19 83/18 83/20
86/8 86/12 90/2 91/1
**every [13]** 10/13
47/25 48/12 73/6 97/3
108/7 114/6 117/14
120/24 122/12 124/3
131/7 139/1
**everybody [3]** 128/2
128/7 128/17
**everyone [2]** 3/5
98/5
**everything [3]**
110/23 113/21 139/18
**evidence [50]** 4/22
6/2 6/5 6/5 6/16
6/18 6/21 7/21 7/22
7/23 9/10 9/11 9/18
9/19 9/19 10/12 19/5
23/3 32/14 32/17
38/23 39/1 40/14 41/3
84/5 96/9 100/9
100/10 100/19 100/21
100/25 105/20 108/5
110/3 111/19 114/20
115/2 115/7 115/10
115/13 115/14 115/18
116/8 116/8 116/17
118/21 121/15 124/10
137/3 138/21
**evident [1]** 109/5
**exact [7]** 17/20
17/22 21/11 127/5
128/24 132/6 134/3
**exactly [3]** 43/1
96/13 130/18
**examination [21]**
11/21 14/11 14/13

16/1 20/5 22/11 22/13
27/21 28/7 33/16
54/19 54/22 55/11
61/19 62/16 66/4
78/24 86/21 86/24
87/5 91/15
**examine [1]** 109/18
**example [4]** 8/18
58/1 66/13 133/9
**exceed [1]** 119/15
**except [1]** 119/14
**excerpt [1]** 105/7
**exclamation [3]**
127/10 127/10 127/10
**exclusive [1]** 59/9
**excuse [10]** 4/16 5/5
13/5 22/18 36/7 86/14
108/22 109/18 113/9
114/14
**excused [1]** 31/18
**execution [1]** 127/11
**exercise [2]** 6/10
15/19
**exhibit [69]** 23/6
23/9 39/6 97/4 98/6
98/13 98/13 98/14
98/15 98/16 98/22
98/23 99/1 99/5 101/4
101/9 101/15 101/15
102/1 102/5 102/11
102/18 102/20 103/3
103/11 103/12 104/2
104/14 104/21 105/5
105/7 105/10 105/15
105/16 106/3 106/4
106/6 106/9 106/10
106/11 106/12 106/16
106/16 106/17 106/19
106/24 106/25 107/1
107/5 107/6 107/7
107/14 107/17 107/17
112/15 118/5 122/13
122/14 122/21 124/22
125/5 125/17 125/19
127/8 127/19 127/25
130/10 131/19 137/2
**exhibits [20]** 5/6
23/3 96/9 96/10 96/13
96/25 97/2 97/5 98/8
98/12 98/18 98/22
99/4 100/23 105/20
105/24 107/24 110/20
139/16 139/21
**exhortation [1]**
126/23
**exhortations [1]**
126/25
**exist [6]** 109/24
110/1 111/21 111/25
123/16 136/11
**existed [2]** 93/19
114/5

**existence [1]** 136/12
**exists [2]** 108/18
113/8
**expectation [1]**
127/16
**expecting [1]** 139/11
**experience [1]**
28/17
**experienced [1]**
30/9
**explain [4]** 47/3
48/18 86/1 126/21
**explaining [1]** 128/1
**explicit [2]** 24/23
101/23
**expressed [1]** 81/18
**expresses [1]** 127/4
**expression [1]** 126/8
**extend [1]** 113/21
**extent [1]** 114/15
**extremely [1]**
125/11
**eye [1]** 128/2
**eyebrows [1]** 132/8
**eyes [2]** 136/15
136/16

**F**

**F-ing [2]** 127/11
132/18
**F.2d [1]** 4/10
**F.3d [2]** 4/24 100/6
**F.App [2]** 135/4
135/7
**F.Supp [1]** 135/20
**face [3]** 101/23
123/13 127/3
**facie [2]** 4/4 100/2
**fact [10]** 30/14 62/7
62/20 83/2 87/23
88/23 125/24 127/2
134/9 138/20
**factor [9]** 55/15
55/18 56/1 59/9 64/6
64/10 90/6 91/3 111/5
**factors [1]** 53/14
**facts [7]** 7/21 74/14
75/4 81/24 106/2
114/18 119/21
**fails [2]** 113/15
113/16
**failure [1]** 135/1
**fair [5]** 24/11 59/6
59/7 60/8 61/9
**faith [1]** 114/6
**fall [1]** 138/1
**familiar [7]** 24/11
24/19 25/1 59/1 65/19
65/22 89/22
**family [4]** 52/4 86/7
101/20 105/17
**famous [1]** 137/17

**far [4]** 29/19 89/11
111/13 120/25
**fashion [2]** 4/13 6/1
**fast [2]** 97/17 101/23
**fault [2]** 10/23 99/3
**FBI [5]** 121/14
132/20 133/25 136/6
136/19
**fear [1]** 13/12
**feared [1]** 13/22
**February [5]** 1/5 3/1
98/1 103/8 140/6
**federal [12]** 1/15
3/17 101/12 101/14
101/24 107/21 111/21
111/23 112/1 132/2
137/12 137/14
**federally [5]** 101/6
101/8 105/18 105/18
108/11
**feel [9]** 38/11 40/6
40/7 40/9 53/21 53/24
53/25 128/4 130/12
**feeling [1]** 13/21
**feet [1]** 136/13
**Feliciano [2]** 103/4
103/5
**fellow [1]** 102/8
**felonies [3]** 118/8
129/22 129/24
**felony [5]** 77/7 118/2
118/3 130/25 137/9
**felt [2]** 18/8 50/11
**female [2]** 8/25 11/1
**few [4]** 57/20 109/1
109/3 117/23
**FF [1]** 107/5
**FFF [1]** 127/25
**field [1]** 79/11
**Fifteen [1]** 74/7
**figure [5]** 47/6 47/11
47/13 111/20 138/17
**filed [3]** 3/20 99/6
117/2
**filing [1]** 128/20
**filings [1]** 117/9
**final [3]** 15/18
130/13 137/1
**finally [6]** 30/4 64/13
105/15 106/17 108/3
137/1
**find [25]** 4/8 9/12
9/24 10/2 84/10 88/14
103/1 103/8 103/24
104/11 104/12 104/19
108/4 108/15 108/20
108/24 111/9 111/9
112/21 112/23 114/23
136/10 137/13 138/23
139/4
**finding [1]** 121/5
**findings [2]** 50/12

81/14
**fine [11]** 5/10 11/19
23/4 28/14 37/17 39/5
41/4 43/23 99/13
99/17 119/12
**finger [1]** 9/12
**finish [2]** 5/5 137/7
**finished [2]** 92/1
99/6
**firearm [2]** 93/18
104/19
**firearms [2]** 88/12
88/16
**first [33]** 4/4 5/21
5/22 6/2 6/7 6/17
7/15 7/19 10/15 13/20
23/20 25/20 25/21
37/10 46/1 50/5 63/11
98/11 99/20 101/1
105/21 109/24 110/10
110/14 110/18 114/18
117/17 117/21 117/21
122/9 133/9 133/14
137/1
**five [8]** 14/16 14/18
83/17 104/9 119/20
121/22 125/12 138/23
**fix [1]** 18/11
**flag [1]** 31/5
**floor [3]** 1/11 123/12
123/17
**FLORIDA [21]** 1/1
1/4 1/11 1/16 1/22
11/3 11/6 48/21 56/12
56/24 57/13 67/11
67/14 67/24 68/5 76/4
121/17 131/13 133/14
137/6 140/8
**flow [1]** 136/17
**Flowers [2]** 9/21
10/1
**focus [2]** 87/11
130/6
**focused [1]** 116/14
**focusing [1]** 117/16
**folder [1]** 97/4
**follow [1]** 61/6
**following [6]** 5/19
30/10 30/15 56/25
92/21 93/5
**follows [1]** 129/6
**Footnote [2]** 132/12
137/21
**foregoing [1]** 140/3
**forgive [2]** 30/2
90/17
**forgiven [1]** 138/14
**form [2]** 44/25 61/21
**former [11]** 12/2
16/15 20/9 24/5 30/10
34/11 37/24 101/18
102/13 104/5 126/2

**F**

**formerly [1]** 12/1
**FORT [6]** 1/2 1/4
1/11 1/16 1/22 140/8
**forth [1]** 69/24
**forward [11]** 18/6
42/2 42/4 42/6 43/5
48/23 67/17 70/14
73/15 95/11 118/23
**forwarded [4]** 13/13
17/16 21/13 21/15
**forwarding [2]**
16/10 28/18
**found [4]** 108/23
127/3 130/15 130/19
**foundation [5]** 44/7
44/25 46/4 50/23
65/14
**four [7]** 5/2 7/2
20/16 26/2 45/7 83/17
118/12
**fourth [5]** 30/1 30/2
106/3 122/6 128/22
**FRANK [7]** 1/6 3/8
3/17 12/8 21/24 34/7
112/24
**frankly [1]** 16/11
**free [1]** 128/4
**freely [2]** 42/10
95/16
**friend [1]** 88/15
**front [6]** 37/14 38/3
49/16 63/1 63/5
121/19
**full [1]** 108/4
**function [1]** 113/23
**further [16]** 14/9
15/23 19/17 22/10
26/10 27/5 28/5 30/12
31/15 54/17 77/19
81/20 86/19 92/6
95/21 130/24

**G**

**G-U-I-L-L-E-R-M-O
[1]** 33/14
**Gabrielle [6]** 17/10
24/13 104/3 104/4
104/7 104/10
**Gaherty [1]** 106/10
**game [1]** 7/25
**Gasper [1]** 101/11
**gather [1]** 73/11
**gave [2]** 81/24
110/23
**gay [8]** 6/11 37/4
37/18 37/21 55/4 55/5
55/8 55/13
**general [3]** 12/18
32/8 134/12
**generally [2]** 56/17
84/4

**generation [1]**
136/11
**George [6]** 12/2
20/10 24/5 34/11
102/19 125/6
**Georgia [3]** 56/14
104/16 104/17
**get [41]** 5/22 9/10
15/20 16/24 24/2
36/21 36/21 36/23
39/6 39/15 40/5 40/5
60/4 61/21 67/23
69/20 71/22 72/15
73/11 80/16 82/9
84/18 89/3 92/9 95/4
96/20 97/6 101/20
104/18 107/22 108/3
114/11 116/24 118/25
119/4 119/10 122/18
123/23 128/3 131/13
134/25
**gets [8]** 57/22 64/15
67/24 112/13 114/9
117/25 118/1 128/11
**getting [5]** 16/9
64/13 72/12 80/17
117/21
**GG [1]** 107/7
**Giffen [1]** 106/16
**give [21]** 9/11 17/21
17/23 18/12 22/23
23/7 33/11 44/2 79/22
82/4 89/7 89/10 90/21
93/4 110/18 114/1
123/21 132/23 135/3
139/15 139/15
**given [6]** 28/17
28/19 83/13 83/14
122/25 123/20
**go [34]** 7/1 8/21 10/8
10/21 23/2 33/5 34/14
37/9 37/10 66/25
68/21 68/22 72/6
72/15 78/10 82/19
84/5 92/3 92/11 92/24
97/5 97/10 99/17
104/18 118/6 118/22
120/1 121/10 122/12
124/3 124/11 126/21
127/8 132/25
**goes [6]** 42/25 49/8
77/6 82/17 128/1
136/21
**going [76]** 6/13 9/7
9/11 9/12 9/13 9/15
9/22 10/8 10/9 10/11
11/25 17/3 17/7 23/9
27/14 30/4 31/2 32/1
32/5 37/9 39/9 39/21
41/10 41/11 46/24
48/8 51/17 52/7 52/16
52/21 53/7 58/21 60/8

60/9 66/19 68/25 69/1
69/3 69/23 69/25
70/14 72/3 72/9 72/20
80/22 84/4 88/21
91/19 92/4 93/18 96/5
96/8 96/21 98/14
100/23 100/24 100/25
104/18 110/22 114/10
114/19 117/14 118/6
119/8 126/12 126/16
127/9 127/23 128/12
128/15 130/12 133/18
134/20 135/21 136/9
139/12
**good [14]** 3/5 3/11
3/15 3/16 3/19 22/15
33/18 54/24 55/1
77/23 87/2 87/4 95/24
114/6
**GOP [1]** 101/12
**Gordon [3]** 99/20
115/4 115/13
**Gosar [2]** 102/7
127/19
**got [6]** 16/4 98/17
115/15 120/10 131/11
131/12
**gotten [3]** 93/8
122/17 139/17
**government [51]**
5/18 6/2 6/22 7/9
7/25 8/4 8/5 8/11
8/14 9/4 9/9 10/14
19/6 23/8 41/24 97/5
97/19 98/21 99/2
108/15 109/20 111/15
113/7 115/16 116/20
117/6 117/12 121/1
121/9 121/11 124/17
127/17 130/10 130/21
132/5 132/10 132/13
132/15 132/20 132/22
133/7 135/15 136/14
136/23 137/20 137/20
137/21 137/23 138/16
138/21 139/4
**Government's [18]**
4/21 7/12 7/17 10/9
98/15 98/22 98/23
100/18 105/9 107/6
122/13 122/20 125/5
135/18 136/24 138/2
138/6 138/10
**GPS [1]** 136/5
**grand [10]** 8/16 49/1
49/5 49/14 49/16 63/1
63/5 63/13 77/9 83/20
**granting [2]** 131/2
131/6
**great [4]** 11/11 20/3
23/15 123/25
**greater [1]** 119/19

**greet [1]** 85/8
**Gregory [1]** 106/8
**ground [1]** 133/20
**Guantanamo [2]**
127/11 127/16
**guess [5]** 30/17 48/8
80/4 85/20 87/8
**guessing [2]** 48/15
48/25
**guideline [1]** 109/9
**guidelines [2]**
109/10 111/25
**guiding [1]** 111/24
**Guillermo [4]** 33/13
33/16 54/22 66/4
**guilty [5]** 120/17
129/7 130/15 130/15
130/19
**gun [2]** 36/15 123/13
**guns [2]** 88/10 88/14
**guy [1]** 124/1

**H**

**had [65]** 12/20 13/13
16/6 17/4 18/24 19/14
24/4 24/5 27/3 28/16
29/7 29/11 29/25 30/2
30/9 30/10 30/11
30/15 31/1 35/10
35/11 35/17 35/21
36/7 36/8 39/18 41/13
42/9 42/10 42/17
42/22 48/16 55/2 55/7
55/12 63/21 65/15
67/2 67/22 68/20 70/9
70/18 72/24 73/21
74/5 74/8 81/17 84/15
84/17 87/15 90/19
90/24 94/15 98/7
111/14 116/20 118/18
121/5 121/13 123/24
125/4 125/9 130/11
131/18 134/13
**half [1]** 133/15
**Hall [1]** 106/5
**Hampshire [2]**
112/14 120/14
**hand [4]** 11/12 19/25
33/8 78/15
**handcuffs [1]** 92/7
**handled [9]** 51/19
57/18 70/8 75/18
76/13 76/18 77/9
76/13 78/18 77/9
76/13 76/18 77/9
**handling [1]** 23/22
**hands [2]** 42/7 95/12
**Hannon [1]** 107/14
**happen [10]** 15/3
41/25 113/4 114/25
123/25 123/25 126/13
126/18 131/2 134/19
**happened [8]** 15/9

47/10 104/17 114/8
120/19 123/24 132/25
133/21
**happening [5]** 9/8
112/2 114/8 115/12
115/12
**happens [8]** 9/16
41/23 95/1 123/17
127/6 127/7 130/2
132/14
**hard [2]** 88/1 121/5
**hardwood [1]**
136/13
**harm [11]** 29/4
29/20 30/14 31/6
39/24 52/9 53/7 58/3
103/17 103/17 103/18
**harming [1]** 29/4
**has [40]** 4/5 5/20 6/2
6/9 6/14 6/16 6/21
7/1 8/14 9/4 36/15
59/19 60/23 70/19
81/2 88/11 88/16
100/3 100/8 108/5
109/20 111/2 111/11
111/15 113/7 113/21
115/3 115/3 115/5
117/2 117/8 120/12
120/19 120/24 121/5
124/5 125/15 131/8
132/13 138/21
**hasn't [2]** 60/25 69/8
**have [272]**
**haven't [4]** 110/20
115/17 122/17 139/17
**having [8]** 18/10
22/24 65/5 90/2 91/1
101/3 134/9 137/11
**he [150]**
**he's [10]** 3/18 29/3
29/18 45/1 59/24
70/18 96/13 96/22
102/19 129/10
**head [1]** 126/11
**headquarters [1]**
136/6
**health [1]** 36/17
**hear [21]** 11/9 18/13
22/8 22/16 22/22
23/13 23/14 32/19
32/22 33/2 33/6 33/7
71/15 78/11 78/12
78/13 78/14 78/22
87/3 99/17 110/19
**heard [5]** 5/13 69/13
104/3 118/16 121/15
**hearing [10]** 1/7 7/4
8/4 8/11 19/9 96/7
98/12 120/21 122/15
122/19
**hearings [3]** 19/6
109/20 111/14

