UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cr-80064-Smith

UNITED STATES OF AMERICA

v.

FRANK STANZIONE,

     Defendant.

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL

    The United States, through counsel, hereby respectfully submits the following response in opposition to the Defendant's Motion for New Trial (DE 122). Stanzione accuses the government prosecutors of engaging in severe misconduct during the trial. Specifically, he alleges that the government made four improper arguments to the jury during closing arguments that denied him a fair trial. For the reasons set forth below, his request for a new trial should be denied.

**I.    Facts Adduced at Trial**

    The government called two witnesses at trial. First, Charles Lovett testified that in January 2023, he worked as the Chief of Staff for Congressman George Santos.[1] On the morning of January 30, 2023, he reported to work at the Congressman's Congressional office in Washington,

---

[1] As of the filing of this response, the government has been unable to acquire the full transcript of the trial proceedings. Thus, the factual recitation of the evidence presented at trial is based on the recollection of undersigned counsel for the government. Since Stanzione filed transcripts of the closing arguments as an attachment to his Motion for a New Trial, the government cites herein to the transcript regarding comments made during closing arguments.

D.C.  Shortly after his arrival, he checked the office's answering system and received the following message:

> George Santos you fat fucking piece of shit f*****. You better watch your mother fucking back because I'm gonna bash your mother fucking f***** head in with a bat until your brains are splattered across the fucking wall. You lying, disgusting, disgraceful, motherfucking f*****. You mother fucking piece of shit. You're gonna get fucking murdered you goddamn lying piece of garbage. Watch your back you fat, ugly, piece of shit. You and your husband are dead.

The parties stipulated that Stanzione made the call from his home in Boynton Beach on January 29, 2023, at approximately 10:24 p.m.  Concerned about the nature of the call, Mr. Lovett reported the call to the United States Capitol Police, Threat Assessment Section, as he had been trained to do.

The government's second witness was Special Agent Matthew Hurtig of the United States Capitol Police.  Agent Hurtig testified that he was assigned on January 30, 2023, to contact Stanzione to interview him about the call.  The following day, he and other officers responded to Stanzione's residence.  After the officers introduced themselves, the defendant invited them into his home and agreed to speak to them about the call.  The interview was audio recorded.  The jury heard approximately 12 minutes of the interview, during which the defendant made several incriminating statements.  Specifically, Agent Hurtig asked, "have you ever made threatening phone calls before?"  Stanzione responded, "Yes."[2]  The agents asked, "okay. Um, to whom?"  The defendant responded, "George Santos."  Moments later, the defendant claimed, "I never threatened to hurt anyone until Sunday night."  He explained that he was "watching the news" that evening and that he looked up the Congressman's phone number online through Google.  He

---

[2] Quotation marks set forth in this paragraph relate to the transcript of the interview which was admitted at trial as Exhibit 4.

claimed, "I can't stand him, I'm sorry... I'm gay, I'm offended by him, I don't want him in my community... He's a liar." When asked to explain what he hoped to accomplish by making the call, the defendant responded, "Nothing ... Just to make him feel like shit ... [t]o make him feel like the piece of dirt that he is." When asked to repeat from his memory the message that he left the Congressman, the defendant replied, "Your husband and you better watch your back. You're both dead. Something like that. I'm going to bash your head in." To leave no uncertainty behind, Agent Hurtig asked if he said, "I'm going to bash your motherfucking faggot head in with a bat until your brains are splattered against the fucking wall." The defendant responded, "Yeah, I said that." The defendant admitted that he "shouldn't have done it" and that he was "embarrassed" by his conduct.

After the interview, Agent Hurtig reported his interview back to the case agent, Special Agent Joshua Bank. The parties also stipulated that after the interview, Stanzione called the Congressman's office and spoke to a member of his staff to apologize for leaving the message on January 29, 2023.

On April 5, 2023, Agent Hurtig and other officers returned to Stanzione's residence to arrest him for making the threatening communication. The interaction was audio and video recorded. During the encounter, the defendant contacted his father by phone and informed him that he was "being arrested ... for making a threatening call to a congressman about two months ago."[3] He told his father that he "threatened to beat him up with a bat and bash his head in ..." He explained that he did it because, "I was stupid, okay."

