UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80064-CR-SMITH/MAYNARD

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

FRANK STANZIONE,

      Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, Frank Stanzione, through counsel, files the following Memorandum in support of sentencing in this case. In support thereof, the Defendant states the following:

### 1. The Nature of the Offense:

This case involves words and speech. No party has ever contended in this case that the Defendant ever had an intention, or exhibited an intention to actually follow through with the threatening statements made in the voicemail left for former Representative Santos ("Santos"), or that the Defendant ever had the ability to carry out the conduct threatened in the voicemail.[1] This was abundantly clear to U.S.

---

[1] The Defendant did not contend at trial that the voicemail message he left was not a "threat." He maintained that the threat did not rise to the level of a Constitutionally unprotected "true threat," because it was not intentional conduct, not intended as a true threat, and was not serious. For a threat to be a felony offense, it must be intentional, and it must be serious.

Capitol Police less than 48-hours after the voicemail was left, when they interviewed the Defendant at his home in Florida. The agents have repeatedly admitted that the nature of their meeting with the Defendant that day was to determine whether he had the intention, capability, and ability to carry out the threats. The agents have repeatedly testified the Defendant had none of the three.

This case involves a remote phone call. No party contends that the Defendant was at any time anywhere near former Representative Santos. The Defendant was at all times, distant from Santos. The parties never contended that the Defendant ever made any plans to travel for the purposes of actually confronting or physically harming Santos. This case involves an unusual set of facts (as evidenced by the Defendant's selective prosecution motion) involving a single phone call the Defendant was remorseful for, and admitted was something he lost control of his emotions in, and did not originally intend to make as a threat call. The Defendant does *not* contend that all 875(c) prosecutions are unserious, and admits that such conduct can be very serious. The Defendant merely contends this is not such a fact pattern.

As a case that involved no intention to carry out the threat; no ability to carry out the threat; no capability to carry out the threat; and a non-face-to-face, remote communication, it is clear that the offense conduct involves nothing other than communicated speech (not an overt act in furtherance of action). Such speech may still be criminal in nature, if it is "serious." Eleventh Circuit Pattern Jury Instruction O30.3 (2016). Criminal laws that make such speech illegal are often the subject of Court opinions attempting to identify the line that distinguishes between

speech protected by the First Amendment and speech that is not protected. The lack of clarity involved in this subject is immediately apparent from the number of dissenting opinions in the most significant of those rulings. *See. e.g. Counterman v. Colorado,* 143 S.Ct. 2106 (2023); *Elonis v. United States,* 575 U.S. 723 (2016). The government also noted the complexity of speech based prosecutions during the arguments regarding the Defendant's selective prosecution motion, noting:

> But there is a reason why the bar is so high, and I think that we shouldn't overstep that, Your Honor. The reason for that is that there are many different considerations that need to be given into a threat case. They are difficult to analyze at times because the determination needs to be met not only whether it actually qualifies as a true threat under the analysis that's been most recently laid out in *Counterman v. Colorado* which was 600 U.S. 66 issued this last June, but also looking back even to cases like *Virginia v. Black* or to the *Watts* case….

[Motion to dismiss, transcript at Pages 122-23]. Yet, as written by Congress, laws regarding threatening communication appear to often operate contrary to common sense understandings of danger, or risk of harm.

As an example, the Court may recall from DE:14, the Defendant referring the Court to United States Capitol police reports from that agency's website describing cases handled in Washington, D.C. These reports in that exhibit read as follows:

> 5/8/23 Threats to do bodily harm- misd. 230508001013 R/O responded to a House Office Building for a report of an individual making threats via phone. The Complainant stated the Suspect has been calling over the past couple of months making threatening comments. An email was sent to the Threats Section (TAS) of USCP by the Complainant notifying them of the incident. TAS will continue to investigate.

> 9/2/22 Threats to do bodily harm- misd 220902001334 R/O responded for a report of staff in distress in the Longworth House Office Building. The Complainant advised that the Suspect had called the office multiple times, indicated they were outside the building, and had threatened to inject the Complainant with a lethal substance. While the R/O was present, the Suspect called again and advised they were outside the New Jersey Avenue and C Street, SE, door of the Longworth House Office Building. The Assisting Officer (A/O) approached the Suspect at New Jersey Avenue and C Street, SE, where the Suspect confirmed they threatened the Complainant. The Suspect was placed under arrest and transported to Headquarters for processing."

https://www.uscp.gov/daily-arrests (last accessed June 30, 2023). What stands out from these reports was that, in the report from "9/2/22," there was a threat of death by injection of a lethal substance to a member of Congress, and that the threats had been made "multiple times" via multiple calls. Most critically, the person making the threats was on-scene, and was arrested outside the Congressperson's office building. Common sense dictates that this presence immediately outside the Congress member's office building provides a far higher level of "ability" to carry out a threat "immediately." Yet, the arrest was for a misdemeanor, and thus, less serious than the case involving this Defendant.

Common sense would also appear to indicate that a person making a threat to harm another person, who is actually near the person they wish to harm would constitute a more dangerous situation than a distant and remote person, as they would have the immediate and apparent ability to actually carry out the threatened harm due to their presence.[2] The State of Florida's criminalization of threatening

---

[2] The danger involved in remote communications still must be analyzed on a case-by-case basis, for a threat involving, for example, a mailed bomb, or mailed lethal

speech makes this exact conclusion, only criminalizing threatening speech if it is "coupled with an apparent ability" to carry out the threat. [3] Threatening communications are governed in this state by "assault" laws. Florida defines "assault" as follows:

> An "assault" is an intentional, unlawful **threat** by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

Fla. Stat. § 784.011(1) (2021) (emphasis added). The Supreme Court of Florida has explained that a "threat" under § 784.011(1) is "an 'expression' of an intent or a 'communicated intent' to do violence to another." *Somers v. United States*, 355 So.3d 887, 892 (2022). A threat's criminality under § 784.011(1) is, however, grounded in an overt act directed toward the victim. *See id.*; *Battles v. State*, 288 So.2d 573 (holding that feeling threatened by an intention or opportunity to commit an assault is not enough for conviction). Notably, under Florida law, an "assault," is defined as a "threat." Fla. Stat. § 784.011(1) (2021).

Some federal threat statutes use the same common law definition of "assault" as Florida, and criminalize a threat only if there is an immediate and apparent ability

---

chemical are obviously situations which remove the remote (translate, "unable to immediately carry out") factor from an interstate communication. While the conduct can be covered by the same statute, the inherent dangers are different. As the government presented during the motions in this case, Capitol Police routinely use their discretion and judgement to determine which remote threats to follow up with investigation regarding, and even on those they investigate, use their judgement regarding which threats actually have dangerous elements involved.

3 As will be shown in this pleading, Florida's assault statutes are taken from the common law definition of assaults or threats.

to carry out the threatened communication. For instance, an "assault" on a member of Congress is a misdemeanor, as long as no injury occurs and no dangerous weapon was possessed. 18 U.S.C. § 351(e). At initial glance, that statute would appear to govern the conduct in this case, as the Defendant was basically accused of assaulting a member of Congress. It does not because the Defendant in this case had no immediate, apparent ability to carry out his threat. Section 351(e) does not define the term "assault." This was noted by the Tenth Circuit in *United States v. Calderon,* 655 F.2d 1037 (10th Cir. 1981) That Court's ruling determined that "assault" is a common-law term and should be given its common-law meaning.

This Circuit considered the term "assault," in the context of violations of 18 U.S.C. § 111(a). Section 111 falls under Chapter 7 of the United States Code, titled, "Assault." Section 111, on its face, deals with crimes involving "forcible assault" upon a federal officer during the performance of, or on account of the performance of their official duties. *United States v. Martinez,* 486 F.3d 1239, 1244-45 (11th Cir. 2007). The Court in *Martinez* determined that "[i]n sum, § 111(a) establishes these categories of forcible assault, each with its own penalty: (1) 'simple assault,' punishable by not more than a year of imprisonment; (2) 'all other cases' of forcible assault, which are punishable by not more than three years' imprisonment; and (3) 'all other cases' of forcible assault where the defendant uses a deadly or dangerous weapon or inflicts bodily injury, which are punishable by not more than ten years' imprisonment." *Id.* The *Martinez* ruling noted that Congress failed to provide any definition of the term "simple assault" in the statute, "or the difference between a forcible assault that

6

should be considered a 'simple assault' and an 'all other cases' forcible assault." *Id.* at 1245. The Court in *Martinez,* instead referred back to another Eleventh Circuit opinion to determine "that simple assault at common law 'is defined as a "*willful attempt to inflict injury* upon the person of another, *or … a threat to inflict injury* upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm."' *Id.* at 1245 (internal citation omitted)(Italics in original); *See also, United States v. Temple,* 447 F.3d 130, 139 (2nd Cir. 2006). The Court further noted that with respect to "forcible assault[s]" in "§ 111(a) 'have to be something more, such as a willful attempt or threat to inflict serious bodily injury, coupled with an apparent present ability, which causes the intended victim a reasonable apprehension of immediate serious bodily harm or death.'" *Martinez,* 486 F.3d at 1245 (internal citation omitted).

