UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80064-CR-SMITH/MAYNARD

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

FRANK STANZIONE,

      Defendant.

_____/

## DEFENDANT'S REPLY TO
## GOVERNMENT'S SENTENCING MEMORANDUM

      The Defendant, Frank Stanzione, through counsel, files the following Reply to the Government's Sentencing Memorandum in this case. In support thereof, the Defendant states the following:

      The Defendant has not received formal objections from the government regarding a "mistake" in the Pre-Sentence Investigation report ("PSI"). [1] The government *did* indicate to undersigned counsel in an e-mail that they had contacted probation to claim a mistake had been made in the PSI related to the failure to include this enhancement they seek for an "official victim." Undersigned counsel then reached out to Probation to inquire if the government was filing an objection, to which Probation indicated they believed the government would do so. Undersigned counsel

---

[1] Undersigned counsel has been on leave since May 14, 2024 until May 20, 2024, but was alerted to this filing by my assistant. Undersigned counsel is out of the office and will return on Monday, May 20, 2024.

informed Probation that the Defendant disagreed with the government that the enhancement was appropriate and could provide case law to support that position if necessary. Undersigned counsel never heard back regarding the conclusion of this issue until the government's memorandum.

In the government's sentencing memorandum, they indicate a mistake was made in the PSI by not including an official victim enhancement, and that Probation *had agreed*. Upon seeing the government's memorandum, undersigned counsel contacted the Probation Officer who wrote the PSI by e-mail, who has indicated he did tell the government he agreed that he would file a new PSI with the enhancement (though that has not been done to date as far as undersigned counsel is aware, though see Footnote 1 herein). Undersigned counsel was previously unaware that Probation agreed with the government's position. If the government had such an objection to the PSI it should have been filed as per the local rules, allowing both Probation and the Defendant to file appropriate replies with each other and the Court.

The Defendant objects to the enhancement sought by the government because the government has steadfastly maintained throughout pre-trial communications that the Defendant's conduct was **not based** in any way upon the official duties or role of the victim in this case. On July 18, 2023, in response to the Defendant's request to plead guilty to a misdemeanor under 18 U.S.C. § 115, the government responded: "I know you suggested previously that he be allowed to plead to a misdemeanor, but I don't recall having talked with you about a 115. What exactly do you have in mind? **He specifically said when questioned that he did not make the call to impede the work of a government official.** How would the 1 yr max fit?" (emphasis added).

The government has informed the Court of the same on numerous occasions during the selective prosecution motion hearings in this matter, informing the Court that the Defendant had merely wished to make the now former Congressman feel like a "piece of shit," and was not meant to intimidate or effect his duties. During the motion in this case, the government argued to this Court:

> So, the one statute, 875, requires it to be an interstate transmission of a threat. The other statute, 115, requires there to be either one of three or four things. Either an attempt to impede, to influence, or to retaliate against a U.S. official, doesn't have to be a member of Congress, but a U.S. official in their official duties.
>
> In this case, as you heard from the testimony today, that the questions were asked of this defendant whether or not he had any of those intents. As he indicated, he did not, and there was not separate proof of those separate intents, then charging under 115 would probably be improper unless there was some other way for us to provide that evidence.

[Transcript of motion to dismiss at page 118].

The government having refused to agree for plea purposes that this case was based upon official duties of the former Congressman now alters their position and makes the claim that the threat in this case was based upon the official role or duties of Santos (as is required to obtain this enhancement).[2]  The government cannot refuse a plea offer to a misdemeanor the Defendant requested because the threats in this case were not based on the official role or duties of Santos, and now turn around and

---

2 As undersigned counsel is away from the office on leave while writing this, there is no access to the case law that undersigned counsel offered to Probation regarding this issue (that Probation did not request). Undersigned counsel will provide the case law as a supplement on Monday, May 20, 2024 when back in the office from another PSI interview in the morning.

3

attempt to enhance this case because they now claim the threat was based upon the official role and duties of Santos.