**H**

**heart [1]** 49/9
**heated [1]** 29/16
**heavily [1]** 115/23
**help [2]** 16/20 42/13
**helped [2]** 42/9
95/16
**helps [1]** 95/18
**her [9]** 17/6 22/21
23/10 123/14 132/15
132/16 132/20 132/21
135/12
**here [70]** 3/20 7/17
9/7 9/8 9/9 9/15 9/22
11/3 12/1 19/23 31/2
35/6 48/19 66/6 66/7
67/10 67/11 67/22
68/25 70/1 70/2 70/19
72/12 76/4 76/6 78/8
79/14 85/8 97/4 97/22
105/1 107/10 108/4
110/11 111/8 111/20
111/22 112/2 112/10
113/3 113/8 114/8
114/22 115/1 115/12
115/13 116/5 116/10
116/12 117/15 117/17
117/24 118/5 118/25
119/17 121/10 121/17
124/10 125/11 126/6
127/6 128/2 128/12
132/19 133/13 134/2
134/10 135/18 136/25
139/13
**here's [4]** 70/6 114/9
121/10 138/1
**hereby [1]** 140/3
**Herman [1]** 1/13
**Hertig [1]** 43/14
**hey [3]** 15/2 15/3
126/5
**HH [1]** 106/7
**high [3]** 28/19
122/16 122/22
**higher [3]** 89/11
120/18 130/23
**highest [1]** 61/17
**highly [2]** 91/8 132/7
**him [58]** 13/2 20/13
28/3 31/6 31/21 31/24
32/24 34/18 34/22
34/23 34/24 34/24
35/11 37/18 37/19
37/25 38/11 39/2 40/2
40/3 40/6 40/7 40/8
40/8 41/11 41/12
41/16 41/23 42/6
42/25 43/1 43/10 47/6
47/8 51/1 55/3 59/24
62/13 64/7 66/25 67/8
67/19 70/18 73/18

78/9 81/6 88/4 88/6
88/10 92/7 95/11
95/12 95/16 95/16
95/17 95/18 102/8
135/15
**himself [1]** 72/2
**hired [1]** 22/18
**his [43]** 10/23 18/24
19/14 29/7 29/7 30/10
32/23 36/7 36/8 41/11
41/12 42/23 43/1
54/10 59/12 59/23
61/12 62/12 62/14
84/6 84/7 84/7 84/8
84/10 84/12 88/15
88/15 88/15 88/15
93/13 96/15 97/20
102/21 102/25 103/6
104/6 105/17 120/9
120/15 120/18 120/20
129/3 129/10
**history [2]** 80/16
81/1
**hit [2]** 117/14 135/25
**hmm [1]** 74/1
**Hold [1]** 51/6
**home [3]** 34/14 56/9
88/14
**homosexual [4]**
50/22 113/2 113/5
116/19
**homosexuals [1]**
114/25
**honest [2]** 90/21
95/19
**honestly [4]** 16/11
30/8 90/21 129/24
**Honor [113]** 3/11
3/16 3/23 3/25 3/25
5/1 5/11 5/13 5/16
5/24 6/8 6/14 6/20
7/11 10/19 11/7 11/16
14/10 15/23 18/18
19/1 19/5 19/11 19/17
22/4 22/10 23/1 23/5
23/9 31/16 31/19 32/5
32/8 32/13 32/24
38/21 38/22 39/3
40/19 40/23 43/23
46/6 49/8 49/21 50/25
54/18 59/11 59/22
61/12 65/14 77/6
77/11 77/20 78/1 78/3
86/20 95/22 96/3 96/8
96/12 96/24 97/9
97/12 97/17 97/18
97/21 97/24 98/7
98/11 98/19 98/25
99/3 99/8 99/16 103/4
103/11 103/13 104/2
104/14 105/6 105/15
107/24 108/4 110/13

110/16 110/25 117/5
117/7 118/24 120/23
122/4 122/8 122/23
124/21 125/23 127/7
127/13 129/4 129/19
129/20 130/5 132/8
132/9 132/12 132/24
133/4 133/14 134/4
135/3 137/1 137/7
139/6 139/20
**HONORABLE [3]** 1/8
1/21 140/7
**hope [11]** 15/3 34/6
101/19 101/20 124/7
125/21 127/6 128/13
129/18 129/21 138/14
**hoping [1]** 97/16
**horrible [1]** 126/18
**hostile [3]** 30/5 30/6
31/11
**hour [3]** 7/2 97/4
136/3
**hours [1]** 12/22
**House [2]** 123/12
123/17
**how [70]** 17/11
17/18 17/24 18/3
20/12 21/10 24/1 34/1
42/13 43/5 43/25 44/6
44/16 44/21 45/12
45/24 46/2 46/18
46/25 47/13 47/22
48/19 49/24 50/2 50/3
50/24 52/10 53/4
53/10 54/13 57/17
59/9 65/15 67/17
69/25 71/13 73/3 73/8
73/9 73/15 74/10
75/19 76/7 76/19
76/23 79/10 79/12
79/17 79/20 80/2
81/22 82/1 82/7 83/11
83/11 83/15 83/22
84/18 85/17 85/23
88/21 90/18 92/6
92/25 97/15 107/20
108/23 114/20 127/2
137/8
**how's [1]** 136/9
**however [10]** 58/5
70/23 103/25 119/5
120/5 121/12 121/23
126/4 126/24 133/20
**hundred [1]** 61/18
**hung [1]** 129/7
**Hunter [1]** 129/3
**Hurtig [37]** 31/20
32/3 34/6 34/6 34/14
35/9 35/12 35/17 36/8
36/11 37/17 37/19
40/20 41/18 42/1 42/5
42/9 42/22 42/25 43/6

43/7 55/12 56/25 62/9
78/7 78/11 78/12
78/24 79/2 79/5 86/24
87/2 91/15 95/24
105/8 108/25 116/22
**Hurtig's [2]** 42/7
116/19
**hyperbole [2]** 123/6
135/14

**I**

**I got [1]** 131/12
**I will [17]** 19/9 59/4
66/16 67/15 76/9
82/10 96/17 105/6
110/11 110/20 117/7
117/22 123/8 128/25
134/2 137/10 139/9
**I'd [3]** 5/6 5/11
101/22
**I'll [38]** 23/7 37/10
38/3 38/4 38/19 38/19
39/6 40/14 43/17
47/23 49/11 58/10
58/10 69/19 96/9
98/18 100/22 102/5
105/21 105/10 105/10
105/21 106/1 110/14
115/4 117/3 118/22
119/24 120/3 125/19
128/24 132/23 132/23
134/21 135/3 137/7
138/18 139/15
**I'm [109]** 8/2 9/1
10/4 10/11 11/25
12/11 16/17 19/23
22/3 22/7 22/16 23/9
24/10 26/22 26/23
28/13 29/15 29/22
30/4 33/20 34/6 37/9
37/12 37/15 37/16
37/18 37/18 38/22
39/21 42/5 43/13 45/7
46/24 48/3 48/8 48/15
48/25 52/7 54/24 55/4
55/7 55/9 57/8 57/8
59/6 60/3 61/21 62/11
63/10 63/13 65/22
66/19 67/7 67/8 69/1
69/3 70/1 70/1 70/6
70/14 70/14 70/16
71/15 72/5 72/12
72/12 73/9 74/3 74/10
74/17 77/10 79/3 82/3
82/8 84/4 87/10 90/14
91/6 91/19 91/24 92/4
92/13 92/24 93/18
94/8 95/7 95/8 97/1
97/16 97/17 100/23
100/25 101/18 106/13
110/17 110/22 117/14
127/1 127/9 128/2

128/3 128/6 128/23
130/17 131/12 131/21
133/18 134/20 135/21
**I've [8]** 34/3 34/3
51/8 51/9 82/4 90/22
114/24 134/21
**idea [5]** 76/7 76/11
77/16 89/7 94/6
**identifiable [1]**
112/11
**identified [9]** 101/3
111/3 111/7 112/17
112/25 113/2 115/1
116/18 122/11
**identify [4]** 22/3
80/8 80/12 105/22
**if [172]**
**ignite [1]** 104/17
**II [1]** 106/8
**Illinois [1]** 115/20
**illogical [2]** 138/10
138/11
**image [1]** 127/20
**immediate [3]** 47/6
60/11 93/17
**immediately [1]**
92/21
**impact [2]** 115/11
115/19
**impede [2]** 118/13
119/23
**impermissible [1]**
111/5
**implying [1]** 132/19
**important [9]** 42/11
42/11 43/1 43/3 59/9
67/10 100/12 107/22
109/24
**importantly [1]**
111/13
**impossible [3]** 75/6
80/21 88/3
**imprisonment [4]**
119/13 119/14 138/4
138/8
**improper [2]** 91/9
118/20
**in [498]**
**inaccuracies [1]**
117/8
**inaccurate [1]**
120/25
**inbox [2]** 17/2 17/8
**incident [2]** 10/3
**include [4]** 14/24
14/25 109/8 115/10
**includes [4]** 102/3
103/1 109/11 124/24
**incoming [1]** 17/5
**incorrect [2]** 138/19
138/22
**independent [1]**
6/14

## I

**INDEX [1]** 1/24
**Indiana [2]** 105/17
105/19
**indicate [4]** 51/18
103/15 106/3 109/19
**indicated [33]** 8/6
13/11 13/22 16/13
27/25 28/7 28/24
29/25 30/5 37/4 37/23
42/17 65/15 66/6 66/7
66/21 67/4 70/9 71/20
73/1 74/4 92/13 95/6
95/15 104/7 109/1
109/6 109/20 114/24
118/18 122/7 132/13
138/16
**indicates [3]** 7/15
9/17 115/21
**indicating [1]** 38/16
**indication [1]**
127/15
**indictment [1]** 3/20
**indictments [1]**
96/18
**individual [26]** 4/20
12/7 21/23 27/14
80/16 87/11 88/19
89/14 90/19 91/4
96/20 100/16 103/23
105/16 112/16 120/14
122/3 123/11 127/16
127/18 130/14 131/20
133/19 134/12 134/16
134/18
**individual's [2]** 90/6
131/24
**individually [1]**
100/24
**individuals [14]**
24/12 50/22 56/19
60/17 62/20 63/16
108/9 110/4 110/6
111/9 112/24 114/24
116/4 132/1
**inflict [1]** 126/8
**influence [4]** 38/17
118/13 133/24 134/6
**information [21]** 8/9
9/12 24/2 35/2 35/3
35/4 35/4 40/5 40/5
43/4 48/23 53/16
57/17 61/23 67/19
70/5 73/11 80/17
83/13 108/1 114/2
**infrastructure [1]**
101/13
**ing [2]** 127/11
132/18
**initial [11]** 4/11 4/25
55/3 55/11 65/5 68/12

81/17 88/18 106/13
109/6 109/17
**initially [16]** 7/11
59/10 64/20 65/9
65/10 65/24 66/7
81/24 82/23 82/24
83/12 83/14 85/6 89/4
100/2 111/5
**injure [4]** 24/24
126/23 126/25 127/1
**injury [1]** 126/8
**inquiry [1]** 115/6
**insidious [1]** 115/10
**instance [2]** 35/9
127/21
**instances [2]** 103/22
125/9
**instead [3]** 106/18
113/9 119/8
**instruction [1]** 133/4
**integrity [1]** 128/6
**intend [4]** 88/24
121/1 121/11 139/18
**intended [1]** 88/6
**intending [3]** 88/2
96/13 134/25
**intends [2]** 88/19
96/11
**intent [7]** 10/3 67/4
87/22 115/7 115/10
123/21 127/14
**intention [4]** 39/16
39/18 126/8 134/6
**intentions [3]** 39/10
39/12 41/13
**intents [3]** 118/18
118/19 119/2
**interest [50]** 25/2
26/17 26/24 51/24
52/1 52/5 52/8 52/11
52/22 53/9 53/14
53/17 55/20 57/21
58/5 58/11 58/22 59/3
59/21 60/5 60/16
60/19 60/21 61/5
64/14 64/16 64/22
65/7 65/12 66/9 68/4
69/6 69/22 76/16
81/18 82/14 82/21
82/24 85/11 85/13
85/18 85/24 86/1 87/8
89/1 89/4 89/9 89/11
95/4 118/22
**interesting [2]** 113/3
137/23
**interests [1]** 58/16
**internal [2]** 8/17
10/24
**interpreted [1]**
100/8
**interrupt [3]** 38/21
68/21 95/8

**interstate [5]** 118/11
119/22 120/1 120/2
120/5
**interview [86]** 12/24
34/16 34/18 34/18
34/21 34/24 35/7
36/23 37/21 39/12
40/1 40/4 42/24 43/7
43/10 46/12 47/10
47/25 48/2 48/22
50/10 50/10 53/10
53/15 53/18 53/20
54/1 54/1 54/2 54/9
55/3 55/11 57/1 60/10
61/2 62/9 66/11 66/12
66/14 66/21 66/25
66/25 67/3 67/8 67/15
67/19 67/24 67/25
68/6 68/13 68/16
68/17 68/24 70/5
70/24 76/5 79/15 80/5
80/8 80/11 80/12
80/23 81/3 81/14
81/25 84/1 84/19
84/23 85/5 87/12
87/16 92/1 92/18
92/21 93/1 93/3 93/4
93/6 93/6 93/7 93/8
93/11 94/10 94/25
95/18 105/8
**interviewed [11]**
39/10 47/23 48/1
50/11 50/22 53/13
80/9 81/4 81/6 85/13
91/17
**interviewing [3]**
36/13 47/19 70/2
**interviews [8]** 36/5
46/18 46/25 47/23
56/18 80/2 87/6 91/18
**interwoven [1]**
114/9
**intimidate [1]**
102/15
**into [24]** 7/22 14/21
16/18 17/2 17/2 23/2
25/21 26/3 39/1 63/18
81/1 82/17 96/9
107/22 115/6 117/18
120/15 122/25 124/24
127/3 128/1 135/12
136/12 137/3
**introduce [1]** 5/7
**inundate [1]** 121/1
**inure [1]** 120/9
**inures [1]** 120/8
**investigate [5]**
10/13 58/11 60/8
61/11 69/4
**investigated [11]**
44/1 44/16 44/22
52/11 55/21 58/16

63/7 63/17 77/17
104/25 109/4
**investigating [2]**
63/4 133/25
**investigation [21]**
34/19 34/22 48/9
48/10 48/11 48/20
54/11 55/23 60/11
64/17 64/21 66/10
66/17 74/12 82/18
83/1 88/21 88/25 94/9
105/2 136/9
**investigations [8]**
49/6 49/9 57/4 57/10
57/16 79/14 85/18
124/24
**investigative [2]**
56/2 84/23
**investigatively [1]**
55/16
**investigator [3]**
51/15 75/19 79/13
**invidious [4]** 6/4
6/10 6/21 7/9
**involve [1]** 57/23
**involved [15]** 4/2
27/13 29/4 31/1 36/2
45/21 57/15 58/2
62/20 63/3 63/4 65/3
99/20 116/24 127/19
**involvement [2]**
57/4 57/9
**involves [1]** 102/21
**involving [7]** 29/19
57/10 82/2 83/23
101/16 102/2 106/18
**irrelevant [1]** 90/15
**is [457]**
**issue [5]** 6/13 8/6
113/6 133/4 139/12
**issued [1]** 123/4
**issues [4]** 97/11 98/6
117/16 125/1
**it [249]**
**it's [92]** 9/8 9/20
9/20 10/10 30/7 30/8
30/24 30/24 32/17
36/23 37/17 38/7
39/15 40/18 40/19
41/3 43/3 43/9 43/18
43/20 43/20 44/13
48/15 50/9 52/8 52/8
52/9 53/6 53/6 53/6
53/20 54/7 55/18
58/21 59/9 59/11
59/22 60/4 66/12
67/10 67/22 67/24
72/1 72/13 72/14
72/23 73/25 75/10
75/14 80/21 83/5 83/9
83/13 84/5 85/22 88/1
88/3 89/21 90/22 92/5

95/13 96/4 106/9
111/1 111/16 111/17
111/25 112/4 112/15
112/15 113/2 113/3
115/20 118/5 120/12
124/18 126/17 126/19
127/13 127/14 130/18
131/21 134/5 135/4
135/7 135/8 135/16
136/24 137/8 137/16
138/5 138/11
**its [3]** 6/9 9/17 127/3
**itself [1]** 13/14

## J

**jacket [1]** 76/9
**Jan [3]** 1/15 3/16
10/23
**January [26]** 12/4
12/11 12/12 12/12
20/14 29/6 29/8 29/12
29/12 34/7 34/12 54/9
55/4 62/21 75/23
75/24 76/1 81/12
85/15 85/16 87/10
87/11 94/7 116/18
120/22 128/21
**January 29th [4]**
12/12 29/6 29/12
34/12
**January 30th [2]**
12/11 12/12
**January 31 [1]** 54/9
**January 31st [5]**
34/7 55/4 81/12 94/7
116/18
**January 7th [2]** 12/4
12/12
**JJ [1]** 106/9
**job [28]** 40/3 43/10
47/19 48/19 48/21
48/22 58/19 58/24
67/10 67/11 67/12
67/18 67/24 68/6 70/4
70/4 73/10 73/13 75/4
75/4 75/8 75/10 75/11
75/15 75/17 76/4 76/5
76/6
**Joe [3]** 3/12 14/15
129/3
**John [3]** 128/23
129/2 129/9
**joining [1]** 79/24
**Jonathan [4]** 101/16
101/16 125/20 127/6
**Jones [1]** 4/9
**Joseph [2]** 1/13
117/11
**Joshua [3]** 3/13
12/25 106/5
**judge [22]** 1/8 9/23
23/16 27/18 42/14

## J

**judge... [17]** 43/19
44/7 44/24 46/4 50/23
54/20 66/1 69/7 69/13
74/19 86/22 91/12
129/15 135/11 137/22
139/14 139/19
**judgment [1]** 130/13
**July [1]** 13/21
**June [1]** 123/4
**jurisdiction [2]**
56/12 111/21
**jurisdictions [2]** 8/7
108/12
**juror [1]** 9/23
**jury [12]** 8/16 49/1
49/5 49/14 49/16 63/1
63/5 63/13 77/9 83/20
129/14 133/3
**just [86]** 6/18 8/16
9/13 10/20 10/22
10/24 11/8 15/2 18/12
21/11 22/3 22/25
23/24 26/6 26/13 28/4
28/16 28/18 29/2 29/3
29/17 29/18 29/18
30/4 30/7 30/14 30/24
30/24 31/3 31/4 31/8
31/9 31/10 32/4 32/24
38/3 38/11 40/9 43/13
50/13 50/17 59/12
62/21 66/20 67/2
67/12 67/22 71/17
72/13 78/20 81/24
82/20 84/4 89/22
92/25 93/4 95/9 96/8
96/19 96/21 106/1
108/7 108/20 108/24
109/9 112/2 113/3
120/19 120/22 121/12
121/23 122/8 124/21
125/24 127/11 128/19
128/20 129/4 131/19
132/9 133/7 133/14
134/12 135/21 136/7
139/12
**justice [7]** 15/21
107/18 107/19 112/7
114/6 131/23 136/20
**Justin [1]** 106/8