---

[3] Quotation marks set forth in this paragraph relate to the transcript of the arrest which was admitted at trial as Exhibit 6.

Stanzione called one witness at trial.  Officer Jeanniton from the Boynton Beach Police Department testified about the defendant's arrest.  In short, the officer authenticated the entire arrest video, which depicted a civil encounter between the police and the defendant.

To rebut any suggestion that law enforcement's respectful treatment of Stanzione was an indication that they did not take the threat seriously, the government cross-examined the officer extensively about his training and experience with the treatment of civilians.  Officer Jeanniton testified that in the 18 years he has been working as a police officer, he strives to treat all persons with dignity and respect.  He acknowledged that he has been trained to conduct himself in this manner and that he works to serve the members of his community.  He also acknowledged that his respectful treatment of others is not a reflection on how he regards the seriousness of the alleged crime that he may be investigating.  To this point, he strives to treat those accused of serious crimes with as much dignity and respect as those accused of committing petty offenses.

Finally, Office Jeanniton testified that prior to arriving at the defendant's home on the date of his arrest, he and his fellow law enforcement officers met at a local police station for a pre-arrest meeting.  During that meeting, the officers were informed of the charge for which the defendant was being arrested.  He also testified that several officers were part of the arrest team.  He acknowledged that upon approaching the residence, he was prepared to use force if needed.  Once he discovered that the defendant was compliant, no force was needed.

## II.    Jury Instructions

On the substantive crime charged, the Court correctly provided the jury with the charging language set forth in the Eleventh Circuit Patter Jury Instructions (2016 Edition).  Specifically, on the charge of making a threatening communication in violation of Title 18, United States Code, Section 875(c), the Court instructed the jury as follows:

The Defendant can be found guilty of this crime only if the following facts are proved beyond a reasonable doubt:

  (1) the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another, and

  (2) the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

  The Government doesn't have to prove that the Defendant intended to carry out the threat.  To transmit something in "interstate commerce" means to send it from a place in one state to a place in another state or the District of Columbia.

  A "true threat" is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured.

*See* Eleventh Circuit Pattern Jury Instruction, Offense Instruction O30.3 (2016 Edition).

The defendant requested a Theory of Defense Instruction which contained numerous contextual factors that the jury may consider in determining whether he made a true threat.  Over the government's objection, the court allowed the instruction.  It stated:

To make this determination of whether a threat is a "true threat" you must look to the entire factual context of the threat. You may consider the following, non-exhaustive list of factors to assist you in making this determination: The reaction of the recipient of the threat; The reaction of law enforcement and the government to the threat; Was the threat communicated directly to the victim; The tone of voice in the message; Whether the threat was conditional; Whether the Defendant made similar threats to the victim in the past; Whether the victim had reason to believe the Defendant had engaged in this type of violence before; The number of threatening phone calls made; Whether the threat included a date, time and place that the threatened violence would occur; The relationship between the speaker and the recipient of the communication; The language, including profanity, used in the communication; Whether, after his arrest, the Defendant indicated he meant the threat he had communicated and stood by its seriousness, or not; Whether the Defendant had a means to carry out his threats; Whether the threats were posted on social media; Whether the Defendant travelled in furtherance of his threats. You may consider the factors above as you see fit within these instructions to determine the entire context of the threat to assist you in determining if this was a "true threat." If you find, based on your review of the entire context of the evidence, that the Defendant did not make a serious "true threat" under the circumstances to the

victim, you must find him not guilty.

In closing arguments, both sides objected to some of the arguments made by the attorneys. The defendant alleges that the four government arguments addressed below were manifestly unjust thereby requiring a new trial.  As explained in more detail below, Stanzione's motion should be denied because he has failed to show both that the arguments were improper and that the remarks prejudicially affected his substantive rights.