Thus, the common law definitions of "simple assault" and "forcible assault" mandates "apparent" and "immediate" ability to carry out the threatened conduct. This Circuit turns that concept of "assault" into a felony for "forcible assault," only if the there is an "attempt" to carry out the threat, or the "apparent" and "immediate" ability to carry out a threat of "serious bodily harm or death." *Martinez,* 486 F.3d at 1245. Obviously, the Defendant could not have been charged with the less serious offense, or the equally serious offense in this case because his threat: (1) was not based upon the former Congressman's performance of his official duties; and (2) he had no immediate and apparent ability to carry out the threat. Once again, the result was that the Defendant is convicted of a *more* serious offense.

It is immediately apparent that the common law definition of "assault," whether "forcible" or "simple," incorporates the term "threat" as a critical part of its definition. *Id.* at 1245. A "threat" may be an "assault" (if there is an immediate, apparent ability to carry out the threat), and an "assault" is a "threat." If it appears that the terms "assault" and "threat" are used interchangeably in most of these cases, or seem to share the same definition, it is because they do. Merriam-Webster's dictionary defines the term "assault" for "law" purposes as, "a threat or attempt to inflict offensive physical contact or bodily harm on a person (as by lifting a fist in a threatening manner) that puts the person in immediate danger of or in apprehension … of such harm or contact compare battery sense." https://www.merriam-webster.com/dictionary/assault (last accessed April 26, 2024). The same dictionary defines the term, "threat" as, "an expression of intention to inflict evil, injury, or damage." https://www.merriam-webster.com/dictionary/threat (last accessed April 26, 2024). According to these definitions, an "assault," includes an "attempt," while a "threat," is merely an "expression." *See, United States v. Shrader,* 2014 WL 4954408 at *1 (D. Arizona, 2014) (Unpublished).

The term "threat," is defined by case law, and not by statute. A "true threat" is a communication of "a serious expression of intent to inflict bodily harm upon that person." *United States v. Bundy,* 2017 WL 449593 at *7 (D. Nevada, 2017) (Unpublished). Thus, it appears that a "true threat" is merely an "assault" **without** a requirement of an apparent and immediate ability to carry out the threatened conduct, despite the fact that a "true threat" has to be a "serious expression of intent."

*See, Martinez,* 486 F.3d at 1244 (for common law definition of "assault" which is a threat to inflict bodily injury coupled with an apparent ability to do so).[4]

Thus, in multiple federal statutes directed against threats towards members of Congress or federal officials, a threat to inflict injury upon the official, along with the "apparent present ability" to carry out the threat, results in a misdemeanor offense. Yet, actual presence and ability to carry out the threat would appear to be the more dangerous and significant conduct when compared with an inability to carry out a threat. Much like the offender noted in the U.S. Capitol Police report from 9/2/22 above, it appears that, *had the Defendant directed his threat to Santos outside of his office, or in his presence, he possibly could have been arrested and prosecuted under 18 U.S.C. § 351(e), for a misdemeanor.* However, because he had no apparent present ability to carry out the threat, or to cause immediate bodily harm, he could not be charged with the misdemeanor offense and was charged with a more serious offense under 18 U.S.C. § 875(c).

Under § 111(a), for forcibly assaulting a federal officer while performing their duties, the Defendant would have to "use[] a deadly or dangerous weapon or inflict[] bodily injury," to have the same resulting maximum possible penalty as he faces now

---

4 This is why 18 U.S.C. § 115 is so difficult to decipher. An "assault" without injury or physical contact is a misdemeanor. But a "threat" to "assault, kidnap, or murder" is a felony. The statute does not define "assault" or "threat" and includes an offense of "threaten[ing] to assault," which would appear to be a threat to threaten as those terms are defined by common law. But a threat without the present, apparent, immediate ability or intent to carry it out could still constitute a "true threat" (defined as a "serious expression of intent to inflict bodily harm" for purposes of § 875(c) under the present jury instruction in this Circuit.

under § 875(c) for his speech without any injury, weapon, or apparent ability to carry out the threat. *Martinez,* 486 F.3d at 1244-45. Much like a violation of § 351(e), all violations, both the misdemeanor and felony offenses, of § 111(a), require the immediate and apparent ability to carry out the threat. Under the prevailing case law in this Circuit, the Defendant could **not have been charged with the offense of simple (or forcible) assault § 111(a)** for his actions because: (1) he had no immediate ability to carry out the threat; and (2) because, just as the government has stated repeatedly in this prosecution, they could not charge him with a violation of 18 U.S.C. § 115, as the threat was not "on account of the performance of official duties." Thus, once again, because of the nature of the threat, and the lack of any ability to carry it out, the Defendant was instead charged with the felony in § 875(c).

In sum, because the facts reveal that Defendant engaged in *less* serious, *less* dangerous conduct, *far* from Congress, *far* from Santos, and with no intention to carry out the threat, nor apparent ability to carry out the threat, and not because of the official role or duties of the former Congressman, he has been convicted of a far more serious offense, and faces a more significant penalty than he would have faced for confronting Santos face-to-face, or threatening him because he was a Congressman related to his official duties. This must be taken into account as to the seriousness of the offense and nature of the offense under 18 U.S.C. § 3553(a).

### 2. Other 875(c) Prosecutions involving members of Congress:

There are not many of these types of prosecutions for threatening members of Congress to compare this case with. Those found by the Defendant are all factually driven by the conduct that occurred in the case (as one would expect).

In another § 875(c) prosecution, Joshua Hall was sentenced in the Southern District of New York to a term of 20-months imprisonment, concurrent with his sentence in another federal prosecution that he was on pre-trial release from when he made a series of multiple threatening phone calls to a member of Congress's office. [21-cr-00605-GHW (SDNY)]. During those telephone calls, Hall conveyed threats to kill the Congressman to at least three different members of the Congressman's staff, and stated that he had a lot of AR-15 rifles. He also stated that if he saw the Congressman, he would kill him. Hall also stated that he wanted to "beat the shit out of" the Congressman and that he would find the Congressman wherever he was and hurt him.

In 2022, Justin Kuchta, was charged in the District of Maryland, for making threats to murder a member of Congress in violation of 18 U.S.C. § 875(c). Kuchta made threats through a district office in Texas in July of 2022, using an event management website (more or less as an online "pfishing" operation to obtain email addresses for the Congressman). Kuchta denied making the threats when he was initially interviewed by law enforcement. Kuchta stated that he used the event planning website — meant to coordinate an event in Missouri that the Congressperson was attending — to send an email threatening the lives of featured guests, including that member of Congress. Kuchta in several emails, explicitly stated

his intent to murder the Congressperson. Despite the sophistication of his efforts, Kuchta was sentenced to 4-months incarceration. 23-CR-00014-RDB (DMD).

In 2023, Allan Poller was charged in the District of New Hampshire for violating 18 U.S.C. § 115(a)(1)(B) and 18 U.S.C. § 875(c) for leaving a voicemail for a U.S. Congressperson which stated: "Hi, my name is Allan Poller, A-L-L-A-N P-O-L-L-E-R, phone number []8931. And I just want to let you know, Representative [Name], if you keep on coming for the gays, we're gonna strike back and I guarantee you, you do not want to fuck with us. We will kill you if that's what it takes. I will take a bullet to your fucking head if you fuck with my rights anymore. And then if you want to keep going down that path, you know who's next." [23-cr-00039-LM (DNH), DE:1]. Poller was sentenced, pursuant to the government's recommendation, to a downward variance from his 10-16 month Guidelines range to 3-years of probation. Notably, Poller's conduct was (based upon the language of the threat) entirely based on influencing the official duties of the victim, and referenced members of the member of Congress's family ("you know who's next"), and threatened a murder. There is no indication whether Poller had the capability, ability, or intention to carry out the threat in the pleadings available from that case.