The Defendant's threat in this case was not based upon the official role of former Representative Santos, but solely upon the embarrassment his celebrity status caused to homosexuals. This was evident (and relied upon by the government pre-trial) from the Defendant's statement to the agents. As the Defendant told the agents who interviewed him, he found Santos an embarrassment and did not want him representing his community. Far from his role as a legislator, Santos was a celebrity due to his incredible level of outrageousness, not because of any official congressional role or efforts. The popular and long-running comedy series "Saturday Night Live" had an actor devoted to playing Santos (Bowen Yang), to play upon this level of outrageous conduct (mostly lies told by Santos **prior to his election** that were of an extraordinary nature, such as related to his family and his college sports career). An example (along with a multitude of others) can be found here: https://www.youtube.com/watch?v=oFTKCcVSTHY (last accessed May 17, 2024).

Next, the government claims the Defendant's threat placed Santos in fear of bodily harm and indicates that Santos had no knowledge of who the Defendant was or if he would carry out the threat. The government makes the claim that it "frightened" him "to death." Thus, the government claims the Defendant "accomplished his intended goal- to instill fear in the congressman." **How the government is able to, in good faith, make this claim is unknown, as throughout pre-trial discovery the government has always claimed to this Court and the Defendant that they have *never communicated with Santos.***

The Defendant had requested evidence concerning contact with Santos by the government as part of his *Brady/Giglio* motion and was informed by the government that they had no communication with him. The government offered no assistance in attempts by the Defendant to contact Santos, as the Defendant's investigator previously testified she made attempts via Santos's lawyer that were never returned. Further, it was undersigned counsel that communicated with the house counsel for the GOP to attempt to communicate with Santos. Those attempts were unsuccessful, but it was the assistance of the House Counsel that produced the statements from Santos's staff that were introduced by the defense regarding other threat calls.

Further, it was clear from the motions and testimony in this case, that Santos informed an interviewer of incorrect information about the threat, claiming it was based out of New York, and included a bomb threat. There is no evidence before this Court as to what Santos was ever told about the threat, nor why he gave incorrect information about it to an interviewer. How the government now contends what Santos knew or did not know, or how he felt is impossible to ascertain. **The Defendant renews his previous *Brady/Giglio* motion at this time for all reports of discussions by the government with Santos.**

In addition, the government now claims the threat by the Defendant was meant to instill fear in Santos, when they claimed in pre-trial negotiations (as noted earlier herein) that this was merely meant to "make him feel like a piece of shit," and not intimidate him, and once again, this impacted what plea they could convey. The evidence relied upon by the government as to intent was the Defendant's statement to the agents, and that impacted the plea negotiations. The government had always

claimed there was no intent to intimidate or effect Santos's work, and that was why this could not be prosecuted under a different statute.

Remarkably, after all of the pre-trial litigation in this case regarding other prosecutions for threats against members of Congress in which the government not only contended that the numbers of threats from the Capitol Police website the Defendant referenced meant nothing (because the Court may recall the government claimed to the Court that most of them were not really threats during the selective prosecution motion), and that the government could not possibly know more about those cases than the mere number of cases listed by the defense, the government now turns around an relies on those statistics in their memorandum as significant. The Court may recall when the Defendant attempted to refer to these statistics in his motion to dismiss, the government argued, "But those concerning communications in the thousands are not threats, Your Honor. Those are just concerning communications." [Transcript of motion to dismiss at Page 124]. The government had the capital police agents testify that they do not investigate "concerning communications," which are different from threats. The government had the agents testify that the vast majority of the numbers cited by the Capital Police website merely constituted "concerning communications," that are not investigated.

Further, and more incredible *the government finally offers a number of arrests that resulted from those reports to the Capital police.* **The Defendant moves this Court to order the government to turn over the nature of those arrests and the outcome of those cases, as that should have been made available in response to the Defendant's discovery requests in the selective prosecution**

**motion**. How long has the government had this information that the Defendant has been seeking from them since the first motion hearing when defense investigator Carr testified?

The Defendant has gone to great lengths to attempt to find and identify other threat cases involving members of Congress. In response, the government claimed near impossibility to find other cases and threats during the first motion hearing in this case. The government claimed not to have this information. The defense has gone into great detail to examine similar cases and prosecutions, including the number of threats, the nature of threats, the remorse, or lack of, the ability to carry out a threat, and other factors in all the cases referred to in prior pleadings. The cases typically have critical factors that make them different in some respects from one another, yet, also similar in certain ways. In response, the government has relied almost solely throughout this prosecution on the *Kaye* case, which did not involve a member of Congress and was a multiple threat case (in which she was found not guilty as to count one by a jury).[3]  What was the nature of the 74 arrests in 2022 they now finally refer to that was previously unavailable to the Defendant? How many involve single threat cases under 875(c)?