## K

**K-U-C-H-T-A [1]**
106/9
**Kaye [2]** 121/13
132/12
**Kennedy [2]** 101/5
132/4
**Kenneth [1]** 101/11
**Kevin [1]** 137/4
**key [3]** 8/6 106/12
112/18

**kill [10]** 41/17 91/19
101/12 102/3 103/23
126/23 126/25 126/25
127/1 134/21
**killed [1]** 126/16
**killing [1]** 127/20
**kind [5]** 95/1 114/20
121/24 121/25 128/11
**kinds [3]** 41/21
57/23 113/11
**KK [2]** 107/17 112/15
**knew [3]** 23/24
27/25 84/17
**know [84]** 8/2 9/10
16/7 16/8 16/11 16/21
17/18 17/20 17/20
17/21 17/21 21/18
21/20 22/7 24/1 24/2
26/7 26/20 28/16
28/20 30/17 30/21
31/10 38/2 38/19
40/21 41/2 44/11
44/12 44/13 44/14
44/25 45/5 45/25 46/2
46/2 47/22 50/24
52/14 52/17 52/21
65/15 65/16 69/23
72/5 73/24 75/20
76/19 77/1 77/3 77/13
80/13 80/14 80/15
82/11 82/13 82/17
83/3 83/7 83/11 83/15
83/22 83/25 84/18
85/17 85/23 86/3 88/7
88/11 88/15 89/22
89/23 90/16 93/5 95/3
95/9 96/21 113/25
116/9 123/24 128/5
132/14 133/5 133/7
**knowledge [13]**
15/9 19/3 21/17 26/5
26/7 57/16 59/12
59/23 61/13 65/3
65/15 84/6 109/2
**known [1]** 102/6
**knows [10]** 7/25
19/6 19/7 44/8 45/1
46/6 46/7 46/8 50/25
61/14
**Krohn [1]** 137/4
**Kuchta [1]** 106/8

## L

**labeled [1]** 98/13
**lack [10]** 7/24 19/3
44/7 44/25 46/4 50/23
56/11 58/10 64/16
112/10
**laid [3]** 10/1 117/9
123/3
**land [1]** 133/17
**landed [1]** 114/21

**lane [1]** 118/7
**language [3]** 53/2
86/6 136/22
**large [1]** 47/18
**last [22]** 12/25 29/5
29/23 30/8 33/14
40/19 44/16 44/21
45/10 45/11 54/13
76/13 76/18 76/19
76/23 85/3 92/22
93/11 95/15 105/1
122/19 123/4
**latch [1]** 130/6
**late [1]** 25/17
**later [3]** 18/23 19/13
107/22
**LAUDERDALE [6]**
1/2 1/4 1/11 1/16
1/22 140/8
**Laurence [1]** 106/12
**law [7]** 4/1 5/17 5/25
7/14 94/11 94/15
137/12
**lead [10]** 6/18 11/6
48/21 48/22 52/24
67/5 75/18 79/13
79/14 79/15
**leads [1]** 68/12
**learn [1]** 53/5
**learned [2]** 25/21
26/11
**least [7]** 45/7 75/22
76/25 87/10 125/3
125/8 128/25
**leave [4]** 59/4 92/5
97/4 138/18
**leaves [1]** 115/17
**leaving [2]** 36/24
95/10
**led [3]** 68/13 79/19
80/15
**left [8]** 21/25 32/2
34/11 38/6 38/16 81/5
96/6 121/22
**Lemke [1]** 106/12
**lengthy [1]** 53/24
**lenient [1]** 120/11
**Leo [2]** 103/4 103/4
**Leonetti [1]** 106/12
**less [7]** 14/16 25/7
67/1 109/12 120/6
125/7 136/16
**let [14]** 10/14 26/23
35/6 38/19 43/4 47/5
48/18 50/13 63/15
73/12 76/23 93/4
100/21 111/5
**let's [10]** 8/15 14/20
46/11 57/20 66/11
70/17 73/5 111/16
124/11 124/23
**level [9]** 24/23 31/12

52/3 53/19 54/2 58/6
60/25 83/2 89/5
**LexisNexis [1]**
108/23
**liar [3]** 16/22 29/3
29/18
**lie [1]** 40/8
**lieu [1]** 103/6
**life [2]** 102/25
105/16
**lift [1]** 9/12
**light [1]** 135/17
**lightly [2]** 102/14
128/4
**like [45]** 5/6 5/11
12/10 16/16 16/22
23/25 24/12 29/3
29/16 29/19 31/3
35/24 38/12 39/23
40/12 41/1 46/18
46/25 47/3 56/13
56/23 63/10 71/17
72/7 72/16 80/2 80/14
84/14 85/6 85/7 86/2
89/7 93/17 99/8 99/15
106/1 108/8 109/12
110/8 122/9 123/5
124/7 132/3 136/11
137/12
**likelihood [1]** 132/5
**likely [7]** 26/15
80/20 80/24 87/16
92/23 92/25 134/1
**limited [3]** 25/6 61/9
61/10
**line [9]** 12/17 30/17
30/21 30/22 40/17
48/1 119/8 121/23
121/25
**lines [1]** 12/19
**Lipsky [6]** 17/10
24/13 104/3 104/4
104/7 104/10
**list [9]** 23/6 97/11
98/13 98/19 99/1 99/5
103/14 103/16 117/17
**listed [3]** 45/1
103/18 104/1
**listen [1]** 30/24
**listening [1]** 37/12
**listing [1]** 104/10
**lists [2]** 104/24
136/22
**litany [1]** 124/2
**little [11]** 20/16 28/4
28/14 28/15 28/24
46/11 48/18 60/23
94/13 122/3 122/8
**live [3]** 31/9 56/21
57/6
**lives [1]** 56/24
**LL [1]** 106/10

**local [2]** 94/15
105/19
**locally [2]** 8/19
112/5
**locate [10]** 48/22
60/9 60/16 67/24
68/24 70/4 76/5 79/15
81/13 87/11
**located [3]** 24/8
60/13 85/13
**locating [1]** 56/17
**location [2]** 53/15
123/18
**long [6]** 5/3 20/12
34/1 42/25 79/10
97/15
**longer [3]** 97/4
97/16 122/3
**look [35]** 6/1 10/22
38/13 38/18 43/15
60/12 67/2 76/9 89/24
93/9 101/24 103/20
109/9 113/25 114/2
115/3 115/3 115/11
115/14 115/19 118/24
119/21 123/6 123/6
124/4 125/14 125/17
128/13 128/17 134/11
134/11 135/16 136/21
137/13 139/3
**looked [2]** 126/5
134/22
**looking [7]** 85/19
96/22 96/23 119/3
123/5 136/9 136/24
**looks [3]** 128/17
129/14 131/23
**lose [1]** 122/20
**loser [5]** 15/3 16/21
16/22 124/7 128/13
**loses [1]** 10/7
**lost [2]** 22/22 22/23
**lot [18]** 13/24 41/21
79/24 85/21 85/22
89/3 90/22 90/22
90/24 95/4 95/7 95/7
95/9 97/2 105/13
117/3 119/9 121/7
**Louisiana [1]** 56/14
**Lovett [19]** 11/9
11/21 11/23 11/24
11/25 14/13 14/15
16/1 16/3 18/10 18/13
18/20 19/21 21/1
21/20 25/24 27/1 28/8
104/7
**Lovett's [2]** 21/2
27/23
**low [1]** 125/11
**lower [2]** 66/18
125/3
**lowered [1]** 120/18

**L**

**lunch [3]**  96/5 97/4 97/5
**Luncheon [1]**  97/25

**M**

**made [46]**  8/8 10/25 13/11 25/12 35/1 35/14 39/13 39/15 40/6 41/10 41/15 43/2 43/11 47/19 52/2 52/3 53/12 56/19 56/23 63/22 65/5 70/3 75/2 80/18 81/2 81/23 84/15 86/5 87/7 87/21 91/1 92/10 102/16 104/16 105/25 108/9 108/13 110/7 119/11 120/6 124/22 125/5 126/1 131/15 133/6 133/8
**Madison [3]**  102/13 127/25 128/6
**magazine [1]**  113/1
**mail [1]**  17/16
**main [3]**  12/17 24/8 87/11
**major [2]**  11/8 29/17
**majority [1]**  58/9
**make [36]**  4/4 7/5 14/19 26/6 27/6 38/11 39/4 40/4 40/6 40/7 41/11 43/12 50/6 50/8 50/14 53/20 61/1 69/20 70/9 70/24 77/9 81/21 82/7 89/19 92/6 100/1 100/2 105/14 110/22 110/23 117/24 122/1 126/6 129/23 130/21 131/19
**makes [3]**  52/15 122/2 127/22
**making [15]**  9/17 40/11 55/22 56/1 63/17 70/20 72/4 80/15 82/17 110/17 117/19 126/12 127/18 130/17 131/17
**manager [1]**  17/4
**manner [3]**  4/19 99/24 100/15
**many [47]**  17/11 17/18 17/24 21/10 43/25 44/6 44/16 44/21 45/12 45/24 46/2 46/18 46/25 47/22 49/24 50/2 50/3 52/10 53/10 53/13 54/14 60/20 65/15 71/13 73/3 75/19 76/7 76/19 76/23 79/12 79/17 79/20 80/2 82/1

83/15 83/22 84/6 85/17 85/23 90/18 108/23 117/8 117/17 122/24 123/19 128/12 128/15
**Maria [1]**  11/1
**mark [7]**  1/10 3/11 22/15 54/24 87/2 106/6 129/9
**materials [1]**  113/1
**matter [7]**  25/11 25/25 26/24 27/3 62/15 62/15 140/4
**matters [7]**  27/12 55/20 57/5 57/18 58/5 58/9 97/15
**Matthew [6]**  31/20 78/7 78/24 79/5 86/24 91/15
**max [1]**  120/18
**maximum [2]**  119/19 119/20
**may [33]**  3/5 3/24 5/13 10/18 11/16 11/18 12/5 18/16 20/14 21/15 23/16 24/17 24/23 25/7 38/21 58/6 64/19 64/20 65/6 65/11 96/19 98/5 115/7 115/10 117/13 121/8 126/17 129/11 129/12 130/2 130/3 130/4 132/9
**May 31st [1]**  12/5
**may be [6]**  3/5 98/5 126/17 130/2 130/3 130/4
**maybe [5]**  10/24 61/9 73/9 80/4 128/1
**McGowan [1]**  106/14
**McMichael [1]**  9/2
**me [72]**  4/16 5/5 8/15 10/14 11/9 13/5 13/15 13/16 14/5 14/7 16/11 16/20 22/16 22/18 24/21 25/4 26/23 27/2 28/25 30/2 35/6 35/15 36/7 37/11 37/12 37/14 38/19 40/13 42/19 43/17 44/2 47/5 48/18 50/16 53/14 63/11 63/15 65/8 66/7 66/10 66/14 67/2 69/24 72/4 74/12 76/21 76/23 78/11 78/13 78/22 86/1 86/14 87/3 88/18 90/17 91/8 99/8 99/15 100/9 100/21 108/22 109/19 110/18 111/5 113/9 114/14 131/4

136/2 136/11 136/16 139/15 139/20
**mean [17]**  11/7 21/22 26/20 47/3 68/21 72/18 80/21 82/4 83/9 85/19 88/25 89/10 93/9 111/3 126/18 128/16 131/6
**meaning [1]**  126/7
**means [8]**  4/17 41/13 63/9 66/15 66/15 66/22 86/2 100/14
**meant [4]**  11/8 66/22 91/19 92/4
**meantime [1]**  23/2
**media [5]**  26/17 26/17 26/24 86/5 102/8
**meet [11]**  4/25 5/21 6/7 6/17 6/25 10/6 10/10 15/4 85/8 126/20 128/16
**meeting [2]**  81/17 81/21
**meetings [1]**  82/6
**meets [2]**  5/22 129/16
**member [14]**  25/14 29/4 30/15 33/23 34/20 41/17 52/4 56/24 58/3 60/14 79/8 107/12 107/15 118/14
**members [12]**  14/7 14/19 16/8 24/4 40/22 44/4 45/22 103/21 105/25 106/22 116/2 121/6
**memos [1]**  96/18
**men [1]**  136/11
**mental [1]**  36/17
**mention [1]**  131/18
**mentioned [11]**  16/5 17/13 47/25 121/8 121/21 122/6 122/16 130/1 130/11 131/19 139/16
**mentioning [1]**  125/18
**Meredith [1]**  106/17
**message [7]**  16/3 18/25 28/1 34/10 38/16 81/4 101/18
**messages [1]**  18/3
**met [9]**  34/5 47/5 47/7 82/1 110/10 110/14 110/18 116/6 123/1
**Miah [1]**  135/19
**Miami [2]**  81/18 85/7
**mic [2]**  69/16 99/14
**Michael [4]**  101/5

103/12 106/4 128/23
**microphone [3]**  11/18 33/4 99/12
**mid [1]**  20/14
**middle [2]**  85/9 133/22
**might [7]**  30/5 37/7 84/12 89/22 89/25 94/11 124/13
**Mike [3]**  106/25 135/25 136/8
**miles [1]**  101/21
**military [2]**  35/10 35/17
**Miller [3]**  102/2 127/9 127/18
**mind [3]**  41/1 43/2 43/16
**mingle [1]**  114/11
**minority [1]**  9/24
**minute [2]**  18/10 97/20
**minutes [3]**  57/20 97/17 97/18
**misdemeanor [6]**  77/8 118/2 118/25 119/4 137/9 138/5
**misdemeanors [2]**  103/18 104/1
**Mississippi [3]**  9/22 10/2 56/14
**misspoke [1]**  55/10
**mistaken [1]**  9/2
**misunderstanding [2]**  73/10 138/14
**mixing [1]**  75/25
**Mm [1]**  74/1
**Mm-hmm [1]**  74/1
**moment [5]**  18/12 22/23 36/22 76/10 92/8
**moments [1]**  117/23
**MONDAY [3]**  3/1 25/22 98/1
**monitoring [1]**  17/5
**months [6]**  14/17 14/18 20/16 26/2 130/20 130/23
**more [22]**  13/20 14/5 17/5 17/6 26/19 28/4 28/15 28/24 30/24 36/23 52/8 60/11 67/1 85/7 89/11 110/7 119/13 129/19 130/7 136/15 138/5 138/8
**morning [13]**  3/1 3/5 3/11 3/15 3/16 3/19 22/15 25/22 33/18 54/24 55/1 99/4 109/17
**morning's [1]**  7/3

**most [14]**  15/15 15/16 15/17 16/3 16/14 26/15 53/19 59/8 92/23 92/25 96/17 120/11 123/3 136/1
**mostly [1]**  137/19
**motion [32]**  1/7 3/20 4/1 4/2 4/3 4/8 4/16 5/17 7/1 7/13 7/14 8/3 10/7 19/6 77/7 97/1 99/20 100/13 102/21 106/15 107/25 109/6 111/1 113/10 117/3 122/7 128/25 129/1 131/2 131/3 131/6 131/9
**motions [7]**  8/1 8/1 9/15 9/16 108/2 113/6 122/19
**motivation [1]**  99/25
**move [19]**  5/8 14/1 23/2 23/4 39/1 39/21 42/2 42/4 43/5 67/17 73/15 96/9 96/11 96/13 97/6 98/11 98/18 119/10 129/20
**moved [3]**  67/11 67/14 95/11
**moves [1]**  42/6
**Mr [105]**  3/22 6/3 6/14 6/22 7/8 9/2 10/7 10/17 11/9 11/23 11/25 12/8 14/15 16/3 18/10 18/13 18/17 18/20 18/24 19/10 19/21 21/2 25/20 25/24 27/1 27/23 28/7 28/8 31/5 34/14 35/10 35/11 35/17 35/20 36/24 37/4 37/16 37/21 38/10 38/15 38/22 39/23 40/10 40/15 40/19 41/6 42/9 42/10 42/22 42/22 43/6 43/14 47/1 47/4 47/5 50/21 53/11 54/3 55/2 55/4 55/7 55/13 55/15 56/23 57/1 58/1 62/8 62/10 64/1 64/5 64/9 66/21 67/18 68/2 68/16 69/22 70/6 70/25 73/16 74/15 75/23 80/3 81/4 81/25 84/1 87/15 88/23 91/17 93/12 94/3 94/20 94/25 97/7 97/9 98/10 100/3 114/24 114/25 116/18 117/4 126/1 129/6 131/12 132/4 135/10
**Mr. [12]**  10/23 19/14

**M**

**Mr.... [10]** 25/12
34/17 37/18 38/5 55/5
55/12 63/23 69/4
100/16 104/7
**Mr. Dispoto [1]** 69/4
**Mr. Jan [1]** 10/23
**Mr. Lovett [1]** 104/7
**Mr. Stanzione [9]**
19/14 25/12 34/17
37/18 38/5 55/5 55/12
63/23 100/16
**Ms. [12]** 17/10 19/20
20/7 22/15 22/18
23/13 23/19 27/17
27/23 31/18 32/4
32/24
**Ms. Carr [2]** 32/4
32/24
**Ms. Gabrielle [1]**
17/10
**Ms. Woomer [9]**
19/20 20/7 22/15
22/18 23/13 23/19
27/17 27/23 31/18
**much [8]** 31/3 36/22
41/12 47/13 68/23
95/19 125/3 130/23
**multiple [14]** 60/23
101/1 105/25 106/20
106/22 107/2 107/8
108/13 110/7 121/16
122/1 122/10 130/17
138/24
**multitude [1]** 109/14
**murder [2]** 119/17
135/11
**murdered [1]** 101/20
**must [4]** 4/4 71/22
115/6 119/3
**muted [2]** 33/3 33/7
**my [99]** 4/11 5/16
7/14 8/1 8/23 10/5
10/6 11/5 12/10 12/21
13/13 13/17 16/5
16/21 17/2 17/8 17/13
18/1 18/22 20/23
21/17 22/15 23/19
26/5 26/7 26/16 26/18
27/3 30/1 32/7 32/7
33/13 37/19 40/3
40/21 42/13 44/14
48/19 48/21 53/3
54/24 55/10 58/24
62/11 66/14 66/17
66/19 66/24 67/10
67/11 67/18 68/6
68/11 68/11 68/12
68/15 68/23 69/16
69/24 69/25 70/4 70/4
70/11 70/11 71/11