## III.    Legal Analysis

The Federal Rules of Criminal Procedure allow a district court to grant a new trial following a conviction where the "interests of justice" warrant such relief. Fed. R. Crim. P. 33(a). Where a defendant basis a request for a new trial on statements made during closing arguments, the defendant must show that (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Taohim*, 817 F.3d 1215, 1224 (11th Cir. 2013).  The prejudicial effect of a prosecutor's argument must be assessed by "evaluat[ing] them in the context of the trial as a whole and assess[ing] their probable impact on the jury. To warrant a new trial, there must be a reasonable probability that but for the remarks, the outcome would be different." *Id.* (internal quotation marks and citation omitted).

"[A]lthough a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). A prosecutor "is forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice." *United States v. Sosa*, 777 F.3d 1279, 1298 (11th Cir. 2015).  However, a prosecutor is allowed to make "statements that indicate his opinion or knowledge of the case . . . if the attorney

makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). Furthermore, "it is not improper for him to urge upon the jury that his side of the issue be found to have been established beyond question." *Id*. Importantly, "[a] prosecutor's comments in closing argument must be viewed in the context of the record as a whole . . . ." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (quotation marks, alteration marks, and citation omitted). Therefore, "isolated or ambiguous or unintentional remarks must be viewed with lenity." *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987) (per curiam)).

### A.   Government's Contested Remarks During Closing Arguments Were Not Improper.

Stanzione alleges that the government made four improper remarks in its closing argument warranting a new trial.  He also alleges, falsely, that the government "repeatedly and improperly sought to alter the required elements for conviction from the Defendant's intentions (as required by *Elonis*[4]) to the reaction of the recipient of a threat" *See* Def. Mot. at p.8.  The government did no such thing.  In fact, the government relied heavily in its closing argument on the content of the voicemail message itself to demonstrate that it was a true threat.  The government argued to the jury that contextual factors such as the tone of voice used; language used, including the use of profanity and clarity of threat; and the relationship between the speaker and the target all demonstrated that the threat was a true threat, regardless of the recipient's reaction.  The government focused precisely on the textual factors that Stanzione himself acknowledged were

---

[4] *Elonis v. United States*, 135 S.Ct. 2001 (2015).

7

relevant.   At no time did the government alter the required elements of the crime charged. Moreover, none of the four remarks at issue warrant a new trial.

1.   <u>Government's argument in initial close that Stanzione's apology call two days after the crime was not relevant to the ultimate issue of guilt was proper</u>

Stanzione argues that the government improperly told the jury during closing argument that his apology call two days after the crime was committed was not relevant.  He claims that remark directly conflicted with the parties' stipulation wherein they agreed that he made the apology call.  Although not articulated in his motion, Stanzione might also claim that the remark is inconsistent with the court's Theory of Defense Instruction which charged the jury that they may consider whether, after his arrest, the Defendant indicated that he meant the threat he had communicated and stood by its seriousness, or not.  These arguments are without merit.

First, the stipulation of fact regarding Stanzione's apology phone call is not a concession from the government that the fact is relevant to the ultimate determination of guilt.  Rather, a stipulation is simply an agreement between the parties that a certain fact or set of facts are true. The government may agree to a stipulation of fact for a variety of reasons.  For example, as in the instant case, the government may stipulate to a fact to avoid the inconvenience of having an out of state witnesses testify about a minor fact not in dispute.  Here, the government stipulated to the apology phone to avoid having a member of the Congressman's staff travel from Washington, D.C. to testify about the call that the government does not contest.

Additionally, the government may stipulate to a fact in the interest of justice.  Here, Stanzione indicated through pre-trial litigation that his defense would include his claim that his threat was not a true threat as evidenced by him apologizing afterwards.  Despite the government's firm belief that an apology after the fact in no way exonerates him, the government agreed to

8

stipulate to the fact to give Stanzione the opportunity to make his argument to the jury.  However, the government never intended to give up its right to argue to the jury that his apology did not evidence a lack of a true threat.

Moreover, even if the government conceded that the call was relevant, it's concession would merely be limited to the fact that the call may have had the tendency to make another fact more or less probable than it would without the evidence. *See* Fed. R. Evid. 401.  The government did not concede, however, that it was relevant to the ultimate determination of guilt.