Also in the District of New Hampshire, Ryder Winegar was convicted of making a series of threats to members of Congress. *United States v. Winegar,* 21-00021-SM (D.NH 2021). He threatened one Congressperson, "Uh, you better support Donald Trump as your president. There has been massive fraud in this country. And

if you don't support it, we're going to drag you out and we're going to hang you by your neck to die. Good luck." Id. He threatened a second Congressperson:

> but also, really, we're going to hang all you motherfuckers. And it really, really, it boils down to two camps. You either support our president, support liberty, and fuck this global homo, uh, vaccination Jewish agenda, or you're not. In which case we're going to fucking kill you. Do you understand? Like you can be afraid of being doxxed and be outed as a racist and all this shit, which nobody really fucking cares about because there's no consequences, or you can be scared about motherfuckers like me stringing your ass up. Yeah. So do the right goddamn thing and get behind our president and save this country and our Constitution or else you're really going to fucking regret it as the last thought that you have in your stupid little RINO brain. Get it? So stop being a RINO and fucking line up. You got it? Stupid bitch."

Id. Winegar threatened a third member of Congress,

> I think, you know, I'm not only going to have to register as a Republican in the future, but I might have to come and hang you personally, like until you die, and all of your aides, including you, who are listening to this right now, like some 24 year old, uh, from Arizona named Chase or some gay name like that. Do the right thing or patriots are going to come, and we're going to fucking kill you all. You understand.

Id. He threatened a fourth member of Congress, "You better get behind Donald Trump or we're going to hang you, and I'm going to laugh, and I'm going to pee in your face, and I'm going to fuck your ass, you stupid fucking Democrat, piece of shit, communist [inaudible]." He threatened that member again, "If you're not behind this, then we're going to hang you to die. Do the right thing, or you're going to get caught being a fucking Communist, like a Chinese Communist Party, or actually, yeah.

[foreign language] We're going to hang you to death. You understand that?" Id. He threatened yet another member of Congress, "Like we're going to come hang you, you specifically. And I know who you are." Id. Winegar threatened a sixth member of Congress, and their aides, "If you don't get behind him, we're going to hang you until you die. Uh there's there's no other option. You, there's two roads right now." Winegar was believed to be armed. Id. Winegar was charged with six counts of violating 18 U.S.C. § 115(a)(1)(B), and one count of violating 18 U.S.C. § 875(c). Id at DE:14. He plead guilty to the indictment. Id. at DE:26. He was sentenced to the bottom of his Guidelines range, 33-months imprisonment. Id. at DE:39. Much like Poller, Winegar's threats sought to influence the official duties of the Congressperson.

In 2019, Darryl Albert Varnum was charged in the District of Maryland with three counts of violating § 875(c) for repeatedly calling a Congressperson's Florida office, threatening to come down to Miami and kill her if a certain bill was introduced. "I'm gonna kill your ass if you do that bill. I swear. I will f---ing come down and kill your f---ing ass. And you're a congressperson, that's fine. I hope the f---ing FBI, CIA and everybody else hears this s---," Varnum was recorded as saying on the Congressperson's voicemail according to the complaint. "This is the United States of America, bitch. Get the f--- out... I'll tell you what I'll come down to Miami bitch. I'll f--- you up. Like Cubans don't even know." [19-CR-00337-RDB-1 (D.MD)]. Varnum was sentenced to 6-months of home detention for his conduct after admitting he was drunk when he left some messages. Much like Poller and Winegar, Varnum's threats were based upon influencing the official duties of the Congressperson.

In 2021, Robert Lemke was charged in the Southern District of New York with violating 18 U.S.C. §875(c) after he sent a series of threats to a New York Congressman's brother during the January 6th attack on the Capitol. One of the threats included a photo of a home in the brother's neighborhood, while another stated, "Your brother is putting your entire family at risk with his lies and other words. We are armed and nearby your house," Lemke allegedly said in the text to Jeffries' brother. "You had better have a word with him. We are not far from his either. Already spoke to [Congressman-1's son] and know where his kids are." According to the United States' sentencing submission in that case:

> The defendant engaged in a concerted campaign, sustained over more than two months, to terrify and intimidate dozens of journalists, members of Congress, and their families in the wake of the 2020 U.S. presidential election. He hunted his victims over the internet, amassing information about their private lives. He deliberately took steps to mask his identity, acquiring at least two extra phone numbers to use in threatening his victims. As he hid behind the anonymity of those numbers, he terrified his victims by explicitly threatening to harm them while also conveying detailed knowledge of their lives, their loved ones' names, their addresses, and even sending photographs that were personal to them, such as images of the inside of homes belonging to them and their family members. The victims feared for their safety, and that of their children, their parents, and their partners.

[21-CR-00100-AKH-1 DE:48 (SDNY)] Lemke was sentenced to 36-months imprisonment.

In 2023, Robert Vargo was charged with violating 18 U.S.C. § 871, 875 and 115(a)(1)(B) for mailing threatening communications to a U.S. Congressman, the President and a United States District Judge, threatening to kill them and their

families. The threats were directed at the Congressman's role on the January 6th committee. Vargo pled guilty to the § 875(c) count and was sentenced by the Judge to a term of 37-months imprisonment. [22-cr-00366-JRS, DE:32, MDPA]. The judge "noted Vargo's lengthy criminal history and the disturbing nature of the threats in imposing the 37-month sentence. Upon release from prison, Vargo must serve three years on federal supervised release. Vargo's federal sentence will begin after he finishes serving a three to six year term in state prison for a 2022 escape conviction." https://www.justice.gov/usao-mdpa/pr/columbia-county-man-sentenced-threatening-president-congressman-bennie-thompson-and [Last accessed April 29, 2024]. This threat was directly related to the Congressperson's official acts in Congress.

In 2010, Norman LeBoon, pleaded guilty to threatening a Congressman and transmitting in interstate commerce a threatening communication in violation of 18 U.S.C. § 875(c) and 115(a)(1)(B). [10-CR-00696-JP, EDPA]. LeBoon produced and transmitted a YouTube video over the Internet, containing a threat to kill Congressman Eric Cantor. In the video, LeBoon stated:

> My Congressman Eric Cantor, and you and your cupcake evil wife... Remember Eric...our judgment time, the final Yom Kippur has been given. You are a liar, you're a Lucifer, you're a pig, a greedy f------ pig, you're an abomination, you receive my bullets in your office, remember they will be placed in your heads. You and your children are Lucifer's abominations.

Following his arrest, LeBoon told federal agents that he meant his threats because Cantor was "pure evil"; "will be dead"; and that "Cantor's family is suffering because of his father's wrath." https://archives.fbi.gov/archives/philadelphia/press-releases/2011/ph040711.htm (last accessed July 5, 2023). LeBoon's interest in cantor

stemmed from a recent vote regarding what was widely referred to at the time as "Obama-care," (hence, the § 115 charge and conviction) and the video was issued one day after a bullet was shot through the window of Cantor's office (though he was not a suspect in the shooting). The government's sentencing memorandum in that case made it clear that LeBoon suffered from a long and violent mental health history where he assumed the identity of "Seth," and was very dangerous during those times, as he considered himself the Angel "Gabriel." [10-CR-00696-JP, EDPA DE:22] LeBoon was sentenced to 24-months imprisonment.

In 2018, Carlos Bayon was convicted by a jury of two counts of interstate communication of a threat and two counts of assault on a Congressperson in violation of 18 U.S.C. § 875(c) and 115(a)(1)(B) after leaving voicemails for a Congressperson which stated: "hey listen, this message is for you and the people that sent you there. You are taking ours, we are taking yours. Anytime, anywhere. We know where they are. We are not going to feed them sandwiches, we are going to feed them lead. Make no mistake you will pay. Ojo por ojo, diente por diente (Spanish for "an eye for an eye, a tooth for a tooth). That is our law and we are the majority. Have a good day." On the same day, the Washington State office of another United States Congressman received a threatening voicemail with the exact same message. Both calls were traced to Bayon. https://www.justice.gov/usao-wdny/pr/grand-island-man-arrested-leaving-threatening-voicemails-two-us-congressmen (last accessed July 5, 2023). [18-CR-00163-FPG-JJM (WDNY)]. Bayon refused the appointment of counsel and represented himself throughout the case. Bayon moved to strike the Pre-Sentence

Report prior to sentencing because he was "not guilty." Id. at DE:149. Bayon's threats were based upon the Congressional action related to immigration detention.