---

[3] While the government has indicated repeatedly that the number of threats don't matter, or that repeated calls are not much a of a factor, and attempted also to claim this prosecution involves multiple threats because of how many sentences it included, the Guidelines recognize that repeated threats are an enhancing factor. Put simply, (as Justice Barrett recognized in her concurring opinion in *Counterman* and as this Circuit has repeatedly recognized in multiple threat cases), the *actus reus* of making several calls rather than a single call is evidence of intent. This fact seems patently obvious, as it exhibits less of an emotional outburst (as was seen in this case) and more of an effort to communicate the threat.

The government also refers to a host of other case citations for the first time to support their argument for a significant jail sentence in this case. Yet, the government fails to include critical details relevant to their outcomes in those cases. For instance, in the *Howard* case (*United States v. Howard*, 947 F.3d 936 (6th Cir. 2020)), the government referred to in their pleading as a "single voicemail" case, they neglect to inform the Court that at the time the voicemail was left, the defendant was on federal supervised release, and that there were five calls made. The calls went from 27-seconds long, to one-minute and 29-seconds, and a final fifth call was 3-minutes and 52 seconds long. His sentence was 30-months as to the 875(c) violation, concurrent with 24-months for violating his federal supervised release. There are clear differences, mostly stemming from the fact that the case involved a personal vendetta based upon a prior prosecution of Howard. The government's memorandum makes it seem as though the case involved one threat call and nothing more.[4]

Of particular note, the government cites to the sentence in *United States v. Dierks*, 978 F.3d 585 (8th Cir. 2019), which was a multiple threat case where the defendant was warned by law enforcement to cease his threats, but persisted and actually got worse, **but that case also indicates that after *Elonis* § 875(c) is a specific intent crime.** When the Defendant told the jury this during this trial, the government objected claiming the defense made a misstatement of law, and the Court

---

4 The government includes a quote from the Court sentencing *Kaye* that made reference to the *Howard* case the government provided at that sentencing as well. Thus, it is apparent that Court based a portion of its sentencing decision on the government's submission of *Howard*. It is not clear if it was made aware to that court the details provided about that case in this pleading which distinguish it mightily.

sustained the objection. The government now refers the Court to that case for authority, in which the Court noted that **§ 875(c) is a specific intent crime.**

The government points to the sentence in *United States v. Fratus*, 2021 WL 3145732 at *1, (E.D. Pa., July 26, 2021), but neglects to include that the government in that case sought to introduce Rule 404(b) evidence about prior threats by Fratus (as relevant to intent). Fratus had left a threat similar to the charged threat referred to by the government against a police commissioner for Congresswoman Maxine Waters and three prior threats were made to "Kars 4 Kids" which was a Jewish charity in New Jersey.

Confusingly, the government refers in their pleading to *United States v. Comiskey*, Case No. 22-cr-80084 (S.D. FL.), where the threat on "Twitter read, 'If I ever saw Lauren I'd be glad to take her out and go to prison. Would be job well done.'" This is *exactly the same threat type* referred to in the Defendant's selective prosecution motion in the Reeser threat that the government continuously informed the Court *could not be* prosecuted because of the way it was phrased. Obviously, that was not the case, raising the question as to why some of these cases are prosecuted and others are not. The government argued to this Court that Reeser, and Schneider, and others referred to by the defense could not possibly be prosecuted because

> if an individual were to say, well, if I was on the floor of the House right now, and she said that in my face and I had a gun, then I would probably shoot her. That is not a threat that we would prosecute because that is a conditional threat. That is conditioned on something that is not possible to exist. He can't possibly be on the House floor right now because he happens to be in whatever location he is standing.

> … And so any of these cases in which we get, well, I wish that this had happened, or you know what I think would be great if it did happen, or what really ought to happen to that guy is, none of those are things that would be prosecuted and none of those are threats, but you have a litany of those before you today. And again, I won't go through every single on of these, but I would ask that the Court look at the affidavits that it has, PPP and QQQ, in which the staffers from the congressman's office discussed some of these different threats and there are things like, well, you're a loser, I hope you die. Not a threat.