72/13 73/4 73/10
73/12 74/6 74/12
74/12 74/13 74/14
75/4 75/4 75/4 75/8
75/11 75/14 75/17
76/4 76/6 76/9 79/3
89/21 96/9 97/4 97/4
98/12 99/3 101/1
105/21 109/17 111/17
123/13 132/17 138/19
139/5
**myself [5]** 28/3 55/7
72/18 94/11 136/2

**N**

**Nadidas [1]** 11/2
**name [12]** 11/23
20/7 22/15 33/11
33/13 33/14 54/24
62/13 79/2 79/3 79/4
117/10
**names [1]** 102/23
**national [5]** 9/1 11/2
11/8 112/6 112/6
**nature [7]** 13/6
20/22 27/8 57/17
89/15 104/12 114/13
**Naysa [5]** 19/19 20/5
20/8 22/13 27/21
**near [2]** 40/18 43/6
**necessarily [11]**
15/10 17/7 18/9 25/6
52/2 58/6 63/6 88/20
88/24 89/4 109/2
**necessary [3]** 28/20
31/9 63/6
**need [13]** 6/6 32/17
40/22 43/21 66/6 84/5
96/21 97/14 113/12
122/25 123/19 129/23
131/15
**needed [4]** 18/8
38/24 120/17 134/11
**needs [7]** 29/2 32/23
54/1 72/10 85/13
123/1 134/15
**negate [1]** 137/24
**negotiate [1]** 120/16
**negotiated [1]**
120/20
**neighbor [1]** 88/15
**Neil [1]** 106/7
**Neill [1]** 107/5
**neither [2]** 111/11
126/7
**networking [1]**
22/24
**Nevada [1]** 137/17
**never [22]** 21/22
26/13 26/15 27/9 29/3
31/10 49/16 55/18
55/24 56/3 61/6 62/25

63/10 63/17 76/21
101/17 101/24 102/3
102/10 111/15 113/7
113/8
**new [7]** 24/9 101/10
102/9 102/20 112/14
120/14 128/22
**news [3]** 102/12
108/23 134/13
**newspaper [4]**
101/5 104/15 113/1
128/15
**next [22]** 14/1 19/18
31/17 31/19 77/25
78/4 101/9 101/15
102/1 102/5 102/11
102/18 103/3 103/11
104/2 104/14 104/21
105/5 105/24 125/22
136/12 139/8
**Nick [2]** 135/25
136/8
**night [1]** 25/17
**Ninth [2]** 125/25
126/5
**Niviane [1]** 106/19
**NN [1]** 106/11
**no [104]** 1/2 5/24
6/5 6/5 6/18 10/16
10/17 10/23 11/4 14/9
15/22 15/22 15/23
21/25 25/3 28/14
29/16 31/15 33/24
36/10 38/23 39/1
39/19 40/3 41/1 46/9
48/18 50/19 50/19
51/6 54/4 54/12 54/12
54/17 55/18 55/24
56/5 57/3 57/4 57/9
57/16 59/4 60/3 60/3
60/11 60/18 62/2 62/6
62/11 64/8 64/12 68/9
68/11 68/20 72/13
72/21 72/21 72/21
74/2 74/4 75/11 75/11
76/3 76/7 76/11 76/11
76/11 76/12 77/15
77/18 78/1 82/20
83/19 83/21 85/16
86/19 88/7 88/14 90/4
90/13 90/15 91/5 91/7
92/3 92/5 95/8 95/21
97/16 98/24 101/24
103/1 103/8 103/24
104/12 104/19 105/11
108/4 108/15 108/20
114/23 116/11 127/15
128/7 128/10
**nobody [2]** 8/11
19/7
**non [3]** 30/6 101/14
109/8

**non-direct [1]** 30/6
**non-prosecutions
[1]** 101/14
**non-threats [1]**
109/8
**none [6]** 6/12 26/8
29/17 85/25 108/8
112/11 124/1 124/2
**nonviolent [1]**
137/25
**norm [2]** 28/25
67/21
**normal [1]** 69/11
**normally [1]** 36/3
**not [233]**
**note [4]** 67/10
103/25 108/25 110/22
**noted [4]** 113/23
114/10 114/12 137/16
**notes [2]** 40/4
137/22
**nothing [10]** 19/17
22/10 29/19 67/1 67/1
77/19 91/25 97/1
115/15 139/5
**notified [4]** 26/25
27/1 27/10 103/7
**November [2]**
106/11 125/8
**November 16th [1]**
125/8
**now [57]** 6/15 7/24
8/14 10/4 22/24 23/10
26/2 32/10 35/15
35/23 37/20 38/2
39/21 41/6 45/6 45/8
46/14 48/3 48/15 51/4
58/19 60/4 61/19
62/25 63/11 63/21
68/4 70/14 71/20
72/22 72/24 73/24
75/21 76/13 77/2
78/22 87/15 89/3
89/13 96/4 100/23
108/9 109/15 110/2
110/5 110/20 111/16
111/18 114/9 121/9
121/17 122/15 123/12
123/17 133/18 134/20
139/9
**Nowhere [1]** 137/12
**number [23]** 3/8 5/6
17/20 17/22 21/11
39/6 44/13 44/14
44/15 49/8 62/17
79/22 82/5 90/22
98/15 103/1 104/24
109/7 109/12 124/24
129/12 129/13 137/18
**numbers [3]** 58/14
125/2 125/3
**numerous [2]** 8/1

57/22

**O**

**oath [1]** 90/21
**Obama [4]** 126/2
126/9 126/11 127/4
**object [6]** 44/24
59/11 59/22 65/14
96/21 98/21
**objection [28]** 19/1
22/1 28/10 38/23 39/1
42/14 44/7 45/3 46/4
46/20 49/2 49/7 49/20
50/23 61/12 69/7
74/19 74/23 77/4
77/10 91/21 93/14
93/20 93/25 94/21
96/10 98/24 105/11
**objects [1]** 5/19
**obstruction [1]**
136/20
**obviously [12]** 7/6
59/8 73/21 99/19
108/17 109/14 111/1
111/7 111/23 116/8
117/2 137/18
**Ocasio [1]** 102/9
**Ocasio-Cortez [1]**
102/9
**occasions [2]** 64/19
90/24
**occurred [1]** 109/21
**October [1]** 120/21
**off [7]** 16/17 49/9
69/16 92/3 93/12
106/2 117/7
**offended [2]** 37/18
37/24
**offense [8]** 87/22
87/24 119/18 119/20
130/25 132/7 132/21
135/15
**offenses [2]** 109/10
118/3
**offer [6]** 8/20 97/2
109/22 111/18 115/16
115/16
**offered [2]** 111/11
111/15
**offering [1]** 25/14
**offers [2]** 98/22
139/4
**office [62]** 1/10 1/15
3/17 10/25 11/5 12/13
12/17 12/18 14/6 14/7
14/16 14/19 14/21
15/10 16/4 16/7 16/8
16/18 17/2 17/4 17/19
19/7 19/14 20/17 21/6
21/7 23/23 24/6 24/7
24/8 25/12 25/21 26/4
27/8 28/15 28/19 29/7

(14) Mr.... - office

(CASENUM)   (WITNESSNAME)   (DATE)

## O

**office... [25]**  30/22
31/11 41/19 42/3
51/13 65/23 71/20
79/11 81/15 81/16
82/4 86/12 87/3 89/18
93/8 94/16 95/13
103/5 103/24 104/6
105/19 121/23 124/6
125/6 128/9
**office's [1]**  65/19
**officer [12]**  12/25
31/20 31/22 32/2
33/16 46/19 47/2
47/24 54/22 56/25
62/9 135/23
**officers [1]**  121/16
**offices [3]**  30/18
30/22 128/12
**official [6]**  1/21
118/14 118/15 118/15
119/1 140/7
**officials [1]**  41/24
**often [5]**  41/23
41/25 82/4 95/1
114/15
**oh [4]**  9/23 42/21
69/15 112/2
**okay [100]**  5/9 12/7
12/11 12/15 14/1 14/1
14/9 18/15 19/22 21/5
21/14 21/18 21/23
22/16 23/5 23/11 24/1
24/7 24/15 25/4 25/10
26/6 27/6 27/17 28/21
28/24 29/21 29/23
30/2 30/17 31/7 32/18
33/6 34/1 35/3 35/6
35/14 35/16 36/1
36/14 37/9 37/14
37/23 39/3 40/14
40/20 41/2 41/5 42/13
43/17 43/18 44/6 45/9
45/12 45/18 47/3 47/5
48/11 48/25 49/18
50/6 50/14 51/4 52/10
56/4 56/6 57/20 60/4
61/9 61/19 62/16 63/9
63/21 70/13 71/17
72/6 72/11 72/22
73/14 74/4 75/12
75/16 76/23 77/10
77/24 78/15 82/13
83/11 86/8 86/17 87/3
91/11 91/11 91/25
95/21 99/11 110/12
110/24 111/22 139/10
**on [187]**
**once [8]**  5/4 27/12
39/6 43/19 78/18
82/10 101/9 134/13

**one [93]**  1/16 4/17
5/8 7/6 7/22 9/20
10/10 14/8 14/15
15/18 16/6 16/25 17/3
17/14 17/16 21/12
21/15 22/4 22/16 23/6
23/6 23/7 27/2 30/9
30/25 31/12 32/14
32/17 34/25 35/1
38/21 43/8 43/21 44/3
48/12 49/10 50/4
54/25 63/6 67/16
67/16 67/21 75/22
76/2 78/7 80/2 88/20
91/17 97/3 100/13
103/23 106/21 108/7
108/20 110/19 111/3
111/24 112/9 112/13
112/13 112/18 112/22
112/23 114/10 117/14
118/2 118/2 118/10
118/12 119/1 120/12
121/4 121/4 121/24
122/3 122/12 123/20
125/9 125/21 126/21
127/19 127/20 127/25
128/22 131/4 131/7
131/11 131/18 136/20
138/5 138/11 138/22
139/3
**one's [3]**  55/25
87/22 90/10
**ones [7]**  17/1 28/25
29/2 29/10 89/25
117/20 125/18
**only [58]**  5/21 7/17
14/8 14/16 16/6 17/14
18/20 21/12 21/14
25/15 26/18 27/1
30/13 32/17 67/19
67/23 70/1 70/4 70/24
76/4 76/13 82/8 83/17
84/12 85/6 86/15
89/21 108/6 108/15
112/20 112/21 112/22
112/23 112/24 113/2
113/4 114/24 114/25
115/17 116/15 116/15
118/5 118/25 119/20
120/3 120/12 120/12
120/17 122/4 123/2
130/9 131/11 131/13
138/22 139/3
**onto [1]**  130/6
**OO [1]**  106/25
**open [3]**  44/22 45/5
48/15
**opened [2]**  79/11
105/2
**operate [1]**  93/1
**opinion [17]**  50/10

53/3 64/1 74/13 74/13
74/14 75/5 89/18
89/21 90/2 90/5
114/18 115/23 135/8
135/17 136/22 136/22
**opinions [1]**  50/12
**opportunistic [1]**
136/2
**opportunities [1]**
90/25
**opportunity [3]**  15/6
98/7 139/16
**opposed [1]**  134/12
**options [1]**  129/25
**or [167]**
**oral [1]**  133/2
**order [4]**  3/4 7/10
98/4 139/12
**ordinary [1]**  126/7
**orientation [9]**
55/15 55/22 59/19
61/25 62/9 62/14 64/6
90/7 91/2
**other [69]**  7/7 8/7
8/13 8/19 9/5 14/2
14/19 14/19 14/25
15/10 16/8 16/17
16/25 17/18 21/18
24/12 26/3 26/9 26/12
27/7 28/15 28/25 29/2
29/10 29/11 29/13
30/5 32/16 43/8 43/21
45/19 50/12 50/20
50/21 51/20 53/8
54/10 57/6 57/12
57/15 77/13 93/23
97/13 97/15 98/13
98/18 108/20 109/11
110/2 111/9 111/18
112/16 112/18 113/14
113/17 114/11 116/3
116/14 118/11 118/21
121/24 122/4 129/24
130/3 131/10 131/18
133/22 135/16 135/19
**others [11]**  4/6 4/12
21/22 99/21 100/4
108/16 126/23 126/25
127/1 128/19 136/16
**otherwise [5]**  74/13
117/2 124/16 126/13
135/1
**ought [3]**  123/25
124/19 131/17
**our [36]**  4/1 4/8 8/4
11/2 18/7 23/3 43/10
49/22 50/10 50/12
50/12 60/20 60/24
67/24 67/25 77/6
79/15 82/15 85/8
96/22 97/11 98/19
106/3 106/12 106/13

106/20 107/22 108/1
109/6 113/6 113/10
115/4 115/21 116/6
116/13 130/6
**out [49]**  4/5 6/19
8/24 9/5 9/12 10/1
13/15 16/20 32/4
32/10 39/19 42/6 47/6
47/11 47/13 58/14
66/22 67/5 72/8 72/14
80/20 80/22 80/25
84/10 84/10 84/13
87/17 87/22 88/2 88/7
88/19 88/24 95/12
100/3 104/10 105/6
111/20 115/24 117/9
123/3 125/21 125/25
128/9 129/1 130/23
134/19 135/5 136/22
138/17
**out by [1]**  117/9
**outline [1]**  80/6
**outside [4]**  11/4
11/8 57/13 103/24
**over [11]**  8/15 8/17
20/16 39/21 39/22
55/9 70/17 90/23 97/5
129/20 130/8
**overall [2]**  69/24
71/10
**overlap [1]**  114/15
**overnight [1]**  12/20
**overrule [1]**  49/11
**Overruled [9]**  28/11
44/8 46/21 49/22
59/14 59/24 61/14
69/9 91/22
**oversight [1]**  99/5
**overstep [1]**  122/23
**own [7]**  71/11 73/4
73/5 74/5 74/6 85/8
96/22
**owns [1]**  88/10

## P

**P-R-O-C-E-E-D-I-N-
G-S [2]**  3/2 98/2
**p.m [1]**  139/23
**page [14]**  35/9 35/13
35/14 37/6 37/9 37/10
37/16 38/4 40/15
40/18 40/18 40/20
43/18 104/9
**pages [1]**  105/12
**Palm [2]**  8/22 94/15
**paper [1]**  139/21
**papers [1]**  6/9
**paragraph [1]**
124/23
**parents [2]**  36/7
36/8
**parents' [1]**  84/7

**part [17]**  7/19 47/18
53/19 55/19 58/19
61/20 61/25 62/4
63/13 63/13 79/21
80/3 94/3 101/19
118/23 121/16 130/9
**participate [4]**  54/3
81/9 116/22 116/23
**participated [4]**
54/14 82/2 83/16
85/18
**particular [12]**  5/25
15/21 17/3 18/3 28/1
52/16 54/11 67/18
68/6 70/23 103/2
104/20
**parties [2]**  40/15
139/11
**party [1]**  111/11
**pass [2]**  14/10
139/20
**passport [1]**  16/21
**passports [1]**  136/10
**past [6]**  44/2 44/3
62/18 62/21 67/14
75/24
**pasta [1]**  135/24
**patience [2]**  29/6
85/3
**Patricia [2]**  23/12
32/6
**Paul [2]**  102/7
127/19
**pause [2]**  66/20
110/11
**Payne's [1]**  137/24
**penalty [5]**  132/22
137/24 138/4 138/6
138/12
**pending [3]**  45/1
48/9 120/19
**Pennsylvania [1]**
135/21
**people [12]**  38/3
47/19 47/22 56/21
63/6 110/8 113/17
120/10 131/7 131/8
131/10 138/23
**percent [4]**  61/18
109/12 125/12 125/13
**percentage [3]**  89/7
89/8 89/10
**percentages [1]**
125/11
**perfect [1]**  109/11
**perhaps [3]**  48/8
112/10 138/19
**period [7]**  12/4 44/3
125/7 127/12 129/8
129/8 129/9
**permission [1]**
105/9

**P**

permitted [2]  59/18
109/18
person [32]  4/16
18/7 30/3 36/13 36/14
36/23 39/10 39/12
39/24 43/9 48/2 50/11
53/8 53/11 53/15
53/22 53/23 60/13
61/2 66/15 80/9 86/13
90/7 91/18 92/13
100/12 101/10 101/11
101/22 104/4 108/19
138/2
person's [4]  55/22
61/25 62/3 80/12
personal [3]  19/3
30/16 57/16
personally [7]  14/5
14/6 14/7 15/22 16/6
16/24 18/22
persons [5]  36/20
53/10 105/24 108/13
109/15
Phelps [1]  106/19
phone [20]  12/18
16/9 17/18 17/24 18/4
21/8 29/13 29/16 30/9
31/11 80/15 86/5
86/13 92/6 92/9 95/7
95/9 103/7 103/22
128/3
phrase [1]  25/1
physical [2]  29/20
30/14
piece [1]  31/2
pieces [1]  101/22
Pittsburgh [1]  136/6
place [1]  103/15
placed [2]  102/7
138/22
plain [2]  51/14 53/6
plaintiff [3]  1/4 1/10
115/22
plaintiffs [1]  116/1
plan [3]  4/22 100/19
117/15
plane [2]  133/17
135/25
plans [6]  84/8 84/14
84/15 84/16 92/14
93/18
plastic [1]  101/23
played [3]  12/7 27/2
28/3
plea [5]  8/20 120/15
120/16 120/20 120/21
plead [1]  120/17
pleaded [1]  130/15
pleading [5]  103/1
138/2 138/6 138/11