In fact, the government's remark here about the relevancy of Stanzione's apology was not inconsistent with any of the Court's instructions to the jury.  The Court correctly informed the jury that the government must prove the following two elements:

 (1)     the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another, and

(2)     the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

The Court also correctly define a "true threat" as "a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to injure another person."  Thus, "the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *United States v. Elonis v. United States*, 575 U.S. 723 (2015).

The government acknowledges that context matters.  It recognizes that our courts look to a variety of factors to determine whether a threat is a true threat.  *United States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir. 2003).  However, the law does not require the fact finder to reserve

judgment on the four corners of the threatening statement to investigate other factors independent of the threat itself to determine whether the threat is a true threat.  As the government correctly argued to the jury in its closing, the jury **can** evaluate the threat based on the four corners of the threat itself – tone, language, specificity, etc…

Conversely, the fact finder **can** look to other factors outside the threat itself to make that determination.  In fact, the Court instructed the jury as to the discretionary nature of its analysis. In the Theory of Defense Charge, the Court instructed the jury that, "You **may** consider the following, non-exhaustive list of factors to assist you in making this determination…"  In other words, the Court told the jury that it was within their discretion to consider any of the non-exhaustive list of factors set forth in the instruction.  For those the jury considered, it could also reject them as non-persuasive or not relevant.

In its closing argument, the government argued to the jury that the crime was committed the moment Stanzione made the phone call to the Congressman.  Stanzione's criminal intent was formed during that call.  The fact that he apologized two days later after he got caught in no way provided reliable evidence of his intent at the time of the alleged crime.  As such, the government implored the jury to soundly reject the apology as relevant to the actual elements of the offense based on the circumstances of this case, as the jury was permitted to do. In this context, the government's claim that the apology was not relevant was not improper, but rather was permissible commentary on the context of one piece of evidence within the trial as a whole.

2.  <u>Government's argument in rebuttal that the reasonable person can determine whether the threat is a true threat by looking at the threat itself was proper to rebut claims by Stanzione that the jury should be persuaded by other contextual factors</u>

Next, Stanzione argues that the government's remarks in rebuttal close about the

reasonable person standard was legally inaccurate and misleading to the jury.  He claims that the government impermissibly instructed the jury that the focus of its analysis was on the reasonable person standard and not on his intent.  This argument is factually inaccurate.  With all due respect to the court's trial ruling sustaining Stanzione's objection, the government maintains that its argument was accurate and proper.

During its initial closing argument, the government informed the jury correctly that the definition of a true threat is a reasonable person standard: "… a true threat is a serious threat that is made under circumstances that would place a reasonable person in fear of being injured."  *See* Def. Mot., Attachment A at p. 34.  In its rebuttal close, the government repeated the definition correctly: "So when you look at the definition of true threat, okay, and we talk about a serious threat that is made under circumstances that would place a reasonable person in fear of being injured; that's the focus on true threat analysis." *Id.* at 47.  These stated definitions of true threat are identical to the definition provided by the Court in its jury instructions.

Therefore, by supplementing the definition of true threat into the elements of the offense, the government would have to prove the following two elements:

(1)     the Defendant knowingly sent a message in interstate commerce containing a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured; and

(2)     the Defendant sent the message with the intent to communicate a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being injured true threat or with the knowledge that it would be viewed as a true threat.

To elaborate on the evidence necessary to convict, the government correctly argued to the jury that a focus of its analysis should be on how a reasonable person would perceive the threatening statement under the circumstances.  The government also correctly pointed out that crime itself occurs the moment the threat is transmitted.  Thus, the law doesn't require that the reasonable person refrain from having any reaction until that reasonable person does its own investigation.  While the jury may consider a variety of contextual factors to determine Stanzione's intent at the time he made the threat, the law provides that the reasonable person standard is a critical part of the analysis in determining whether the threat was a true threat.  The government correctly argued that the definition of true threat must be viewed "through the prism of the reasonable person." *Id.* at 48.