The government's sentencing memorandum against Bayon noted that he never once expressed remorse. Bayon's messages were identical, and the government indicated that he had written them out before-hand to read them during his calls. He was sentenced to 60-months imprisonment. At Bayon's home, agents found books regarding bomb-making and "hit-men." [18-CR-00163-FPG-JJM (WDNY) DE:157]. Also found at Bayon's home were 150 rounds of 7.62mm ammunition for an SKS assault rifle, 50 rounds of shotgun ammunition, a receipt for the purchase of an SKS assault rifle, a receipt for the purchase of a .38 caliber revolver. No firearms were located. [18-CR-00163-FPG-JJM (WDNY) DE:111]. The books that were found included: "How to create foolproof new identity; Ragnar's homemade detonators; Homemade C-4; New & Improved C-4; Middle Eastern Terrorist Bomb Designs; Poor man's TNT; CIA field manual for explosives prep; Disguise techniques; How to circumvent security alarms; Silent But Deadly: homemade silencers; Hit Man: technical manual; Expedient B&E: circumventing alarms; Improvised radio detonation techniques; Homemade Semtex; Secrets of a Super Hacker; How to make disposable silencers; and, How to build practical firearm suppressors." Id. An interview with Bayon's girlfriend revealed that he had gotten her to purchase the SKS rifle and ammunition for him, and that he admired Timothy McVeigh, "sympathized with David Koresh," and travelled to Colorado to have his picture taken by the school where the Columbine shooting had taken place. Id. Finally, after

searching a storage unit the Defendant rented, agents found the SKS rifle and bomb-making materials. Bayon was sentenced above Guidelines to 60-months imprisonment.[5]

In 2018, the United States Attorney's Office in this District prosecuted Laurence Key for violating 18 U.S.C. § 875(c). *United States v. Laurence Key,* 18-14053-CR-JEM. Key was arrested after calling and speaking to an intern in Congressman Brian Mast's office, and telling them: "I'm going to find the congressman's kids and kill them. If you are going to separate kids at the border, I'm going to kill his kids. Don't try to find me because you won't." [18-14053-CR-JEM [DE:1]]. Records revealed Key had also called the offices of Senator's Rubio and Nelson. Id. Records also revealed Key had called Mast's office 478 times. Key was indicted for one count of violating 18 U.S.C. § 875(c). Id. at DE:19. Evidence revealed that Key had previously threatened to poison Mast in a Facebook comment; Key had personally approached and spoke to Mast at a rally and had asked him if his children

---

5 Incredibly, in a pre-trial memorandum in Bayon's case, the government indicated to the District Court that: **"The defendant's ability to carry out the threat is relevant to determining whether he intended his words to constitute a threat.** *See Parr*, 545 F.3d at 502 (holding that evidence of defendant's knowledge of explosives is relevant to assessing his threat to blow up buildings)." [18-CR-00163-FPG-JJM (WDNY) DE:111] *citing, United States v. Parr*, 545 F.3d 491, 498-501 (7th Cir. 2008) (emphasis added). In this case, the government instead argued that the Defendant's *inability* to carry out the threat was irrelevant to intent. In Docket Entry 111 in Bayon, the government cited extensively to *Parr* for the conclusion they could admit prejudicial background information during trial about the Defendant's views because it would prove his intent to communicate a "true threat." In this case, it was the Defendant arguing that *Parr* meant that the Defendant could argue and offer proof of a *lack* of preparation and ability to dispute his intent to communicate a "true threat" and it was the government arguing that *Parr* did not apply.

were with him; and Key had sent an email with a veiled threat of death to Mast that the government argued did not rise to the level of a charge, but was nonetheless evidence of guilt. Id. at DE:31. The case was dismissed by the U.S. Attorney's Office after a jury was unable to reach a verdict. Id. at DE:69. The case was not re-tried. Key's threats were related to Congressional action regarding immigration detention.

In 2018, Christopher McGowan was charged with one count of violating 18 U.S.C. § 875(c) "based on many 'concerning' and 'threatening' tweets McGowan sent in which he tagged or otherwise directed comments at a United States congressman." *United States v. McGowan,* 2022 WL 2654228 at *1 (W.D. VA 2022) (unpublished). He plead guilty to that charge and was sentenced to a term of time-served and supervised release. *Id.*

In 19-CR-80221-DMM, Michael Shapiro was charged in a four count indictment with three violations of 18 U.S.C. § 875(c), and one count of retaliating against a federal officer in violation of 18 U.S.C. § 115(a)(1)(B). The defendant therein was alleged to have made approximately 12 threatening calls to members of Congress. Shapiro pled guilty to one count of violating § 875(c) and was sentenced pursuant to a joint recommendation by the parties to a downward variance of 3-years of probation. In December of 2023, Mr. Shapiro was re-arrested, for allegedly making five calls to threaten a member of Congress. He was indicted for one count of violating § 875(c) in case number 24-CR-80007-DMM. That case remains pending.

### 3. Threats against members of Congress prosecuted only under 18 U.S.C. § 115:

Prosecutions under 18 U.S.C. § 115(a)(1)(B) mandate that the threat be based upon official actions by the victim. The following cases involve threats against members of Congress filed under that statute.

In 2017, E. Stanley Huff was charged in the Southern District of Ohio with violating 18 U.S.C. § 115(a)(1)(B) for leaving a series of voicemails threatening the life and family of Rep. Steve Stivers (Ohio). Huff had been leaving voicemails for the Congressman from February, through June, 2017. [17-CR-00144-MHW, DE:1]. The final voicemail was over 2-minutes long, and stated:

> Yeah sissy boy Stivers. Hey let me tell you something. I've seen the ah prayer ya'll were saying at the baseball diamond last night. I think ya'll better hit your knees and pray for the people that you re screwin' up their lives with your secret legislation that you're tryin' to run through everything. And by the way, we the people are on the march now to take back our country and our government. So says the constitution because it does say we the people. Something you repugnant fuckers don't understand. Now I've tried to warn you but you keep calling that little pissy sissy pig friend of yours. And he keeps disturbing me. Now he's gonna get ah, ah, ah civil charge filed on him if he continues. And so are you. We are coming to get every god damn one of you and your families. We are taking our country back. We are on the march. The other day is the tip of the iceberg. I've tried to warn you. You don't want to listen to me. You don't want to sit down and talk about it. So S.O.L. is going to move. One of the greatest Americans ever said that it is obvious that these meetings are doing no good that now is the time for action. You hear me clearly, queer. Ok? Maybe the next one taken down will be your daughter. Huh? Or your wife. Or even you. Think about it dumbass. We own this country. You are nothing more than a public servant. And that's what you gonna be. Ok? You are going to serve all of the public. Not just the

21

repugnant public. All of the public. Fuck you in your left ear. Fuck you in the right ear. And everywhere else I can put it. You understand that, dumbass? Don't let your piggy friend call me. Or you'll hear from me more often.

[17-CR-00144-MHW, SDOH, DE:1]. The "baseball" reference was to the shooting on a baseball field of several members of Congress by a sniper around that time period.

This was the last of five threatening and harassing voicemails Huff left for the Congressman, all lengthy in duration. Federal agents visited Huff to advise him to stop leaving messages for the Congressman, but he continued unabated, and even commented in the next message about the visit his prior calls had generated from law enforcement. In that next message, he stated, "'go Fuck yourself.' Hoff then said, 'And apparently you don't have any problem with the fact if we're out one day and see your daughter out walking around or your wife we can go grab them in the crotch'. Hoff also warned, 'Steal one more election, there will not be one word spoken about it. There will be no less than one million shots fired.'" [17-CR-00144-MHW, SDOH, DE:47].[6] In a prior message, Huff stated: "that 'If you shoot down one of our troops and you will have the bloodiest massacre God's Earth has ever seen', 'We're going to

---

6 Notably, the government's sentencing memorandum in the Huff case uses the definition of the term "threat" from Merriam-Webster's dictionary referred to in part 1 of this pleading: "A threat has been defined as an 'expression of intention to inflict evil, injury or damage' and 'a communicated intent to inflict physical or other harm on any person or on property'". (Merriam-Webster and Blacks Law Dictionary)." [17-CR-00144-MHW, SDOH, DE:47]. In addition, the government went on in that pleading to define "true threat" as: "A statement rises to the level of a "true threat" when it is a 'serious expression of an intention to inflict bodily harm' and is 'conveyed for the purpose of furthering some goal through the use of intimidation.'" Id. (internal citation omitted).

take care of it you see and we're going to take care of it our way' and 'Leave Obamacare alone or die.'" Id. In another voicemail, "Hoff warned 'If you go down with a yes and that bill passes, I guarantee you my death will not be in vain. You want a more dangerous, hateful country to live in? We're going to give it to you.'" Id. Huff also had prior convictions for stalking, violation of a domestic protection order, and domestic violence. Huff had 23-prior arrests, a multitude of which involved violations of stay-away orders, which the government argued matched the behavior in Huff's case, when he was warned to stop calling but only disregarded the warning and got worse. Id. Huff was sentenced to 40-months imprisonment.