[Motion to dismiss transcript at pages 123- 124]. Clearly, such cases *have been* prosecuted *in this District*.

The government refers to the case of *United States v. Michael Shapiro*, 24-cr-80007-DMM (S.D. Fla), but *not to Shapiro's prior case in this District for threatening a member of Congress, to note the sentence imposed and recommended by the U.S. Attorney's Office in this District (probation)*. Instead, the government does not acknowledge the prior case or, facts, or sentence they recommended in that case but only includes this subsequent prosecution instead in a section of their pleading about the significance of these threat cases ("As stated above, threats to kill our elected leaders, and prosecutions for those threats, have increased significantly over the past few years. *See*, *e.g.*, *United States v. Michael Shapiro*, 24-cr-80007-DMM (S.D. Fla) (defendant allegedly called the office of a United States Congressman on December 19, 2023, and said that he was "going to come after you and kill you" and that he was "going to come after you and kill your children)).

The government makes reference to the Joshua Hall case, referred to by the Defendant as well,[5] but the government left out the detail that at the time Hall made his threats (multiple threats to use his AR-15 rifle), he was on pre-trial release in another federal case. https://www.justice.gov/usao-sdny/pr/pennsylvania-man-pleads-guilty-making-threats-kill-united-states-congressman.

The government refers to the sentence in *United States v. Pratersch*, 808 Fed. Appx. 768 (11th Cir. 2020) (unpublished), but neglects to include that the Court found that Pratersch lied under oath when he testified at trial. *Id.* The government's appellate brief in that case reveals that Pratersch made three calls to Bernie Sanders, and made threats in all three. The threats were as follows:

> *First Message (4:43 p.m.)*
> "Bernie, you Jew bastard. You had your chance. Now we're going to behead you ISIS style video taped for the world to see. [Inaudible] fucking hoes you got working for you. What do you got them sucking your cock too? You freak bastard."
> *Second Message (5:12 p.m.)*
> "Bernie you fucking Jew bastard. How's the knife going to feel cutting your head off boy? You Jew fucking cocksucker."
> *Third Message (5:13 p.m.)*
> "You pussy ass fucking Bernie Sanders cocksucker. Leave your name and address we'll get back to you. You

---

5 The Defendant included the following information about the Hall case in his pleading: "In another § 875(c) prosecution, Joshua Hall was sentenced in the Southern District of New York to a term of 20-months imprisonment, concurrent with his sentence in another federal prosecution that he was on pre-trial release from when he made a series of multiple threatening phone calls to a member of Congress's office. [21-cr-00605-GHW (SDNY)]. During those telephone calls, Hall conveyed threats to kill the Congressman to at least three different members of the Congressman's staff, and stated that he had a lot of AR-15 rifles. He also stated that if he saw the Congressman, he would kill him. Hall also stated that he wanted to "beat the shit out of" the Congressman and that he would find the Congressman wherever he was and hurt him."

motherfucker. Listen you Jew fucking cocksucker. You're dead. You're fucking dead."

*Pratersch*, 808 Fed. Appx. 768 (11th Cir. 2020) (unpublished) (Brief of the United States).[6]

All of the "trial" cases cited by the government have important differences with this prosecution that must be noted and not ignored. The same is true of the cases the government refers to with "pleas."

In *United States v. Russell*, 22-01661-PHX-SPL (D.C. Az., March 26, 2024), the government notes that three threatening calls and messages were left, and the sentence imposed, but neglects to include that when confronted at his home, the Defendant barricaded himself inside. The home was surrounded by law enforcement and he refused to exit for 15-20 minutes, after a "flash-bang" device was employed. After his arrest, the Defendant was belligerent and shouting at officers and agents. He denied making the calls. The calls he made were from August, September, and November of 2022 (one each month). [22-01661-PHX-SPL (D.C. Az., March 26, 2024) at DE:47].