138/16
pleadings [13]  10/5
96/15 96/25 102/19
111/14 112/25 113/10
115/4 115/21 116/13
117/3 117/19 121/2
please [13]  3/10
11/11 11/23 18/12
19/24 20/7 33/8 42/21
72/6 78/15 79/2 128/3
139/22
podium [1]  99/14
point [15]  6/16 7/13
40/2 40/8 100/21
100/22 102/11 109/3
125/24 127/10 127/10
127/11 128/25 130/23
134/5
pointed [1]  131/8
points [1]  108/15
POLICE [65]  1/12
3/14 12/24 13/6 13/15
13/15 14/3 14/20
16/10 17/12 17/15
17/17 17/25 18/4 18/6
18/21 20/21 21/3
21/13 21/15 21/19
24/18 25/25 26/10
27/5 28/5 28/18 28/22
30/7 30/12 30/23
31/20 32/9 33/20
33/24 34/7 45/14
46/19 47/1 47/24
48/20 51/4 51/8 51/10
51/11 51/18 52/14
57/5 58/7 79/7 86/8
90/18 103/8 103/10
103/14 103/18 103/22
104/1 104/8 104/11
104/23 115/20 121/15
124/9 129/12
policies [1]  65/20
policy [6]  65/23
71/21 71/21 72/1 72/7
82/13
political [13]  6/11
55/25 55/25 62/3 62/3
64/9 64/9 73/18 90/10
90/11 91/2 91/3 123/6
Poller [10]  107/16
112/14 112/15 112/16
112/24 114/24 116/16
120/13 120/14 120/15
pop [1]  136/12
pops [1]  116/15
portion [5]  34/22
37/6 39/22 105/12
112/6
posed [1]  47/14
posited [1]  137/22
position [7]  44/14
67/22 68/11 68/11

68/13 68/15 68/23
possible [9]  5/12
26/13 27/7 27/10
27/11 32/17 63/16
64/14 123/16
possibly [3]  56/13
123/11 123/16
post [3]  127/8 127/9
136/7
posted [3]  128/25
129/2 137/21
posts [1]  135/24
potentially [1]  27/4
power [4]  9/5
133/24 134/16 134/17
PP [1]  106/12
PPP [2]  104/2 124/5
practical [1]  131/2
precautions [2]
28/20 31/9
precedes [1]  7/16
predicated [1]  99/24
predict [1]  80/21
prediction [1]
126/10
predictions [2]
126/12 126/24
predominantly [1]
56/12
preparation [3]
84/12 84/15 94/12
preparations [1]
48/17
prepared [3]  5/1
5/16 10/4
present [19]  3/13
3/18 6/23 41/19 41/21
42/3 65/24 67/25 71/9
71/12 71/23 71/25
75/6 76/4 81/15 81/16
82/3 109/19 123/21
presentations [1]
81/20
presented [9]  65/21
71/22 72/10 84/19
96/2 99/4 110/3
120/25 121/18
presently [2]  44/19
44/22
presents [1]  137/23
president [11]  107/9
126/2 126/15 126/23
126/25 127/1 129/3
129/6 130/3 137/3
137/5
presume [1]  5/5
pretrial [1]  8/20
pretty [4]  36/22
41/12 68/23 97/17
previous [3]  24/6
28/17 30/3
previously [5]  20/9

23/5 30/18 68/2 96/14
prima [2]  4/4 100/2
principles [1]  111/24
print [1]  97/3
prior [11]  18/24
19/14 22/18 23/20
24/4 31/1 50/3 63/22
90/19 90/25 109/20
priorities [4]  4/22
100/18 112/8 113/24
prioritize [1]  61/10
prioritized [1]  132/1
priority [7]  61/17
113/11 113/20 113/22
114/4 116/11 124/15
prison [1]  132/22
privy [1]  8/11
probably [14]  26/15
59/8 62/12 96/15
96/17 96/18 97/21
118/4 118/20 121/4
123/13 125/12 126/14
132/7
problem [4]  10/17
22/23 128/12 132/10
problematic [1]
113/3
procedure [2]  7/3
13/6
procedures [3]
22/20 23/21 65/20
proceed [15]  3/22
11/16 50/7 73/8 73/9
74/10 81/22 82/7
88/21 92/6 98/9 99/9
110/14 110/15 117/13
proceeded [1]  81/20
proceeding [1]
139/23
proceedings [1]
140/4
process [4]  23/19
81/13 81/13 120/1
produce [1]  100/9
proffered [3]  112/11
113/8 116/9
profile [1]  28/19
progression [1]
124/14
prong [7]  6/1 6/7
6/15 6/18 7/10 114/17
114/20
prongs [1]  114/13
pronounce [1]  62/12
proof [6]  4/11 10/6
100/2 100/7 115/10
118/19
proper [3]  90/6
90/10 130/22
property [1]  134/1
propose [3]  5/5 5/7
7/3

prosecutable [4]
87/21 87/23 127/7
129/18
prosecute [8]  6/3
6/22 95/14 123/14
126/19 133/9 134/3
134/24
prosecuted [62]  4/7
4/13 8/22 8/23 9/6
11/5 27/14 44/6 44/15
63/7 63/16 65/16 77/1
77/3 77/14 99/22
99/24 100/5 101/2
101/3 101/5 101/7
101/12 101/17 102/3
102/10 105/23 106/23
108/11 108/11 108/12
108/14 109/16 109/23
110/4 110/8 111/8
111/10 112/17 112/19
112/22 113/18 113/19
114/7 115/1 117/22
122/11 124/1 125/23
126/14 131/4 131/5
131/9 131/10 131/10
131/11 131/20 131/25
132/4 132/4 132/16
133/16
prosecuting [2]
124/15 131/25
prosecution [45]  4/2
4/5 4/16 4/19 6/12
8/3 8/8 8/12 9/16
9/22 15/21 42/4 48/9
48/16 50/8 50/15
64/25 65/13 65/21
76/20 76/24 83/24
100/3 100/13 100/16
101/10 101/25 102/17
103/2 103/9 103/25
104/19 106/18 107/8
107/13 108/6 112/5
113/16 114/14 114/14
115/6 115/25 131/3
132/2 132/6
prosecutions [11]
46/3 49/9 76/8 101/14
104/12 108/16 108/21
109/4 109/13 109/21
114/19
prosecutor [6]  11/6
16/13 77/16 91/2
112/3 129/13
prosecutor's [2]
10/25 105/19
prosecutorial [2]
15/19 131/15
prosecutors [19]  8/7
8/18 14/16 22/16 48/5
48/7 48/12 48/17
54/25 63/22 64/4
65/21 90/19 90/25

**P**

**prosecutors... [5]**
119/21 119/25 120/6
129/23 131/16
**protected [1]** 116/2
**protecting [2]** 51/12
51/13
**prove [8]** 4/12 8/7
9/9 9/10 111/17
115/22 116/1 120/1
**provide [20]** 4/14
50/12 53/16 67/19
68/17 68/24 70/5
73/11 74/13 74/14
74/14 75/4 76/5 84/25
93/5 97/10 118/6
118/7 118/21 122/19
**provided [8]** 35/1
72/14 92/1 96/14
116/8 116/8 116/21
125/16
**proving [1]** 120/2
**public [6]** 1/15 3/17
113/12 114/5 114/6
125/2
**publicity [1]** 121/7
**publicly [1]** 129/7
**punished [1]** 119/12
**punishment [5]**
119/5 119/11 119/19
119/20 120/18
**purchase [1]** 84/16
**purported [1]**
102/24
**purportedly [1]** 6/17
**purpose [16]** 6/4
6/10 6/21 7/9 7/23
19/9 34/16 34/18
34/21 41/10 66/24
80/8 80/11 80/12
80/23 87/5
**purposes [3]** 4/16
87/15 98/12
**put [9]** 10/5 10/6
15/19 68/16 70/15
124/19 125/18 128/20
130/10
**putting [1]** 92/7

**Q**

**QQ [1]** 137/3
**QQQ [1]** 124/5
**qualified [1]** 26/24
**qualifies [1]** 123/2
**qualify [1]** 26/20
**question [41]** 13/16
14/1 15/18 19/10 22/5
23/20 29/23 30/4
36/12 36/14 36/17
37/9 38/7 38/7 38/9
39/9 42/13 42/21
44/25 49/12 52/18
52/20 59/14 63/15
66/19 68/12 69/14
70/7 71/9 72/13 72/22
73/10 76/21 76/23
90/16 94/8 95/15
111/2 111/12 127/13
129/9
**questioned [1]**
55/10
**questioning [5]**
18/17 39/9 39/22 48/1
88/18
**questionnaire [2]**
62/1 62/5
**questions [41]**
13/20 14/10 15/23
29/5 31/15 32/15
32/16 34/24 35/12
35/23 35/24 35/24
35/25 36/3 36/4 36/19
36/20 41/16 42/18
42/23 47/16 51/8
54/13 54/17 61/20
78/9 80/5 80/6 80/7
84/6 84/9 85/3 85/4
86/19 87/18 89/15
91/18 92/22 95/22
117/1 118/17
**quickly [2]** 93/8 93/9
**quite [3]** 41/23 41/25
95/1
**quote [6]** 115/4
126/9 132/16 133/15
135/23 138/2
**quotes [1]** 126/11

**R**

**racial [2]** 126/10
126/22
**racist [1]** 126/2
**raise [8]** 11/11 19/25
33/8 53/18 53/19 54/2
78/15 132/8
**raised [1]** 113/6
**rally [1]** 102/14
**rambling [1]** 121/24
**rancher [1]** 137/17
**raped [1]** 136/8
**Rasheed [1]** 136/8
**RASSIE [3]** 1/20
140/6 140/6
**rather [3]** 102/6
123/10 127/11
**rational [1]** 127/2
**reach [2]** 9/5 120/7
**reached [3]** 13/15
52/2 60/25
**reaching [2]** 16/20
32/10
**read [12]** 37/6 38/19
38/20 43/17 101/19
106/1 125/20 127/9
128/24 129/15 135/21
139/16
**reading [1]** 37/12
**ready [4]** 3/22 5/2
18/16 98/9
**reality [1]** 123/11
**really [9]** 9/8 25/15
53/11 57/16 62/14
90/1 111/1 111/17
123/25
**reason [14]** 5/19
9/25 27/25 40/6 47/7
107/19 113/15 113/16
114/21 114/23 116/14
116/15 122/22 122/23
**reasonably [1]**
127/2
**reasoning [2]**
113/20 117/8
**reasons [3]** 116/9
121/2 121/5
**rebut [1]** 138/21
**recall [55]** 13/11
13/21 13/24 13/25
14/2 14/5 17/15 20/12
21/5 21/10 21/11
21/11 21/12 21/19
21/21 21/21 22/9
25/11 25/13 25/17
25/20 26/2 26/9 35/12
35/16 35/20 36/10
37/5 37/20 37/23 38/4
38/6 38/7 38/8 38/10
38/15 39/21 39/23
41/3 43/6 43/13 50/21
62/8 75/21 76/9 76/12
77/2 81/23 82/12 85/4
86/18 87/17 89/14
90/1 94/25
**recalls [1]** 104/10
**receive [9]** 13/5 21/7
48/2 48/21 53/21
60/12 73/6 89/12
138/11
**received [12]** 12/8
12/10 12/12 14/3
16/14 21/6 21/18
21/24 28/16 93/10
103/7 130/19
**receiver [1]** 18/7
**recently [2]** 84/16
123/3
**recess [2]** 96/5
97/25
**recognize [1]** 114/12
**recognized [1]**
113/22
**recollection [13]**
12/21 13/2 13/13
13/17 16/5 17/13
18/22 37/7 37/20
38/20 40/25 43/18
62/11
**recommend [3]** 67/6
69/5 75/6
**recommendation [8]**
50/18 67/9 69/21 70/9
81/23 89/19 89/24
116/24
**recommendations
[9]** 50/6 50/8 50/14
70/20 70/25 75/2
81/22 82/7 92/12
**recommended [2]**
68/10 89/25
**recommending [1]**
89/14
**reconsideration [2]**
7/13 7/14
**record [13]** 3/10
10/6 11/23 20/7 33/12
70/17 103/2 103/8
103/25 104/12 104/19
117/10 130/9
**recorded [3]** 46/12
85/5 105/1
**recording [6]** 13/14
27/2 28/3 84/19 93/6
93/8
**records [1]** 85/19
**RECROSS [1]** 2/4
**recurring [1]** 60/21
**red [2]** 31/5 33/4
**redirect [6]** 2/4 16/1
27/21 66/2 66/4 91/15
**Reeser [4]** 101/16
101/17 125/20 127/6
**refer [18]** 9/18 9/18
9/19 28/21 47/23
51/17 100/24 102/5
103/11 104/21 105/5
115/23 117/21 122/10
128/14 128/15 132/23
138/8
**reference [12]** 10/25
13/20 18/4 34/10
34/19 34/25 35/14
41/17 87/21 103/6
110/17 137/19
**referenced [3]** 96/15
96/25 106/5
**referral [2]** 58/20
60/4
**referrals [3]** 57/23
65/13 103/9
**referred [16]** 17/25
24/17 25/5 25/24 26/4
26/9 27/9 27/12 30/11
57/5 57/11 64/15
64/24 96/25 104/11
108/7
**referring [10]** 8/8
11/1 20/19 22/20 29/1
29/10 29/14 35/3
35/14 104/8
**refresh [3]** 37/7
37/20 40/25
**refreshes [2]** 38/20
43/18
**regarding [10]**
14/20 57/5 57/17
65/20 82/13 84/6
86/13 89/18 102/12
102/21
**Regardless [1]**
136/16
**regret [1]** 40/15
**regretted [1]** 40/10
**regular [1]** 17/7
**regularly [1]** 125/3
**relates [1]** 5/17
**relative [2]** 7/3
55/23
**Relatively [1]** 93/9
**relaxed [1]** 19/6
**relaxing [1]** 32/16
**relay [1]** 43/4
**released [1]** 102/23
**relevance [14]** 19/1
22/1 28/10 42/14
46/20 49/2 49/7 49/20
49/21 77/4 91/21
93/20 93/25 94/21
**relevant [2]** 8/9 91/3
**reliance [1]** 118/5
**relied [2]** 6/22 7/9
**rely [3]** 56/1 117/2
117/3
**remainder [1]**
117/24
**remaining [1]** 96/6
**remarks [2]** 104/16
126/2
**remember [14]**
25/15 30/8 30/13 36/9
36/11 37/25 73/16
73/18 75/22 86/15
90/4 92/20 120/22
136/15
**render [1]** 110/21
**repeat [9]** 19/10
42/21 46/24 50/2
52/18 52/20 69/19
71/15 72/6
**rephrase [2]** 63/9
63/15
**report [15]** 13/6
15/6 18/20 21/2 30/7
32/8 60/10 66/25 68/7
81/14 87/12 97/12
103/13 107/18 125/8
**reported [17]** 1/20
14/2 15/11 15/12 16/6
17/11 17/14 17/19

## R

**reported... [9]**  18/8
21/19 31/12 31/13
55/2 55/8 55/12 56/20
107/21
**Reporter [2]**  1/21
140/7
**reporting [8]**  14/5
30/19 30/19 56/18
83/14 86/3 86/4
107/19
**reports [5]**  14/19
84/22 103/19 103/21
116/21
**representative [26]**
12/2 12/17 13/12
13/23 14/4 16/15
18/21 20/9 21/6 34/11
37/24 38/11 38/17
47/7 47/14 101/19
102/2 102/7 102/9
102/13 102/24 103/5
104/5 104/5 104/16
105/17
**representative's [1]**
17/19
**representatives [1]**
102/15
**requested [1]**  8/20
**required [3]**  63/18
116/2 130/24
**requirement [1]**
128/16
**requirements [1]**
139/1
**requires [3]**  5/25
118/10 118/12
**requiring [1]**  100/9
**researching [1]**
79/23
**reset [1]**  139/10
**reside [1]**  57/12
**residence [2]**  41/11
132/20
**resign [2]**  29/2 29/18
**resolved [1]**  98/6
**resources [1]**  61/10
**respect [2]**  25/10
70/25
**respond [1]**  86/12
**responded [2]**  8/1
40/20
**response [5]**  7/14
8/1 113/10 129/8
132/10
**responsibility [6]**
20/19 20/23 20/23
21/2 21/4 70/20
**rest [3]**  14/6 16/7
71/17
**result [8]**  64/17

64/20 65/13 92/14
102/17 108/3 115/12
119/24
**resulted [13]**  46/3
62/23 65/4 65/12
75/19 76/8 76/19
76/24 83/23 85/24
101/24 108/6 109/4
**resulting [3]**  107/9
107/15 109/13
**results [2]**  82/18
122/20
**retaliate [2]**  118/14
119/23
**retaliatory [1]**  6/12
**return [1]**  139/5
**reveal [1]**  102/22
**revealed [2]**  51/1
111/18
**review [14]**  8/21
21/13 21/16 26/10
27/5 28/6 30/12 97/11
98/8 100/25 110/21
110/23 139/17 139/22
**reviewed [3]**  8/13
52/25 110/20
**ride [1]**  126/15
**right [154]**
**rights [1]**  6/11
**ripped [1]**  101/21
**rise [5]**  24/23 31/12
58/6 83/2 89/5
**risk [2]**  47/13 80/9
**RMR [2]**  1/20 140/6
**RMR-CRR [2]**  1/20
140/6
**Robert [2]**  106/11
106/24
**robust [1]**  109/3
**RODNEY [3]**  1/8
1/21 140/7
**role [7]**  20/17 20/19
29/7 57/3 70/24 79/15
89/13
**roles [1]**  70/19
**room [3]**  1/22
128/17 140/8
**routinely [1]**  126/14
**rude [1]**  126/1
**Rules [3]**  19/5 32/14
32/17
**ruling [2]**  113/23
114/10
**run [1]**  125/8
**Ryder [1]**  107/1