This is not to say, nor did the government imply, that there is no subjective intent *mens rea* required.  At no time did the government argue or suggest to the jury that Stanzione's intent was not relevant to the analysis.  To the contrary, the government argued throughout its closing remarks that Stanzione intended to convey a true threat as evidenced by his tone, profanity, and graphic violent descriptions.  Contrary to his claim, the government did not convert the offense from a subjective to objective standard.  The government correctly addressed both elements of the crime charged and accurately stated the facts presented at trial.  Stanzione's claim to the contrary is simply false.

3.  <u>Government argument in rebuttal that the defense was asking the jury for a "freebie" was fair to rebut Stanzione's argument that the jury was being asked to assess guilt of a 53-year old man based on a single 33-second phone for which he later apologized</u>

Third, Stanzione argues that government's counsel remarks in closing which characterized the defense as requesting the jury for "a freebie" was improper.  Although the Court sustained

counsel's objection and instructed the jury that what the attorneys say in closing argument is not evidence, the government maintains that the use of the term "freebie" was a proper retort to the theory of defense as laid out by the defense during closing argument.

Stanzione's entire defense was that his message to Congressman Santos was not a true threat as evidenced by numerous contextual factors, most of which were unrelated to the actual content of the message. Those factors include the following: no evidence of an intent to carry out his threat; the civil and non-aggressive treatment of him by law enforcement during his interview and arrest; the threat was not communicated directly to the victim; no evidence that he made similar threats to the victim in the past; the number of threatening phone calls made; the relationship between the speaker and the recipient of the communication; Stanzione's indication after his arrest that he made the threat because he meant to make the Congressman feel like "shit" and "dirt;" and his apology call to the Congressman's office.

When considering these contextual factors as a whole, Stanzione's counsel argued to the jury:

> you're going to decide whether 34 seconds of this 57-something-year-old man's life, sitting on a toilet, a thousand miles from Washington D.C., late at night on a Sunday night while Congress was closed in January -- you're going to decide without hesitation whether that was a crime and whether Frank Stanzione is now a criminal. That's what you're going to decide. That's the gravity of what you're about to do... **It was a stupid 34 seconds in his life. Stupid. But that's not enough to make this a crime** (emphasis added).

Id. at 37-38.

The argument here was clear: the jury should not convict a man who has lived for more than 57 years for a 34 second lapse in judgment. While it was certainly proper for the defense to argue contextual factors, it is equally proper for the government to argue that even one phone call

is enough to convict.  In fact, the Court's instruction to the jury did not mandate that it consider any particular contextual factor.  Rather, the court instructed the jury that it "may" consider the non-exhaustive list of factors provided by the court.  Thus, the jury did not have to consider the number of phone calls made as a factor in deciding whether it was a true threat.  The jury was free to consider one phone call to be enough.

In other words, Stanzione does not get a pass merely because he committed his crime during one short phone call.  In this context, the government's characterization of Stanzione's argument that he was seeking a "freebie" was a proper.  The government's use of the term "freebie" was consistent with its entire theory of prosecution.  Throughout the trial, the government told the jury, without objection, that "words matter."  It also told the jury that the trial was about holding Stanzione accountable for his actions.  The government argued in closing that accountability means that Stanzione should not get a "free pass" or "freebie" merely because his crime was short and took place one time.[5]

---

[5] The term "freebie" or "free pass" has been used and recognized by our courts in a variety of other contexts as appropriate terminology.  *See*, *e.g.*, *United States v. Pulley*, 2024 WL 518993 (S.D. Il., February 9, 2024) (court recognizes that the criminal justice system cannot give defendant a "free pass" by granting his motion for compassionate release to care for an ailing family member whose medical condition existed prior to the offense); *Carter v. Howard*, 2023 WL 5668021 at *32 (N.D. Ga., June 6, 2023) (in a claim of sexual harassment and hostile work environment in violation of Title 42, United States Code, Section 1983, court recognizes that it would obviously be absurd for an individual harasser to avoid liability for his own intentional harassment under § 1983 simply because the victim has not yet reported the harassment; such a defense would equate to at least one "free pass" of intentional harassment, because an act of harassment will necessarily pre-date the complaint about it); *Chance v. Cook*, 50 F.4th 48 at *3 (11th Cir. 2022) (court indicates that it does not give a "free pass" to attorneys who engage in less-than-ethical conduct on behalf of their clients); *United States v. Spivey*, 2022 WL 1450035 (S.D. Fla, May 9, 2022) (government argues that to run sentences on violation of supervised release with the underlying substantive offense would "would not only give the defendant a free pass for violating her supervised release but would reward her for doing so"). *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008) ("generally, pro se pleadings are construed liberally and held to a less strict standard than pleadings filed by