In 2022, Chase Neill was charged in the District of Kansas with violating 18 U.S.C. § 115(a)(1)(B) for repeatedly threatening a U.S. congressman that he would kill him. The defendant represented himself and was convicted at trial. [22-cr-40037-HLT (DKS) DE:1]. "Neill admitted in court that he left the June 5 voicemail and others with more death threats the next day." https://apnews.com/article/politics-albuquerque-kansas-topeka-prisons-bf01d9142e08750036a8eb1148de7b08 (last accessed June 29, 2023). The defendant was a very intelligent and high achieving young man, who had been trained both as an EMT and as a future naval aviator, but had mental health problems (which he denied). He had previously been arrested for trespass in disregard of a protective order by a member of his family. In 2019, he was convicted of threatening to kill his mother and girlfriend and of domestic battery. In 2018, he was arrested for possession of multiple firearms. He had fled the country for Israel at one time to avoid a warrant for his arrest. Throughout case proceedings the

23

defendant declared himself immune from prosecution, and declared that all local and federal law enforcement and the intelligence community were conspiring against him. He showed no remorse for his actions, and declared that they were legitimate. [22-cr-40037-HLT (DKS) DE:155]. He was sentenced to 46-months imprisonment.

In 2022, David Hannon was prosecuted in the Middle District of Florida for violating 18 U.S.C. § 115(a)(1)(B). Hannon pled guilty to sending an email to a member of Congress "threatening to kill her." https://www.justice.gov/usao-mdfl/pr/florida-man-pleads-guilty-federal-charges-hate-motivated-threats-against-us-member (last accessed June 29, 2023). The e-mail read:

> We Are Ready To Carryout Mass Assassinations Against Alquida Radicals That Have Somehow Got Into Our American Political Parties! Your Already On The HIT LIST BY OUR AMERICAN PATRIOT ARMY AND THE MOUSAD! YOU BETTER GET MORE SECURITY, OR WITHIN A WEEK YOU AND THE OTHER THREE RADICAL RATS WILL BE SIX FEET UNDER! THIS IS NOT A THREAT BUT FACT! ARE YOU READY TO DIE FOR ISLAM? ARE YOU READY TO DIE FOR ALLAH? ARE YOU READY TO GET OUT OF OUR COUNTRY! YOU WONT HEAR THE BULLET GOING THROUGH YOUR OR THEIR HEADS! ALL FOUR OF YOU CONGRESS WOMEN WILL DIE AND THE AMERICAN PEOPLE WILL CHEER! PATRIOTS AGAINST ISLAM! GOD BLESS AMERICA!"

[22-cr-00134-KKM-CPT-1 (MDFL) DE:33]. The e-mail immediately followed a press conference by the Congress woman and another Congress woman of Islamic faith to respond to criticism leveled against them by then-President Trump. The Sentencing Guidelines recommended a sentence of 10-16 months imprisonment. Id. The government recommended that the Court sentence Hannon to a term of 10-months

imprisonment. Id. The government did admit in that pleading that because the threat was a single threat, not a multiple series of threats, this was a mitigating factor. Id. The Court refused to follow the government's suggestion that a prison sentence was required under 18 U.S.C. § 3553(a) and sentenced Hannon to a term of 36-months-probation. [22-cr-00134-KKM-CPT-1 (MDFL) DE:37].

### 4. Un-prosecuted (Federally) "threats" against elected officials:

On December 23, 2016, Kevin Krohn was arrested in the Southern District of Florida for threatening President Elect Donald Trump. He was accused of violating 18 U.S.C. § 871(a) and 18 U.S.C. § 879(a)(2) for threatening the life of, or inflicting great bodily harm upon the President-elect. *United States v. Krohn,* 16-06531-MJ-BSS [DE:1].

It was alleged by the government that the prior day (December 22, 2016), Krohn had posted on his account on Facebook "in a thread of comments related to [President] Trump's ongoing visit to Palm Beach, Florida" a "threat" which "read: "I'm just glad Obama didn't take [all] our gunz! I see a good use for one now" above an image of [President] Trump which read,' 'He's not my president/He's an enemy of the state." An additional comment made by Facebook user KROHN stated, "The EXPEDITER of Trump! He will never last long!" above an image of a camouflaged man holding a scoped sniper rifle. Another Facebook user replied, "WTF does that mean?' 'to which Facebook user KROHN replied, "Keep yer eyes open!' *United States v. Krohn,* 16-06531-MJ-BSS [DE:1].

Krohn was visited by U.S. Secret Service Agents at his home in Broward County at which time he "declared any statements he made were an expression of his First Amendment Rights." Id. Krohn was asked by law enforcement if he had made threatening comments towards President Trump "at which time he became further confrontational, began pacing in the yard, and in a loud voice said, "Well then arrest me." After multiple failed attempts to calm KROHN, KROHN was restrained and placed in the back of a PPPD vehicle." A post-arrest frisk of Krohn by law enforcement "revealed he possessed a retractable knife in his pocket." Id.

After rejecting multiple pre-indictment plea offers from the government (including an option of possible **pre-trial diversion**), the U.S. Attorney's Office for the Southern District of Florida dismissed the case against Krohn. *United States v. Krohn,* 16-06531-MJ-BSS [DE:9].

In May, 2023, Congressman Eric Swalwell was reportedly threatened by Bruce Miller via private message, which read: "'Almost time!!! Would you rather Guantanamo or just execution f—kin traitor,'" along with three cry-laughing emoji." Miller engaged in further dialogue with Congressman Swalwell, following up that communication with, "that punishment is in the cards for you and many others!" https://www.sfgate.com/49ers/article/49ers-bruce-miller-swalwell-threat-18106503.php (last accessed June 29, 2023). Miller has not been arrested or charged for these threats.

In January, 2023, Congressman Eric Swalwell received a private message from a man in Indiana named Jonathan Reeser. Part of the message reported by the media read:

> I HOPE YOU FAMILY IS RAPED AND MURDERED AND I HOPE YOU GET TIED TO THE BACK OF A TRUCK AND DRUG 10,000 MILES UNTIL YOU BODY IS RIPPED TO PIECES YOU SCUM. I WISH I SAW YOU IN PERSON ID BREAK YOUR (explicit) FACE SO FAST YOUD HAVE PLASTIC SURGERY AND NEVER LOOK THE SAME AGAIN.

https://www.indystar.com/story/news/politics/2023/01/14/indiana-man-threatens-u-s-rep-eric-swalwell-loses-job/69809292007/. (last accessed June 28, 2023)(all caps in original). Reeser was never arrested or charged for the message that was sent, though he was fired by his employer.

In 2023, Aaron Thompson was arrested and charged in state court in Indiana for misdemeanor assault for multiple threatening calls to a Congressman, for calling the:

> office and [leaving] threatening messages on a number of occasions. Thompson made one of these calls on April 6 and seven on April 11 …."Mole-ay, MOle-ay, Mole-ay, Mole-ay…Hope you die," Thompson said in one voicemail, "yay Mole-ay three daughters. Hey hey hey three bullets hey hey hey one wife yay. Oh yeah, yeah, we'll give her two bullets. Mole-ay how's your moles on face you little f—khead? I hope you f—king get your brains blown out," …."Here's the choice. Your daughters grow up without their dad. Or you grow old without your daughters," ….emphasizing to [the Congressman] that he owned a gun. "How you like that? Let me know what your opinion is. I'll make the decision. Love you f—king f–got."

https://www.dailysignal.com/2023/06/06/boom-boom-you-pick-authorities-arrest-man-who-threatened-gop-congressman-young-daughters/ (last accessed June 29, 2023).

In 2023, Michael Kennedy was charged in state court in Colorado with threatening a U.S. Congressman, for

> repeatedly leaving voicemail messages for the Democratic congressman in which he threatened to shoot Neguse over his advocacy for stricter gun laws. The messages were peppered with racist language and insinuations against Neguse, who is Black. The arrest warrant lists 17 separate voicemails left between mid-May and late June last year, many of them referencing past mass shootings, including those at the Table Mesa King Soopers, which was in Neguse's district, and the Buffalo Tops grocery, in which the shooter specifically targeted Black people…."Check this out, Joe Neguse," Kennedy allegedly said in one message. "What are you going to do about me? I got me a AK-47 pointed directly at you. What are you gonna (expletive) do about that?"

https://www.cpr.org/2023/04/12/denver-man-arrested-threatening-joe-neguse/ (last accessed June 29, 2023). He was never charged by federal prosecutors.

In 2021, Kenneth Gasper was charged in state court in New York for a telephoned death threat against a Congressperson over a vote that Gasper "did not agree with." Gasper called a district office, cursed at the staff member who answered, and called the Congressman a RINO, an insult that stands for "Republican in name only," according to the criminal complaint. Gasper warned that if he saw the Congressman on the street he would kill him. Gasper, was charged with aggravated second-degree harassment. https://www.fox5ny.com/news/long-island-man-arrested-for-threatening-congressman-garbarino (last accessed July 5, 2023).