The government refers to the sentence in *United States v. Comiskey*, Case No. 22-cr-80084 (S.D. FL.). The government correctly notes that the case involved five threats to a Congresswoman, but fails to note that the Defendant therein also

---

6 It must be noted that the PSI in that case recommended the 4-level decrease for little or no deliberation that the Defendant in this case indicates he should receive despite making three calls. *See Pratersch*, 808 Fed. Appx. 768 (11th Cir. 2020) Government's brief, "In the PSR, the United States Probation Office recommended…a four-level reduction under section 2A6.1(b)(1), because the offense involved a single instance evidencing little or no deliberation,"

threatened the governor of Florida. [*United States v. Comiskey*, Case No. 22-cr-80084 (S.D. FL.) DE:19]. The five threats to a member of Congress read:

> on or about August 31, 2021, the Defendant stated, "If I ever saw Lauren I'd be glad to take her out and go to prison. Would be job well done." Count 2 charges that on or about September 8, 2021, the Defendant stated, "Don't worry Lauren, someone is coming soon to show your face the 2nd amendment in practice with a copper jacket. Enjoy." Count 3 charges that on or about September 15, 2021, the Defendant stated, "Someone needs to put lauren down like a sick dog. She is a true waste of life! Someone exercise their 2nd amendment right to her face! Since the @CIA is a failure and @FBI is incompetent at charging her for being a terrorist it's time to do it ourselves! Pew pew Lauren." Count 4 charges that on or about September 17, 2021, the Defendant stated, "I got my 2 amendment tool all ready to destroy Lauren's face! Hopefully in front of her kids." Count 5 charges that on or about September 17, 2021, the Defendant stated, "[D]on't come to Florida us libs have big guns here and we stand out [sic] ground. Take you down like Trayvon."

*Id*. The Defendant in that case had no mental health issues and was a college graduate from a "good" school district. Id at DE:53.

The government cites to the sentence in *United States v. Rana*, 773 Fed. Appx. 218 (5th Cir. 2019), but fails to note that Rana made six calls to the Congress member's office to threaten them, followed by an additional five threat calls after the police were notified. *Rana*, 773 Fed. Appx. 218 (5th Cir. 2019) (see Brief of the United States). At the time, Rana was wanted on an outstanding warrant for violation of a protective order. *Id*. Rana had six criminal history points, four of which were for threatening his wife. At the time Rana made the threat calls, he was also on probation. *Id*.

The government cites to *United States v. Hoff*, 767 Fed. Appx. 614 (6th Cir. 2019), which the Defendant also referred to in his sentencing memorandum. The Defendant provided a full summary of the offense conduct in that case, as follows: In 2017, E. Stanley Huff was charged in the Southern District of Ohio with violating 18 U.S.C. § 115(a)(1)(B) for leaving a series of voicemails threatening the life and family of Rep. Steve Stivers (Ohio). Huff had been leaving voicemails for the Congressman from February, through June, 2017. [17-CR-00144-MHW, DE:1]. The final voicemail was over 2-minutes long, and stated:

> Yeah sissy boy Stivers. Hey let me tell you something. I've seen the ah prayer ya'll were saying at the baseball diamond last night. I think ya'll better hit your knees and pray for the people that you re screwin' up their lives with your secret legislation that you're tryin' to run through everything. And by the way, we the people are on the march now to take back our country and our government. So says the constitution because it does say we the people. Something you repugnant fuckers don't understand. Now I've tried to warn you but you keep calling that little pissy sissy pig friend of yours. And he keeps disturbing me. Now he's gonna get ah, ah, ah civil charge filed on him if he continues. And so are you. We are coming to get every god damn one of you and your families. We are taking our country back. We are on the march. The other day is the tip of the iceberg. I've tried to warn you. You don't want to listen to me. You don't want to sit down and talk about it. So S.O.L. is going to move. One of the greatest Americans ever said that it is obvious that these meetings are doing no good that now is the time for action. You hear me clearly, queer. Ok? Maybe the next one taken down will be your daughter. Huh? Or your wife. Or even you. Think about it dumbass. We own this country. You are nothing more than a public servant. And that's what you gonna be. Ok? You are going to serve all of the public. Not just the repugnant public. All of the public. Fuck you in your left ear. Fuck you in the right ear. And everywhere else I can put it. You understand that, dumbass? Don't let your piggy friend call me. Or you'll hear from me more often.

[17-CR-00144-MHW, SDOH, DE:1]. The "baseball" reference was to the shooting on a baseball field of several members of Congress by a sniper around that time period.