## S

**safety [4]**  13/12
13/19 13/23 60/14
**said [39]**  10/23 16/7
16/12 23/2 28/4 28/14
28/16 28/16 28/17

29/17 37/16 37/16
37/17 37/18 37/19
38/8 38/14 39/19
43/20 61/22 62/18
79/3 81/1 81/24 85/6
88/1 89/3 89/17 90/15
91/19 94/13 94/14
95/3 115/3 123/13
126/5 132/13 132/17
133/17
**same [34]**  4/17 4/18
4/19 4/20 4/21 9/20
9/21 48/1 49/21 53/11
60/9 60/24 92/14
99/21 100/4 100/13
100/15 100/15 100/17
100/17 101/24 106/16
111/11 112/4 113/18
114/7 116/20 117/23
121/25 127/5 130/18
131/9 132/7 138/15
**Santos [23]**  12/2
12/17 14/4 16/15
18/21 20/13 21/6
22/19 23/21 24/5
24/12 30/1 31/1 31/5
34/11 37/24 38/11
38/17 47/7 47/14
104/6 125/6 127/24
**Santos' [6]**  13/12
13/23 24/8 102/19
102/24 103/5
**sat [1]**  27/1
**satisfied [1]**  5/8
**satisfy [2]**  6/15 7/10
**Saudi [1]**  136/10
**saw [3]**  17/4 101/22
134/13
**say [61]**  6/2 8/16
9/22 10/9 10/11 13/18
13/22 14/20 15/17
16/17 20/14 21/7
23/24 24/11 26/7
26/22 26/23 33/22
42/5 43/7 44/4 45/15
52/7 52/13 54/16 57/8
59/6 59/7 60/8 61/9
66/11 66/12 69/3
71/14 71/16 74/2
78/18 79/4 85/22 88/7
88/21 89/8 96/17
119/22 119/25 121/10
121/17 123/12 126/15
127/5 128/5 128/9
128/18 129/1 129/16
131/9 133/20 133/23
134/2 134/12 136/21
**say if [1]**  13/22
**saying [6]**  9/9
29/18 31/1 34/6 37/25
48/3 63/14 70/18
82/20 82/25 92/25

95/9 104/16 111/5
117/8 120/10
**says [9]**  15/2 15/3
40/19 92/3 115/13
119/11 126/21 129/14
139/2
**scenarios [1]**  133/23
**Schneider [3]**
128/23 129/2 129/9
**scope [3]**  59/12
59/23 61/12
**scream [1]**  134/19
**screen [3]**  32/7
32/19 78/15
**scum [1]**  101/22
**seal [1]**  102/25
**sealed [4]**  98/14
98/16 98/23 122/14
**sealing [1]**  98/25
**search [1]**  88/14
**searched [1]**  108/22
**searches [1]**  108/20
**seated [4]**  3/6 11/18
98/5 99/11
**second [22]**  5/23 6/1
6/15 6/18 7/16 7/18
7/20 10/20 16/3 38/22
99/23 106/15 106/20
109/25 110/14 111/1
111/16 112/19 114/20
124/23 132/18 135/25
**secret [2]**  126/13
131/21
**section [45]**  10/12
11/3 13/7 14/3 15/6
24/18 27/13 33/21
33/23 34/2 34/3 51/18
52/12 54/15 56/7
56/21 57/6 57/11
57/22 58/20 70/8 71/7
79/8 104/24 106/1
106/23 106/24 107/3
107/9 107/13 111/25
112/19 118/24 119/4
119/12 135/8 136/19
137/8 137/19 137/24
138/1 138/4 138/7
138/9 138/14
**sections [2]**  119/9
119/18
**Security [4]**  9/1 11/2
112/6 112/6
**see [32]**  4/1 6/6 9/6
16/20 23/10 31/21
32/5 32/18 35/1 38/20
40/12 40/23 41/1
41/12 64/20 66/14
67/3 67/17 78/5 92/6
93/9 97/22 102/16
112/9 114/8 115/12
115/12 116/11 124/14
124/23 127/2 139/13

**seeing [2]**  16/9
112/10
**Seek [1]**  92/12
**seeking [1]**  100/22
**seeks [1]**  111/23
**seem [1]**  80/24
**seemed [2]**  31/3
39/23
**seems [6]**  28/14
109/13 111/7 122/4
128/9 130/6
**seen [1]**  35/7 84/1
135/13
**selected [1]**  18/4
**selective [11]**  4/1
4/16 8/2 9/16 100/13
114/13 114/14 114/19
115/5 115/25 131/3
**selectively [1]**
114/17
**self [1]**  116/18
**self-identified [1]**
116/18
**sending [2]**  28/5
108/19
**sense [5]**  7/6 7/19
81/7 110/7 123/8
**sensitive [1]**  115/6
**sent [7]**  17/15 23/5
27/4 52/24 66/10
79/16 101/17
**sentence [1]**  125/21
**sentenced [1]**
120/22
**sentencing [3]**
96/18 109/10 111/25
**separate [2]**  118/19
118/19
**separately [1]**
114/16
**September [2]**  76/3
120/20
**sequential [1]**  7/15
**series [2]**  61/20
105/24
**serious [3]**  28/4
110/7 130/7
**seriously [2]**  31/4
113/13
**servant [1]**  114/7
**servants [2]**  113/12
114/5
**serve [1]**  32/9
**Service [1]**  126/13
**SESSION [3]**  3/1
98/1
**set [1]**  30/4
**seven [1]**  117/18
**several [5]**  18/23
19/13 21/24 103/6
103/16
**severe [3]**  26/19

**S**

**severe... [2]** 28/15
28/25
**severity [1]** 138/19
**sexual [9]** 55/15
55/22 59/19 61/25
62/8 62/14 64/5 90/6
91/2
**sexuality [3]** 73/18
74/17 75/10
**shall [2]** 119/12
119/15
**Shapiro [3]** 106/4
121/20 121/22
**share [3]** 66/17
67/25 112/23
**shared [3]** 81/25
84/21 84/23
**sharing [1]** 131/22
**she [5]** 22/22 123/13
132/16 132/17 132/21
**she'll [1]** 132/19
**she's [2]** 22/3 23/10
**Sheriff's [1]** 94/16
**shit [1]** 38/12
**shoot [7]** 123/14
126/22 132/18 133/18
133/23 134/2 134/20
**shortly [1]** 40/14
**should [19]** 5/20
6/23 21/7 27/4 28/17
28/21 29/18 42/5 64/1
64/10 88/25 90/7
90/11 112/9 116/10
116/11 129/7 130/24
132/1
**shouldn't [5]** 111/21
111/22 122/23 126/18
131/10
**show [7]** 10/4 41/2
107/21 116/2 116/7
116/7 133/9
**showed [1]** 103/23
**showing [3]** 4/5
100/3 114/14
**shown [8]** 108/9
108/13 109/15 110/3
110/5 113/17 116/5
116/13
**shows [2]** 111/19
137/4
**side [2]** 40/21
133/22
**sides [1]** 139/17
**Sierra [1]** 104/15
**signers [1]** 102/22
**similar [8]** 4/7 24/6
105/22 106/18 107/10
112/10 112/13 137/11
**similarity [1]** 112/23
**similarly [15]** 4/6

4/12 4/14 4/15 100/4
100/11 100/12 109/14
110/4 110/6 111/10
111/23 111/24 116/3
127/21
**simple [10]** 53/6
86/4 86/6 119/1 119/6
137/14 137/25 138/3
138/12 138/13
**simply [8]** 108/24
117/15 118/3 121/18
122/3 126/19 126/21
130/10
**since [23]** 34/3
45/21 51/5 51/10
51/17 52/11 54/14
56/6 57/15 58/15 65/3
70/8 71/6 71/13 72/24
73/3 79/11 79/12
79/24 85/8 105/11
120/19 139/1
**Sincerely [1]** 129/9
**single [22]** 101/1
107/12 107/15 108/5
108/8 108/16 112/17
112/21 113/4 114/6
116/16 121/14 122/5
122/10 122/12 124/3
130/15 130/15 130/19
131/7 138/23 139/3
**singled [2]** 4/5 100/3
**sir [65]** 19/21 33/25
35/8 37/1 38/18 39/20
40/25 41/25 42/19
42/24 43/15 44/2
44/11 44/18 45/7 45/8
45/15 45/23 46/17
47/9 48/6 48/14 48/18
49/16 49/24 50/2 50/5
50/16 50/19 51/6 54/5
54/8 54/12 54/16
55/18 55/24 56/5
56/16 58/8 58/18 62/2
62/6 62/22 62/24 63/3
64/18 66/24 68/11
69/23 70/22 71/16
71/24 73/9 73/20 74/6
75/4 75/8 75/14 77/18
77/23 87/4 87/20 91/8
95/24 97/8
**sit [1]** 9/22
**sitting [1]** 9/9
**situated [14]** 4/6
4/12 4/14 4/15 100/4
100/11 100/12 109/15
110/4 110/6 111/10
111/23 116/4 127/21
**situation [14]** 9/4
18/11 23/25 24/6
30/14 30/25 30/25
31/3 31/5 53/11 80/7
114/23 120/4 123/10

**six [5]** 117/19 119/15
138/8 138/11 138/24
**skip [1]** 118/23
**slight [1]** 124/14
**slightly [2]** 67/12
127/21
**slur [2]** 126/10
126/22
**SMITH [24]** 1/8 1/15
1/21 3/9 3/16 3/22
4/24 6/14 7/8 10/17
18/17 19/10 38/22
87/15 97/9 98/10
100/6 100/7 113/22
113/23 114/10 114/18
117/4 140/7
**so [219]**
**social [2]** 86/5 102/8
**solely [1]** 82/16
**some [39]** 6/14 11/7
16/8 25/13 26/17
56/13 60/18 61/5
64/14 64/19 64/19
65/6 65/11 80/16 92/6
96/14 96/14 96/19
102/25 103/22 104/16
114/15 118/21 119/25
120/10 120/10 121/6
121/24 124/6 124/11
124/12 124/12 124/13
124/13 125/14 126/1
130/1 131/9 132/8
**somebody [8]** 15/2
22/22 36/17 88/2 92/3
132/3 132/13 134/13
**somebody's [1]**
73/17
**somehow [4]** 118/2
122/2 127/17 129/16
**someone [22]** 16/20
30/10 30/15 31/1 31/6
39/24 52/1 52/9 53/7
60/23 78/7 86/4 86/5
89/18 90/2 90/5 90/11
117/25 118/1 126/17
133/24 133/25
**someone's [1]** 80/22
**something [26]** 7/22
10/22 17/6 18/8 26/11
27/4 38/13 40/22 53/7
62/4 67/3 82/25 86/6
109/12 112/9 123/7
123/16 124/18 124/19
128/10 129/13 129/14
132/8 133/21 134/16
134/17
**sometimes [2]** 89/21
89/21
**somewhat [2]** 24/5
107/10
**son [2]** 129/3 129/8
**soon [1]** 126/12

**sorry [33]** 12/11
22/7 26/22 26/23
28/13 29/15 37/17
38/22 42/5 44/20
46/24 55/4 55/7 55/9
57/8 57/8 62/12 70/14
71/15 74/3 79/3 87/10
90/14 91/6 91/24
92/24 94/8 95/7 95/8
101/18 106/13 127/1
128/23
**sort [10]** 24/2 24/16
26/14 26/17 30/5
58/19 68/25 82/9
114/9 115/2
**sought [1]** 132/22
**sound [1]** 23/12
**sounds [3]** 29/9 72/7
72/16
**south [2]** 1/13
135/25
**southeast [1]** 56/13
**SOUTHERN [6]** 1/1
11/3 11/5 131/13
133/13 137/6
**speak [13]** 14/6 16/7
26/14 42/12 48/24
59/4 59/5 59/7 59/13
73/25 90/25 93/2
134/1
**speaker [1]** 59/20
**speaking [1]** 102/14
**spec [1]** 130/19
**special [9]** 13/21
32/18 37/17 37/19
40/20 48/20 70/21
77/22 85/8
**specialized [2]**
35/10 35/17
**specific [6]** 25/11
112/3 112/3 119/2
125/2 127/22
**specifically [2]** 84/5
124/23
**specification [1]**
130/16
**specifics [1]** 13/24
**speech [1]** 6/11
**spell [1]** 79/3
**spelled [1]** 33/14
**spend [1]** 117/12
**spoke [4]** 63/22 85/6
92/18 95/16
**spoken [2]** 42/10
90/22
**Springer [2]** 135/4
135/25
**SS [1]** 106/14
**staff [9]** 12/2 20/24
20/25 21/4 24/23
30/11 52/4 58/7 86/4
**staffer [2]** 18/5 18/6

**staffers [1]** 124/5
**stalker [1]** 31/3
**stand [2]** 74/7 99/13
**standard [15]** 35/25
36/2 36/11 36/14
36/19 38/7 38/9 47/16
61/21 62/1 62/5 69/19
80/5 100/1 100/9
**standards [1]**
112/11
**standing [1]** 123/18
**stands [1]** 139/9
**STANZIONE [71]**
1/6 3/8 3/17 6/3 6/22
10/7 12/8 18/24 19/14
21/24 25/12 34/7
34/17 35/10 35/11
35/17 35/20 36/24
37/4 37/16 37/18
37/21 38/5 38/10
38/15 39/23 40/10
40/15 40/19 41/6 42/9
42/10 42/22 42/22
43/6 43/14 47/1 47/4
47/5 50/21 53/11 54/3
55/2 55/5 55/7 55/12
55/13 57/1 62/10
62/13 63/23 64/1
67/18 68/16 80/3 81/4
81/25 84/1 88/23
91/17 93/12 94/3
94/20 94/25 100/3
100/16 112/24 114/25
116/16 116/18 131/12
**Stanzione's [9]**
34/14 55/15 56/23
58/1 62/8 64/5 64/9
66/21 70/25
**start [10]** 23/9 44/3
55/9 73/5 100/22
101/1 111/5 117/7
125/19 128/5
**starts [7]** 71/21 72/2
72/7 72/14 101/4
125/21 129/17
**state [18]** 3/10
11/23 20/7 43/1 48/21
56/12 67/11 67/23
76/4 79/2 101/6
101/10 104/16 108/11
115/20 117/10 131/20
137/11
**stated [5]** 8/11
44/15 50/5 53/7 76/3
**statement [27]** 40/6
43/12 52/2 52/3 52/9
53/2 53/16 53/22
53/25 60/22 60/24
72/4 87/7 104/20
123/21 126/6 126/7
126/10 127/3 127/14
127/18 127/23 128/8

**S**

**statement... [4]**
128/10 129/2 129/4
129/6
**statements [2]**
124/24 128/13
**states [26]** 1/1 1/4
1/8 1/10 1/12 3/7
3/12 4/15 33/20 48/19
50/9 56/13 57/7 57/12
57/13 79/7 99/19
100/6 102/7 103/14
104/22 106/24 124/23
135/4 137/16 138/3
**stating [2]** 39/23
129/10
**statistical [3]** 9/18
107/22 108/1
**statistically [1]**
108/18
**statute [6]** 118/4
118/10 118/12 126/24
129/21 131/4
**statutes [3]** 118/9
130/3 131/11
**stay [1]** 99/11
**stems [2]** 4/9 100/6
**STENOGRAPHICALL
Y [1]** 1/20
**step [29]** 4/4 4/11
4/25 5/8 5/8 5/21
5/22 7/15 7/18 7/19
7/19 7/20 7/22 10/10
49/10 99/21 99/23
109/24 109/25 110/10
110/14 110/14 110/18
111/1 111/3 114/11
114/12 114/18 116/6
**stepped [1]** 32/4
**steps [3]** 4/2 99/20
114/10
**still [13]** 9/24 15/5
33/3 33/6 33/7 58/6
63/13 63/13 91/25
110/21 123/9 136/11
139/8
**stipulate [2]** 38/25
43/19
**stop [2]** 111/16
134/19
**straight [1]** 12/1
**straightforward [1]**
127/22
**strapping [1]** 135/11
**Street [1]** 1/13
**stress [1]** 125/24
**strike [1]** 9/25
**strong [2]** 4/23
100/19
**stronger [2]** 4/23
100/19

**struck [1]** 9/23
**structure [1]** 137/24
**stuff [4]** 29/3 29/19
41/23 119/9
**subject [15]** 5/14
5/18 25/10 48/1 52/7
56/24 60/9 62/11 64/5
64/13 66/12 76/5
81/14 85/12 87/16
**subject's [1]** 91/2
**subjects [12]** 46/25
47/3 56/17 57/6 57/12
60/20 61/20 62/1 62/4
79/15 87/6 95/10
**submit [6]** 5/24 6/8
6/14 6/15 6/20 14/23
**submitting [1]** 14/23
**subpoena [1]** 32/4
**subpoenas [1]** 32/9
**subsequently [1]**
137/5
**substandard [1]**
109/8
**substantially [2]**
4/18 100/15
**substitute [1]**
105/10
**successive [1]**
121/24
**such [8]** 47/19 88/19
108/18 114/15 115/7
123/11 128/13 131/2
**suggest [2]** 28/5
28/18
**suggested [3]** 6/9
28/21 28/23
**suggestion [1]**
124/16
**Suite [1]** 1/16
**summaries [1]**
67/25
**summary [7]** 68/17
84/23 92/1 93/5
103/13 103/19 103/21
**summer [1]** 12/25
**Sunday [1]** 25/18
**super [1]** 11/8
**supervised [2]** 8/19
112/5
**supervising [1]** 11/4
**supervisor [19]** 8/18
8/21 8/25 9/1 11/1
52/25 53/1 53/3 58/23
58/25 59/1 59/4 59/5
59/7 59/13 59/18
66/16 66/17 112/6
**supervisors [2]**
59/23 67/17
**supplement [5]**
106/4 106/13 106/15
122/6 128/22
**supporting [1]** 128/5