14

4.  <u>Government argument in rebuttal that the case was important, like all criminal cases, because it was about speech was not improper</u>

Finally, Stanzione alleges that the government improperly informed the jury that their verdict would be something of importance in future first amendment cases.  This claim is a complete fabrication.  At worst, it is a blatant misrepresentation of the trial transcript.  At best, it is an obvious misunderstanding of the government's remarks.  Either way, this claim is unpersuasive and fails wholly to establish grounds for a new trial.

Stanzione's entire defense revolved around his claim that his statement to Congressman Santos was not a "true threat."  Thus, his defense implicates the First Amendment to the United States Constitution.  The First Amendment generally precludes the government from prohibiting speech based on the content of a message. *See Regan v. Time, Inc.*, 468 U.S. 641, 648-49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.").  The First Amendment does not prevent the government from prohibiting and punishing speech that constitutes a true threat. *See United States v. Alvarez*, 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012).  Thus, regardless of whether Stanzione mentioned the First Amendment explicitly in his defense, the Constitution is inextricably intertwined in this case about speech.

The fundamental question for the jury was whether Stanzione's threatening statement amounted to a true threat unprotected by the constitution or a non-true threat that is cloaked by the

lawyers, but this does not give pro se plaintiffs a free pass to disregard the federal pleading standards altogether"); *James v. Marshals*, 2020 WL 5604663 at *2 (S.D. Ga., September 18, 2020) (court unaware of any common-law or rule of statutory construction that allows a party a "free pass" to change their judge without good cause).

First Amendment.   To pose that indisputably accurate question in its rebuttal argument, the government stated the following:

> I would submit to you, that while the length of [this] trial was short, the trial is important. And all criminal trials are important. Okay. But this trial is particularly important because the crux of this case is really about speech, right? Its about criminal speech, noncriminal speech.

Id. at 51.

Stanzione's counsel objected and the Court sustained the objection.   Contrary to Stanzione's assertion, at no point did the government say or suggest that the jury's verdict would be important for future First Amendment cases.   The remarks were not intended to mislead or inflame the jury.   Government counsel did not inject personal beliefs or personal views of the evidence.   He did not attempt to appeal to the jury's passions or prejudice or in any way seek to inflame the jury.   In fact, the point that government counsel intended to make was never made because counsel abruptly objected and the court sustained the objection.

The propriety of the government's remarks and intended argument is clearly seen in a similar threats case tried here in this district only a few years ago.   In *United States v. Kaye*, 21-80039-cr-RLR(s), the defendant was charged with violating Title 18, United States Code, Section 875(c) for posting a 45-second video on social media threatening to kill an FBI agent if he came to her house.   The defendant claimed that her statements were political hyperbole and not a true threat.   As in the instant, the Court provided the jury with the pattern instruction on Section 875(c) threats.

In its rebuttal, the government made the following remarks:

> We have to recognize a fundamental truth when it comes to our Constitution and it was contained within the Judge's instructions to you. The Constitution and freedoms that are set forth therein have certain very narrow limits. The First

16

Amendment tolerates a lot of things, but it doesn't tolerate you to walk into a crowded movie theater and yell "fire," and it also doesn't allow you to utter a true threat. The Second Amendment tolerates a lot of things and it guarantees each and every one of us the right to bear arms, but it does not allow you to invite Federal agents to your home and then shoot to kill them if they show up. There are limits and Ms. Kaye is here because she crossed the line.