In December, 2023, television actor John Schneider posted a statement on Twitter (now "X") threatening President Joe Biden, and his son, Hunter Biden. A news source reporting on this threat indicated that the United States Secret Service is investigating the actor for the post. Schneider wrote and posted on his electronic media account: "Mr President, I believe you are guilty of treason and should be publicly hung,"... Your son too. Your response is..? Sincerely, John Schneider." https://www.theguardian.com/us-news/2023/dec/21/dukes-hazzard-actor-john-schneider-biden-execution (Last accessed January 22, 2024). Schneider has not been arrested or charged for transmitting an interstate threat or threatening the president under 18 U.S.C. § 871 or 875(c) at this time.

Ali Alexander, a key organizer of the January 6th rally, "has continued to publish violent rhetoric since the riots. …. in a new Internet video, he vowed: 'We are going to punish the traitors,' referring to Republican politicians who endorsed Biden's electoral victory. 'The Lord says vengeance is his, and I pray I am the tool to stab these motherf---ers.'" https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP (last accessed June 29, 2023). Alexander has not been charged with a crime.

**5. Threat cases against other elected officials:**

In 2017, Kamran Ebrahim was charged for making threats against the President, and a retaliatory threat against a law enforcement official in violation of

18 U.S.C. § 871 and 18 U.S.C. § 115, in the Southern District of Florida. Ebrahim was charged after investigation revealed that he had made threats against President Trump, the White House, and a Secret Service Agent while being hospitalized at a facility in Palm Beach County for mental health. This included a statement that he hated the Secret Service Agent and would rip his throat out when he saw him. He also stated: "I will nuke the White House." Additionally, while being Baker Acted for suicidal ideation and drug use, he threatened police and stated he would assassinate the President. During a subsequent interview with Secret Service Agents, he was apologetic and cooperative. *United States v. Ebrahimi,* 17-MJ-08192-WM [DE:1]; *United States v. Ebrahimi,* 19-CR-80057-RLR [DE:50] Ebrahimi was granted **pre-trial diversion** by the U.S. Attorney's Office for the Southern District of Florida in that case. Id at DE:35 & 38.

After violating pre-trial diversion, Ebrahimi was charged by a one-count information with only resisting or obstructing, or intimidating by force a Secret Service Agent, in violation of 18 U.S.C. § 111(a)(1), which is a misdemeanor with a one-year maximum possible sentence. *United States v. Ebrahimi,* 19-CR-80057-RLR [DE:40]. While on bond in that case, Ebrahimi tested positive for the use of cocaine. Id. at DE:44. Nonetheless, he was sentenced to a term of six-months-probation. Id. at DE:52. After four violations of probation, he violated and was sentenced to a term of 4-months incarceration. Id. at DE:70 & 74. Ebrahimi was competent despite his mental health condition.

In 2021, Niviane Phelps was charged in the Southern District of Florida with violating 18 U.S.C. § 871, for threatening Vice president Harris. In *United States v. Phelps,* 21-20240-CR-JEM, she was charged with six counts of threatening the vice president. Id. at DE:15. She sent a series of videos to her husband, who was incarcerated by the state of Florida. The videos:

> Generally depict [Phelps] complaining and speaking angrily to the camera about her hatred for President Joe Biden and Vice President Kamala Harris, among others.... in a video dated February 2021 ... [she] stated: Kamala Harris you are going to die. Your days are numbered already. Someone paid me $53,000 just to fuck you up and I'm gonna take the, I'm gonna do the job, okay." ln a video dated February 2021 ... [she] stated "I'm going to the gun range, just for your ass, until you fuckin' leave the chair." And in a video dated February 18, 2021 ... [she] stated: And fuckin 'Kamala Harris, I swear to God, today is your day you're gonna die.50 days from today, mark this day down, stupid bitch, Kamala fuckin' Harris vice president. You gonna fuckin' die 50 days from today, I swear to fuckin' God! Your day is...(cut off)"

21-20240-CR-JEM at DE:3. The Secret Service also discovered photos of Phelps actually at a gun range with a firearm and a target that had been shot multiple times, and learned that Phelps had actually applied for a Florida concealed carry permit for a firearm. Id. They also discovered photos of Phelps' son with a firearm at a gun range. Id. During an initial attempt to interview Phelps, she refused to speak with the agents. During a second meeting, she spoke to the agents and admitted that she was not sure what would have occurred had the agents not intervened and interviewed her. Id. During that meeting Phelps was asked if she had plans to travel to Washington, D.C. She answered she did not, but her daughter blurted out that

31

they did. Phelps plead guilty in that case, and was sentenced to 12-months incarceration. Id. at DE:55.

**6. Cases involving violence or trespass in Congress for the purposes of influencing or otherwise impacting Congressional action:**

On January 6, 2021, a large crowd left a political rally in support of former President Trump, marched to the United States Capitol while Congress was in session preparing to certify the results of an election the former president disputed, and attacked Congress to stop that certification. The term "attack" is not hyperbole in this pleading, as it is the term used by the government in virtually all of the pleadings in what have become known as "January 6th" cases to describe the actions of the crowd that took place that day. See e.g. https://www.justice.gov/usao-dc/case-multi-defendant/file/1469276/download (last accessed June 29, 2023).

As of June 29, 2023, 1,049 people have been charged federally with offenses related to this entry and disruption of Congress' official business. https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (last accessed June 29, 2023). 553 of these persons have been sentenced by federal courts. Id. The median sentence for those who have received prison time has been 90-days. As noted in section 1 of this pleading, offense conduct of a seemingly more dangerous nature (actual ability to immediately carry out a threat) is treated by statute, as less serious than the offense conduct in this case that revealed no apparent, immediate ability to carry out a threat. The January 6th cases reveal a similar dichotomy. The persons who entered the capitol on that date did so with a

specific political purpose, to wit: to either harm members of Congress, or intimidate them out of doing their Congressional duty. **There was no other reason to unlawfully enter the Capitol that day**. The immediacy of the danger they posed has been well revealed by the cases that have resulted, and the investigation by the January 6th Committee. The manner of entry has been well documented, including overwhelming police lines, removal of barricades, and destruction of doors and windows to gain access via secured entrances via an angry mob of people. The government alleged in the *Kaye* case they have repeatedly referenced, some connection between Kaye and January 6th (the nature of the connection is unclear from the complaint, but it appears to be something that was raised during trial).

Yet, once again, despite being an immediate danger to members of Congress, the sentences imposed (as an average) are far lower than the recommendation in this case. The Defendant previously provided these examples along with the median sentence:

1) *United States v. Paul Edward Kovacik*: 1:22-mj-100 Paul Kovacik breached the U.S. Capitol on Jan. 6, 2021, through the Senate wing doors and filmed several YouTube videos over the course of the roughly 25 minutes that he remained in the building. Prosecutors say they further confirmed Kovacik's presence in the building through surveillance camera footage and police body-worn camera footage…..Kovacik pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges are dismissed. Sentenced to 90 Days of incarceration; 3 Years of Probation; Special Assessment of $10; Restitution of $500. Kovacik has prior criminal contacts and had recent criminal contact with the Mequon (Wisconsin) Police Department.

2) *United States v. Brian McGhee:* 1:23-mj-33 Brian McGee entered the Capitol. Court documents state that during a conversation with the FBI over the phone, McGee said that he saw police officers waving rioters inside and fist-bumping them. An FBI review of surveillance footage does not back

this up. McGee pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. Sentencing set for 10/13/2023.

3) *United States v. Melody Steele-Smith,* 21-cr-00077 Her conduct included posting on Facebook- "I'm trying to figure out how I could be there all day and miss all this violence and destruction I'm seeing on TV,"… "I think photos for the news were staged." One of the photos Steele-Smith took appeared to show her inside House Speaker Nancy Pelosi's office. Under the caption, "Nancy's Office," there is a collage of images -- a framed photo of Pelosi hanging on a wall, a coin rack on top of a cabinet and in one, in a partial reflection, what looked to be a white fuzzy headband and light hair that investigators said was consistent with selfies that Steele-Smith took of herself on Jan. 6. … According to a court document, Steele-Smith served in the Navy and was honorably discharged in 1999. She plead guilty to Count Two of the Indictment, charging Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), which carries a maximum sentence of one (1) year of imprisonment. She was sentenced to 36 months Probation with 90 days home detention; $500 Restitution; and $25 Special Assessment.

4) *United States v. William Vogel,* 1:21-cr-56 An FBI tipster claimed William Vogel was "very vocal" about being at the rally in Washington, D.C.. Court documents indicate Vogel was identified as a rioter after law enforcement received videos he shot and narrated while he was inside the Capitol building. …In Snapchat videos, Vogel can be seen walking around the Capitol building while law enforcement is seen retreating from the rioters. …Vogel's Facebook account, … was used to send photos that showed him participating in the riot. He also shared a video taken from the top of the west front steps of the Capitol building. Vogel pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges were dismissed. Sentenced to 30 days of incarceration; 36 Months of Probation; a Special Assessment of $10.