This was the last of five threatening and harassing voicemails Huff left for the Congressman, all lengthy in duration. Federal agents visited Huff to advise him to stop leaving messages for the Congressman, but he continued unabated, and even commented in the next message about the visit his prior calls had generated from law enforcement. In that next message, he stated, "'go Fuck yourself.' Hoff then said, 'And apparently you don't have any problem with the fact if we're out one day and see your daughter out walking around or your wife we can go grab them in the crotch'. Hoff also warned, 'Steal one more election, there will not be one word spoken about it. There will be no less than one million shots fired.'" [17-CR-00144-MHW, SDOH, DE:47].[7] In a prior message, Huff stated: "that 'If you shoot down one of our troops and you will have the bloodiest massacre God's Earth has ever seen', 'We're going to take care of it you see and we're going to take care of it our way' and 'Leave Obamacare alone or die.'" Id. In another voicemail, "Hoff warned 'If you go down with a yes and that bill passes, I guarantee you my death will not be in vain. You want a

_____

[7] Notably, the government's sentencing memorandum in the Huff case uses the definition of the term "threat" from Merriam-Webster's dictionary referred to in part 1 of this pleading: "A threat has been defined as an 'expression of intention to inflict evil, injury or damage' and 'a communicated intent to inflict physical or other harm on any person or on property'". (Merriam-Webster and Blacks Law Dictionary)." [17-CR-00144-MHW, SDOH, DE:47]. In addition, the government went on in that pleading to define "true threat" as: "A statement rises to the level of a "true threat" when it is a 'serious expression of an intention to inflict bodily harm' and is 'conveyed for the purpose of furthering some goal through the use of intimidation.'" Id. (internal citation omitted).

more dangerous, hateful country to live in? We're going to give it to you.'" Id. Huff also had prior convictions for stalking, violation of a domestic protection order, and domestic violence. Huff had 23-prior arrests, a multitude of which involved violations of stay-away orders, which the government argued matched the behavior in Huff's case, when he was warned to stop calling but only disregarded the warning and got worse. Id. Huff was sentenced to 40-months imprisonment.

The government cites to the sentence in *United States v. Killingsworth*, 2020 WL 4703090 at *1 (N.D. OH., August 12, 2020), but neglects to include that at the time the defendant made the series of threats in the case, he was on parole in Ohio and that the threats were considered retaliatory. *Id.* (See brief of United States).

In sum, there are critical distinguishing factors in every one of the cases referred to by the government that do not exist in this case. If anything, the more severe conduct in the cases cited by the government, when compared with the conduct in this case, reveal (once again) how utterly different this prosecution and case are. Of particular note are the lack of any prior or subsequent threat, the remorse exhibited by the Defendant, the lack of planning that the threat involved, and the Defendant's post arrest statement. The government's attempts to transform this conduct into something akin to more significant conduct and cases cannot change the facts and evidence from what this case is.

Thus, instead, the government directs the Court's attention to a DUI conviction from 2008, more than 15-years ago, when the Defendant's blood alcohol level of .08% revealed impairment. The Defendant admitted to that offense, served his term of probation, and now "rarely drinks alcohol." PSI at ¶ 40. The Defendant obviously

learned from his mistake, and has never repeated it again, and changed his behavior accordingly. This constitutes successful criminal justice system intervention. The Defendant admitted his improper conduct, successfully underwent rehabilitative measures, and has modified his conduct and never had such a violation again. The government also makes the most possible out of a 2001 (23-year old) conviction for resisting arrest and battery on a public official, to claim the Defendant is a harmful person. PSI at ¶ 23. The Defendant spoke to the agents about that case when they interviewed him. He told them,

> Frank STANZIONE:
> "Um, I was arrested for refusing to answer police questions when my cousin was in a fight in Boston in 2001.
> Special Agent Hurtig:
> Okay.
> Frank STANZIONE:
> And that lasted about three hours, but the court system lasted about a year and a half.