**supposed [2]** 112/4
125/14
**Supreme [2]** 100/8
115/24
**sure [17]** 5/15 23/17
26/6 27/6 37/8 40/4
52/19 53/20 57/9 61/1
67/10 69/2 69/17 72/7
99/10 110/23 131/19
**surgery [1]** 101/23
**surrounding [2]**
56/13 57/13
**susceptibility [1]**
120/18
**sustained [15]** 19/4
22/2 42/15 43/22 45/3
46/5 49/3 65/17 74/20
74/24 77/5 93/15
93/21 94/1 94/23
**sustaining [1]** 77/10
**SW [1]** 1/13
**Swalwell [3]** 101/19
102/3 102/4
**Swalwell's [1]**
121/23
**switch [1]** 23/11
**sworn [4]** 11/13 20/1
33/9 78/16
**system [3]** 22/24
111/23 112/1

**T**

**T-O-R-R-E-S [1]**
33/14
**table [1]** 3/13
**tad [1]** 78/20
**take [19]** 5/3 21/23
28/20 31/4 31/9 61/17
79/14 96/19 97/3
109/6 110/21 125/17
127/3 127/15 129/14
133/19 133/19 135/2
136/21
**taken [3]** 84/13
97/25 113/12
**taking [4]** 40/4 81/1
114/4 135/16
**talk [11]** 13/2 40/7
57/20 65/2 70/17
72/21 73/6 73/17
80/14 120/13 122/9
**talked [3]** 73/7
92/20 122/3
**talking [7]** 40/3
42/19 46/14 67/16
67/16 71/6 80/18
**Tampa [1]** 56/9
**tapes [1]** 136/16
**TAS [9]** 79/10 79/12
79/17 79/21 79/25
83/16 83/23 85/18
105/2

**task [1]** 17/6
**tasked [3]** 56/17
56/25 70/24
**technical [2]** 18/11
22/25
**television [1]** 129/1
**tell [17]** 28/25 33/18
40/9 43/1 43/9 43/17
44/14 69/3 70/3 73/9
76/21 76/22 88/10
95/12 95/17 134/20
137/10
**telling [5]** 13/21
43/6 94/25 114/18
128/3
**telltale [1]** 48/8
**ten [10]** 44/5 44/6
45/9 62/18 76/13
76/18 76/20 76/24
119/13 119/18
**ten-year [1]** 119/18
**term [9]** 4/14 7/25
24/19 58/10 83/8
93/14 119/13 138/4
138/7
**termed [1]** 125/15
**terms [5]** 7/6 56/11
58/10 64/16 70/20
**test [3]** 5/22 5/25
6/25
**testified [23]** 45/24
49/5 49/14 49/16
49/18 49/25 49/25
50/3 56/6 59/12 61/19
62/25 62/25 63/10
63/21 63/25 68/2
69/20 82/19 83/18
83/20 87/5 116/22
**testify [5]** 5/2 32/1
49/1 63/18 69/19
**testimony [16]** 5/3
5/4 5/6 6/6 7/2 8/16
12/1 68/4 100/12
103/6 104/4 107/25
108/25 109/19 116/19
118/16
**texted [1]** 32/24
**than [31]** 4/23 14/16
16/25 28/15 28/25
29/19 50/12 50/21
67/12 67/21 89/11
93/23 97/4 97/16
98/13 100/20 111/18
112/18 113/15 116/3
119/13 119/19 122/2
122/3 123/10 125/3
125/7 130/23 138/5
138/8 138/12
**thank [51]** 3/25
10/19 11/15 14/9
14/11 18/18 19/21
19/22 20/3 20/7

22/10 27/17 29/5
31/15 31/17 31/18
31/24 32/6 32/25 39/7
48/25 51/16 52/10
54/17 54/20 66/1 66/2
68/12 71/3 72/22
77/19 77/21 77/22
77/24 85/3 86/19
86/22 91/12 95/21
95/23 95/24 95/25
97/23 97/24 99/7
110/16 117/4 117/5
139/7 139/14 139/19
**that [931]**
**that's [81]** 4/24 5/9
5/10 8/14 8/24 9/3
9/15 11/19 14/1 21/4
22/24 23/4 25/15
26/18 27/17 27/24
28/14 30/13 32/11
33/13 37/15 38/9
38/13 39/5 40/13 41/3
43/7 43/23 44/15
47/10 47/16 52/1 66/1
66/12 72/25 73/12
73/21 74/2 75/8 75/24
76/3 76/6 77/9 78/6
78/7 88/7 90/15 91/2
92/25 97/2 98/14 99/3
99/13 99/17 101/16
106/7 106/20 107/19
107/20 108/23 109/24
111/24 112/20 114/7
114/8 114/20 115/14
115/18 118/2 123/3
126/9 127/13 127/18
128/2 129/4 129/14
130/10 130/22 133/9
136/21 139/5
**their [22]** 7/12 8/18
10/10 30/15 36/17
52/4 81/1 102/14
102/23 103/14 104/18
104/23 104/23 109/2
111/16 113/10 117/9
117/19 118/15 122/6
122/9 138/16
**them [59]** 5/3 8/17
14/23 15/6 16/10 17/3
17/7 18/6 23/4 29/17
32/4 32/17 40/22 50/8
53/17 53/18 54/2
60/18 60/18 71/17
75/22 80/18 83/13
84/18 84/21 93/4 93/5
96/14 96/16 97/3 97/6
97/6 97/12 100/24
100/25 102/15 102/23
102/25 103/1 103/15
103/23 103/23 104/12
104/13 108/8 110/21
114/16 116/21 117/22

**T**

**them... [10]** 122/10
122/19 125/15 128/4
129/5 129/15 133/19
134/1 134/11 139/22
**themselves [1]**
114/19
**then [53]** 5/4 5/6 5/7
5/8 5/22 6/5 15/18
16/16 24/11 25/4
37/17 40/4 51/14 53/3
54/1 60/22 66/17
71/11 74/7 78/3 78/9
80/6 82/20 82/25 83/2
96/9 97/6 107/17
111/4 114/6 115/9
117/24 118/19 119/4
119/6 123/8 123/13
125/21 126/10 126/11
126/22 129/16 129/22
132/5 133/18 133/23
134/2 134/20 134/21
135/16
**there [88]** 6/2 6/5
11/3 17/19 17/25
19/20 21/14 23/10
23/24 25/13 25/13
26/3 26/3 26/7 29/11
31/11 31/22 31/25
32/19 32/19 33/5
34/22 34/24 37/10
41/16 43/10 46/12
53/13 61/5 61/19
66/20 66/23 66/25
67/3 67/4 75/22 78/4
78/5 80/5 81/7 84/6
92/12 94/5 94/11
99/20 102/16 103/16
105/1 105/11 105/15
107/2 107/20 108/9
109/14 109/25 110/6
111/7 111/19 111/22
114/22 116/10 118/12
118/19 118/20 119/21
119/22 119/23 119/25
121/12 121/13 121/24
122/6 122/22 122/24
123/19 124/7 124/11
124/13 124/14 124/15
124/16 129/24 130/1
130/17 131/13 133/5
133/10 134/6
**there's [31]** 4/2 5/24
6/5 22/23 35/1 36/2
45/19 48/8 69/23 70/2
70/15 70/16 71/10
80/6 89/23 92/3 97/1
97/2 112/18 112/22
113/10 116/9 116/12
119/8 121/2 122/16

127/15 128/7 128/10
130/8 136/21
**therefore [4]** 119/17
120/17 122/2 122/17
**Thereupon [1]**
139/23
**these [58]** 6/12 9/5
9/6 9/16 16/24 29/16
31/8 32/11 36/4 36/4
36/19 36/20 41/21
42/1 43/25 47/16
47/23 48/11 74/16
84/9 89/23 91/17 95/1
96/14 99/4 101/13
102/3 103/21 105/13
109/10 109/21 110/2
112/12 112/21 112/25
113/11 114/19 117/18
120/9 121/10 122/12
123/23 124/4 124/6
124/9 124/15 125/3
125/22 126/6 126/12
129/11 129/22 131/8
131/15 134/8 134/11
135/23 136/18
**they [115]** 7/25 8/2
8/8 8/15 8/16 9/23
10/9 10/13 13/16 15/4
15/11 17/8 18/5 18/7
18/8 18/9 25/7 31/2
31/11 32/15 36/21
39/16 39/16 41/22
42/4 52/3 53/7 53/15
53/16 53/19 53/23
62/23 73/17 77/13
78/3 78/4 80/13 80/24
81/18 93/10 94/17
102/24 103/14 103/15
104/18 105/13 105/14
107/20 107/20 109/3
109/20 109/21 109/23
110/1 110/7 111/17
112/22 112/23 113/7
114/1 114/2 114/2
114/12 114/15 114/16
115/15 115/17 115/23
116/2 116/3 116/23
117/17 117/21 117/24
118/3 120/20 121/8
121/16 122/7 122/9
122/10 122/17 122/18
122/25 123/20 123/21
125/3 125/15 126/3
126/6 126/14 126/21
128/16 128/19 128/20
128/20 128/22 129/1
130/3 130/4 131/4
131/16 132/20 134/2
134/13 134/17 134/18
134/18 134/22 134/24
134/25 135/1 136/5
138/8 138/17

**they're [17]** 9/7 43/9
51/10 53/22 80/19
84/11 85/12 96/18
96/18 100/25 103/18
109/22 110/7 113/2
114/19 118/8 129/13
**they've [6]** 109/3
113/8 113/9 117/18
121/17 133/8
**thing [10]** 7/17
25/15 25/22 30/13
40/19 40/21 95/1
127/5 128/24 138/15
**things [27]** 14/25
15/3 15/4 16/22 18/8
31/8 51/10 66/6 69/23
69/24 70/2 70/15
70/16 75/25 104/17
118/13 124/1 124/7
124/9 125/18 128/15
129/11 129/18 129/18
134/8 136/9 137/1
**think [45]** 5/2 7/5
9/2 29/21 29/23 32/4
32/16 38/16 44/13
47/18 54/13 58/15
59/23 61/22 67/10
69/13 72/13 83/13
83/17 96/12 96/15
96/20 96/21 97/18
97/20 100/11 107/21
109/5 109/17 110/1
110/22 112/7 112/9
115/20 115/20 118/4
122/23 123/24 128/11
129/16 129/17 131/21
132/10 134/8 136/6
**third [3]** 29/24
106/13 106/15
**this [276]**
**those [89]** 8/7 14/23
15/4 16/10 16/12
16/19 18/3 27/10
27/14 30/7 35/12
35/23 35/25 36/2 44/6
45/24 46/2 48/12
51/25 52/4 53/1 53/10
53/17 56/21 56/21
57/15 57/17 57/17
60/17 62/23 64/24
65/4 65/5 65/11 65/11
67/25 71/7 74/7 74/8
75/19 76/16 76/17
76/20 77/1 77/3 82/6
87/17 90/24 96/17
96/20 98/22 98/24
99/22 103/2 103/9
105/20 105/22 106/2
106/24 107/5 107/24
115/9 117/3 117/15
117/23 118/18 118/19
119/1 121/4 121/8

121/18 121/18 121/23
122/1 124/1 124/2
124/2 124/20 124/21
125/9 127/7 129/18
130/5 130/6 132/1
133/15 133/23 134/22
134/23
**though [6]** 4/6 15/11
63/10 119/18 121/4
122/8
**thought [4]** 64/1
68/21 78/6 95/19
**thoughts [2]** 27/3
118/25
**thousands [4]** 10/13
10/13 124/10 124/20
**threat [222]**
**threaten [5]** 102/14
123/20 128/4 133/18
134/18
**threatened [5]**
101/12 102/2 105/16
119/14 134/14
**threatening [15]**
20/21 21/7 23/22 25/7
56/19 101/18 108/19
108/19 129/3 129/5
135/10 136/19 137/25
138/7 138/12
**threats [71]** 8/13
14/2 14/24 15/10 21/3
25/6 26/9 27/15 30/7
41/24 42/3 45/12
45/21 51/9 57/10
57/17 57/21 58/11
61/17 63/17 64/13
65/24 75/18 82/2
83/23 89/5 89/11 95/5
102/3 102/24 103/2
103/7 103/16 103/17
103/17 103/22 104/8
104/10 105/25 106/22
107/8 108/10 108/14
109/2 109/8 109/9
110/8 113/11 114/4
122/1 124/2 124/7
124/21 124/25 125/2
125/22 126/6 126/13
126/14 127/7 128/16
130/25 131/3 133/15
133/24 134/24 135/25
135/9 135/22 136/23
137/19
**three [4]** 24/4 29/24
45/7 118/12
**through [25]** 7/2
8/21 9/2 9/14 9/15
10/23 12/10 12/18
16/9 17/3 17/7 32/9
53/5 67/3 72/3 72/9
72/15 72/20 84/5 97/5
100/24 113/21 120/1

122/12 124/3
**throughout [1]**
116/13
**thrust [1]** 128/11
**tied [1]** 101/20
**time [47]** 5/8 6/6
6/19 11/2 11/25 12/4
14/4 15/9 15/9 16/4
16/15 17/19 17/25
18/21 20/20 20/25
21/5 21/14 26/18
30/11 30/16 35/6
39/16 43/2 43/3 44/2
45/13 46/1 47/24 50/5
50/11 51/20 61/10
63/11 82/3 83/16 96/4
96/19 97/10 110/19
117/15 121/5 125/7
127/10 136/1 136/12
137/5
**times [9]** 21/10
49/24 50/3 73/3 82/1
90/18 123/1 125/6
138/11
**title [1]** 119/13
**today [12]** 96/2
97/13 97/14 117/15
117/19 118/16 121/15
122/15 124/3 125/4
128/20 139/18
**Todd [1]** 106/16
**together [3]** 32/15
68/17 70/16
**told [20]** 9/3 40/10
40/13 41/18 41/23
42/1 42/5 42/6 42/9
42/22 42/25 43/14
57/22 69/22 70/6
75/23 81/3 90/1 95/11
95/16
**tomorrow [1]**
139/18
**too [4]** 7/20 32/7
99/13 129/8
**took [5]** 19/7 22/4
39/22 70/11 103/15
**topic [1]** 93/11
**Torres [24]** 31/22
31/25 32/2 32/3 32/18
32/20 32/22 33/1 33/5
33/13 33/14 33/16
33/18 54/22 54/24
55/3 55/4 55/6 66/4
70/21 77/22 105/8
109/1 116/22
**total [5]** 45/12 62/17
79/20 109/7 110/19
**totality [1]** 138/25
**touch [1]** 128/19
**tough [1]** 13/22
**towards [9]** 7/23
25/14 25/14 40/1 97/1

**T**

**towards... [4]**
107/25 114/20 116/17
117/3
**tower [1]** 135/25
**trained [2]** 22/19
23/21
**training [4]** 23/24
35/10 35/18 53/5
**traitor [1]** 127/12
**transcript [19]**
13/14 35/7 37/6 37/11
38/2 38/18 38/23
38/24 38/25 39/1
39/22 40/12 43/15
43/20 84/2 95/15
105/7 105/11 105/12
**transcription [1]**
140/4
**transferred [1]**
51/14
**transferring [1]**
54/15
**transmission [1]**
118/11
**transpired [1]** 80/14
**travel [7]** 52/16 84/8
84/14 84/15 84/16
92/14 93/18
**treason [1]** 129/7
**treat [3]** 53/4 61/2
111/23
**treated [5]** 60/13
69/25 98/16 109/23
116/3
**treatment [1]**
112/12
**triage [1]** 58/19
**trial [3]** 10/8 126/3
139/8
**tried [2]** 36/15 84/16
**trier [1]** 127/2
**Triple [12]** 98/13
101/4 101/16 102/1
102/5 102/6 102/12
102/18 102/20 103/3
103/12 104/15
**trouble [2]** 43/8
43/10
**truck [1]** 101/21
**true [13]** 8/14 15/5
15/10 65/23 73/22
73/23 83/10 87/20
88/7 123/2 123/9
129/4 139/1
**truth [2]** 40/9 118/3
**try [14]** 9/12 10/2
17/21 34/22 47/6 60/9
60/12 60/22 61/1 69/1
96/8 117/24 120/7
134/6

**trying [14]** 18/11
22/3 38/5 47/10 47/13
111/20 118/7 125/17
130/21 133/18 133/24
134/18 134/19 134/19
**TT [1]** 107/1
**TTT [1]** 107/18
**turn [4]** 6/19 8/15
8/17 132/5
**twelve [3]** 18/2 18/3
130/23
**Twitter [8]** 127/8
127/9 129/2 135/24
136/3 136/5 136/8
136/15
**two [58]** 4/2 5/9
7/10 32/10 32/11
32/12 34/11 35/1
35/12 35/24 41/18
42/10 47/8 51/10
62/20 62/23 66/6
67/23 69/24 70/2
70/15 70/15 70/16
70/18 75/25 76/25
81/4 96/22 99/4 99/20
109/12 112/20 112/21
112/24 113/2 113/4
114/10 114/11 114/12
114/13 114/24 114/25
116/6 116/15 117/16
118/9 120/12 129/24
130/5 130/7 131/5
131/11 132/23 135/3
136/18 137/1 138/22
139/4
**type [9]** 4/17 31/3
52/15 93/19 100/14
126/12 129/11 134/3
134/23
**types [5]** 36/5 51/20
51/23 105/13 124/15
**typical [1]** 29/18
**typically [1]** 48/19

**U**

**U.S [48]** 8/24 12/24
13/6 14/20 31/20
41/19 50/6 50/15
51/10 51/18 57/4
81/15 81/16 81/17
81/19 81/21 82/1 82/3
82/6 84/20 85/1 85/4
85/7 85/8 87/2 89/17
89/22 90/22 92/2
92/11 92/15 92/19
92/20 93/2 93/7 95/13
101/18 101/18 102/9
102/13 105/17 118/14
118/15 119/1 121/13
123/4 125/25 135/19
**U.S.C [4]** 118/1
118/1 118/24 135/9