Ms. Darsch and I have told you during the course of this trial repeatedly that a lot of what Ms. Kaye said is constitutionally protected. She thinks General Flynn was persecuted with no evidence, that is her right. She wants to tell the FBI to go fuck themselves, that is her right, but as soon as she said, I will shoot your fucking ass if you come here, she crossed the line, and in the eyes of the law that is not okay. We have to respect those boundaries. The law requires that we have to respect those boundaries. The law requires it, respect those boundaries. She didn't.

Id. at Docket Entry 184, p. 43-44.

Neither of Kaye's attorneys, both of whom work for the same office as Stanzione's counsel, objected to the government's remarks. On appeal, Kaye did not raise the propriety of the remarks as an issue for the appellate court to review. The Eleventh Circuit upheld Kaye's conviction on other grounds. In short, the government's reference to the First Amendment in *Kaye* was a non-issue.

Yet Stanzione raises this issue as grounds for a new trial. Not surprisingly, he does not cite to a single case where any court anywhere found similar government remarks to be improper. More importantly, he does present one example where a defendant was granted a new trial based on similar comments. He does not offer such cases because no such cases exist. Thus, Stanzione has failed to demonstrate that the government's brief remarks about the First Amendment was improper.

### B.   Government's Remarks Did Not Prejudicially Affect the Substantial Rights of the Defendant

Because the government's closing argument contained no impropriety, the court need not consider the question of prejudice to the defendant. *See Brooks v. Kemp*, 762 F.2d 1383, 1403

("[G]uidelines for reviewing the effect of prosecutorial argument only come into play when an improper argument has been made. A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional.").

However, even if the Court finds that the contested remarks were improper, Stanzione is not entitled to a new trial unless he establishes that the government's remarks "prejudicially affect[ed] the substantial rights of the defendant." *Eckhardt*, 466 F.3d at 947. "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *Id.* (citation omitted). In considering whether the defendant's substantial rights were affected, the courts generally consider four factors:

> (1) whether the challenged comments had a tendency to mislead the jury or prejudice the defendant; (2) whether the comments were isolated or extensive; (3) whether the comments were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof establishing the guilt of the defendant.

*United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014).

Thus, a curative instruction to the jury or substantial evidence establishing guilt can counteract the prosecutor's misconduct. *United States v. Nerey*, 877 F.3d 956, 970 (11th Cir. 2017); *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990) ("statements and arguments of counsel are not evidence, [and] improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered"). Moreover, prosecutorial misconduct only requires reversal if it "permeate[s] the entire atmosphere of the trial." *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017) (quotation omitted). When the trial court gives a curative jury instruction, the Eleventh Circuit Court of Appeals will only reverse if the evidence was so highly prejudicial that it was incurable. *United States v. Newsome*, 475 F.3d 1221,

1227 (11th Cir. 2007).  If the record contains sufficient independent evidence of guilt, any error is harmless. *United States v. Rivera*, 780 F.3d 1084, 1096 (11th Cir. 2015) (quotation omitted).

Stanzione has failed to demonstrate a reasonable probability that but for the government's challenged remarks, the jury would have found him not guilty.  First, there was little risk that the government comments would mislead the jury. The comments were not inflammatory and did not rely on prejudices or induce emotional responses. The jury could examine the recording of Stanzione's threatening message and assess for itself whether the threat was a true threat.

Even if the remarks were improper, Your Honor sustained Stanzione's objections, granted his request to strike the comments from the record, and instructed the jury that the lawyers' statements were not evidence. By doing so, the Court cured any problem that may have been created by the comments.  Jurors are presumed to follow the court's instructions.  *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir.2005).