5) *United States v. Timothy Wayne Williams,* 21-mj-454 Williams was present in the Capitol Crypt and was observed to take a selfie …, and at approximately 14:18:47 a fire extinguisher is thrown by an unknown individual standing near Williams. He was seen joining in chants with the crowd towards law enforcement officers. Williams pleaded Guilty to two charges: Entering and Remaining in a Restricted Building or Grounds and Theft of Government Property. The other charges were dismissed. Sentenced to 6 Months of Incarceration;12 months of supervised release with 6 months of home confinement; Special Assessment $50; Restitution of $500.

6) *United States v. Rasha N. Abual-Ragheb,* 1:21-cr-43 Abual-Ragheb admitted to entering the U.S. Capital on January 6th. A Facebook page for Abual-Ragheb in November 2020 showed her participating in Facebook and Telegram group chats with members of the New Jersey chapter of the

American Patriot 3%, a far-right anti-government militia movement. In one of those chats, a user whom the FBI believes was Abual-Ragheb said that a civil war was coming and that people needed to show support and rise up and fight for the Constitution. During an FBI interview, Abual-Ragheb allegedly told agents she was born in Lebanon and fled to Jordan when she was a child to escape the civil war there. She told agents she had been in the U.S. for 21 years and was a Trump supporter, attended his rallies and was blocked from Facebook and Twitter for some of her pro-Trump postings. Abual-Ragheb pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. Sentenced to 36 months probation, the first 2 months as Home Detention; 60 hours community service; $10 assessment; $500 restitution.

7) *United States v. Chase Kevin Allen,* 1:22-cr-361 Allen pleaded Guilty to the charge of committing an act of physical violence on capital grounds. A tipster provided a photo from a Facebook page called "The Allen Report" where Allen can be seen wearing a white Boston Red Sox beanie and a camouflage backpack. Law enforcement recognized that outfit from YouTube videos of a previously unidentified young man stomping on and smashing media equipment outside the Capitol. In one of those videos, Allen can allegedly be heard yelling multiple times: "Get the f*** out of here" after a journalist repeatedly said, "We are leaving." In a May interview with law enforcement, Allen said he runs a YouTube channel called "The Allen Report" and "considers himself to be a documentary filmmaker" who travels across the country to film events. Allen said that he did not enter the Capitol and that he did not destroy any media equipment. He also said that he "sometimes does things while filming among groups like those at the U.S. Capitol to fit in and cause those around him to believe that he is one of them." He told police the worst thing he did was "use foul language." Sentenced to 3 years of probation; 14 days of intermittent confinement; 50 hours of community service; $500 restitution; $10 special assessment.

8) *United States v. Michael Jerrett Amos,* DC Court, Michael Amos was arrested for breach of the U.S. Capitol on Jan. 6, 2021. D.C. Superior Court documents show Amos was charged with unlawful entry. Amos pleaded not guilty. Amos successfully completed a diversion program and his case was dismissed on January 25, 2022.

9) *United States v. Neil Ashcraft,* 1:22-cr-295 Neil Ashcraft pleaded guilty to stealing an American flag and flagpole from the U.S. Capitol on Jan. 6, 2021, and taking them to his home in Florida. A fellow rioter later burned the flag at Ashcraft's mother's house and tossed the pole into a pond in an attempt to conceal the evidence. Ashcraft admitted he scaled scaffolding outside and "exhorted other rioters to storm the Capitol" before the crowd broke windows to access the building, according to the filing. He was among the first rioters to enter the Senate wing, carrying a white metal pole inside

and striking the floor repeatedly, according to the filing. Ashcraft also posed for a photo with a statue of former President Ronald Reagan inside the Rotunda before stealing the flag from a room or hallway near the Rotunda and wrapping it around his shoulders. According to the filing, Ashcraft left the Capitol after about 40 minutes inside. In a sentencing memorandum filed in federal court, prosecutors identified Ashcraft as a former U.S. Marine and said his military experience made his knowledge of the flag burning unexpected, saying that Ashcraft would have instead been expected to hold the flag "sacrosanct." Ashcraft pleaded Guilty to both charges. Sentenced to 80 days incarceration; 36 months supervised release; $50 special assessment.

10) *United States v. Ryan Keith Ashlock,* 1:21-cr-160 According to court records, videos from the Jan. 6, 2021, riot show several people who the FBI has assessed as members of the far-right group Proud Boys marching toward the Capitol. Videos show Ryan Keith Ashlock marching with this group. In one video, the same group, led by Proud Boys organizers Joseph Biggs and Ethan Nordean, is seen marching toward the entrance of the Capitol, according to the affidavit. Images from the riot and FBI statements link Ashlock to the Kansas City Proud Boys. He can be seen wearing a green tactical vest with orange tape affixed to the front, a gray respirator, yellow goggles and gray kneepads. According to the FBI, U.S. Capitol Police footage also shows Ashlock and several confirmed Proud Boys members trying to pass the barricades and officers guarding the Capitol entrance. Individuals are not only seen moving together but also gesturing to one another while moving together on the Capitol grounds, said the FBI. As the group tried to enter the building, Ashlock allegedly pushed on the barricades and law enforcement but got repelled by officers when they used pepper spray. Ashlock pleaded Guilty to one charge: Entering and Remaining in a Restricted Building or Grounds. The other charges were dismissed. Sentenced to 70 days of Incarceration followed by 12 months of Supervised Release; 100 hours of community service; $25 Special Assessment and Restitution of $500.

11) *United States v. Stephen Michael Ayres,* 1:21-cr-156 Stephen Ayres and two unidentified friends filmed a video in their hotel room to "share what really happened" at the Capitol building and posted it on YouTube following the riot. According to an FBI affidavit, at some point during the video, Ayres' male friend claimed that "Antifa breached" the Capitol and that police "escorted" them into the building. He stated it was a "staged Antifa setup" coordinated by media, police and the mayor of Washington, D.C. In response, Ayers agreed that the entire incident was "definitely planned out." Court documents also cite a witness who contacted the authorities after allegedly watching a livestream Ayers broadcasted from his Facebook account. According to the witness, Ayers was acting "like he was at war." The witness also said that at some point during the streaming video, Ayres

stated that the incident at the Capitol was "just the beginning" and that there was "more to come next week." Ayres pleaded Guilty to one charge: Disorderly and Disruptive Conduct in a Restricted Building or Grounds. The other charges were dismissed. Sentenced to 24 months of probation, $500 restitution; $25 special assessment; 100 hours community service.

12) *United States v. Stephen Maury Baker,* 1:21-cr-273 Stephen Baker recorded live footage under the alias "Stephen Ignoramus" during the protests at the Capitol. Once inside, Baker is allegedly heard on tape saying: "All right, what's up, y'all? How you guys doin'? Super-intense. Welcome, I am Stephen. I'm a livestreamer and a musician. We're having fun, huh? Repent and believe in Jesus." Baker also makes multiple references to members from the far-right groups The Red Elephants and Oath Keepers, identifying some of them by name, during his livestream. Baker is also seen on video saying, "I was inside for like an hour, dude. I was one of like the last 10 people in there. ... this s*** is history." A witness who was interviewed by the FBI stated that they've known Baker for about 10 years and were alarmed by the content of those videos, which included, according to the witness, the "advancement of conspiracy theories and mockery of minority groups." Baker pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges were dismissed. Sentenced to 24 months probation; 9 days intermittent incarceration; $500 restitution; $10 special assessment.

13) *United States v. Tyler Bensch,* 22-mj-184, Bensch is a member of a Florida right-wing militia group called the "B- Squad." He "wore a tactical vest, as well as a military-style helmet with goggles and a black gas mask," along with "a chemical irritant in front of the vest," the Justice Department said. While other members of the "B Squad" allegedly pushed on the police line guarding the tunnel on the west side of the Capitol, Bensch "remained just outside." After police successfully repelled the group, Bensch "used one of his chemical irritants to spray the face of an individual who was an unknown member of the crowd, even though that person posed no threat to him," the Justice Department stated. He was permitted to plead guilty to two misdemeanor counts and was sentenced to 2-years of probation.

https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (last accessed June 29, 2023).

The government noted in the filings in these cases (and virtually all others) that Congress and the Vice President were **actually present** in the Capital and were engaged in government proceedings at the time all the individuals in question

entered the capital. Thus, all of these individuals were committing their criminal conduct in Washington, with congresspersons and the Vice president present and nearby.          See. e.g.          https://www.justice.gov/usao-dc/case-multi-defendant/file/1511641/download (last accessed June 29, 2023).