The facts from that case were that the Defendant's cousin got into a fight with a taxi driver, which the Defendant broke up and had nothing to do with. The Defendant stayed with the taxi until the police came.  The police came and arrested the Defendant's cousin and wanted to question the Defendant. The Defendant wanted to go home but was not permitted to leave. The Defendant agreed to answer questions in front of a lawyer, but wanted to go home because he had to work in the morning. The Defendant was blocked in by three police officers in front of him and on each side with his back against the taxi. The Defendant tried to walk in between them to leave and one of them grabbed his shoulder, and the Defendant took the back of his hand and removed their hand from his shoulder and that was assault and battery on a police officer. The taxi driver told the police the Defendant had done nothing wrong.

The Defendant was taken to the police station, was booked paid cash bond and was released within 2 hours. Special Agent Torres testified at the motion hearing that the agents would examine the "criminal background" of a suspect as part of their investigation. [Motion to dismiss transcript at page 53]. Certainly, the agents were aware of that prior case when they visited the Defendant, but no special precautions were taken, and the Boynton Beach police indicated that they treated this case as they would any other. The Defendant's statement about the prior case would explain the sentence of 6-months of probation in that case.

The government argues that, "[n]onetheless, these incidents demonstrate a concerning history of harmful conduct and bad judgment. Consistent with his history, Defendant engaged in harmful conduct in the instant matter." Yet, the government agreed that the Defendant was not a danger to the community at his first appearance in this case, and agreed to recommend a Personal surety bond in this matter. [DE:4-5].

As the Defendant previously claimed in his sentencing memorandum to this Court, prosecutions for violations of 18 U.S.C. § 875(c) related to members of Congress vary greatly in severity, and with regard to the sentences that are imposed. The Defendant included all the prior cases of threats against members of Congress that had been found, whether they were lengthy sentences, or probationary sentences, and noted the reasons for the sentences imposed in those cases. The government makes no reference in their sentencing memorandum to any cases the Defendant cited to where sentences below Guidelines and to probation were imposed, as if they do not exist.

The facts in this case are very different from those cases cited by the government. The facts cannot be altered by either party. What is evident from the cases referred to by the parties is that the line used by the government to determine when and what to prosecute in threat cases appears far more random than the government has claimed. Cases the government claimed the Defendant was ridiculous for citing where no prosecution resulted have now appeared to be strikingly similar to cases that *have been* prosecuted (including in this District in the *United States v. Comiskey*, Case No. 22-cr-80084 (S.D. FL.) case). Further, the punishment recommended by the government in these cases also seems far more random than it should. The government wants a sentence of 27-months or more in this case. In the similar Poller prosecution, the government agreed pre-trial to a recommendation to probation. Justin Kuchta was sentenced to 4-months incarceration. Darryl Varnum repeatedly threatened a member of Congress to get her to alter her votes, and was sentenced to 6-months of home detention. Christopher McGowan posted and sent many threats to a Congressperson, and was sentenced to "time served." Michael Shapiro, in this District, was sentenced with the agreement of the prosecutor to probation after making 12-threatening calls to a Congressperson and "retaliating against a federal official" in this District. And, of course, there are much longer sentences in the other cases referred to, *where the facts justified such a sentence.*

WHEREFORE; the Defendant, requests that this Court sentence him to a term of probation in this case. The conduct in this case was not planned, or the result of forethought or consideration; was the result of a poor decision by the Defendant during a mental low-point in his life; lasted less than 40-seconds; that was something

that was not repeated; that the Defendant has expressed remorse for; that the Defendant has felt shame for; that the Defendant has been publicly shamed for; that the Defendant has felt an appropriate amount of fear from, understanding the possible consequences he faces for his conduct from this Court, resulting in high levels of anxiety which exhibit his understanding of the nature of these proceedings. The Defendant treated law enforcement who interviewed him and arrested him with nothing but respect and kindness. The Defendant admitted his actions to his family and acknowledged the stupidity of what he had done. The public does not need to be protected from the Defendant.

Respectfully submitted,

HECTOR DOPICO
INTERIM FEDERAL PUBLIC DEFENDER

By:     s/ *Jan C. Smith, II*
        Assistant Federal Public Defender
        Florida Bar No. 0117341
        One East Broward Boulevard, Suite 1100
        Fort Lauderdale, Florida 33301-1842
        Tel: 954-356-7436
        Fax: 954-356-7556
        E-Mail: Jan_Smith@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on May 17, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    s/   *Jan C. Smith, II* AFPD