**ultimately [3]** 63/7
65/4 65/11
**under [39]** 9/21 32/3
41/6 41/16 52/16
89/19 90/21 99/19
102/25 106/1 106/21
106/23 107/13 107/13
108/14 112/17 112/22
117/25 118/1 118/20
119/12 119/20 120/10
120/11 123/2 125/12
130/2 130/3 130/18
131/4 131/5 131/11
132/6 136/18 137/19
138/1 138/3 138/7
138/25
**understand [13]**
10/24 26/6 27/6 37/15
43/13 50/17 57/3
70/18 77/11 80/23
92/9 94/8 110/25
**understandably [1]**
121/6
**understanding [4]**
8/23 17/23 24/15
72/12
**understands [1]**
71/3
**understood [3]**
60/15 61/3 61/5
**undertake [2]**
113/25 115/6
**uniform [8]** 51/12
51/12 51/13 51/14
86/8 86/13 86/15
107/19
**UNITED [20]** 1/1 1/4
1/8 1/10 1/12 3/7
3/12 33/20 48/19 50/9
79/7 99/19 100/6
102/7 103/13 104/22
106/23 135/4 137/16
138/3
**unless [2]** 26/16
118/20
**unlike [2]** 106/21
111/8
**unlikely [3]** 108/17
108/18 132/7
**unmute [2]** 33/2
33/5
**unpublished [2]**
135/5 135/7
**unquote [1]** 133/15
**until [5]** 20/14 81/9
96/5 101/21 125/8
**up [40]** 10/8 12/7
24/9 30/4 32/7 43/9
43/11 46/11 50/16
50/16 56/25 61/6 62/7
62/8 62/13 69/3 69/5
75/14 78/20 80/15

85/19 94/13 95/13
97/14 97/21 103/23
116/15 117/18 120/10
120/14 122/8 124/19
125/8 126/4 128/19
128/20 133/17 136/12
137/14 139/20
**update [1]** 93/4
**updated [2]** 23/6
23/7
**upon [2]** 111/4
123/22
**urgency [2]** 80/8
81/7
**urgent [2]** 60/14
93/17
**us [44]** 3/13 17/23
18/12 18/13 22/22
22/23 22/25 32/19
32/22 33/11 36/22
40/3 40/7 40/8 40/9
41/10 41/22 42/12
43/1 43/9 43/11 46/14
48/22 57/22 78/12
79/16 80/14 81/3
81/13 81/25 85/12
89/7 90/1 90/17 90/20
94/16 95/19 96/19
97/10 114/1 114/18
115/17 118/21 129/23
**use [2]** 58/10 132/19
**used [2]** 86/5 109/10
**uses [1]** 128/1
**using [1]** 61/21
**usually [4]** 29/2 30/8
92/25 97/17
**UU [1]** 106/16
**UUU [1]** 106/17

**V**

**value [2]** 4/20
100/17
**Vargo [1]** 106/24
**various [3]** 8/12
89/25 96/25
**Varnum [1]** 106/11
**vary [1]** 126/1
**verbiage [1]** 134/12
**versus [14]** 3/8 4/9
9/21 10/2 59/2 64/14
99/19 100/6 115/20
125/25 135/4 135/19
137/17 138/18
**very [23]** 7/25 28/19
29/16 31/3 41/10 52/6
53/6 53/6 60/13 63/16
88/1 109/1 109/3
113/19 126/1 126/1
127/22 127/22 134/9
137/9
**Victim [3]** 121/8

121/9 121/9
**victims [2]** 121/11
130/4
**video [3]** 33/2 102/8
116/20
**View [1]** 96/19
**views [6]** 55/25 62/3
64/10 73/18 90/10
91/3
**vindictive [1]** 6/12
**violation [3]** 112/19
119/12 136/19
**violations [3]** 107/3
107/4 137/18
**violence [6]** 25/14
25/14 123/21 127/15
128/8 132/19
**Virginia [2]** 123/5
139/2
**visits [1]** 138/24
**voice [2]** 17/5 17/16
**voicemail [21]** 12/8
12/13 12/20 13/3 13/5
13/11 13/23 16/14
18/24 19/15 21/8
21/25 25/16 25/17
25/21 34/10 36/25
38/6 39/11 47/8
108/19
**voicemails [14]** 16/9
16/17 16/24 17/1 17/5
17/11 17/18 17/24
20/20 28/15 95/10
121/22 130/17 138/24
**voted [1]** 101/13
**voting [1]** 128/9
**vulgar [2]** 126/1
126/17
**VV [1]** 106/16

**W**

**Wait [3]** 18/10 70/17
76/1
**walked [1]** 133/17
**Walter [1]** 106/7
**want [23]** 7/8 10/22
26/6 27/6 37/18 40/8
40/8 53/20 59/5 59/12
66/20 72/19 95/8 97/7
99/13 112/1 120/1
121/7 128/9 129/14
131/19 133/19 139/20
**wanted [4]** 31/6
38/11 120/13 120/15
**wants [4]** 38/22
38/25 97/5 137/13
**war [2]** 104/18
133/22
**warranted [1]** 21/12
**was [301]**
**Washington [6]** 1/14
24/8 24/10 86/10

**W**

**Washington... [2]** 103/24 104/6
**wasn't [7]** 16/11 17/6 30/14 81/9 81/12 131/5 133/4
**waste [2]** 6/6 6/19
**watching [1]** 135/24
**Watts [1]** 123/6
**way [20]** 4/21 15/20 35/16 41/2 42/25 43/3 43/8 43/21 58/1 60/9 88/20 89/8 100/18 103/20 114/7 116/23 118/21 118/25 119/10 120/9
**ways [2]** 117/20 130/4
**we [231]**
**we'll [7]** 14/1 71/11 97/10 97/12 97/22 121/21 130/6
**we're [25]** 3/19 9/11 9/11 9/13 9/15 10/16 18/10 18/11 19/21 22/24 36/13 39/6 46/14 69/23 77/21 77/22 96/5 96/12 96/20 96/22 109/25 111/20 112/10 113/25 134/9
**we've [11]** 108/22 108/22 110/5 111/7 111/14 113/17 115/15 116/13 116/14 116/14 117/2
**weapon [1]** 84/17
**weapons [7]** 35/12 35/21 36/8 84/7 84/7 84/7 84/17
**wearing [2]** 31/2 94/17
**website [2]** 103/14 104/23
**Webster's [1]** 126/9
**Wednesday [3]** 110/22 139/10 139/14
**week [1]** 139/8
**weeks [1]** 128/21
**welcome [1]** 96/1
**well [45]** 3/19 7/5 7/25 10/9 17/1 21/21 35/16 35/23 35/24 37/16 42/17 47/5 52/24 59/6 62/13 66/12 74/15 75/22 84/13 84/17 84/24 84/25 95/25 96/23 100/23 102/6 102/25 109/8 119/22 119/25 120/10 121/10 122/7

123/12 123/23 124/7 125/12 126/5 126/12 129/25 130/7 131/9 133/8 134/12 139/17
**well-being [1]** 102/25
**well-known [1]** 102/6
**went [7]** 9/2 9/14 63/10 93/12 121/25 126/4 130/9
**were [114]** 9/6 9/23 12/1 14/16 15/11 15/14 16/8 16/9 16/18 16/19 17/1 17/2 17/2 17/8 17/18 17/24 18/3 18/5 20/21 21/18 21/19 21/23 22/19 23/21 25/13 25/13 26/3 26/4 26/8 27/8 27/9 29/11 29/16 29/17 31/11 32/3 32/15 34/22 34/24 37/6 39/11 41/13 41/16 47/13 50/17 50/22 55/2 55/10 56/20 57/5 57/11 57/18 62/13 62/16 62/20 62/21 63/3 63/17 63/25 65/24 68/22 70/24 71/17 71/18 76/16 76/17 77/1 77/14 80/4 80/13 82/11 84/6 88/23 89/13 89/17 90/5 90/16 90/17 94/3 94/17 96/15 101/2 102/16 102/21 102/23 102/25 103/21 104/18 105/2 105/13 105/25 107/2 107/3 113/18 116/3 116/15 117/22 118/17 121/23 122/11 122/18 123/11 126/3 130/17 131/8 133/5 133/21 133/22 135/22 135/24 136/5 136/18 138/15 139/16
**weren't [3]** 15/12 18/9 131/10
**West [1]** 8/21
**Western [1]** 135/20
**Westlaw [2]** 108/22 137/17
**what [139]** 5/1 5/4 5/5 5/11 6/2 6/8 6/8 7/8 9/3 9/14 9/15 9/16 10/4 16/3 16/11 16/15 16/19 17/20 17/21 20/17 23/1 23/25 24/1 24/2 24/16 24/18 26/20 28/8

28/16 29/13 29/19 30/17 30/21 30/22 34/16 34/21 34/22 35/3 38/5 38/8 38/24 39/10 40/13 40/17 41/12 43/1 43/20 45/16 47/3 47/23 48/3 50/11 51/19 51/23 51/25 55/25 59/1 59/2 59/2 59/23 62/3 63/14 64/19 65/20 66/10 66/20 66/21 66/23 67/8 68/13 70/18 72/16 72/18 72/25 74/22 77/3 78/6 80/11 80/13 80/14 80/15 81/1 81/2 81/24 81/25 82/17 82/24 83/7 84/12 86/1 86/2 89/7 91/19 91/19 92/9 92/13 92/19 93/12 93/17 96/6 97/7 102/24 105/10 105/21 108/3 110/20 111/3 111/13 112/1 112/1 112/10 113/9 114/7 114/17 115/12 115/14 115/18 116/5 116/14 117/23 122/20 123/24 123/25 125/13 127/23 128/2 128/5 129/22 130/5 130/22 130/22 131/1 132/11 132/17 132/25 134/21 135/21 137/14 139/2
**what's [7]** 9/8 32/5 46/24 109/24 114/8 114/21 118/8
**whatever [3]** 6/16 18/5 123/18
**whatsoever [1]** 128/8
**Wheeler [4]** 1/13 3/12 14/15 117/11
**when [37]** 8/20 10/25 13/5 14/23 18/6 22/18 24/16 25/21 26/6 29/10 41/22 43/2 48/7 50/11 51/8 51/11 52/1 58/14 59/1 60/11 60/12 65/2 70/11 70/19 79/15 82/23 91/17 93/10 107/22 114/11 125/8 126/4 126/14 128/17 131/3 132/3 133/25
**whenever [2]** 36/2 53/21
**where [29]** 24/1 30/4 33/18 36/21 39/15 39/22 53/15 60/13 63/17 77/1 79/6

100/11 102/19 103/14 105/12 105/16 105/24 109/5 114/9 114/21 116/10 117/24 120/4 120/11 120/16 123/6 126/21 133/9 134/13
**Wherever [1]** 99/15
**whether [64]** 13/11 15/4 15/20 21/6 26/3 27/13 34/25 39/16 41/13 42/6 43/9 45/1 45/5 47/6 50/7 52/21 55/2 55/20 58/21 59/18 59/20 64/1 64/6 64/10 66/8 66/18 67/3 67/4 67/5 68/3 68/15 69/5 69/21 72/25 73/17 74/15 74/18 75/2 75/12 77/7 80/13 80/19 80/21 82/11 87/16 87/20 87/23 88/1 88/19 89/18 90/2 90/5 90/7 90/11 91/4 95/11 95/13 110/17 118/17 123/2 123/7 131/23 132/1 137/8
**which [75]** 4/10 4/17 6/18 10/23 23/20 48/23 49/9 52/15 52/25 63/6 65/6 71/11 87/6 87/7 87/21 96/13 96/21 98/22 100/14 101/1 101/4 101/9 101/19 101/24 102/18 105/1 105/21 106/5 106/6 106/8 106/9 106/16 106/20 106/21 107/1 107/5 107/6 107/11 107/13 107/17 107/18 107/21 109/2 109/6 109/11 115/2 115/4 115/21 115/24 119/8 119/9 119/20 120/17 121/13 122/9 123/4 123/23 124/5 124/22 125/5 125/18 125/19 125/25 127/21 129/24 130/5 131/20 132/12 133/11 135/19 135/20 135/20 136/1 137/3 138/25
**while [4]** 82/10 86/13 88/18 112/5
**whims [1]** 112/3
**White [1]** 4/9
**who [71]** 4/6 4/6 4/12 4/17 11/2 11/4 12/7 17/9 17/16 18/7 19/7 20/25 21/23 22/4 25/20 25/24 28/21 30/10 31/6 32/1 32/9 35/1 39/24 47/19

52/14 52/15 52/15 52/21 53/3 53/12 56/19 62/7 62/8 62/13 71/22 71/22 82/22 83/4 94/14 99/21 100/4 100/13 101/5 101/13 102/2 102/7 102/13 103/23 104/5 104/7 104/7 104/16 108/9 108/10 108/10 108/13 109/15 110/4 112/17 113/17 116/22 119/21 119/25 121/10 126/17 127/15 130/4 131/20 132/3 132/4 137/13
**who's [1]** 101/11
**whole [3]** 71/10 86/7 136/1
**whom [2]** 4/22 100/19
**why [39]** 8/7 8/8 8/24 9/6 22/24 35/23 36/19 37/15 39/10 39/12 40/6 41/9 44/3 47/10 47/16 67/21 70/6 77/13 77/16 81/12 84/11 95/3 95/12 95/17 109/22 109/25 111/2 111/12 111/15 111/18 111/20 111/25 113/8 114/22 116/9 122/22 131/12 131/13 136/21
**will [47]** 5/3 6/18 8/15 8/16 17/23 19/9 32/17 38/25 39/4 40/14 52/7 53/1 54/1 56/9 57/23 59/4 61/21 66/16 66/16 67/15 67/15 67/16 71/25 76/9 82/10 96/17 97/18 98/15 99/5 105/6 106/19 107/22 110/11 110/20 114/15 117/7 117/22 123/8 126/11 128/25 132/14 134/2 136/1 136/13 136/17 137/10 139/4
**Winegar [1]** 107/1
**wise [1]** 89/7
**wish [8]** 15/3 86/6 86/7 101/22 123/24 125/22 127/6 129/17
**wishing [1]** 29/4
**within [1]** 114/5
**without [1]** 7/6 48/3 72/3 72/9 72/19 79/22 85/19 100/24 106/2 116/14 129/18
**witness [19]** 5/12 10/18 11/13 14/10

**W**

**witness... [15]** 19/18 20/1 31/17 31/19 33/9 38/24 43/20 44/22 45/1 45/1 45/5 45/7 77/25 78/4 78/16
**witnesses [15]** 2/3 5/2 5/18 5/21 6/13 6/17 6/23 7/2 10/5 32/2 32/12 96/2 109/18 109/19 125/4
**women [1]** 45/13
**won't [3]** 62/12 122/12 124/3
**Woomer [14]** 19/19 19/20 20/5 20/7 20/8 22/13 22/15 22/18 23/13 23/19 27/17 27/21 27/23 31/18
**word [7]** 38/8 38/8 40/12 40/12 126/8 128/1 134/23
**words [2]** 61/22 115/9
**work [8]** 20/9 22/19 51/20 51/23 85/10 85/15 86/8 139/18
**worked [12]** 20/12 24/4 24/12 26/2 29/24 30/18 30/22 44/1 62/17 79/24 83/23 85/16
**working [5]** 21/5 23/20 51/4 51/9 51/9
**workings [1]** 10/24
**works [1]** 48/19
**world [2]** 25/4 31/8
**worries [1]** 74/4
**worse [1]** 29/19
**worth [2]** 135/16 136/24
**would [167]**
**wouldn't [10]** 23/24 61/2 64/24 65/16 79/22 85/19 97/9 117/15 133/8 135/2
**Wow [1]** 52/13
**wrap [2]** 97/14 97/21
**writes [1]** 126/17
**wrong [3]** 7/12 47/20 131/12
**WW [1]** 106/19
**WWW [1]** 106/3

**Y**

**Yahoo [1]** 104/22
**yeah [18]** 12/18 13/4 14/18 18/1 26/23 29/9 29/15 29/16 30/21 37/13 39/14 40/20 52/21 65/19 78/6 85/12 91/18 92/4

**year [19]** 10/13 44/2 44/3 44/3 44/16 44/21 45/9 45/10 45/11 62/18 76/13 76/18 105/1 119/18 119/20 120/21 125/7 125/12 138/5
**year's [2]** 76/19 76/24
**years [5]** 90/23 119/14 119/15 136/11 138/8
**yellow [1]** 136/16
**Yep [2]** 37/15 51/7
**yes [145]**
**yet [5]** 9/24 69/8 79/19 109/25 136/11
**York [4]** 24/9 101/10 102/9 102/20
**you [711]**
**you were [21]** 14/16 15/14 27/9 47/13 55/2 55/10 62/16 63/3 63/17 63/25 68/22 70/24 71/18 82/11 88/23 89/13 89/17 90/5 90/16 90/17 133/22
**you'd [1]** 101/23
**you're [37]** 14/23 15/2 16/21 16/21 16/22 16/22 16/22 19/24 24/11 26/7 27/13 28/25 29/13 33/2 33/7 33/19 35/14 37/11 45/5 47/10 57/15 58/24 60/8 60/9 63/3 63/7 63/14 63/15 63/18 71/6 75/24 78/20 95/24 96/1 124/7 128/13 133/24
**you've [15]** 29/23 30/22 49/25 49/25 51/4 51/19 55/21 56/6 62/17 62/25 65/3 70/7 73/21 85/18 85/24
**your [236]**
**yours [2]** 66/9 76/2
**yourself [5]** 33/2 40/15 72/16 94/13 94/14
**YY [1]** 124/22

**Z**

**zero [1]** 136/3
**Zoom [2]** 5/2 5/12