The government's remarks also were not extensive.  Although occurring on four separate occasions, defense counsel promptly objected to the remarks and the government was permitted to go no further.  The possibility that these few incidents by themselves could have changed the jury's verdict is exceptionally remote.[6]

---

[6] Stanzione alleges that "the jury deliberations confirm that this case was not one involving overwhelming guilt" (Def. Mot., at 6).  He claims that "the jury deliberated for more than four hours before reaching a verdict" *Id.*  Conveniently, he does not mention that for the first few hours of jury deliberation, the jury dealt with a juror who admitted to the panel that she conducted her own online research about Congressman Santos.  The jury foreperson informed the court of this incident by sending it a note.  The parties then discussed the matter with the court and jointly recommended that the court *voir dire* the juror.  The court conducted a limited *voir dire* of the juror twice in open court outside the presence of the remaining jurors.  Shortly thereafter, the court excused the juror.  The court then conducted a *voir dire* of the remaining jurors to ensure that they can continue to be fair and impartial, despite the information shared by the discharged juror.  They indicated unanimously that they could.  An alternate juror was then impaneled.  The court

The government's actions were also not willful or taken with bad intent.  Both sides engaged in zealous advocacy.  At times, the arguments of the attorneys were contentious.  But at no time did either side engage in bad faith or conduct themselves outside the bounds of professionalism.  The remarks made by the government were well within its obligation to conduct itself fairly and justly.   Notably, Stanzione has not articulated any credible allegation of government misconduct, beyond his claim that the remarks were improper.  To the extent that the Court might now agree with Stanzione that the government should not have made any of the remarks, the Court should recognize that the statements were not made with bad intent.

Finally, the evidence in this case was strong.  Stanzione made a direct and clear threat to kill Congressman Santos.  The threat was neither vague nor conditional – "I'm gonna bash your mother fucking head in with a bat until your brains are splattered across the fucking wall."  In case his intent from his first threat was not clear enough, Stanzione then added, "You're gonna get fucking murdered you goddamn lying piece of garbage."   And for good measure, Stanzione concluded the call by stating, "watch your back you fat, ugly, piece of shit. You and your husband are dead."

---

instructed the jury with the new juror that they had to begin their deliberations anew.  Being that lunchtime was approaching, the court informed the new juror that lunch would be ordered for her.  The court then instructed the jury to return to the jury room to re-start their deliberations (and presumably, eat lunch).

Approximately one hour later, the jury notified the court that they had reached a unanimous verdict.  The parties are unaware of whether the jury used the entire hour deliberating or whether they used some of that time to eat their lunch.  Either way, Stanzione's failure to account for the aforementioned developments during jury deliberations casts serious doubt on the veracity of his claims.   Simply stated, nobody knows how much time the new jury actually deliberated in rendering its unanimous guilty verdict.  It could have been as much as an hour or as little as one minute.

When questioned by the police, Stanzione admitted that he made the "threatening" call to the Congressman. He also told his father when he was getting arrested that he "threatened to beat him up with a bat and bash his head in." Stanzione's explanation for his actions also proved that his threat was a true threat. He told Agent Hurtig that he made the threat because he wanted the Congressman to feel like "shit" and like "the piece of dirt that he is." Stanzione accomplished this task by making sure his threat would be taken seriously. He used an angry tone riddled with profanity and graphic threats of violence. Thus, Stanzione transmitted his communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat. He could not have believed that his message was to be viewed as non-threatening because he then would have failed in his mission to make the Congressman feel like "shit" or "the piece of dirt."

After considering all the factors prescribed by *Reeves*, it is not reasonably probable that the government's objected to remarks were critical to the jury's consideration of the evidence or to its verdict. Therefore, Stanzione is not entitled to a new trial.

WHEREFORE, the government respectfully opposes Stanzione's motion for new trial.

Respectfully submitted,

MARKENZIE LAPOINTE
UNITED STATES ATTORNEY

By:     s/ Mark Dispoto
        Assistant United States Attorney
        Court ID# A5501143
        500 S. Australian Avenue, Suite 400
        West Palm Beach, Florida 33401
        Tel: (561) 209-1032
        Mark.dispoto@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that the undersigned caused a true and correct copy of the

foregoing to be filed and delivered via CM/ECF this 19th day of March, 2024.


_/s/Mark Dispoto_____
Mark Dispoto
Assistant United States Attorney

22