Title 18 U.S.C. § 1752(a) can be punished as a felony with up to ten (10)-years imprisonment if a weapon is possessed during the trespass on restricted grounds, or bodily injury results, or as a misdemeanor with a maximum penalty of one-year of incarceration if not. 18 U.S.C. § 1752(b)(1) and (2). The intent of the entry into the restricted federal grounds does not alter the punishment in § 1752(b)(1) and (2). Other charges *are* concerned with the intent behind the trespass, such as 18 U.S.C. § 1512(c)(2), and 40 U.S.C. § 5104(e)(2). The majority of the individuals arrested and charged in relation to January 6th have been permitted by the government to enter pleas to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G), which is a misdemeanor. See e.g. *United States v. Robert Ballesteros,* Case No. l;21-mj-00132.

**The Defendant's case is not a January 6th case.** Like the January 6th cases, this case *does* involve a member of Congress as the victim. Unlike those cases, the Defendant never carried out any of the things he threatened. He never traveled or planned to travel to Washington. He never attempted to confront a member of Congress in person. He took no steps to carry out, or even have the ability to carry out his threat. He was remorseful. The Defendant was not motivated to disrupt the Congressman's official work. Yet, the government is advocating for a far lengthier

sentence in this case, and charged a far more serious crime than in the majority of January 6th cases involving conduct beyond mere speech.

## CONCLUSION:

Prosecutions for violations of 18 U.S.C. § 875(c) related to members of Congress vary greatly in severity, and with regard to the sentences that are imposed. Joshua Hall was on pre-trial release in another federal case when he made repeated calls to threaten a Congressperson and was sentenced to concurrent 20-month terms of incarceration for both cases. Justin Kuchta used a sophisticated e-mail operation to obtain emails for members of Congress who were to attend a live event in Missouri to repeatedly threaten them, and was sentenced to 4-months incarceration. Allan Poller made a threat of death to a Congressperson to attempt to alter their votes in relation to gay rights, and was sentenced at the behest of the government to a term of probation. Ryder Winegar communicated many threats of death to many Congresspersons, always attempting to get them to change their votes, and was sentenced to the bottom of his Guidelines range, at 33-months. Darryl Varnum repeatedly threatened a member of Congress to get her to alter her votes, and was sentenced to 6-months of home detention. Robert Lemke threatened the family of a New York Congressman, to include photos of the family member's home, repeatedly and the Congressman himself, and sent photos from the family member's neighborhood, and was sentenced to 36-months. Robert Vargo threatened numerous officials, including a Congressperson, and also had a state court case and lengthy

criminal history and was sentenced to 37-months of incarceration. Norman LeBoon and Carlos Bayon were sentenced to lengthy terms of incarceration for their repeated threats and outside conduct. Christopher McGowan posted and sent many threats to a Congressperson, and was sentenced to "time served." Michael Shapiro, in this District, was sentenced to probation after making 12-threatening calls to a Congressperson and "retaliating against a federal official."

The Defendant has always maintained that his case is an outlier when compared with others for the same charged offense conduct (threatening a Congressperson via interstate communication). Most notably, the Defendant communicated a single call, not a multitude of calls and threats. **The number of threats involved is a critical identifier of intent.** This was noted by Justice Barrett in her concurring opinion in *Counterman,* and it makes perfect sense, for, making a multitude of calls and threats reveals no momentary lapse of reason, and reveals planning and connective, continuous thought. Moreover, the Defendant's communication was unrelated to the Congressperson's official duties or role as an official. It was not meant to influence him, or to intimidate him from carrying out his duties, as in almost all other cases. The Defendant, unlike many of the comparable cases, had no capability or ability to carry out any of the threats. The Defendant had no travel plans, no weapons, no research, no intent, to carry out anything of what he said in the voicemail. This case involves 36-seconds of the Defendant's life, at a point in time when he was at one of the lowest mental health stages of his life, when he made a terrible choice he admitted he regretted and was remorseful for. This is far

40

less serious conduct than someone who has the immediate and apparent ability to carry out a threat, or who actually commits acts to carry out threatened acts.

WHEREFORE; the Defendant, requests that this Court sentence him to a term of probation in this case. The conduct in this case was not planned, or the result of forethought or consideration; was the result of a poor decision by the Defendant during a mental low-point in his life; lasted less than 40-seconds; that was something that was not repeated; that the Defendant has expressed remorse for; that the Defendant has felt shame for; that the Defendant has been publicly shamed for; that the Defendant has felt an appropriate amount of fear from, understanding the possible consequences he faces for his conduct from this Court, resulting in high levels of anxiety which exhibit his understanding of the nature of these proceedings. The Defendant treated law enforcement who interviewed him and arrested him with nothing but respect and kindness. The Defendant indicated he understood that his apology call to the office of Santos would "change nothing" about how the case was handled, but indicated an apology was simply the right thing to do. The Defendant admitted his actions to his family and acknowledged the stupidity of what he had done.

The Defendant has proven to be an excellent supervisee while on pre-trial release, and on electronic monitoring since the jury verdict in this matter. He has followed every requirement of U.S. Probation and this Court without fail. The Defendant has had a difficult life noted in the PSI, not through any choosing of his own, that has left him with certain vulnerabilities.

The Defendant's case has been reported to, and highlighted in the press by the prosecution in this case. https://www.justice.gov/usao-sdfl/pr/boynton-beach-man-found-guilty-threatening-member-congress (last accessed May 10, 2024).[7] According to the government's sentencing brief in the Poller case, the "significant consequences as a result of his conduct, arrest, and plea in this case," were part of what warranted a sentence of probation in that case. [23-cr-00039-LM (DNH), DE:24]. According to the government in this case, "Allan Poller wanted to enter into a plea agreement and his defense counsel was able to actually negotiate a plea agreement where he only was needed to plead guilty to the 875 which, therefore, lowered his susceptibility to that higher max punishment. That just happened since this case has been pending. I believed that they negotiated the plea in September." [Transcript of Selective Prosecution motion at page 120]. The government in that case agreed to recommend a sentence of probation.

---

[7] During the selective prosecution motion, the government informed the court that press releases are **not generated** by the Department of Justice in all prosecutions for threats against members of Congress. In this case an apparent decision was made to report the conviction by a jury to the public in a press release. In other threat cases, no such decision was made (according to the government- as a reason other threat prosecutions may exist but were not discovered by the parties for comparison to this case for selective prosecution). However, it seems these case are routinely the subject of press releases by the Department of Justice, as the Suzanne Kaye case was also reported to the press by the prosecution in a press release. https://www.justice.gov/usao-sdfl/pr/boca-raton-woman-sentenced-18-months-prison-threatening-shoot-fbi-agents (last accessed May 10, 2024). The government also issued a press release in the Michael Shapiro case. https://www.justice.gov/usao-sdfl/pr/greenacres-man-arrested-threatening-kill-us-congressperson-and-congresspersons (last accessed May 13, 2024).

The Defendant in this case did not make a threat to attempt to alter or intimidate Santos from the performance of any official duty in Congress, as was the case in Poller. There is no indication that Poller contacted the recipient of his threat to apologize, or express remorse. The government in the Poller case indicated to the Court, "Although the guidelines indicate a range of 10-16 months of imprisonment in Zone C of the sentencing table, the United States submits that this is an unusual case where a sentence of probation is appropriate." [23-cr-00039-LM (DNH), DE:24]. This case is *less* serious than the case in Poller, as it did not involve a violation of 18 U.S.C. § 115, which the government has routinely informed the Court, is a more serious criminal violation than an 875(c) violation. Further, there is no indication of whether Poller had the capability to carry out his threat or that he apologized to his victim. Poller did not proceed to trial, but also had an agreement from the government to jointly recommend a term of probation.

This case is unusual when compared with the other threat to Congress cases, and should be sentenced without the need for incarceration. The Defendant has understood what he did was shameful and wrong. While he disagreed that the conduct constituted a felony offense, because it was not a serious true threat, he has never disputed that the call never should have been made, and the comments he made were inexcusable. The public nor the victim need to be protected from the Defendant via incarceration.

Respectfully submitted,

HECTOR DOPICO
INTERIM FEDERAL PUBLIC DEFENDER


By:     s/ *Jan C. Smith, II*
          Assistant Federal Public Defender
          Florida Bar No. 0117341
          One East Broward Boulevard, Suite 1100
          Fort Lauderdale, Florida 33301-1842
          Tel: 954-356-7436
          Fax: 954-356-7556
          E-Mail: Jan_Smith@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on May 13, 2024, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record via transmission of Notices

of Electronic Filing generated by CM/ECF or in some other authorized manner for

those counsel or parties who are not authorized to receive electronically Notices of

Electronic Filing.

By:___s/   *Jan C. Smith, II* AFPD_____